

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
07/15/2021

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **AGILON ENERGY HOLDINGS II, LLC,** *et al.* | § | **Case No. 21-32156 (MI)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**EMERGENCY ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, AND (VI)  GRANTING RELATED RELIEF**

The Court has considered the *Motion for Entry of an Order (i) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Granting Related Relief* (the "DIP Motion")[2] filed by Agilon Energy Holdings II, LLC ("Agilon") Victoria Port Power, LLC, and Victoria City Power, LLC each as a debtor and debtor in possession (collectively, with Agilon, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an order (this "Emergency Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II, LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 5850 San Felipe, Ste 601, Houston, Texas 77057.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the DIP Motion or the Term Sheet, each as defined herein, as applicable.

Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules") and Rules 1075-1, 4002-1 and 9013-1 of the Bankruptcy Local Rules
for the Southern District of Texas (the "Local Rules") *inter alia*:

(i)     authorizing the Debtors to obtain a senior secured, superpriority, priming debtor-in-possession single draw term loan in the aggregate principal amount of up to $1,000,000 on an interim basis (the "Emergency DIP Facility"), pursuant to the terms and conditions of that certain Emergency Debtor in Possession Financing Term Sheet dated as of July 12, 2021 (the "Term Sheet"),[3] substantially in the form attached hereto as **Exhibit 1**, by and among the Debtors, each as a "Borrower," Wilmington Trust, National Association, as collateral agent under the DIP Documents (in such capacity, the "DIP Agent"), and the lenders party thereto (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties");

(ii)    authorizing the Debtors to execute and deliver the Term Sheet and any other related documents (as amended, restated, supplemented, waived, and/or modified from time to time, and together, with the Term Sheet, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   granting the Emergency DIP Facility and all obligations owing thereunder and all obligations under, or secured by, the DIP Documents (collectively, including all obligations described in the DIP Documents, the "Emergency DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any successor cases;

(iv)    granting to the DIP Agent, for the benefit of the DIP Secured Parties under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(vi)    authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Senior Secured Note Documents (each as defined herein or the Term Sheet, as applicable);

---

[3] The Debtors, the DIP Agent and the DIP Lenders intend to enter into a Replacement Facility, DIP credit agreement and other Definitive Documentation (as defined in the Term Sheet).

(vii)     providing adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral (if any), for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value"); and

(viii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Emergency Order.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Hugh Smith in Support of Chapter 11 Petitions, First Day Motions, and Debtors' Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Granting Related Relief* (the "Smith Declaration"), the DIP Documents, and the evidence submitted and argument made at the emergency hearing (the "Emergency Hearing"); and notice of the Emergency Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Emergency Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the Term Sheet is a sound and prudent exercise of the Debtors' business

judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE EMERGENCY HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

   A. **Prepetition Senior Secured NPA.**[5] The Debtors assert that as of the Petition Date, the Debtors' prepetition secured debt included the Notes issued by Agilon pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (the "Prepetition Senior Secured NPA"), including up to $73 million in aggregate principal amount comprised of Senior Secured Term Notes in the initial aggregate principal amount of $50,000,000 and Senior Secured Revolving Notes in the aggregate principal amount of $23,000,000 (collectively, together with accrued and unpaid interest, and all other amounts payable pursuant to the Prepetition Senior Secured Note Documents, and all other interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Obligations").  The Debtors assert that, prior to the Petition Date, they granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties,[6] a first priority security interest in and continuing lien (the "Prepetition Liens") on substantially all of their assets and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[5] This Emergency Order does not contain any binding stipulations with respect to the assertions set forth in this Paragraph A or any associated challenge period.  The Debtors reserve all rights to include stipulations and appropriate challenge periods in the Interim Replacement Facility Order (as defined herein).

[6] The "Prepetition Secured Parties" means the Prepetition Noteholders, the Prepetition L/C Issuing Bank, and the Prepetition Agent (each as defined in the Term Sheet).

existing or thereafter acquired or arising, including all cash, wherever located, which constitutes Cash Collateral of the Prepetition Secured Parties. (collectively, the "Prepetition Collateral"), subject in priority only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Senior Secured Note Documents (the "Permitted Prior Liens").[7]

B.   **Findings Regarding Emergency Postpetition Financing**

(i)   *Request for Emergency Postpetition Financing*.  The Debtors seek authority to (a) enter into, and borrow under, the Emergency DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein, to administer their Chapter 11 Cases and fund their operations.

(ii)   *Need for Emergency Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to use Cash Collateral and obtain credit on an emergency basis pursuant to the Emergency DIP Facility in order to administer and preserve the value of their estates.

(iii)   *No Credit Available on More Favorable Terms*.  The Emergency DIP Facility is the best and most favorable source of debtor in possession financing available to the Debtors.

(iv)   *Use of Proceeds of the Emergency DIP Facility*.  The DIP Secured Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of

---

[7]   Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.

the Emergency DIP Facility and the Cash Collateral shall be used in a manner consistent with the terms and conditions of this Emergency Order, the Term Sheet and the other DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of this Emergency Order and the DIP Documents, the "Approved Budget"), including paying obligations arising from or related to the Carve Out.[8]

   C. **Adequate Protection**.  Until such time as the Prepetition Obligations are Paid in Full,[9] the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection to the extent of any Diminution in Value of its respective interests in the Prepetition Collateral as set forth in this Emergency Order.

