IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| AGILON ENERGY HOLDINGS II LLC, *et al.* | § § § | Case No. 21-32156 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

**ORDER GRANTING DEBTORS' MOTION FOR ORDER, PURSUANT TO SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO RETAIN TATESWOOD ENERGY COMPANY, LLC TO PROVIDE GENERAL ASSET MANAGEMENT SERVICES AND (II) APPROVING THE AGREEMENT RELATED THERETO**

Upon the Debtors' motion (the "***Motion***")[2] pursuant to 11 U.S.C. §§ 105(a) and 363(b) for entry of an order authorizing the Debtors to employ and retain Tateswood Energy Company, LLC ("***Tateswood***") to provide general asset management services to the Debtors, effective as of July 13, 2021, on the terms set forth in the asset management agreement between Agilon and Tateswood dated July 13, 2021 (the "*Asset Management Agreement*"); the Court finds that jurisdiction over this matter is proper and that notice of the Motion and the hearing thereon was sufficient under the circumstances, and upon the record herein after due deliberation thereon, good and sufficient cause exists for the relief granted herein. It is **HEREBY ORDERED THAT**:

1. The Debtors are authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to retain Tateswood to provide General Asset Management Services to the

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II LLC (3389) ("***Agilon***"), Case No. 21-32156; Victoria Port Power LLC (4894) ("***VPP***"), Case No. 21-32157; and Victoria City Power LLC (4169) ("***VCP***" and together with Agilon and VPP, the "***Debtors***"), Case No. 21-32158. The Debtors' mailing address is: 480 Wildwood Forest Drive, Suite 475, Spring, Texas 77380.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Debtors effective as of July 13, 2021, in accordance with the terms and conditions set forth in the Motion and the Asset Management Agreement attached hereto as **Exhibit 1**.

2. The terms of the Asset Management Agreement, including without limitation, the compensation provisions and the indemnification provisions, are reasonable terms and conditions of employment and are hereby approved.

3. Tateswood shall be paid in accordance with the Asset Management Agreement in the ordinary course of business.

4. Tateswood's Monthly Fee shall be prorated for any month in which Tateswood is not employed for each day of the month.

5. To the extent there is inconsistency between the terms of the Asset Management Agreement, the Motion, and this Order, the terms of this Order shall govern.

6. The following indemnification procedures are approved during the pendency of this case:

   a. As set forth and subject to the limitations in subparagraph (c) below, Tateswood shall not be entitled to indemnification pursuant to the Asset Management Agreement for services, unless such services and the indemnification therefore are approved by the Court;

   b. The Debtors shall have no obligation to indemnify Tateswood for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from Tateswood's gross negligence, willful misconduct, fraud, breach of fiduciary duty, if any, bad faith or self-dealing, or (ii) settled prior to a judicial determination as to Tateswood's gross negligence, willful misconduct, breach of fiduciary duty, or bad faith or self-dealing but

    determined by this Court, after notice and a hearing to be a claim or expense for which Tateswood should not receive indemnity under the terms of the Asset Management Agreement as modified by this Order; and

  c. If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these Chapter 11 Cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these Chapter 11 Cases, Tateswood believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification obligations under the Asset Management Agreement (as modified by this Motion), including without limitation the advancement of defense costs, Tateswood must file an application therefore in this Court, and the Debtors may not pay any such amounts to Tateswood before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Tateswood for indemnification, and not a provision limiting the duration of the Debtors' obligation to indemnify Tateswood. All parties in interest shall retain the right to object to any demand by Tateswood for indemnification.

  7. In the event that, during the pendency of these Chapter 11 Cases, Tateswood seeks reimbursement for any attorneys' fees and/or expenses, Tateswood shall file a fee application and include the invoices and supporting time records from such attorneys; and such invoices and time records shall be in compliance with the Bankruptcy Local Rules, applicable Guidelines and approval of the Court under the standards of Bankruptcy Code sections 330 and 331, without regard to whether such attorney has been retained under Bankruptcy Code section 327; provided,

however, that Tateswood shall not seek reimbursement from the Debtors' estates for any fees incurred in defending any fee applications in these Chapter 11 Cases.

