## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **AGILON ENERGY HOLDINGS II, LLC**, *et al.* | § | Case No. 21-32156 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

### DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING SENIOR SECURED POSTPETITION FINANCING PURSUANT
### TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT
### TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION PURSUANT
### TO 11 U.S.C. §§ 361, 363, AND 364, AND (IV) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:30 P.M. ON SEPTEMBER 2, 2021.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THE RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON SEPTEMBER 2, 2021 AT 1:30 P.M. (CENTRAL TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.  VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE.  THE MEETING CODE IS "JUDGEISGUR". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH  ELECTRONIC  AND  IN-PERSON  HEARINGS.    TO  MAKE  YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II, LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 5850 San Felipe, Ste 601, Houston, Texas 77057.

> **ISGUR'S HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this *Emergency Motion for Entry of an Order (i) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Granting Related Relief* (the "<u>Motion</u>").  In support of the Motion, the Debtors submit the *Declaration of Hugh Smith in Support of the Debtors' Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Granting Related Relief* (the "<u>Second Smith Declaration</u>") and state as follows:[2]

## PRELIMINARY STATEMENT

1. The Interim DIP Order represents the culmination of extensive and robust negotiations between the Debtors, the DIP Lenders and the Creditors Committee.  In the last two weeks, the parties have been engaged in ongoing discussions with regard to all of the potentially disputed issues relating to the Replacement DIP Facility.  Thus, the Interim DIP Order that the Debtors now present to the Court represents the parties' complete consensus on all issues relating to the Replacement DIP Facility, an achievement that is very rare at this stage of the proceedings.

2. The Court approved the Emergency DIP Facility on July 15, 2021, which was funded on July 16, 2021.  The Emergency DIP Facility provided urgent liquidity as a bridge to a comprehensive DIP Credit Agreement that would repay the Emergency DIP Facility, fund

---

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Interim DIP Order or the DIP Credit Agreement (each as defined herein), as applicable.

operations, and allow for a process for the sale of substantially all of the Debtors' assets (the "Replacement DIP Facility").

3.      Since the Emergency DIP Facility was approved, the Debtors have recommenced operations at their two gas-fired power plants, restoring some revenue, and are now on a path towards achieving the goals of these Cases. Approval of the Replacement DIP Facility is the next essential step.

4.      The $30 million Replacement DIP Facility will: (a) provide working capital for the Debtors; (b) refinance and/or repay all outstanding obligations in connection with the Emergency DIP Facility and certain Prepetition Obligations; (c) allow payment of Adequate Protection Fees and Expenses; and (d) fund the Carve Out (as described further below).

5.      The proposed Replacement DIP Facility is a central pillar of the Debtors' strategy in these Cases. It provides critical liquidity for the business and its restored operations through the duration of the sale process and permits the Debtors to administer these Cases to their conclusion with a high degree of certainty and consensus among key stakeholders. To that end, the Debtors, the Prepetition Secured Parties, and the DIP Lenders have collaborated efficiently to execute the DIP Credit Agreement substantially in the form attached to the Interim DIP Order as **Exhibit 1**. Accordingly, the Debtors request entry of DIP Orders authorizing the Debtors to enter into the Replacement DIP Facility.

## RELIEF REQUESTED

6.      The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim DIP Order") and a final order (the "Final DIP Order,"[3] and, together with the Interim DIP Order, the "DIP Orders"), *inter alia,*

    (i)      authorizing the Debtors to obtain senior secured postpetition financing on a

---

[3] The Debtors will file a proposed Final DIP Order prior to the Final Hearing.

superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of up to $30,000,000.00 (the "Replacement DIP Facility") consisting of: (a) a new money multi-draw new money (x) term loan facility in the aggregate principal amount of up to $6,000,000 on an interim basis (the "Interim DIP Term Loan"), a portion of which shall be used to repay the Emergency DIP Facility in full, (y) term loan facility in the aggregate principal amount of up to $15,000,000, minus the principal amount of the Interim DIP Term Loan, on a final basis (the "Final DIP Term Loans", and together with the Interim DIP Term Loan, the "DIP Term Loans") and (b) roll-up loans to refinance on a one-to-one basis the Term Notes and the Revolving Notes on a pro rata basis across the Prepetition Secured Parties' holdings of the Senior Notes (as such terms are defined below), (x) upon entry of the Interim DIP Order, the principal amount of the Interim DIP Term Loan on an interim basis (the "Interim Roll-Up Loans"); and (y) upon entry of the Final DIP Order, the principal amount of the Final DIP Term Loan on a final basis (the "Final Roll-Up Loans" and together with the Interim Roll-Up Loans, the "Roll-Up Loans"; and the DIP Term Loans, together with the Roll-Up Loans, collectively, the "DIP Loans"), pursuant to the terms and conditions of that certain Senior Secured, Superpriority Debtor-In-Possession Credit Agreement dated as of September [__], 2021 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement"), substantially in the form attached to the Interim DIP Order as **Exhibit 1**, by and among the Debtors, each as a "Borrower," The Prudential Insurance Company of America, as administrative agent under the DIP Documents (as defined below, in such capacity, the "DIP Administrative Agent"), Wilmington Trust, National Association, as collateral agent under the DIP Documents (as defined below, in such capacity, the "DIP Collateral Agent" and, together with the DIP Administrative Agent, the "DIP Agents"), and the lenders party thereto (the "DIP Lenders" and, together with the DIP Agents, the "DIP Secured Parties");

(ii)    authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other loan documents and documents related thereto (including any security agreements, mortgages, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Credit Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   granting the Replacement DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents to the DIP Secured Parties (collectively, including all obligations described in the DIP Documents, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases;

(iv)    granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties under the DIP Documents automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all

4

property of the Debtors constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)  authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due and payable, including, without limitation, letter of credit fees (including issuance and other related charges), collateral agent's fees, the reasonable fees and disbursements of the DIP Lenders' and the DIP Agents' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi)  authorizing the Debtors to use, on the terms described herein and in the Interim DIP Order, the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Senior Secured Note Documents (each as defined herein);

(vii)  providing adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein and in the Interim DIP Order ("Diminution in Value");

(viii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim DIP Order;

(ix)  deeming a portion of the Term Notes and Revolving Notes to be Roll-Up Loans issued and outstanding under the DIP Documents and all obligations in connection with such rolled-up Term Notes to constitute Obligations (as defined in the DIP Documents) for all purposes thereof;

(x)  approving on a final basis the relief set forth in the *Emergency Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* (the "Emergency DIP Order") [Docket No. 49]; and

(xi)  scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.

This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      Pursuant to Bankruptcy Rule 7008, the Debtors consent to the entry of a final order by the Court with regard to the relief requested in the Motion.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

### BACKGROUND

9.      The Debtors are in the business of providing gas-fired peaking electric energy to the ERCOT market.  The Debtors own and operate two (2) facilities located near Victoria, Texas: Victoria Port Generation Station (the "Victoria Port Facility") and Victoria City Generation Station (the "Victory City Facility" and together with the Victoria Port Facility, the "Facilities").  When fully functional, the Facilities have a total nominal capacity of 172 megawatts. The Facilities incorporate two refurbished LM6000 aero derivative combustion turbines and associated generators manufactured by General Electric.