   Based upon the foregoing findings and conclusions, the DIP Motion, the Smith Declaration, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

   **IT IS HEREBY ORDERED** that:

   1. Emergency Financing Approved.  The DIP Motion is granted on an interim basis as set forth in this Emergency Order and the Emergency DIP Facility is approved. The Debtors are authorized to request extensions of credit up to an aggregate outstanding principal amount of not greater than $1,000,000 in accordance with the Emergency DIP Facility

---

[8] A copy of the initial Approved Budget is attached hereto as **Exhibit 2**.

[9] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, and (b) with respect to the Prepetition Obligations, the Prepetition Secured Parties or the DIP Lenders, as applicable, have received (i) a countersigned payoff letter in form and substance satisfactory to such party and (ii) releases in form and substance satisfactory to such parties, each in their sole discretion.

(the "Emergency DIP Financing").  The Emergency DIP Financing is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Emergency Order.  Any objections to this Emergency Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  The Debtors will seek final approval of the relief set forth in this Emergency Order through the Interim Order (as defined in the Term Sheet) approving the Replacement Facility (as defined in the Term Sheet) (the "Interim Replacement Facility Order").

2.      Emergency DIP Obligations.  The DIP Documents and this Emergency Order shall constitute and evidence the validity and binding effect of the Emergency DIP Obligations, which shall be enforceable against the Debtors, and subject to entry of the Interim Replacement Facility Order, their estates, and any successors thereto.  The Emergency DIP Obligations are non-avoidable.

3.      DIP Liens.  In order to secure the Emergency DIP Obligations, effective immediately upon entry of this Emergency Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Secured Parties, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "DIP Liens") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "DIP Collateral"): (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture,

fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) the proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; and (d) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code.

4.    DIP Lien Priority.   The DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to the Permitted Prior Liens.  For avoidance of doubt, Permitted Prior Liens includes any liens held by ProEnergy Services, LLC that are valid, perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date.

5.    DIP Superpriority Claims.  Upon entry of this Emergency Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor cases (collectively, the "DIP Superpriority Claims") for all Emergency DIP Obligations. The DIP Superpriority Claims shall have priority, to the extent provided by section 507(b) of the

Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, other than the Carve Out.

6.   <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance unless so required under the DIP Documents.

7.   <u>Use of Proceeds of Emergency DIP Facility</u>.  From and after the Petition Date, the Debtors shall use the credit advanced under the Emergency DIP Facility only for the purposes specifically set forth in this Emergency Order, the DIP Documents, and the Approved Budget.

8.   <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Emergency Order, the Emergency DIP Facility, and the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the Maturity Date (as defined in the Term Sheet).

9.   <u>Adequate Protection Liens</u>.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Adequate Protection Liens</u>") on the DIP Collateral. The Adequate Protection Liens shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to: (i) the DIP Liens; and (ii) the Permitted Prior Liens.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims

against any of the DIP Collateral.

10. <u>Adequate Protection Superpriority Claims</u>. As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor cases (the "<u>Adequate Protection Superpriority Claims</u>"). Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever; *provided*, *however*, the Adequate Protection Superpriority Claims shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to the DIP Superpriority Claim.

11. <u>Adequate Protection Reservation</u>. This Emergency Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, and the rights of all parties in interest are reserved with respect thereto.

12. <u>Amendment of the DIP Documents</u>. The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court, in accordance with the terms of the DIP Documents (including the Term Sheet). Amendments of material terms shall require Court approval.

13. <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate the terms

and provisions of this Emergency Order.

14.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Emergency Order shall be and is sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement or mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to evidence, or entitle the DIP Secured Parties and the Prepetition Secured Parties to, the priorities granted herein.

15.     <u>Maintenance and Insurance of DIP Collateral</u>.  Until all Emergency DIP Obligations and all Prepetition Obligations are Paid in Full, and the DIP Secured Parties' obligation to extend credit under the Emergency DIP Facility has terminated, the Debtors shall: obtain and maintain insurance with respect to the DIP Collateral as required under the Emergency DIP Facility.  Upon entry of this Emergency Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (the "<u>DIP Collateral Insurance Policies</u>"). Notwithstanding the foregoing, upon entry of this Emergency Order, the Debtors shall take any and all steps necessary under the DIP Collateral Insurance Policies to name both the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) as additional insureds and loss payees on each DIP Collateral Insurance Policy.

16.     <u>Limitations on Use of DIP Proceeds and Cash Collateral</u>.  The Emergency DIP Facility, the DIP Collateral, the Prepetition Collateral, and the Cash Collateral may only be used as set forth in the Approved Budget or as otherwise agreed in writing by the DIP Lenders.

17.     <u>DIP Events of Default</u>.  The occurrence of any of the following events without the prior written consent of the DIP Lenders shall constitute an event of default (collectively, the "<u>DIP Events of Default</u>"):  (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Emergency Order; or (b) the occurrence of an "Event of Default" under the Term Sheet.