8. To the extent the Debtors wish to expand the scope of Tatewood's services or compensation arrangement as set forth in the Engagement Agreement or this Order, the Debtors shall be required to seek further approval from this Court. The Debtors shall file notice of any proposed additional services or compensation change and any underlying engagement agreement with the Court and serve such notice on the U.S. Trustee, the Committee, and any party requesting notice under Bankruptcy Rule 2002. If no such party files an objection within 21 days of the Debtors filing such notice, the additional services or compensation change and any underlying engagement agreement may be approved by the Court by further order without further notice or hearing.

9. Tateswood shall use its best efforts and will coordinate with the Debtors and their retained professionals, not to duplicate any of the services provided to the Debtors by any of their retained professionals.

10. Notwithstanding anything else contained herein, (a) any relief granted herein, including any payment to be made or authorization contained hereunder, shall be subject in all respects to the terms and conditions of, including all requirements imposed upon the Debtors under, any interim or final order of the Court in these Chapter 11 Cases approving the post-petition secured financing facility and authorizing the use of cash collateral (as may be modified, amended or supplemented, the "**Financing Orders**") (including, without limitation, the budget required in connection therewith)) and the post-petition financing credit documents approved therein and (b) to the extent there is any inconsistency between the terms and conditions of such Financing Orders

or DIP Credit Documents and any action taken or proposed to be taken hereunder, the terms and conditions of such Financing Orders or DIP Credit Documents shall control.

11. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

13. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

14. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:

                                                            Marvin Isgur
United States Bankruptcy Judge

# Exhibit 1

# Asset Management Agreement between
# Agilon Energy Holdings II and Tateswood Energy

**This ASSET MANAGEMENT AGREEMENT**, dated as of July 13, 2021 (this "*Agreement*"), is between Agilon Energy Holdings II LLC, a Texas limited liability company (the "*Company*") and Tateswood Energy Company, LLC, a Texas limited liability company ("*Asset Manager*").

WHEREAS, the Company desires to engage Asset Manager to perform the General Asset Management Services (as defined in Section 5 hereof) on the terms and for the compensation set forth herein, and Asset Manager wishes to accept such engagement, perform such obligations, on such terms and for such compensation.

NOW THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Defined Terms**

1.  Capitalized terms used herein but not otherwise defined herein shall have the respective meanings assigned thereto in <u>Exhibit C</u> hereto.

**Interpretation**

2.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein, including this Agreement, shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified, (b) any definition of or reference to any statute, code or statutory provision are to be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted, and include references to all bylaws, instruments, orders and regulations for the time being made thereunder or deriving validity therefrom unless the context otherwise requires, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, when used in this Agreement shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement and (e) all references herein to Sections and Exhibits shall be construed to refer to Sections of, and Exhibits to, this Agreement.

**Appointment.**

3.  The Company, hereby appoints and retains Asset Manager to provide the General Asset Management Services from and after the Effective Date on and subject to the terms and conditions set forth in this Agreement. Asset Manager hereby accepts such appointment and agrees to perform the General Asset Management Services in accordance with and subject to the terms and conditions of this Agreement.

**Engagement**

4.  From the Effective Date until the date this Agreement is terminated pursuant to Section 13 hereof (the *"Term"*), Asset Manager hereby agrees to perform all of the General Asset Management Services, the services set forth in Section 5 of this Agreement and, if requested in writing by Company, the Optional Additional Services. Such obligations, duties, covenants, agreements and other services shall be performed, and such rights shall be exercised, in a manner that is commercially reasonable and that accords with the customary practices of prudent persons of established reputation that perform similar General Asset Management Services. The *"Effective Date"* shall be July 13, 2021. Asset Manager acknowledges that this Agreement is subject to approval by the bankruptcy court with jurisdiction over the Company's chapter 11 case (the *"Bankruptcy Court"*) and that this Agreement shall not be effective until the Bankruptcy Court has entered a final order approving it.