10.     Additional detail regarding the Debtors, their business, the events leading to the commencement of these Cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Hugh Smith in Support of Chapter 11 Petition, First Day Motion, and Debtors' Emergency Motion for Entry of an Order (i) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (iv) Granting Related Relief* [Docket No. 42] (the "*Smith Declaration*") and the Second Smith

Declaration and is incorporated herein by reference.

### SUMMARY OF THE DEBTORS' PREPETITION
### FUNDED INDEBTEDNESS AND OTHER DEBT

11.     As of the Petition Date, a substantial portion of the Debtors' liabilities consisted of funded indebtedness. None of the Debtors' funded indebtedness or equity is or was publicly offered for sale or publicly traded.

**A.     Prepetition Senior Secured NPA**

12.     Pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Senior Secured NPA," and together with the other "Financing Documents" as defined therein, the "Prepetition Senior Secured Note Documents"), among, *inter alia*, (a) Agilon Energy Holdings II, LLC (the "Borrower"), (b) the guarantors party thereto (the "Prepetition Guarantors"), (c) Wilmington Trust, National Association, as the Collateral Agent under the Collateral Agency Agreement (each as defined in the Prepetition Senior Secured NPA, in such capacity, the "Prepetition Agent"), and (d) the purchasers and noteholders party thereto (collectively, the "Senior Secured Noteholders," and together with the Prepetition Agent, and all other secured parties under the Prepetition Senior Secured Note Documents, the "Prepetition Secured Parties"), the Borrower issued senior secured term notes in the initial aggregate principal amount of $50,000,000 (the "Term Notes," as defined in the Prepetition Senior Secured Note Documents) and senior secured revolving notes in the aggregate principal amount of $23,000,000 (the "Revolving Notes," as defined in the Prepetition Senior Secured Note Documents, and together with the Term Notes, the "Senior Notes"). As of the Petition Date, the aggregate

outstanding principal amount of the Senior Notes was not less than $67,337,975.[4]

13.     As security for the Senior Notes, the Debtors granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties first priority liens upon and senior security interests in (collectively, the "Prepetition Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition Collateral").  All of the Debtors' cash (including any cash in deposit accounts of the Debtors), wherever located, constitutes Prepetition Collateral (the "Cash Collateral") of the Prepetition Secured Parties.

### B.     Subordinated Notes

14.     Pursuant to a separate *Securities Purchase Agreement* dated as of February 23, 2018 (as amended, restated, or otherwise supplemented from time to time), Agilon Energy Holdings II, LLC issued $22 million in Senior Subordinated Notes due in 2025 (the "Subordinated Notes"). The Subordinated Notes are subordinate in all respects to the Senior Notes.  As of the Petition Date, the aggregate principal amount outstanding, excluding fees and expenses, on account of the Subordinated Notes was not less than approximately $26 million.[5]

### C.     Other Trade and Miscellaneous Unsecured Debt

15.     The Debtors estimate that, as of the Petition Date, claims of trade and miscellaneous unsecured creditors exceeded $14.5 million;[6] additionally Shell Energy North America (U.S.), L.P. asserts it holds a claim against the Debtors in the approximate amount of $123 million.

---

[4] Such amount does not include all secured obligations under the Senior Notes, including, without limitation, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Senior Notes and the other Prepetition Senior Secured Note Documents.

[5] Such amount is based on the Debtors' analysis of its books and records to date.  The Debtors reserve any and all rights to amend such amount as they complete their respective analysis.  Such amount does not include interest, PIK interest, default interest, make-whole, other premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Subordinated Notes.

[6] Such amount is based on the Debtors' analysis of its books and records to date.  The Debtors reserve any and all rights to amend such amount as they complete their respective analysis.

## BACKGROUND ON THE CHAPTER 11 CASES AND NEED FOR THE REPLACEMENT DIP FACILITY

A.      **The Chapter 11 Cases and Approval and Funding of the Emergency DIP Facility**

16.      On June 27, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Cases.

17.      The Debtors continue in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On June 28, 2021, the Court entered an order [Docket No. 9] authorizing the joint administration and procedural consolidation of these Cases pursuant to Bankruptcy Rule 1015(b).

18.      On August 2, 2021, the United States Trustee for Region 7 (the "U.S. Trustee") appointed an official committee of unsecured creditors (and as may be reconstituted from time to time, the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Cases.

19.      Shortly after the Petition Date, On July 13, 2021, the Debtors filed their *Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Granting Related Relief* (the "Emergency DIP Motion") [Docket No. 38], requesting approval of the Emergency DIP Facility.  The Emergency DIP Motion was granted on July 15, 2021 (the "Emergency DIP Order") [Docket No. 49].  The DIP Lenders funded under the Emergency DIP Facility on July 16, 2021 in the amount of $500,000.00, and later advanced an additional $250,000 for an aggregate amount of $750,000.00.

20.      By oral motion, the Court extended the maturity date on the Emergency DIP

Facility, with the consent of the DIP Lenders and the Prepetition Secured Parties, to August 31,

2021.  [The Debtors, with the consent of the DIP Lenders and the Prepetition Secured Parties, filed

a motion to approve an amendment to the Emergency DIP Facility further extending the maturity

date thereof until September [1], 2021.]  The parties intend for the Replacement DIP Facility to

refinance and replace the Emergency DIP Facility.

      **B.**    **Overview of the Replacement DIP Facility**

      21.    Pursuant to the DIP Documents (as defined in the DIP Order), the Debtors seek

authority to obtain senior secured postpetition financing on a superpriority basis consisting of a

senior secured superpriority credit facility in the aggregate principal amount of up to

$30,000,000.00 consisting of: (i) an Interim DIP Term Loan in the aggregate principal amount of

up to $[6,000,000]; (ii) Final DIP Term Loans in the aggregate principal amount of up to

$15,000,000, minus the principal amount of the Interim DIP Term Loan; (iii) Interim Roll-Up

Loans in the aggregate principal amount equal to the principal amount of the Interim DIP Term

Loan; and (iv) Final Roll-Up Loans in the aggregate principal amount equal to the aggregate Final

DIP Term Loans.

      22.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to

pay the following interest and fees to the DIP Agents and the DIP Lenders:

    a.    *Interest Rate.* Subject to terms of the DIP Credit Agreement, (i) each LIBOR Loan under the Facility shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable Borrowing date at a rate per annum equal to the LIBO Rate for such Interest Period <u>plus</u> the Applicable Margin and (ii) each Prime Loan under the Facility shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin.  Interest is fully earned, due and owing when it accrues on each Interest Payment Date but is payable in cash on the Maturity Date, subject to an excess cash flow sweep.

    b.    *Upfront Fee.* An Upfront Fee equal to 2.0% of the amount of the Commitment, to be distributed to each Lender on a *pro rata* basis, which shall be fully earned, due

and owing on the Closing Date, but payable in cash on the Maturity Date.

    c.   *Unused Line Fee*.  An Unused Line Fee equal to the actual daily amount by which the Commitments exceed the outstanding principal amount of the Loans times 0.50% per annum to each Lender on a *pro rata* basis, which shall be fully earned, due and owing on the first day after the end of each fiscal month and on the Maturity Date, but payable in cash on the Maturity Date.   The unused line fee shall accrue at all times from the Closing Date until the Maturity Date, including at any time during which one or more of the conditions provided for in the DIP Credit Agreement is not met.

    d.   *Agency Fee*.  An Agency Fee of $50,000 per annum was paid to the Collateral Agent on the Emergency Funding Closing Date with the proceeds of the Initial Emergency DIP Loan (pursuant to and as defined in the Emergency DIP Order). The Agency Fee shall be due and payable by the Borrower to the Collateral Agent on each annual anniversary of the Closing Date.  The Administrative Agent under the Replacement DIP Facility is not charging an administrative agency fee.