18.     <u>Remedies Upon an Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lenders may declare (a) all Emergency DIP Obligations to be immediately due and payable, (b) the termination of the Emergency DIP Facility as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the Emergency DIP Obligations, and (c) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, subject to further order of the Bankruptcy Court and (ii) the Approved Budget shall automatically be deemed not to provide for any payment other than (a) the Carve Out; and (b) fees and expenses of the DIP Agent and the DIP Lenders (including attorneys' fees); and (c) such other expenses, if any, as may be expressly approved in writing by the DIP Lenders in their sole discretion.  For the avoidance of doubt, neither the DIP Agent nor the DIP Lender will take any actions or enforce any remedies against the DIP Collateral absent further order of the Court.

19.     Prior to exercising the remedies set forth in (i) in the preceding paragraph, the DIP Lenders shall provide the Debtors, the U.S. Trustee, and any statutory committee appointed in the Chapter 11 Cases, if any, with three (3) days written notice of the DIP Lenders'

intent to exercise such remedies and shall promptly file such notice with the Bankruptcy Court.

20.      <u>DIP Fees, and Other Expenses</u>.  As set forth in the Term Sheet, the Debtors shall pay (a) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Term Sheet, any DIP Order (as defined in the Term Sheet) and the Emergency DIP Facility, and (c) all other out-of-pocket costs and expenses of the Prepetition Secured Parties (including, without limitation, the ongoing monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings).  The payment of any and all post-petition professional fees, expenses and disbursements set forth in sub-paragraphs (a), (b) and (c) may be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases of invoices therefor.  Such invoices provided to the Debtors, the U.S. Trustee and, as applicable, any statutory committee appointed in these Chapter 11 Cases, shall be in summary format with reasonably sufficient detail such that the nature and extent of the services can be evaluated.   The fees, costs, and expenses incurred by the DIP Agent and the DIP Lenders shall be earned, due and owing by the Debtors upon the Emergency Funding Closing Date (as defined in the Term Sheet), but shall be payable, in full, in cash, on the Maturity Date.

21.      <u>Indemnification</u>.   Subject to entry of the Interim Replacement Facility

Order, as set forth in the Term Sheet, the DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the indemnified party.

22.     Carve Out.  As used in this Emergency Order, the "Carve Out" means the sum of (i) all fees required to be paid (a) to the Clerk of the Court and (b) to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of the counsel, investment bankers, or financial advisors of the Debtors and any committee[10] (the "Allowed Professional Fees"), not to exceed the lesser of (x) the actual amounts, and (y) the amounts set forth for such professionals in the Approved Budget for such period, incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following the Maturity Date.

23.     This Emergency Order is effective on entry and is not stayed.

24.     Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the Emergency DIP Facility,

---

[10] The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction.

14

and/or this Emergency Order.

Signed: July 15, 2021

_____
Marvin Isgur
United States Bankruptcy Judge

**Exhibit 1**

**TERM SHEET**

**AGILON ENERGY HOLDINGS II, LLC**

**Emergency Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet**
**July 12, 2021**

This Emergency Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet (this "Term Sheet") describes the principal terms and conditions of a proposed senior secured superpriority priming debtor-in-possession term loan facility (the "Emergency DIP Facility") to be provided by the DIP Lenders (as defined below) to the Borrower (as defined below) in connection with cases (collectively, the "Chapter 11 Cases") filed by the Debtors (defined below) in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on June 27, 2021 (the "Petition Date").

This Emergency DIP Facility shall be provided for a limited period and shall, no later than thirty (30) days after the Emergency Funding Closing Date (as defined below), pursuant to an interim order of the Bankruptcy Court (the "Interim Order" and together with the Emergency Order (as defined below), the "DIP Orders") approving, on an interim basis, Definitive Documentation (as defined below), for a replacement debtor-in-possession facility (the "Replacement Facility") (with such order, documentation and facility, in each case, in in form and substance acceptable to the DIP Lenders in their sole discretion), be indefeasibly paid, in full, in cash with the proceeds of such Replacement Facility.

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party without our express prior written consent. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **Debtors:** | Agilon Energy Holdings II, LLC, as Texas limited liability company ("Agilon"), Victoria Port Power LLC, a Texas limited liability company ("Victoria Port") and Victoria City Power LLC, a Texas limited liability company ("Victoria City", together with Victoria Port, the "Project Companies" and the Project Companies, each individually and collectively with Agilon, the "Borrower"), each of which is a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (collectively, the "Debtors", and each individually, a "Debtor"). The obligations of the Debtors under the Emergency DIP Facility shall be joint and several. |
| **Prepetition Notes:** | Those certain senior secured notes which were issued under and in accordance with (i) that certain Senior Secured Note Purchase Agreement, dated as of February 23, 2018, by and among Agilon, the various financial institutions from time to time party thereto, as purchasers (the "Prepetition Noteholders") and Manufacturers and |