**General Asset Management Services**

5.

(a) During the Term, Asset Manager shall perform or cause to be performed on behalf of the Company the management, administrative and other support services in connection with the development, operation and management of the Company's interests in the Facilities and the day-to-day business of the Company (collectively, the *"General Asset Management Services"*):

(i) Assist in the oversight of the operator of the Facilities;

(ii) Assist in the oversight of the energy manager/QSE for the Facilities;

(iii) Provide risk management, including advising on insurance management and trading policies;

(iv) Oversee contract compliance for existing Facility agreements;

(v) Assist in the solicitation and negotiation of new Facility agreements as directed by the Company;

(vi) Monthly contract settlements;

(vii) Environmental compliance including reporting and coordination of compliance testing;

(viii) Emissions allowance trading;

(ix) Regulatory oversight, management and reporting, including NERC GP compliance;

(x) Preparation of monthly management reports;

(xi) Assist in the budgeting process, including preparation and variance reporting;

(xii) Assist in property tax oversight;

(xiii) Accounting and preparation of monthly, quarterly and annual GAAP financial statements, including variance to budget and information for monthly bankruptcy court filings;

(xiv) Accounts payable processing;

(xv) Provide advice and administration of Cash management and treasury activities;

(xvi) Assist as requested with lender reporting, compliance, and commercial liaison;

(xvii) Assist with oversight and coordination of tax preparation by third party accounting firms;

(xviii) Maintain the books and records for the Project Companies

(b) Personnel. Asset Manager shall provide and make available as necessary all professional, supervisory, managerial, administrative and other personnel as are necessary to perform the General Asset Management Services, which personnel may be employees of Asset Manager's affiliates. Such personnel shall be qualified and experienced in the duties to which they are assigned. The working hours, rates of compensation and all other matters relating to the employment of individuals employed by Asset Manager or its affiliates in the performance of the Services shall be determined solely by Asset Manager or its respective affiliates. In the performance of the General Asset Management Services.

**Representations and Warranties**

6.  The Asset Manager represents and warrants to the other parties hereto that:

    (a) it is a limited liability company duly formed and validly existing under the laws of its jurisdiction of formation, and is duly qualified and is in good standing in each jurisdiction in which such qualification is required in order to perform its obligations hereunder;

    (b) it has the limited liability company power and authority to transact the business it proposes to transact hereunder and to execute and deliver this Agreement and to perform the provisions hereof;

    (c) this Agreement has been duly authorized by all necessary company action on its part, and this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

    (d) its execution, delivery and performance of this Agreement will not violate any provision of any statute or other rule or regulation of any governmental authority applicable to it, including by virtue of the performance of its obligations hereunder; and

    (e) no consent, approval or authorization of, or registration, filing or declaration with, any governmental authority is required in connection with its execution, delivery or performance of this Agreement.

**Independent Contractor**

7.  Asset Manager shall be deemed an independent contractor in the performance of this Agreement and none of its employees shall be considered employees of the Company. Nothing in this Agreement shall be deemed to constitute either party hereto a partner, joint venturer, agent or legal representative of the other party hereto, nor shall either party hereto have the right or authority to assume, create or incur any liability or obligation, express or implied, against, in the name of, or on behalf of the other party hereto, except as expressly provided in this Agreement or authorized in writing by such other party hereto. Asset Manager shall be solely responsible for all matters relating to the payment of its employees, including compliance with social security, withholding and all other similar regulations governing such matters, and Asset Manager shall be solely responsible for the services performed hereunder. Asset Manager will provide workers compensation insurance and professional liability insurance for its employees acceptable to the Company.

**Additional Reporting**

8.      Unless directed otherwise by the Company, Asset Manager shall prepare and deliver to the Company the financial statements and reports listed in Section 5 and Exhibit B hereto within the time periods and in the forms specified in such Exhibit.