### SUMMARY OF THE KEY PROVISIONS OF DEBTORS' PROPOSED REPLACEMENT DIP FACILITY

23.    Pursuant to Bankruptcy Rules 4001(b) through (d), and the *United States Bankruptcy Court for the Southern District of Texas Procedures for the Complex Chapter 11 Cases* (the "Complex Case Procedures"), the following is a concise summary of the material terms of the Interim DIP Order and the terms of the Replacement DIP Facility, as specified in the DIP Credit Agreement:[7]

| Material Provision | Summary Description of Material Provision |
| --- | --- |
| **DIP Credit Agreement Parties** Fed. R. Bankr. P. 4001(c)(1)(B) | **Borrowers**: Agilon Energy Holdings II, LLC, Victoria Port Power LLC, and Victoria City Power LLC |
| | **Guarantors**: None |
| | **Lenders**: [    ] |
| | **Administrative Agent**: The Prudential Insurance Company of America |
| | **Collateral Agent**: Wilmington Trust, N.A. |

---

[7] The summaries and descriptions of the terms and conditions of the Replacement DIP Facility and the proposed Interim DIP Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Interim DIP Order. In the event there is a conflict between this Motion and the Interim DIP Order, the Interim DIP Order, shall control in all respects. All defined terms in this summary and description shall have the meanings proscribed to them in the Interim DIP Order or the DIP Credit Agreement, as applicable.

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Amount**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>DIP Credit Agreement, Preliminary Statement | Up to $$30,000,000.00. |
| **Use of Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>DIP Credit Agreement, Preliminary Statement | The Replacement DIP Facility shall be used:<br><br>• to refinance and repay in full, in cash, all outstanding obligations in connection with the Emergency DIP Facility;<br><br>• To refinance and repay certain Prepetition Obligations through the Roll-Up Loans;<br><br>• for Adequate Protection Fees and Expenses;<br><br>• for the Carve Out; and<br><br>• for working capital purposes of the Borrowers during the Case, in each case, in accordance with the DIP Budget, subject to the terms and conditions of this Agreement and, when entered, the Interim DIP Order or the Final DIP Order, as applicable. |
| **Conditions of Closing and Borrowing**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>DIP Credit Agreement § 4.1 | Conditions Precedent to the Closing Date include:<br><br>• <u>Credit Agreement</u>. The execution and delivery of the DIP Credit Agreement and related documents.<br><br>• <u>Organization and Good Standing Documents</u>. Certificates by a Responsible Officer (as defined in the DIP Credit Agreement) of each Borrower attaching certified copies of organizational documents, resolutions, and, if available, good standing certificates or certificates of status, as applicable, for each Borrower.<br><br>• <u>Other Certifications</u>. Certifications that (a) all governmental and third-party consents, licenses and approvals necessary in connection with the Replacement DIP Facility have been obtained and remain in effect; (b) that all representations and warranties of each Borrower contained in Article V of the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement) are true and correct in all respects on and as of the date of any Credit Extension (as defined in the DIP Credit Agreement); (c) that no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof and the making of such Credit Extension shall not violate any requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently; (d) certificates of insurance and endorsements; and (e) such other assurances, certificates, documents or consents as any Lender may reasonably require.<br><br>• <u>Retention of Professionals</u>. The Borrowers shall have filed an application with the Bankruptcy Court to retain each of Grant Thornton LLP, as their financial advisor and ERM as their investment banker in connection with the Cases and the Sale Process (both as defined in the DIP Credit Agreement), such applications to be satisfactory to the Required Lenders.<br><br>• <u>Bank Account Control Agreements</u>. The Borrowers shall have delivered to the |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Agents account control agreements in favor of the Collateral Agent and in form and substance satisfactory to the Required Lenders for each of the Borrowers' deposit accounts located at Allegiance Bank.<br><br>• <u>Initial DIP Budget</u>. The Required Lenders shall have received the Initial DIP Budget in form and substance acceptable to the Required Lenders in their sole discretion certifying that the projections therein have been prepared in good faith based on reasonable assumptions, and that such projections contain no statements or conclusions (and there are no omissions of information) which are based upon or include information known to the Borrowers to be misleading in any material respect or which fail to take into account information known to the Borrowers regarding materials reported therein.<br><br>• <u>Fees</u>. The following fees shall have been paid on or before the Closing Date: (a) all fees required to be paid to the Administrative Agent, Collateral Agent and the Lenders; (b) all reasonable and documented fees, charges and disbursements of counsel to the Lenders, the Collateral Agent and the Administrative Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings.<br><br>• <u>Perfected Liens</u>. Collateral Agent shall have a valid first priority perfected Lien on the Collateral (as defined in the DIP Credit Agreement), subject only to the Carve Out and the Permitted Prior Liens.<br><br>• <u>Bankruptcy Matters</u>.<br><br>   o <u>Entry of Interim DIP Order</u>. The Bankruptcy Court shall have approved and entered the Interim DIP Order no later than September [2], 2021, in form and substance satisfactory to the Required Lenders in their sole discretion, and shall not have been reversed, stayed or vacated, or amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay.<br><br>   o <u>Cash Management</u>. The Borrowers shall have established or shall maintain a cash management system acceptable to the Required Lenders and if requested by the Required Lenders, the entry by the Bankruptcy Court of a Cash Management Order shall be a condition to the funding by the Lenders of the Interim DIP Term Loan. To the extent a Cash Management Order has been entered by the Bankruptcy Court prior to the Closing Date, the Borrowers shall have taken all steps necessary to comply with such Cash Management Order. Any Cash Management Order shall not have been reversed, stayed or vacated and shall have not been amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay.<br><br>   o <u>First Day Pleadings and First Day Orders</u>. All "first day" orders shall not have been amended or supplemented in any manner that could be adverse to the Agents' or the Lenders' interests or be inconsistent, in an material respect, with the terms of the DIP Credit Agreement or with the Interim DIP Order unless such amendment or supplement shall have been approved in |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | advance in writing by the Required Lenders. |

o   <u>Control Over Collateral</u>.  No trustee, examiner, or receiver shall have been appointed or designated with respect to the Borrowers' business, properties or assets and the Bankruptcy Court shall not have entered any order granting any party, other than the Borrowers and the Agents, control over any Collateral.

Conditions to all Credit Extensions include:

- <u>Representation and Warranties</u>.  All representations and warranties of each Borrower contained in Article V of the DIP Credit Agreement or any other Loan Document are true and correct in all respects on and as of the date of any Credit Extension.

- <u>Default</u>.  No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof and the making of such Credit Extension shall not violate any requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently.