| | |
|---|---|
| | Traders Trust Company, as letter of credit issuing bank (the "<u>Prepetition L/C Issuing Bank</u>") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Senior Secured NPA</u>"), (ii) that certain Guaranty Agreement, dated as of February 23, 2018, by the Project Companies in favor of the Prepetition Secured Parties (as defined below) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Secured Guaranty</u>"), (iii) that certain Collateral Agency Agreement, dated as of February 23, 2018, by and among Agilon, the Prepetition Noteholders, the Prepetition L/C Issuing Bank and Wilmington Trust, National Association ("<u>Prepetition Agent</u>", and together with the Prepetition L/C Issuing Bank and the Prepetition Noteholders, the "<u>Prepetition Secured Parties</u>") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Collateral Agency Agreement</u>"), (iv) that certain Depositary and Security Agreement, dated as of February 23, 208, by and among Agilon, the Project Companies and the Prepetition Agent (the "<u>Prepetition Depositary and Security Agreement</u>") and (v) the other Financing Documents (together with the Prepetition Senior Secured NPA, the Prepetition Guaranty Agreement, the Prepetition Collateral Agency Agreement and the Prepetition Depositary and Security Agreement, collectively, as amended, restated, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Senior Secured Note Documents</u>"). Capitalized terms not otherwise defined herein shall have the meanings assigned thereto in the Prepetition Senior Secured Note Documents. |
| **Emergency DIP Facility:** | The Emergency DIP Facility shall consist of a new money senior secured, superpriority, priming debtor-in-possession multi-draw term loan (each, an "<u>Emergency DIP Loan</u>" and collectively, the "<u>Emergency DIP Loans</u>") in the aggregate principal amount not to exceed $1,000,000 to be funded as set forth below. Subject to the satisfaction of the conditions to the funding of the Initial Emergency DIP Loan set forth below, the initial Emergency DIP Loan shall not exceed $500,000 (the "<u>Initial Emergency DIP Loan</u>") and Borrower may, subject to the satisfaction of the conditions precedent to all Emergency DIP Loans as set forth below, request two (2) additional fundings of the Emergency DIP Loans, each not to exceed $250,000. |
| **DIP Lenders:** | The Prudential Insurance Company of America, Prudential Legacy Insurance Company of New Jersey, and Prudential Retirement |

| | |
|---|---|
| | Insurance and Annuity Company (from and after consummation of the Emergency DIP Facility, the "<u>DIP Lenders</u>"). |
| **Collateral Agent:** | Wilmington Trust, National Association ("<u>DIP Agent</u>" and together with the DIP Lenders, the "<u>DIP Secured Parties</u>"). |
| **Term/Maturity:** | The Emergency DIP Facility shall mature upon the earliest of: (i) thirty (30) days after the Emergency Funding Closing Date (as defined below), (ii) the date the Interim Order (as defined below) is entered, and (iii) termination by the DIP Lenders following the occurrence of an Event of Default (the "<u>Maturity Date</u>"). |
| **Amortization:** | None. |
| **Security:** | The Emergency DIP Facility shall be secured by a Bankruptcy Court-approved superpriority, priming lien (subject to the Carve Out (as defined below)) on substantially all assets of the Debtors as set forth in the Emergency Order. |
| **Approved Budget and Use of Proceeds:** | Debtors shall deliver to the DIP Lender a budget for the three (3)-week period commencing on the Petition Date (such budget, attached to the Emergency DIP Order, the "<u>Initial Approved Budget</u>") and shall provide the DIP Lenders on Wednesday of each week with an updated three (3)-week budget. Each such three (3)-week budget shall (i) be consistent in form with the Initial Approved Budget, (ii) be subject to approval by the DIP Lenders in their sole discretion and (iii) set forth, among other things, the projected cash disbursements of the Debtors during the three (3)-week period covered thereby (each such approved budget, the "<u>Approved Budget</u>").  If the DIP Lenders do not approve any proposed three (3)-week budget, then the last budget approved by the DIP Lenders shall remain in effect as the Approved Budget.<br><br>The proceeds of the Emergency DIP Loans will be used solely in accordance with the Approved Budget for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses, and (c) costs and expenses related to the Emergency DIP Facility. |
| **Interest Rate:** | The Emergency DIP Facility shall accrue interest at a rate equal to either of the following at the election of the Borrower: (i) LIBO Rate + 8.00% per annum (with one (1)-month Interest Period and 1.00% floor), computed on the basis of the actual number of days elapsed over a year of 360 days or (ii) Prime Rate + 7.00% per annum, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable. |