**Standards of Performance**

9.      Without the prior written consent of the Company, Asset Manager shall not engage any non-affiliate subcontractor or any other person to perform any of its duties and obligations hereunder other than as expressly set forth herein and shall comply in all material respects with applicable law.

**Books and Records**

10.     Asset Manager shall maintain all books of account and other records for and on behalf of the Company and ensure that a copy (electronic or otherwise) is kept at the principal place of business of the Company. Such books and records will be kept on the basis of a calendar year and will reflect the Company's transactions and be appropriate and adequate for conducting the Company's business.

**Reimbursable Expenses & Compensation**

11.     The Company shall be obligated to pay to Asset Manager, and Asset Manager shall have the right to receive from the Company the following amounts (collectively, ***"Reimbursable Amounts"***):

   (a)   The monthly fee specified in Exhibit D, escalated on January 1 of each year starting January 1, 2022 by two percent (2%) percent, payable in equal monthly installments in advance on or before the 1st day of each month pursuant to the payment protocol set forth in Exhibit A;

   (b)   For any period within the Term that the Company has elected in writing to have Asset Manager perform the Optional Additional Services, the Optional Additional Services Fee specified in Exhibit D, payable in advance on or before the 1st day of each month pursuant to the payment protocol set forth in Exhibit A; and

   (c)   All reasonable, documented out-of-pocket expenses (excluding salaries and all other compensation and overhead) and third-party reimbursable expenses relating to the performance of Asset Manager's duties hereunder, on a monthly basis in accordance with the payment protocol set forth in Exhibit A and in accordance with the approved budget pursuant to any debtor-in-possession financing of the Company. Out-of-Pocket expenses or travel costs exceeding $500 will require Company approval prior to the expense being incurred.

**Indemnification; Limitation of Liability**

12. Each of the Company and Asset Manager (the "*Indemnifying Party*") shall protect, indemnify, defend and hold harmless the other party hereto and its employees, officers, directors, affiliates, agents, members, partners, successors and assigns (collectively, the "*Indemnified Parties*") from and against any and all suits, actions, claims, awards, legal judgments, losses, liabilities, penalties, fines, costs, expenses of whatsoever kind or character (including attorneys' fees), for injury to persons (including death) and damage to property of third parties (collectively referred to herein as "*Damages*") to the extent caused by the negligence, gross negligence or willful misconduct of:

    (a)    the Indemnifying Party; or

    (b)    any person, other than an Indemnified Party, that is acting on Indemnifying Party's behalf, including subcontractors and vendors, their subcontractors and sub-vendors, and the employees and agents of any of the foregoing in connection with, or incident to, Indemnifying Party's obligations under this Agreement; provided, that, no Indemnifying Party's indemnity obligations in any calendar year of the Term shall exceed an amount equal to the aggregate Reimbursable Amounts actually paid from the Company to Asset Manager in such calendar year.

Notwithstanding anything herein to the contrary, neither the Company, on one hand, nor the Asset Manager, on the other, shall be liable to the other for any indirect, special, incidental, punitive or consequential damages arising out of the performance or non-performance by such party of its obligations under this Agreement, including loss of profits, down time and loss of use, and each party hereby releases the other party from any claims which it may have against the other party for any such damages.

**Termination and De-Mobilization**

13.

    (a)    The Company shall have the right to terminate this Agreement: **(i)** following any breach of this Agreement by Asset Manager, upon not less than 30 days prior written notice to Asset Manager, unless Asset Manager has cured such breach during such notice period, unless a longer period of time to cure said breach is reasonably required, in which case Asset Manager shall not be in default hereunder if it commences to cure said breach within said 30 day period and diligently prosecutes the same to completion within 60 days after commencement of such cure; or (ii) upon not less than 60 days' notice to Asset Manager (the "*Convenience Termination Notice*").