- <u>Loan Notice</u>.  Except with respect to the Roll-Up Loans deemed funded pursuant to Section 2.01(c) of the DIP Credit Agreement, the Administrative Agent shall have received a Committed Loan Notice in accordance with the DIP Credit Agreement.

- <u>Subsequent Credit Extension</u>.  With respect to any Credit Extension requested after the Final Order Entry Date, the Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on the date that is on or before twenty-one (21) calendar days after the Interim Order Entry Date, and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned or modified in any respect without the written consent of the Required Lenders in their sole discretion, and shall not have been reversed, stayed or vacated and shall have not been amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay.

- <u>Budget</u>.  Each Borrowing (as defined in the DIP Credit Agreement) shall demonstrate prospective compliance with the DIP Budget (as defined in the DIP Credit Agreement) and the applicable Variance Report (as defined in the DIP Credit Agreement) for such period.

14

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Sale Milestones**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>DIP Credit Agreement, Annex I | • On or before September [22], 2021, entry of the Final DIP Order;<br><br>• On or before November 30, 2021, the Borrowers shall have filed a motion seeking entry of an order (the "Bidding Procedures Order") approving the Sale Process (as defined in the DIP Credit Agreement) and including the Acceptable Sale Provisions (as defined in the DIP Credit Agreement) and an asset purchase agreement in form and substance acceptable to the Required Lenders (as defined in the DIP Credit Agreement);<br><br>• On or before December 21, 2021, the Bidding Procedures Order shall have been approved by order of the Court, in form and substance acceptable to the Required Lenders;<br><br>• On or before February 10, 2022, an auction (to the extent necessary) for the sale of substantially all of the Borrowers' assets shall have occurred in accordance with the requirements for the Sale Process, including, without limitation, the Acceptable Sale Provisions (such process, the "Auction");<br><br>• On or before February 15, 2022, the Court shall have approved the results of the Auction and an agreement or agreements for the sale of the assets (the "Approved Sale(s)"), which order and agreements shall be in form and substance acceptable to the Required Lenders; and<br><br>• The Approved Sale(s) shall be consummated within 2 days of Court approval of such Approved Sale(s). |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **DIP Financing Maturity Dates** Fed. R. Bankr. P. 4001(c)(1)(B) DIP Credit Agreement, definition of "Maturity Date" | The Replacement DIP Facility will mature at the earliest of (such earliest date the "Maturity Date"):<br><br>• March 1, 2022,<br><br>• the earlier of the date (i) the Borrowers enter into (or file a motion with the Bankruptcy Court or otherwise support another Person taking action to pursue the Bankruptcy Court for approval of) a purchase agreement, unless such purchase agreement is entered into in connection with the Auction conducted pursuant to the Bidding Procedures Order, and (ii) the Borrowers file a motion or otherwise support another person taking action to pursue the Bankruptcy Court for approval of a sale (other than an Auction conducted pursuant to the Bidding Procedures Order),<br><br>• the consummation of a sale of all or substantially all of the assets of any of the Borrowers or any Equity Interests of a Borrower pursuant to section 363 of the Bankruptcy Code or otherwise,<br><br>• the effective date of a Plan of Reorganization or liquidation in the Cases,<br><br>• the date of filing or support by the Borrowers of a Plan of Reorganization that (i) does not provide for indefeasible payment in full in cash of all Obligations in connection with the Facility and all obligations in connection with the Prepetition Senior Secured Note Documents and (ii) is not otherwise acceptable to the Required Lenders,<br><br>• the filing of a motion by the Borrowers seeking dismissal of any Cases, the dismissal of any of the Cases, the filing of a motion by the Borrowers seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code or the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code,<br><br>• the acceleration of the Obligations under the Facility following the occurrence of an Event of Default under the Loan Documents, and<br><br>• the appointment of a Chapter 11 trustee. |
| **Interest Rate** Fed. R. Bankr. P. 4001(c)(1)(B) DIP Credit Agreement, various definitions | Subject to terms of the DIP Credit Agreement, (i) each LIBOR Loan under the Facility shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable Borrowing date at a rate per annum equal to the LIBO Rate for such Interest Period plus the Applicable Margin and (ii) each Prime Loan under the Facility shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Prime Rate plus the Applicable Margin.<br><br>Default Rate.  While any Event of Default exists, the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  The Default Rate means (a) with respect to any Obligation for which an interest rate is specified, an interest rate per annum equal to 2.0% in excess of the interest rate otherwise applicable thereto and (b) with respect to any Obligation for which an interest rate is not specified or available, an interest rate per annum equal to the Prime Rate plus the Applicable Margin with respect to Prime Loans plus 2.0%, in each case, to the fullest extent permitted by applicable Laws. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Fees**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>DIP Credit Agreement § 2.07 | Fees include:<br><br>• <u>Upfront Fee</u>.  An Upfront Fee equal to 2.0% of the amount of the Commitment, to be distributed to each Lender on a *pro rata* basis, which shall be fully earned, due and owing on the Closing Date, and payable in cash on the Maturity Date.<br><br>• <u>Unused Line Fee</u>.  An Unused Line Fee equal the actual daily amount by which the Commitments exceed the outstanding principal amount of the Loans times 0.50% per annum to each Lender on a *pro rata* basis, which shall be fully earned, due and owing on the first day after the end of each fiscal month and on the Maturity Date, and payable in cash on the Maturity Date.   The unused line fee shall accrue at all times from the Closing Date until the Maturity Date, including at any time during which one or more of the conditions provided for in the DIP Credit Agreement is not met.<br><br>• <u>Agency Fee</u>.  An Agency Fee of $50,000 per annum was paid to the Collateral Agent on the Emergency Funding Closing Date with the proceeds of the Initial Emergency DIP Loan (pursuant to and as defined in the Emergency DIP Order). The Agency Fee shall be due and payable by the Borrower to the Collateral Agent on each annual anniversary of the Closing Date. |

| Events of Default | Usual and customary for debtor-in-possession financings of this type, including, without limitation: |
|---|---|
| Interim DIP Order, ¶ Fed. R. Bankr. P. 4001(c)(1)(B)(v), (x) DIP Credit Agreement § 8.01; Interim DIP Order ¶ 31. | • non-payment of principal, interest, and fees,

• defaults under affirmative and negative covenants (subject to grace periods set forth in the DIP Credit Agreement),

• breaches of representations and warranties,

• cross-defaults to certain material indebtedness and swap,

• invalidity of any Loan Documents,

• loss of perfection or priority of any DIP Liens and DIP Super-Priority Claims,

• termination of any Subordination Provisions (as defined in the DIP Credit Agreement),

• default or event of default under any material contract,

• material uninsured loss incurred by any Borrower,

• injunctions, restraints or other preventions by the order of any court or governmental authority on a material part of the Debtors' business,

• filing of a motion seeking dismissal of any of the Cases or conversion of any of the Cases to a chapter 7 case; the dismissal or conversion to a chapter 7 case of any of the Cases,

• an order that is not stayed pending appeal granting relief from the automatic stay to any creditor of a Borrower other than the Agent or the Lenders with respect to any claim against any property,