| | |
|---|---|
| | Interest shall be payable in cash, on the Maturity Date. Default rate shall be an incremental 2.00% per annum. |
| | Any payment of principal or interest on the Emergency DIP Loans that is due on a date other than a Business Day shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day. |
| | Business Day means any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized to be closed. |
| **Agency Fee:** | $50,000 per annum (which shall be fully earned upon entry of the Emergency Order and payable with the proceeds of the Initial Emergency DIP Loan). |
| **Application of Payments:** | All payments will be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion): |
| | (1)      first, to pay all documented out-of-pocket expenses of the DIP Agent and the DIP Lenders (including, without limitation, fees and expenses of counsel and external advisors); |
| | (2)      second, to pay an amount equal to all accrued and unpaid interest (including, without limitation, any interest that accrued and was "paid in kind") owing to the DIP Lenders; |
| | (3)      third, to repay any principal amounts outstanding in respect of the DIP Loans; and |
| | (4)      fourth, all other amounts owing to the DIP Lenders. |
| **Definitive Documentation:** | The Debtors and the DIP Lenders shall negotiate and execute definitive financing documentation with respect to the Replacement Facility as may be customary and required by the DIP Lenders, including, without limitation, all guaranties thereof, satisfactory in form and substance to each of the DIP Agent, the DIP Lenders and Debtors, which documentation shall be executed by all parties thereto (the "<u>Definitive Documentation</u>"). |
| **Collateral Agent Agreement:** | Except as otherwise provided herein, the terms and conditions of the Prepetition Collateral Agency Agreement shall be applicable to this Term Sheet, the Emergency DIP Facility and the transactions contemplated herein, and shall be incorporated herein by reference, *mutatis mutandis*, as if fully set forth herein. |
| **Borrowing Mechanics:** | The Borrower shall give written notice via a borrowing notice in form and substance acceptable to the DIP Agent and DIP Lenders |

| | |
|---|---|
| | (the "<u>Borrowing Notice</u>") of the proposed borrowing not later than 10:00 a.m. (Houston time) one (1) Business Day's prior to the proposed date of the borrowing.  The Borrowing Notice will be effective upon receipt by the DIP Agent and the DIP Lenders, will be irrevocable, and must specify the date and amount of the requested funding of the Emergency DIP Loan.  On the requested borrowing date, each DIP Lender shall provide Agilon with immediately available funds, to the account at Allegiance Bank, which shall be specified in the Borrowing Notice covering that DIP Lender's pro rata share of the Emergency DIP Loan; provided that the conditions precedent set forth herein and in the DIP Order with respect to funding of the Emergency DIP Loan have been satisfied. The DIP Agent shall act solely in its capacity as collateral agent for the DIP Lenders and shall have no obligations to make any loans or advance any funds as a lender under the DIP Facility. |
| **Conditions Precedent:** | As conditions precedent to the DIP Lender's obligation to fund the Initial Emergency DIP Loan (the date of satisfaction of such conditions, the "<u>Emergency Funding Closing Date</u>"): |
| | (i)     the entry by the Bankruptcy Court of no later than twenty (20) days after the Petition Date, an order (the "<u>Emergency Order</u>"), in form and substance acceptable to the DIP Agent and DIP Lenders in their sole discretion. Such Emergency Order shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lenders (and the Debtors shall be in compliance in all respects with the Emergency Order and modifications of the Emergency Order shall require the prior written consent of the DIP Lenders); |
| | (iii)  Debtors shall have delivered to the DIP Agent and the DIP Lenders a closing certificate, in form and substance satisfactory to the DIP Agent and the DIP Lenders, duly executed by the independent manager of the Debtors, appropriately completed, in which such manager shall certify to the DIP Lenders all of the conditions precedent to the Initial Emergency DIP Loan have been satisfied; and |
| | (iv)  All of the "first day" motions, orders and related pleadings shall have been reviewed in advance by the DIP Lenders and the DIP Agent and shall be reasonably satisfactory in form and substance to the DIP Lenders; provided, however, that the motions regarding non-substantive administrative matters that were filed prior to the date of this Term Sheet shall be deemed satisfactory to the DIP Lenders. |

As conditions precedent to the DIP Lender's obligation to fund all Emergency DIP Loans:

(a)   Debtors shall have timely delivered to the DIP Lenders the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;

(b)   Debtors shall have delivered to the DIP Agent and the DIP Lenders a Borrowing Notice in connection with the draw request;

(c) no Event of Default shall have occurred and be continuing on the Emergency Funding Closing Date, or after giving effect to the Emergency DIP Loan;

(d)   all representations and warranties of the Debtors hereunder shall be true and correct in all material respects to the best knowledge of the independent manager, after due inquiry;

(e)   subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate or limited liability company power and authority to make, deliver and perform its obligations under this Term Sheet and the Emergency Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Emergency Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect; and

(f) the DIP Agent and the DIP Lenders shall have received such other information and/or deliverables as the DIP Agent and DIP Lenders may reasonably require.

| | |
|---|---|
| **Representations and Warranties:** | The representations and warranties set forth in clauses 6.1, 6.2, 6.5, 6.8, 6.11, 6.12, 6.15, 6.18, 6.19(a), (b) and (e), 6.20 and 6.22 of the Prepetition Senior Secured NPA are incorporated herein by reference and shall be deemed made by each of the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of this Term Sheet, the Emergency DIP Facility, the DIP Collateral and Emergency DIP Obligations, *mutatis mutandis*, as if fully set forth herein.<br><br>The representations and warranties set forth in clauses 6.7, 6.9, 6.10, 6.17 and 6.19 (c) and (d) of the Prepetition Senior Secured NPA are incorporated herein by reference and shall be deemed made by each of the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of this Term Sheet, the Emergency DIP Facility, the DIP Collateral and the Emergency DIP Obligations, *mutatis mutandis*, as if fully set forth herein; provided that such representations and |