    (b)    Asset Manager shall have the right to terminate this Agreement (i) following any breach of this Agreement by the Company, upon not less than 60 days'

prior written notice to the Company and approval by the bankruptcy court, unless the Company has cured such breach during such notice period; or (ii) following the first anniversary of the Effective Date, upon not less than 60 days' notice to the Company.

(c) Asset Manager's and Company's obligations under Section 12 hereof shall survive the expiration or termination of this Agreement. Asset Manager's obligations under Section 14 hereof shall survive for a period of two (2) years following the expiration or termination of this Agreement.

**Confidentiality**

14. Asset Manager acknowledges that its performance under this Agreement will necessarily involve access to certain information including the information and other information relating to the organization, personnel, business activities, policies, operations, finances, marketing plans, projected revenues, rights, obligations, liabilities and strategies of the Company (collectively, the ***"Information"***). Asset Manager acknowledges that all Information is confidential and/or proprietary to the Company and agrees that, during the Term and all times thereafter, it will not disclose or otherwise make available any Information to any person other than the Company (or any other person who is not subject to a confidentiality agreement regarding the Information that is at least as restrictive as is contained in this Agreement) without the prior written consent of the Company and shall not use any Information for any purpose other than performing its obligations hereunder. The Information shall not include information which (a) Asset Manager can demonstrate was known to it on a non-confidential basis prior to its disclosure to Asset Manager, (b) is, or later becomes, public knowledge without breach of this Agreement, (c) is received by Asset Manager from a third party without obligation of confidentiality or (d) is developed by Asset Manager independently from any Information received from the Company, as evidenced by appropriate documentation. In the event that disclosure is required by court order or a governmental authority, Asset Manager shall promptly notify the Company and will use reasonable efforts to obtain protective orders or similar restraints with respect to such disclosure.

**Governing Law**

15. This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this Agreement shall be governed by, the law of the State of Texas. Venue for any disputes arising hereunder shall exclusively be in the Bankruptcy Court, and the parties irrevocably submit to the jurisdiction of the Bankruptcy Court.

**Miscellaneous**

16. (a) **Notices.** Except in the case of notices and other communications expressly permitted hereunder to be made orally, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or delivered by electronic mail, as follows:

    (i) if to the Company, to:

    Agilon Energy Holdings II LLC
    5850 San Felipe Road, Suite 601
    Houston, TX 77057
    Attention: Hugh Smith

    Email: hughwsmithconsulting@gmail.com

    (ii) if to Asset Manager, to:

    Tateswood Energy Company, LLC
    480 Wildwood Forest Drive, Suite 475
    Spring, TX 77380
    Attention: John G. Lambert

    Email: jlambert@tateswood.com

All notices and other communications given to either party in accordance with the provisions hereof shall be deemed to have been given (i) on the date of receipt if delivered personally or by email (which, with respect to an item of electronic mail, shall be the date that the intended addressee thereof opens or otherwise accesses such electronic mail), (ii) seven days after the date of posting if transmitted by post or (iii) three days after delivery to the courier if transmitted by courier, whichever shall first occur. Each party hereto may change its address or e-mail address for notices and other communications hereunder by notice to the other party hereto.

(b) **Amendments; Waivers.** This Agreement shall not be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the parties hereto and will be subject to Bankruptcy Court approval and any approvals required under the Company's debtor-in-possession financing. Any waiver of any provision of this Agreement or consent to any departure by either party therefrom shall be effective only in the specific instance and for the purpose for which given.

(c) **Successors and Assigns; No Third-Party Beneficiaries.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. Neither party hereto

may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other party hereto; <u>provided</u>, however, that this Agreement may be assigned by the Company to a successor owner of the Facilities subject to approval of the assignee by Asset Manager, such approval not to be unreasonably withheld. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto and their respective successors and assigns permitted hereby and the Indemnified Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(d) **Counterparts.** This Agreement may be executed and delivered in counterparts (including by facsimile transmission), each of which shall be identical and all of which, when taken together, shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

(e) **Integration.** This Agreement constitutes the entire agreement between and among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

(f) **Severability.** Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(g) **Further Assurances.** Each party hereto hereby agrees to perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further documents, as may be required by law or as may be necessary or desirable to implement and/or give effect to this Agreement.