• the authorization of the liquidation of a Borrower's business or the filing of a section 363 motion for approval to liquidate all or substantially all of the assets of the Borrowers other than in accordance with the Sale Process and without consent by the Required Lenders,

• failure to enter the Final DIP order within twenty-one (21) calendar days after the entry of the Interim DIP Order,

• the entry of an order terminating or reducing the Borrowers' exclusivity period for proposing a plan of reorganization or any party in interest other than the Borrowers shall have the right to file a plan in the Cases,

• the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplementing of any Cash Management Order, the Interim DIP Order, the Final DIP Order, any Loan Document, in any way adversely affecting the Replacement DIP Facility or the claims of the Collateral Agent, the Administrative Agent and the Lenders, in a manner not satisfactory to the Lenders; the waiver of any condition of the Sale Process in any manner not reasonably acceptable to any Lender or, an order shall be entered with respect to the Case or Cases, without the prior written consent of the Required Lenders (A) to permit any administrative expense or any claim (now existing or hereafter |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Collateral Agent and Lenders in respect of the Obligations other than the Carve Out, (B) terminating or denying the use of cash collateral, or authorizing the use of cash collateral, or (C) granting or permitting the grant of a lien that is equal in priority with or senior to the liens securing the Obligations other than the Carve Out and the Permitted Prior Liens,<br><br>• failure to satisfy any of the Milestones, to the extent no extension is agreed to by the Required Lenders,<br><br>• the solicitation, filing and/or seeking or entry of an order by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Cases which (i) does not contain a provision for termination of the Commitments and indefeasible payment in full in cash of all Obligations hereunder and under the other Loan Documents on or before the effective date of such plan upon entry thereof and (ii) is not otherwise reasonably acceptable to the Required Lenders,<br><br>• failure by any Borrower to comply with any provisions of any of the DIP Orders and any Cash Management Order,<br><br>• any Borrower rejects an unexpired lease or other contract that is projected to give rise to a prepetition damages claim or an administrative expense claim, other than with the prior written consent of the Required Lenders,<br><br>• the commencement of any adversary proceeding, contested matter or other action by any Borrower or any of their Affiliated or Related Parties or any other person if such action is supported by any Borrower, asserting any claims and defenses or otherwise against any of the Prepetition Agent or the Prepetition Noteholders with respect to the obligations of any Borrower under the Prepetition Senior Secured NPA or the other Prepetition Senior Secured Note Documents or the Prepetition Liens (including any motion or order), except as may be expressly permitted under the DIP Orders,<br><br>• any Borrower shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date other than as expressly permitted under the DIP Credit Agreement or the DIP Orders without the consent of the Required Lenders,<br><br>• any governmental authority shall declare any Material Project Document (as defined in the DIP Credit Agreement) to be null and void or otherwise unenforceable, or any party to a Material Project Document claims that such document is null, void or unenforceable or otherwise repudiates the same, and such document is not replaced within 90 days with a valid, binding and enforceable agreement that has substantially the same or more favorable terms to the Borrowers than the Material Project Document being replaced, or<br><br>• Victoria Bloomington, LLC fails to deliver a renewal notice pursuant to Section 3.01 of the Victoria Port Master Lease at least (fifteen) 15 months prior to expiration of the existing term. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Security and Priority Status**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i)<br>Interim DIP Order ¶¶ 6–8 | The DIP Collateral Agent, for the benefit of itself and the DIP Secured Parties is granted the following:<br><br>DIP Liens.  Continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "DIP Liens") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "DIP Collateral"): (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) the proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) subject to marshalling in accordance with the Interim DIP Motion, any commercial tort claims, (e) subject to marshalling in accordance with the Interim DIP Motion, the proceeds of any avoidance actions brought against any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtors pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (f) subject to marshalling in accordance with the Interim DIP Motion, the proceeds of any avoidance actions against any non-insider, which action is not listed in the Debtors' statements of financial affairs filed at Docket Nos. 99, 100, and 101; (g) proceeds of the Debtors' rights under sections 506(c) (solely to the extent such rights result from the use of the DIP Facility or the DIP Collateral and are, therefore, enforceable against parties other than the DIP Agents, DIP Lenders or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (g) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  The DIP Liens shall not attach to the avoidance actions against non-insiders listed in the Debtors' statement of financial affairs filed at Docket Nos. 99. 100 and 101 (collectively, the "Scheduled Non-Insider Avoidance Actions").<br><br><br>The DIP Liens shall have super-senior priority except that the DIP Liens shall be subject to the Carve Out (as defined in the DIP Credit Agreement or DIP Orders), and shall otherwise be junior only to Permitted Prior Liens (as defined in the DIP Orders), if any. Other than as set forth in the Interim DIP Order or the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.<br><br>DIP Superpriority Claims.  Upon entry of the Interim DIP Order, the DIP Secured |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Parties shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations. The DIP Superpriority Claims shall have priority over any and all other obligations, liabilities and indebtedness of each Debtor of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code, including, to the extent allowed under the Bankruptcy Code, any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 364, 503(a), 503(b), 507(a) (other than 507(a)(1)), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, to the extent provided under section 364(c)(1) of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claims.  The DIP Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, other than the Carve Out. Notwithstanding the foregoing, the DIP Superpriority Claims shall (i) to the extent applicable pursuant to the Interim DIP Order, be subject to marshalling in accordance with the Interim DIP Order; and (ii) not extend to any Scheduled Non-Insider Avoidance Actions. |
| **Validity of Prepetition Liens** Fed. R. Bankr. 4001(c)(B)(iii) Interim DIP Order ¶ F(iii)-F(iv) | The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Senior Secured Note Documents (collectively, the "Permitted Prior Liens"), if any; (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Senior Secured Note Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or any other applicable law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Financing; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Obligations; and (g) the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Cash Collateral**<br>Fed. R. Bankr. P. 4001(b)(1)(B)<br>Interim DIP Order ¶ F(vii) | All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.<br><br>The Debtors are authorized to use Cash Collateral (subject to the Budget) until the DIP Termination Date (as defined in the DIP Orders) subject to the terms of the DIP Orders, and DIP Documents. |
| **Adequate Protection**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iv), (c)(1)(B)(ii)<br>Interim DIP Order ¶¶ 13-17 | The Debtors shall grant to the Prepetition Agent, for the benefit of the Prepetition Secured Parties:<br><br>Adequate Protection Liens.  As adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral the Debtors shall grant continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Adequate Protection Liens") on the DIP Collateral.<br><br>The Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior only to: (i) the DIP Liens; and (ii) Permitted Prior Liens, if any.  The Prepetition Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.<br><br>Adequate Protection Superpriority Claims.  The Prepetition Secured Parties shall be granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Adequate Protection Superpriority Claims").  Notwithstanding the foregoing, the Adequate Protection Superpriority Claims shall (i) to the extent applicable pursuant to the Interim DIP Order, be subject to marshalling in accordance with the Interim DIP Order; and (ii) not extend to any Scheduled Non-Insider Avoidance Actions.<br><br>The Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever; *provided*, *however*, the Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall otherwise have priority in the following order:  (a) the DIP Superpriority Claim, and (b) the Adequate Protection Superpriority Claims.<br><br>Adequate Protection Fees and Expenses.  The Debtors are authorized to pay reasonable and documented fees, out-of-pocket expenses, and disbursements incurred by the Prepetition Secured Parties (a) arising prior to the Petition Date and reimbursable under the Prepetition Senior Secured Note Documents including reasonable and documented fees and expenses of the Prepetition Secured Party Advisors (as defined in the Interim DIP Order), and (b) in accordance with the procedures set forth in paragraph 35 of the Interim DIP Order, arising subsequent to the Petition Date and reimbursable under the Prepetition Senior Secured Note Documents, including reasonable and documented fees and expenses of the Prepetition Secured Party Advisors. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Waiver of 506(c) and 552(b)**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Interim DIP Order ¶¶ 44, 46 | The DIP Secured Parties and, subject to entry of the Final DIP Order, the Prepetition Secured Parties, would each be entitled to a waiver of the provisions of sections 506(c) and 552(b) of the Bankruptcy Code. |
| **Carve Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Interim DIP Order ¶ 39 | The Carve Out is comprised of:<br><br>• all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate,<br><br>• all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code,<br><br>• all unpaid Allowed Professional Fees and expenses set forth in the Budget, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or the Creditors' Committee,[8] incurred by the Debtor Professionals and Committee Professionals, and<br><br>• Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[___] incurred after the first business day following delivery by the DIP Lenders of the Carve Out Trigger Notice (as defined in the DIP Orders), to the extent allowed at any time, whether by interim order, procedural order, or otherwise. |
| **Indemnification**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix)<br>DIP Credit Agreement §§ 9.07, 11.04 | The Debtors shall indemnify and hold harmless the DIP Secured Parties in accordance with the terms and conditions of the DIP Documents |
| **Right to File Plan**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(v) | [N/A] |
| **Modification of the Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br>Interim DIP Order ¶ 22 | The automatic stay shall be modified as necessary to effectuate all of the terms and provisions of the Interim DIP Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or Prepetition Secured Parties, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties, and the Prepetition Secured Parties under the DIP Documents, the Replacement DIP Facility, and the Interim DIP Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim DIP Order. |