|  | warranties shall be subject to the following introductory statement "Except as otherwise disclosed to the DIP Lenders prior to the Petition Date" and with respect to Section 6.7, shall include the following after such additional introductory statement "and to the best knowledge of the independent manager, after due inquiry".<br><br>The following representations shall also be made by, and be applicable to, the Debtors:<br><br>All documents, certificates or other writings delivered to the DIP Agent or the DIP Lenders by or on behalf of the Debtors in connection with the Emergency DIP Facility (in each case as modified or supplemented by other information so furnished), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made to the best knowledge of the independent manager after due inquiry.  The Approved Budget (a) has been prepared with due care and in good faith on the basis of reasonable assumptions, including as to factual and legal matters material to the estimates included therein, and (b) represented at the time of delivery thereof the best information available to the Debtors. |
|---|---|
| **Covenants:** | Unless otherwise provided in the Approved Budget, no Debtor shall, without the express, prior written consent of the DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following:<br><br>(i)      create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except valid, perfected and unavoidable liens existing as of the Petition Date which, other than Permitted Prior Liens, are junior to the liens securing the Emergency DIP Facility (together with the Permitted Prior Liens, the "<u>Permitted Liens</u>");<br><br>(ii)     convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired;<br><br>(iii)    incur or make any expenditure, investment or other payment, other than in accordance with the Approved Budget;<br><br>(iv)    create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date; or<br><br>(v)     engage in any activities that will result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under the Investment Company Act of 1940. |

| | |
|---|---|
| | Each Debtor shall:<br><br>(1)    comply with the Approved Budget and with provisions of this Term Sheet and the Emergency Order (as applicable);<br><br>(2)    take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lenders to carry out the provisions of this Term Sheet and the Emergency Order, including entering into Definitive Documentation for the Replacement Facility;<br><br>(3)    no later than July 20, 2021, obtain and maintain in full force and effect, insurance consistent with the insurance requirements set forth in the Prepetition Senior Secured NPA and as is otherwise reasonably acceptable to the DIP Lenders.  Such insurance policies shall name DIP Agent, for the benefit of the Secured Parties as additional named insurance or loss payee as applicable;<br><br>(4)  take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than Permitted Liens; and<br><br>(5)  promptly provide such additional information concerning the Debtors, the Chapter 11 Cases or the DIP Collateral as the DIP Agent and the DIP Lenders may reasonably request. |
| **Use of Cash Collateral:** | The Debtors will be permitted to use Cash Collateral (as defined in and subject to the Emergency Order) in such amounts and for such purposes at such times as set forth in the Approved Budget, subject to the adequate protection provisions as described below. |
| **Priority and Liens:** | (i)    The liens securing all borrowings by the Debtors and other obligations of the Debtors under the Emergency DIP Facility and loan documentation (and all guaranties) (the "<u>Emergency DIP Obligations</u>") shall at all times, subject to the Carve Out:<br><br>(a)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code and, subject to entry of the Interim Order, shall be payable from the proceeds of DIP Collateral (the "<u>DIP Superpriority Claims</u>");<br><br>(b)  pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' estates in the Chapter 11 Cases that is not subject to valid, perfected and non-avoidable liens as of the commencement of the |

Chapter 11 Cases, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code;

(c) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' estates in the Chapter 11 Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (such prior liens, the "Permitted Prior Liens") or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clause (d) hereof, which liens shall be primed by the liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, as described in such clause); and

(d) pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property (such property, together with the property described in clauses (c) and (d) above, the "DIP Collateral") of the Debtors' estates in the Chapter 11 Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidaries) that is subject to the existing liens that secure the obligations of any other lenders under or in connection with any existing credit agreement and related documents and agreements and all of which existing liens (the "Primed Liens") shall be primed by and made senior and subordinate to the perfected first priority senior liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens (clauses (b), (c) and (d) collectively, the "DIP Liens").

(ii)    The DIP Liens shall be effective and perfected as of the date the Bankruptcy Court enters an Emergency Order, as the case may be, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, in each case subject to the terms and conditions set forth in the Emergency Order, as the case may be.

(iii) The DIP Superpriority Claims and DIP Liens shall be junior in priority only to the Carve Out and any Permitted Prior Liens

| | As used herein, the "<u>Carve Out</u>" means the sum of (a) all fees required to the paid to (x) the Clerk of the Court and (y) the Office of the U.S. Trustee under section 1930(a) of title 28 of the Bankruptcy Code, plus interest at the statutory rate; (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors and any committee (the "<u>Allowed Professional Fees</u>"), not to exceed the lesser of (x) the actual amounts, and (y) the amounts set forth for such professionals in the Approved Budget for such period, incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following the Maturity Date. The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction. |
|---|---|
| **Adequate Protection:** | Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value (as defined in the Emergency Order) of such interests in the Prepetition Collateral (as defined in the Emergency Order), the Debtors shall grant to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Adequate Protection Liens</u>") on the DIP Collateral; provided that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral and the proceeds thereof) upon which, and solely to the extent that, the grant of an Adequate Protection Lien, unless otherwise expressly permitted by the terms of the applicable executory contracts and unexpired nonresidential leases, would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable nonbankruptcy law), but shall include the proceeds thereof.