[Signature page follows]

Case 21-31256   Document 117-2   Filed in TXSB on 08/12/21   Page 15 of 20

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**Agilon Energy Holdings II LLC**

By: *Hugh Smith*
Name: Hugh Smith
Title: Manager

**TATESWOOD ENERGY COMPANY, LLC**

By: *John Lambert*
Name: John G. Lambert
Title: President

## Exhibit A

## Payment Protocol

On or before the 20th day of the previous month during the term of this Agreement, Asset Manager shall submit an invoice for (i) the monthly fee and Optional Additional Services fee, if applicable, shown in Exhibit D for the upcoming month, and (ii) all third party expenses which comply with Section 11(c) of the Agreement for the immediately preceding calendar month. On or before the later of 10 days following the Company's receipt of the invoice or the 1st day of the following month, the Company shall pay the undisputed amount of the monthly invoice to the Asset Manager. Late payments shall accrue interest at a rate of 6.0% per annum.

# Exhibit B

## Reporting Requirements

1. Unaudited Financial Statements: Within (i) ten (10) days after the end of each month and (ii) sixty (60) days after the end of the fiscal year, an unaudited balance sheet, income statement, statement of cashflows and a statement of changes in partners' equity for the Company, all prepared in accordance with GAAP.

2. Income Tax Returns: Asset Manager shall prepare, or cause to be prepared, any Federal and state income tax returns and extensions, if applicable, when due and will arrange to have such returns filed at the direction of the Company. Also, at the direction of the Company, Asset Manager on behalf of the Company shall file any final Federal and state income tax returns required to be filed by the Company within two hundred ten (210) days after the end of each fiscal year.

3. Other reports: Asset Manager shall provide the Company with copies of (a) all material reports delivered to the Project Companies and (b) all material information received by Asset Manager related to any pending or threatened litigation, insurance or required permits.

## Exhibit C

### Definitions

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Asset Manager" has the meaning set forth in the preamble of this Agreement.

"Company" has the meaning set forth in the preamble of this Agreement.

"Convenience Termination Notice" has the meaning set forth in Section 13 of this Agreement.

"Damages" has the meaning set forth in Section 12 of this Agreement.

"Effective Date" has the meaning set forth in Section 4 of this Agreement.

"Facilities" shall mean the facilities set forth on Exhibit D (each such facility, a "Facility").

"General Asset Management Services" has the meaning set forth in Section 5 of this Agreement.

"Indemnified Parties" has the meaning set forth in Section 12 of this Agreement.

"Indemnifying Parties" has the meaning set forth in Section 12 of this Agreement.

"Information" has the meaning set forth in Section 15 of this Agreement.

"Optional Additional Services" has the meaning set forth in Section 5 of this Agreement.

"Project Companies" shall mean the companies denoted as such in Exhibit D.

"Reimbursable Amounts" has the meaning set forth in Section 11 of this Agreement.

"Term" has the meaning set forth in Section 4 of this Agreement.

# Exhibit D

**Monthly Fee:** $60,000 per month for the first two months following the Effective Date and $55,000 per month thereafter. The initial monthly fee will be paid directly to Asset Manager once the initial retainer has been fully earned.

**Facilities:** (i) the Victoria Port Generating Station, a nominal 86 MW gas-fired peaking power plant located in Victoria, Texas, and (ii) the Victoria City Generating Station, a nominal 86 MW gas-fired peaking plant located in Victoria, Texas (each, a *"Facility"* and collectively, the *"Facilities"*)

**Project Company:** Victoria Port Power, LLC, a Texas limited liability company, and Victoria City Power, LLC, a Texas limited liability company (together, the *"Project Companies"* and each a *"Project Company"*)

Case 21-3126 Document 117-2 Filed in TXSB on 08/12/21 Page 20 of 20