---

[8] The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction.

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Releases**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii)<br><br>Interim DIP Order ¶ F(v) | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Emergency DIP Facility, the Emergency DIP Order, the Replacement DIP Order, the DIP Documents, the Prepetition Financing, the Prepetition Senior Secured Note Documents, and/or the transactions contemplated thereunder or under the Interim DIP Order occurring prior to entry of the Interim DIP Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Collateral Agent, the DIP Administrative Agent, the DIP Lenders, and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations and the DIP Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering the Interim DIP Order. |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

24.     The DIP Orders contain certain of the provisions (the "Significant Provisions")

identified in the Complex Case Procedures as set forth below:

(i)     **Milestones**.  The Interim DIP Order contains Milestones which are outlined in the table above.

(ii)    **No Cross-Collateralization**.  The Interim DIP Order does not provide for cross-collateralization.

(iii)   **Roll ups**.  The Interim DIP Order contains (i) provisions deeming prepetition debt to be postpetition debt; and (ii) provisions requiring the proceeds of postpetition loans to be used to repay pre-petition debt.  The Interim Roll-Up Loans shall roll up, on a one-to-one basis, a principal amount equal to the principal amount of the Interim DIP Loans on a *pro rata* basis across the holdings of the Prepetition Secured Parties.  The Final Roll-Up Loans shall roll up, on a one-to-one basis, a principal amount equal to the principal amount of the Final DIP Loans on a *pro rata* basis across the holdings of the Prepetition Secured Parties.  All of the Roll-Up Loans remain subject to Challenge, consistent with the Interim DIP Order.

(iv)    **Liens on Avoidance Actions**.  As detailed in the Summary of Material Terms herein, the Interim DIP Order contains liens on the proceeds of certain avoidance actions.

(v)     **Default Provisions and Remedies**. As detailed in the Summary of Material Terms

herein, the DIP Credit Agreement contains events of default that are usual and customary for debtor-in-possession financings.

(vi)   **Releases**.  Subject to entry of the Final DIP Order, the Interim DIP Order contains releases and indemnification provisions as detailed in the Summary of Material Terms provided herein.

(vii)  **Limits on Use of Cash Collateral other than "Carve-Outs."**  Proceeds of the Replacement DIP Facility shall be used in a manner consistent with the terms and conditions of the Interim DIP Order and the DIP Documents and in accordance with the DIP Budget.

(viii) **Non-Consensual Priming Liens**. The Interim DIP Order provides for priming of the Prepetition Liens with the consent of the Prepetition Secured Parties and provision of adequate protection.   Nothing in the Interim DIP Order shall constitute a finding or ruling by the Court that any alleged Permitted Prior Lien is, or is not, valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.

(ix)   **No Provisions that Limit the Ability of Estate Fiduciaries to Fulfill their Duties under the Bankruptcy Code and Applicable Law**. The Interim DIP Order does not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

(x)    **Validity, Perfection, and Amount of Prepetition Liens**. As detailed in the Summary of Material Terms herein, the Interim DIP Order includes customary stipulations and admissions regarding the Prepetition Liens.

(xi)   **Challenge Period**.  Parties in interest may challenge the stipulations set forth in the Interim DIP Order (including the Roll-up Loans) by no later than the date that is no later than the earlier of (I) October 29, 2021, or (II) the deadline established by order of the Court for objections to any motion seeking the entry of an order confirming a plan of the Debtors or the sale of all or substantially all the assets of the Debtors.

(xii)  **Provisions Granting Superpriority Claims**. As detailed in the Summary of Material Terms herein, the Interim DIP Order provides for superpriority administrative claims against the Debtors with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases or any Successor Cases.

(xiii) **506(c)/552 Waivers**.  Subject to entry of the Final DIP Order, the Interim DIP Order contains section 506(c) and 552 waivers.

25.   The Debtors submit that these Significant Provisions, as detailed in the Interim DIP

Order, are appropriate under the facts and circumstances of these Cases and should be approved.

**THE DEBTORS' NEED FOR FURTHER POSTPETITION FINANCING**

26.     At the commencement of these Cases, the Debtors had virtually no cash on hand, were in default under their prepetition financing facilities, and had ceased operations.  With funding made available under the Emergency DIP Facility, the Debtors retained professionals, entered into a new agreement with a qualified scheduling entity, restored operations at the power plants, and expect to generate near-term revenues by delivering power to ERCOT.  Approval of the Replacement DIP Facility is the essential next step in the Debtors' plan to maximize the value of their estates for the benefit of all constituents.

27.     Ultimately, following extensive arm's-length negotiations that resulted in material concessions from the DIP Lenders on fees, interest payment/accrual, liquidity, maturity, covenants and other key terms, the Debtors and the DIP Lenders came to a mutual agreement on the terms and conditions of the Replacement DIP Facility.  The Replacement DIP Facility will provide the Debtors with immediate access to necessary liquidity and continued access to the Prepetition Secured Parties' collateral, including Cash Collateral, on a consensual basis.  For these and other reasons, the Debtors believe that the proposed Replacement DIP Facility represents the best available financing alternative.