The Adequate Protection Liens shall be junior only to: (i) the DIP Liens, (ii) any Permitted Prior Liens and (iii) the Carve Out. The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors |

| | |
|---|---|
| | shall grant to the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Cases and any successor cases (the "Adequate Protection Superpriority Claims"). |
| | Except as set forth in the Emergency Order, the Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims, subject to the Carve Out, against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 503(a), 503(b), 507(a) (other than 507(a)(1), 506(c) (subject to entry of the Interim Order), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code; provided, however, the Adequate Protection Superpriority Claims shall be junior in priority to (i) the DIP Superpriority Claims and (ii) the Carve Out. |
| **Events of Default:** | The Emergency DIP Facility shall be subject to the following events of default (each, an "Event of Default"): |
| | (i)   Any payment default by the Debtors under the Emergency DIP Facility. |
| | (ii)  The failure of any representation or warranty to be true and correct in all material respects. |
| | (iii) Any Debtor's failure to comply with any requirement, agreements and covenants of this Term Sheet, the Approved Budget or any DIP Order. |
| | (iv)  The granting, creation or approval of any lien on any of the DIP Collateral *pari passu* or senior to the DIP Liens granted to the DIP Agent. |
| | (v)   Dismissal of any of the Chapter 11 Cases or any successor case with respect to any Debtor or conversion of any Debtor Chapter 11 Case to a Chapter 7 case or the sale of substantially all of the assets of any Debtor without the advance written consent of the DIP Lenders. |
| | (vi)  Appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in any of the Chapter 11 Cases. |
| | (vii) Granting of relief from the automatic stay to permit foreclosure on any assets of any Debtor. |
| | (viii)  Any request or application is made to the Bankruptcy Court for the reversal, vacation or stay of the effectiveness of any DIP |

| | |
|---|---|
| | Order or, without the DIP Agent and each DIP Lender's prior written consent, any modification of the DIP Agent's or any DIP Lender's rights under the DIP Documents or DIP Order. |
| | (ix) Failure of any of the DIP Liens or DIP Superpriority Claims to be valid, perfected and enforceable in all respects or any claim to be senior thereto other than the Carve Out. |
| | (x) The use of Cash Collateral for any purpose other than as permitted by this Term Sheet, any DIP Order or the Approved Budget. |
| | (xi) The commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Order) against any of the DIP Agent, any DIP Lender or their agents and employees, to subordinate or avoid any liens made in connection with the DIP Order. |
| | (xii)(a) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Order or Term Sheet is not valid and binding for any reason, or (b) any material provision of the DIP Order or Term Sheet shall for any reason, or any other order of Bankruptcy Court approving the Debtors' use of Cash Collateral, cease to be valid and binding (without the prior written consent of the DIP Lenders). |
| | (xiii) The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any DIP Collateral. |
| **Remedies upon an Event of Default:** | Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lenders may declare (a) all Emergency DIP Obligations to be immediately due and payable, (b) the termination of the Emergency DIP Facility as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the Emergency DIP Obligations, and (c) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, subject to further order of the Bankruptcy Court and (ii) the Approved Budget shall automatically be deemed not to provide for any payment other than (a) the Carve Out, (b) fees and expenses of the DIP Agent and the DIP Lenders (including attorneys' fees) and (c) such other expenses, if any, as may be expressly approved in writing by the DIP Lenders in their sole discretion. If the DIP Lenders elect to take any of the actions set forth in the foregoing clause (i) of this provision, the DIP Lenders shall provide three (3) days written notice to the Debtors and other required notice parties and shall promptly file such notice with the Bankruptcy Court. |

| | |
|---|---|
| **Expenses and Indemnification:** | (i)  The Debtors shall pay (a) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of this Term Sheet, any DIP Order and the DIP Facility, and (c) all other out-of-pocket costs and expenses of the Prepetition Secured Parties (including, without limitation, the ongoing monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings).  The reimbursement of such costs and expenses shall be earned, due and owing by the Debtors upon the Emergency Funding Closing Date, but shall be payable, in full, in cash, on the Maturity Date.<br><br>(ii)  The DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the indemnified party. |
| **Counsel to the DIP Lenders:** | Morgan, Lewis & Bockius LLP and Gray Reed & McGraw LLP. |
| **Counsel to the DIP Agent:** | Ballard Spahr LLP |
| **Governing Law and Forum:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet, except with respect to conflicts of laws.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **DIP Order Governs** | To the extent of any inconsistency between this Term Sheet and the DIP Orders, the terms of the DIP Orders shall govern. |