28.     An essential component of the Replacement DIP Facility is the Roll-Up Loans that refinance certain Prepetition Obligations.  This is required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral.  Any alternative debtor-in-possession financing available to the Debtors would have required the consent of the Prepetition Secured Parties and the DIP Lenders under the Emergency DIP Facility, or, in the alternative, a *full* refinancing of all such obligations.  Any such alternative would leave the Debtors in a worse position than the structure negotiated under the Replacement

DIP Facility, which only requires rolling up a *portion* of the Prepetition Obligations commensurate with the new money DIP Loans. Given the concessions of the DIP Lenders related to fees and other expenses, liquidity, and maturity (among others) in the Replacement DIP Facility, the Debtors believe that refinancing limited Prepetition Obligations is necessary and appropriate under the circumstances.

29.     In addition to the "roll up," the Replacement DIP Facility contains reasonable fees detailed above, which are required as a condition to providing financing and are integral to the financing package. These fees were the subject of arm's-length, good faith negotiations between the Debtors and the DIP Lenders, are an integral component of the overall terms of the Replacement DIP Facility, were required by the DIP Lenders as consideration for the extension of postpetition financing, and were the subject of significant negotiations and DIP Lender concessions (e.g., the Upfront Fee and Unused Line Fee are not payable until the Maturity Date). Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these Cases, and the Debtors' liability profile, these fees are reasonable and appropriate under the circumstances.

30.     For these reasons, the Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the best postpetition financing available to the Debtors. The Replacement DIP Facility provides the Debtors and their creditor constituencies with postpetition financing on the best available terms.

31.     As proposed, the Replacement DIP Facility will allow the Debtors to fund ongoing operations and maintenance expenses, pay general and administrative expenses associated with the business and these Cases, and, and conduct a robust sale process. Without the Emergency DIP Facility, the Debtors would not be poised to generate additional revenues through operations, and

the Debtors would likely require significantly more funding than budgeted in connection with the

Replacement DIP Facility.   However, absent approval of the Replacement DIP Facility, the

Debtors would not generate sufficient revenues to fund these cases or maximize the value of the

Debtors' assets through a sale of their businesses as going concerns—a result that would

significantly harm all stakeholders.   Accordingly, the Debtors, in the exercise of their sound

business judgment, have determined that entering into the Replacement DIP Facility is in the best

interest of the estates.

## **BASIS FOR RELIEF**

**A.     The Court Should Authorize the Debtors to Obtain Postpetition Financing
Through the DIP Documents as a Sound Exercise of Their Business Judgment.**

32.     The Court should authorize the Debtors, as an exercise of their sound business

judgment, to obtain access to the Replacement DIP Facility.  Courts grant considerable deference

to a debtor's business judgment in obtaining postpetition secured credit consistent with the

provisions of and policies underlying the Bankruptcy Code.  *See ASARCO, Inc. v. Elliott Mgmt.*

*(In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (explaining that the business judgment

standard "encourages discretion"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del.

2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of

the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases

consistently reflect that the court's discretion under section 364 is to be utilized on grounds that

permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest."); *c.f.*, *In re Sanchez Energy Corp.*, No. 19-

34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) (order approving postpetition financing as exercise

of debtors' business judgment); *iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. June 7,

2018) (same); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (same).

33.     To determine whether a debtor has met the business judgment standard, a court should examine "whether a reasonable business person would make a similar decision under similar circumstances." *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (noting that "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").

34.     The Debtors' determination to move forward with the Replacement DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of the availability, viability, and lack of alternatives likely to result in a favorable outcome given their needs in these Cases.  The Debtors and their advisors determined that the Debtors require postpetition financing to administer the Cases, to protect their assets and operate their businesses, and to commence a marketing and sales process during these Cases.  The Debtors negotiated the Replacement DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors.  The DIP Lenders are not willing to provide the financing necessary in the absence of the protections provided in the DIP Documents and the DIP Orders.

35.     The fact that the Debtors have properly exercised their business judgment with regard to the Replacement DIP Facility is underlined by the fact that the Creditors' Committee has fully agreed to all of the terms and conditions set out in the DIP Documents and the Interim DIP order.

36.     Accordingly, entry into the DIP Documents and approval of the Replacement DIP

Facility are appropriate in the Debtors' business judgment.

**B.    The Repayment of Certain Prepetition Obligations and Amounts Borrowed Under the Emergency DIP Facility and Under the DIP Orders Is Appropriate.**

37.    As set forth above, the DIP Credit Agreement provides that, subject to entry of the Interim DIP Order and a Final DIP Order, certain Prepetition Obligations will be refinanced and repaid using part of the proceeds of the Replacement DIP Facility, both on an interim and final basis. This roll-up and refinancing of certain Prepetition Obligations is a common feature in debtor-in-possession financing arrangements and is appropriate as a sound exercise of the Debtors' business judgment.

38.    Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

39.    Repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements.  Courts in this and other jurisdictions have approved similar DIP features, including on the first day of the case. *See, e.g., In re Shoreline Energy LLC*, No. 16- 35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (authorizing approximately $50 million DIP that included

refinancing of $32 million in prepetition debt); *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287 (MI) (Bankr. S.D. Tex. Mar. 18, 2016) (authorizing approximately $15 million DIP that included refinancing of approximately $7.5 million in prepetition debt); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (authorizing approximately $618 million DIP that included refinancing of approximately $368 million in prepetition debt); *In re Radioshack Corp.*, No. 15- 10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP that included refinancing of approximately $250 million in prepetition debt pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included refinancing of approximately $144 million in prepetition debt pursuant to interim order).

40.     Where, as here, the Prepetition Secured Parties are likely oversecured, repaying such creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors; rather, the Replacement DIP Facility's proposed repayment feature merely affects the timing, not the amount, of the Prepetition Secured Parties' recovery. The DIP Lenders do not seek to prime any other secured claims (other than the Prepetition Liens), which makes the Replacement DIP Facility very attractive to the Debtors.  More importantly, the roll-up will not prejudice any party's right to challenge the amount, validity, perfection, enforceability, priority or extent of the debt or liens associated with the Prepetition Obligations; The Interim DIP Order provides that any parties in interest has the ability to bring a challenge proceeding in accordance with applicable law and within a reasonable timeframe.

41.     The DIP Orders do not seek to impair any party's rights with respect to any alleged Permitted Prior Liens; the rights of all parties with respect to the assertion or challenge of any Permitted Prior Liens are reserved for adjudication at the appropriate time.

42.     The Replacement DIP Facility is also integral to the Debtors' ability to bridge to a value-maximizing sale process, as contemplated since the commencement of these Cases and would not be available absent the roll up.  In contrast, absent the Replacement DIP Facility, including the roll-up, the Debtors' ability to continue operating and marketing their assets would be jeopardized to the detriment of all parties in interest.  Given these circumstances, repayment of certain Prepetition Obligations, as set forth in the Interim DIP Order and DIP Credit Agreement, is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

43.     The Debtors similarly should be authorized to repay and/or refinance all amounts borrowed under the Emergency DIP Facility.  These amounts are post-petition secured obligations, with a number of protections detailed in the Emergency DIP Order, that must be repaid prior to obtaining any additional financing from the DIP Lenders.  Repayment of these amounts was contemplated from the outset and is appropriate here.