**Exhibit 2**

**INITIAL APPROVED BUDGET**

**Agilon Energy Holdings II LLC**
**Weekly Cash Flow Forecast**
**Forecast Start Date:  6/27/2021 (Petition Date)**

| Week ending Sunday | Reference | Estimate 7/4/2021 Week 0 | Estimate 7/11/2021 Week 1 | Forecast 7/18/2021 Week 2 | Forecast 7/25/2021 Week 3 | Forecast 8/1/2021 Week 4 |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| HRCO Energy Revenue | | $    - | $    - | $    - | $    - | $    - |
| HRCO Capacity Revenue | | - | - | - | - | - |
| Net ERCOT Sale (Purchase) | | - | - | - | - | - |
| **Total NET  Receipts** | | $    - | $    - | $    - | $    - | $    - |
| **Disbursements** | | | | | | |
| Fuel Supply | | - | - | - | - | - |
| Gas Transport (Kinder for VC) | | - | - | - | - | - |
| Gas Transport (Tennesse for VP) | | - | - | (13,000) | - | - |
| Gas Transport (Victoria Midstream) | | - | - | (37,716) | - | - |
| Water | | - | - | (11,000) | - | - |
| IntelliTrace Communications | | - | - | (9,500) | - | - |
| Other Variable Costs | | - | - | (20,000) | (10,000) | (20,000) |
| **Total Variable O&M Disbursements** | A | - | - | (91,216) | (10,000) | (20,000) |
| Consultants | | - | - | - | - | - |
| Information Technology (IT) | | - | - | (600) | - | - |
| Insurance | | - | - | (85,000) | - | - |
| Plant Management | B | - | - | - | - | (100,000) |
| Asset Management | C | - | - | - | (60,000) | - |
| Rent or Lease | | - | - | (23,617) | - | - |
| Utility Electricity | | - | - | (8,808) | - | - |
| Waste/Trash | | - | - | (550) | - | - |
| Other Expenses | | - | - | (15,000) | (15,000) | (15,000) |
| **Total Other Disbursements** | | - | - | (133,575) | (75,000) | (115,000) |
| **Total Operating Disbursements** | | - | - | (224,791) | (85,000) | (135,000) |
| **Operating Cash Flow** | | - | - | (224,791) | (85,000) | (135,000) |
| **Major Project Outlays** | | | | | | |
| GE Turbine Repair | | - | - | - | - | - |
| Alliance - RATA Testing | | - | - | - | (44,500) | - |
| Major Maintenance | | - | - | - | - | - |
| **Major Project Outlays** | | - | - | - | (44,500) | - |
| **Net Operating Cash Flow** | | - | - | (224,791) | (129,500) | (135,000) |
| **Non-Recurring Expense** | | | | | | |
| Collateral - Gas | | - | - | - | - | - |
| Collateral - QSE | | - | - | - | - | - |
| Adequate Assurances Payment - Utility | D | - | - | (15,000) | - | - |
| Other Non-recurring expense | | - | - | - | - | - |
| **Non-Recurring Expense** | | - | - | (15,000) | - | - |

**Agilon Energy Holdings II LLC**
**Weekly Cash Flow Forecast**
**Forecast Start Date: 6/27/2021 (Petition Date)**

| *Week ending Sunday* | Reference | Estimate 7/4/2021 Week 0 | Estimate 7/11/2021 Week 1 | Forecast 7/18/2021 Week 2 | Forecast 7/25/2021 Week 3 | Forecast 8/1/2021 Week 4 |
|---|---|---|---|---|---|---|
| **Restructuring Costs** | | | | | | |
| Grant Thornton (FA) | | (24,119) | (34,000) | (17,000) | (13,600) | (13,600) |
| Locke Lord (Legal) | | (52,000) | (91,200) | (45,600) | (45,600) | (45,600) |
| Hugh Smith Associates (CRO) | | - | - | (4,667) | - | - |
| ERM Capital (Ibanker) | | - | - | - | - | (30,000) |
| UCC Advisors | | - | - | - | - | - |
| US Trustee | | - | - | - | - | - |
| Claims Agent | | - | (3,000) | (6,000) | (6,000) | (10,000) |
| Other | | - | - | - | - | - |
| Restructuring Costs | | (76,119) | (128,200) | (73,267) | (65,200) | (99,200) |
| **Net Cash Flow before DIP Financing** | | **(76,119)** | **(128,200)** | **(313,058)** | **(194,700)** | **(234,200)** |
| **Beginning Cash** | E | **2,806** | **2,806** | **2,806** | **258,348** | **128,848** |
| Net Change in Cash | | (76,119) | (128,200) | (313,058) | (194,700) | (234,200) |
| DIP Draw (Repayment) | | - | - | 500,000 | - | 250,000 |
| Costs incurred but not yet paid | F | 76,119 | 128,200 | 68,600 | 65,200 | 69,200 |
| **Ending Cash Balance** | | **2,806** | **2,806** | **258,348** | **128,848** | **213,848** |
| **Beginning DIP Balance** | | - | - | - | 500,000 | 500,000 |
| DIP Draw/(Paydown) | | - | - | 500,000 | - | 250,000 |
| **Ending DIP Balance** | | - | - | 500,000 | 500,000 | 750,000 |
| **DIP Commitment/ Availablity** | 1,000,000 | 1,000,000 | 1,000,000 | 500,000 | 500,000 | 250,000 |

**Notes:**

**[A]** While the facilities are not operating and do not incur any variable fuel costs, there are fixed fuel transportations and communication costs to keep the facilities on standby

**[B]** Third-party plant operator to continue to provide site security, routine maintenance safety and operational checks while the facilities are on standby

**[C]** Third-party asset manager to provide all back office and operational support functions

**[D]** Adequate Assurances dollars for electric, water and communications services

**[E]** Bank balance as of May 31, 2021.

**[F]** Includes Debtor advisors and claims agent for fee incurred (less 20% holdbacks) to be paid upon court approval.