**C.      No Comparable Alternative to the Replacement DIP Facility Is Reasonably Available.**

44.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see, e.g.*, *In re UGHS Senior Living, Inc.*, No. 15-80399-G3-11, 2015 WL 7307317, at *8 (Bankr. S.D. Tex. Nov. 18, 2015).  Where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *In re Snowshoe Co.*, 789 F.2d at 1088 ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

45.     Other than the proposed Replacement DIP Facility, there are no viable or comparable financing alternatives available to the Debtors.  No party in interest has presented a more viable or favorable financing package.  For a number of reasons, including the nature and state of the Debtors' business, the Debtors' financing needs, and the liens of the Prepetition Secured Parties on the Prepetition Collateral, the Debtors submit that the Replacement DIP Facility represents the best financing available to them at this time.

**D.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

46.     If a debtor in possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor in possession may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and hearing, may authorize the debtor in possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)      the trustee is unable to obtain such credit otherwise; and

(B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1); *see also In re McKenzie Energy Corp.*, 228 B.R. 854, 874 (S.D. Tex. 1998) (citing section 364(d)).

47.     The Debtors do not have sufficient unencumbered assets to secure debtor-in-possession financing to fund non-consensual chapter 11 cases, and are not aware of any party that is interested in providing, or willing to provide, a comparable postpetition financing package to the Debtors on an unsecured basis. Accordingly, the Replacement DIP Facility's structure is appropriate in light of the Debtors' financing needs and the circumstances of the Cases.  The

Prepetition Secured Parties have consented to the priming of the Prepetition Liens in light of the adequate protection package offered in the Interim DIP Order, including the roll-up of a proportionate amount of their obligations as set forth in the Interim DIP Order. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

E.     **The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

48.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and their right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

49.    As explained herein, the Replacement DIP Facility is the result of arm's-length, good faith negotiations between the Debtors and the DIP Lenders.

50.    The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the Replacement DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. The Debtors are unable to secure post-petition financing on better terms, and the DIP Lenders' are willing to fund the Replacement DIP Facility. The Court should therefore find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to the protections afforded by that section.

**F.**     **The Debtors Should Be Authorized to Pay the Interest and Fees Required under the DIP Documents.**

51.     The Debtors believe that the interest and fees to be paid under the Replacement DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these Cases, and represent the most favorable terms available to the Debtors. The Debtors considered and negotiated the interest rate and fees when determining in their sound business judgment that the Replacement DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to meet the goals of these Cases. Additionally, the Debtors submit that the specific interest and fees and consistent with the postpetition financing market in this and other jurisdictions.  The Court should therefore authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the Replacement DIP Facility.

## REQUEST FOR USE OF CASH COLLATERAL

52.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

53.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

54.     Bankruptcy Code section 363(e) requires adequate protection of interests in cash

collateral when a debtor seeks authority to use cash collateral.  11 U.S.C. § 363(e).  Generally, what constitutes adequate protection is decided on a case-by-case basis.  *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009); *see In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *see also In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) (discussing adequate protection being required to maintain the status quo between a secured party and the debtor).

55.     The Debtors intend to provide the Prepetition Secured Parties with adequate protection in the form of (a) replacement liens, (b) superpriority claims, and (c) the payment of certain professional expenses.  Similar adequate protection packages have been approved by courts in this district.  *See, e.g., In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 16, 2018) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to the applicable prepetition secured creditors); *In re LINN Energy, LLC,* No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15,2016) (same).

56.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in consideration of the proposed adequate protection package.  Additionally, the Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of property of their estates, including the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral, and enhance the likelihood of a successful sale process.  Accordingly, the Court should approve the Debtors' use of Cash Collateral and the adequate protection provided to

the Prepetition Secured Parties under section 363(c)(2) of the Bankruptcy Code.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

57.     The Interim DIP Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to permit the DIP Collateral Agent and Prepetition Secured Parties to perfect their interest in collateral and to take various actions without further order of or application to the Court.

58.     Stay modification provisions of this type are customary features of postpetition debtor in possession financing facilities and are reasonable under the circumstances.  *See, e.g., In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 16, 2018) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same).  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim DIP Order.

## IMMEDIATE ACCESS TO THE REPLACEMENT DIP FACILITY AND CASH COLLATERAL IS NECESSARY TO AVOID IRREPARABLE HARM.

59.     The Debtors require immediate access to Cash Collateral and the Replacement DIP Facility to meet working capital and business operating needs, fund the administration of these Cases, and to pursue their sale process.  The court is empowered to conduct an expedited interim hearing on a motion for approval of debtor-in-possession financing and the use of cash collateral to the extent necessary to avoid immediate and irreparable harm, *see* Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and may authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

60.     Without the immediate approval of the Replacement DIP Facility and authorization

to use Cash Collateral, the Debtors will be unable to continue operating in the ordinary course, which will harm the estates.  The amounts requested on an interim basis in the Replacement DIP Facility are narrowly tailored and necessary to preserve and maximize the value of the Debtors' estates.  Expedited relief is therefore warranted under these circumstances.

## REQUEST FOR FINAL HEARING

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## EMERGENCY CONSIDERATION

62.     As set forth above, the relief requested in the Motion on an emergency basis is necessary to avoid delays and stoppages in operations, and otherwise maximize the value of their estates.  Moreover, no party in interest's rights will be prejudiced as they will have an additional opportunity to respond to certain relief prior to entry of the Final DIP Order.  Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and requests that the Court approve the relief requested herein on an emergency basis.

## WAIVERS OF BANKRUPTCY RULES 6004(a) AND 6004(h)

63.     The Debtors respectfully request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a), and that waives the fourteen-day stay provided for by Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

64.     Except as otherwise provided, nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's

right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **NOTICE**

65.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) those persons who have formally appeared and requested notice of service in this proceeding pursuant to Bankruptcy Rules 2002; (iii) counsel for the Creditors' Committee; (iv) counsel for the Senior Secured Noteholders and the DIP Lenders; (v) the thirty (30) largest unsecured creditors of the Debtors; (vi) governmental agencies having a regulatory or statutory interest in these Cases; and (vii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  A copy of this Motion is also available on the website of the Debtors' notice and claims agent at http://cases.stretto.com/agilonenergy.  In light of the nature of the relief requested herein, the

Debtors submit that no other or further notice is necessary.

## CONCLUSION

The Debtors request that the Court enter the DIP Orders, granting the relief requested in this Motion and such other and further relief as is appropriate under the circumstances.

Dated: August 31, 2021

Respectfully submitted,

By: /s/ Simon R. Mayer
Elizabeth M. Guffy
Texas Bar No. 08592525
Simon R. Mayer
Texas Bar No. 24060243
LOCKE LORD LLP
600 Travis St., Suite 2800
Houston, TX 77002
Telephone: (713) 226-1200
Facsimile: (713) 223-3717
Email: eguffy@lockelord.com
            simon.mayer@lockelord.com

*Attorneys for*
*Agilon Energy Holdings II LLC, et al.*

### Rule 9013-1(i) Certificate

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Simon R. Mayer
Simon R. Mayer

### Certificate of Service

The undersigned certifies that this Motion was served electronically on August 31, 2021 via ECF on those parties registered to receive such ECF service in these Cases.

/s/ Simon R. Mayer
Simon R. Mayer