United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 02, 2021

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **AGILON ENERGY HOLDINGS II LLC**, *et al.* | § | **Case No. 21-32156 (MI)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

(Related to Docket No. 177)

The Court has considered the *Emergency Motion for Entry of an Order (i) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Granting Related Relief* (the "DIP Motion")[2] of Agilon Energy Holdings II, LLC ("Agilon") and its subsidiaries, each as a debtor and debtor in possession (collectively, with Agilon, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim DIP Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 506, 507, and 552 of chapter 11 of title

---

[1] The debtors and debtors in possession in these Cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 480 Wildwood Forest Drive, Suite 475, Spring, Texas 77380.

[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed to such terms in the DIP Motion, the DIP Credit Agreement, or the Prepetition Senior Secured NPA, each as defined herein, as applicable.

11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 1075-1, 4001-1, 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Local Rules</u>"), and the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Case Procedures</u>") *inter alia*:

(i)     authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of up to $30,000,000.00 (the "<u>DIP Facility</u>") consisting of: (a) a new money multi-draw (x) term loan facility in the aggregate principal amount of up to $6,000,000 on an interim basis (the "<u>Interim DIP Term Loan</u>"), a portion of which shall be used to repay the Emergency DIP Facility in full, (y) term loan facility in the aggregate principal amount of up to $15,000,000 minus the principal amount of the Interim DIP Term Loan, on a final basis (the "<u>Final DIP Term Loans</u>", and together with the Interim DIP Term Loan, the "<u>DIP Term Loans</u>") and (b) roll-up loans to refinance on a one-to-one basis the Term Notes and the Revolving Notes on a pro rata basis across the Prepetition Secured Parties' holdings of the Senior Notes (as such terms are defined below), (x) upon entry of the Interim DIP Order, the principal amount of the Interim DIP Term Loan on an interim basis (the "<u>Interim Roll-Up Loans</u>"); and (y) upon entry of the Final DIP Order, the principal amount of the Final DIP Term Loan on a final basis (the "<u>Final Roll-Up Loans</u>" and together with the Interim Roll-Up Loans, the "<u>Roll-Up Loans</u>"; and the DIP Term Loans, together with the Roll-Up Loans, collectively, the "<u>DIP Loans</u>"), pursuant to the terms and conditions of that certain Senior Secured, Superpriority Debtor-In-Possession Credit Agreement dated as of September [__], 2021 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), substantially in the form attached hereto as **<u>Exhibit 1</u>**, by and among the Debtors, each as a "Borrower," The Prudential Insurance Company of America, as administrative agent under the DIP Documents (as defined below, in such capacity, the "<u>DIP Administrative Agent</u>"), Wilmington Trust, National Association, as collateral agent under the DIP Documents (as defined below, in such capacity, the "<u>DIP Collateral Agent</u>" and, together with the DIP Administrative Agent, the "<u>DIP Agents</u>"), and the lenders party thereto (the "<u>DIP Lenders</u>" and, together with the DIP Agents, the "<u>DIP Secured Parties</u>");

(ii)    authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other loan documents and documents related thereto (including any security agreements, mortgages, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Credit Agreement, the "<u>DIP Documents</u>") and to perform such other acts as may be necessary or desirable

in connection with the DIP Documents;

(iii)    granting the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents to the DIP Secured Parties (collectively, including all obligations described in the DIP Documents, the "<u>DIP Obligations</u>") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

(iv)    granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties under the DIP Documents automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property of the Debtors constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due and payable, including, without limitation, letter of credit fees (including issuance and other related charges), collateral agent's fees, the reasonable fees and disbursements of the DIP Lenders' and the DIP Agents' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi)    authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Senior Secured Note Documents (each as defined herein);

(vii)    providing adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("<u>Diminution in Value</u>");

(viii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim DIP Order;

(ix)    deeming a portion of the Term Notes and Revolving Notes to be Roll-Up Loans issued and outstanding under the DIP Documents and all obligations in connection with such rolled-up Term Notes to constitute Obligations (as defined in the DIP Documents) for all purposes thereof;

(x)    approving on a final basis the relief set forth in the *Emergency Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* (the "Emergency DIP Order") [ECF No. 49]; and

(xi)     scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the Smith Declaration, the Second Smith Declaration, the DIP Documents, and the evidence submitted and arguments made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary for the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.      **Petition Date**.  On June 27, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

B.      **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.      **Committee Formation**.  On July 30, 2021, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "Committee") [ECF No. 81].

E.      **Notice**.  Notice of the DIP Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures.

F.      **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 43 herein, the Debtors admit, stipulate, acknowledge, and agree as follows (paragraphs F(i)through F(vii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)     *Prepetition Notes*.  Pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Senior Secured NPA," and collectively with the Financing Documents (as defined in the Prepetition Senior

5

Secured NPA) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Senior Secured Note Documents"), among (a) Agilon Energy Holdings II, LLC (the "Issuer"), (b) the guarantors party thereto (the "Prepetition Guarantors"), (c) Wilmington Trust, National Association as the Collateral Agent under the Collateral Agency Agreement (each as defined in the Prepetition Senior Secured NPA, in such capacity, the "Prepetition Agent"), (d) Manufacturers and Traders Trust Company, as the letter of credit issuing bank thereunder; and (e) the purchasers and noteholders party thereto (collectively, the "Senior Secured Noteholders" and together with the Prepetition Agent, the "Prepetition Secured Parties"), the Prepetition Secured Parties provided for the issuance by the Borrower of Revolving Notes and Term Notes (each as defined below) and other financial accommodations to, and guaranteed letters of credit for the account of, the Prepetition Secured Parties pursuant to the Prepetition Senior Secured Note Documents (the "Prepetition Financing").

(ii)   *Prepetition Obligations*.   The Prepetition Financing provided the Borrower with, among other things, up to $73 million in aggregate principal amount of Notes comprised of Senior Secured Term Notes in the initial aggregate principal amount of $50,000,000 (as defined in the Prepetition Senior Secured Note Documents, the "Term Notes"), Senior Secured Revolving Notes in the aggregate principal amount of $23,000,000 (as defined in the Prepetition Senior Secured Documents, the "Revolving Notes" and, together with the Term Notes, the "Senior Notes").  As of the Petition Date, the aggregate principal amount outstanding on the Prepetition Financing was not less than approximately $67,337,975[4] (collectively, together with accrued and unpaid interest, outstanding letters of credit, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Issuer or the Prepetition Guarantors' obligations pursuant to, or secured by, the Prepetition Senior Secured Note Documents and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Obligations").

(iii)   *Prepetition Liens and Prepetition Collateral*.   As more fully set forth in the Prepetition Senior Secured Note Documents, prior to the Petition Date, the Issuer and the Prepetition Guarantors granted to the Prepetition Agent, for the benefit of

---

[4]   Such amount does not include all secured obligations under the Senior Notes, including, without limitation, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Prepetition Senior Secured Note Documents.

itself and the other Prepetition Secured Parties, a security interest in and continuing lien (the "Prepetition Liens") on substantially all of their assets and property (with certain exceptions set out in the Prepetition Senior Secured Note Documents), including a first priority security interest in and continuing lien on the Collateral (as defined in the Prepetition Senior Secured Note Documents) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral").

(iv)    *Validity, Perfection, and Priority of Prepetition Liens and Prepetition Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Senior Secured Note Documents (collectively, the "Permitted Prior Liens"), if any; (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Senior Secured Note Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or any other applicable law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Financing; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Obligations.

(v)    *Release.* The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of

any and every nature whatsoever relating to, as applicable, the Emergency DIP Facility (as defined in the Emergency DIP Order), the Emergency DIP Order, the DIP Facility, the DIP Documents, the Prepetition Financing, the Prepetition Senior Secured Note Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim DIP Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Collateral Agent, the DIP Administrative Agent, the DIP Lenders, and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations and the DIP Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim DIP Order.

(vi)     *Default by the Debtors.* The Debtors acknowledge and stipulate that Events of Default have occurred under the Prepetition Senior Secured Note Documents as a result of, among other things, the Cases and that the Debtors are in default of their obligations under the Prepetition Senior Secured Note Documents. As of the Petition Date, interest will be accruing on the Prepetition Obligations at the default rate in accordance with the provisions of the Prepetition Senior Secured Note Documents, subject to any limitations imposed by the Bankruptcy Code.

(vii)    *Cash Collateral*. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

G.     **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, or the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.

H.     **Continuation of Prepetition Liens.** In light of the integrated nature of the DIP Facility, the DIP Documents, and the Prepetition Senior Secured Note Documents, the Prepetition Liens, and the DIP Liens that prime certain of the Prepetition Liens, are continuing liens, and the DIP Collateral is and will continue to be encumbered by such liens.

I.    **Findings Regarding Corporate Authority**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

J.    **Findings Regarding Postpetition Financing**

(i)    *Request for Final Approval of the Interim Facility and the Emergency DIP Order*.  The relief set forth in the Emergency DIP Order and the Emergency DIP Facility is hereby approved on a final basis.  The Emergency DIP Facility shall be Paid in Full (as defined herein) from proceeds of the DIP Facility.

(ii)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into, and borrow under, the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein, to administer their Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "Final DIP Order"), which shall be in form and substance acceptable to the Debtors, the DIP Lenders, and the Prepetition Secured Parties.  Notice of the Final Hearing and Final DIP Order will be provided in accordance with this Interim DIP Order.

(iii)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors.  The Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection as set forth in this Interim DIP Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution in Value of each of the Prepetition Secured

Parties' respective interests in the Prepetition Collateral (including Cash Collateral).

(iv)     *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations and to administer and preserve the value of their estates. The ability of the Debtors to maintain business relationships with their vendors, contractors, suppliers, and customers, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties in interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(v)     *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit solely having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not otherwise

available without granting the DIP Agents, for the benefit of themselves and the other DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets (other than any Excluded Assets under the DIP Documents) with the priorities set forth herein; (2) superpriority claims and liens; and (3) the other protections set forth in this Interim DIP Order.

(vi)     *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement and other DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Secured Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Cash Collateral shall be used, in each case in a manner consistent with the terms and conditions of this Interim DIP Order, the DIP Credit Agreement and the other DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of this Interim DIP Order and the DIP Documents and subject to such variances as permitted in this Interim DIP Order and the DIP Credit Agreement, the "Budget").[5]

(vii)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and authorization to use Cash Collateral, the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim DIP Order and the Budget.

(viii)     *Refinancing of Certain Prepetition Obligations*.  Concurrently with the Debtors' incurrence of the Interim DIP Term Loan and the Interim Roll-Up Loans, the Debtors shall use the Interim Roll-Up Loans to refinance and discharge a portion of the Prepetition

---

[5] A copy of the current Budget is attached hereto as **Exhibit 2**.

Obligations held by the Prepetition Secured Parties and, subject to and effective upon entry of the Final DIP Order, concurrently with the Debtors' incurrence of the Final DIP Term Loans and the Final Roll-Up Loans, the Debtors shall use the Final Roll-Up Loans to refinance and discharge on a one-to-one basis the Prepetition Obligations held by the Prepetition Secured Parties. Notwithstanding anything to the contrary in this Interim DIP Order, all Roll-Up Loans are subject to Challenge (as defined below) of parties in interest to the extent set forth in paragraph O.43 of this Interim DIP Order.

      K.    **Adequate Protection**.  Until such time as the Prepetition Obligations are Paid in Full,[6] the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection solely to the extent of any Diminution in Value of its respective interests in the Prepetition Collateral as set forth in this Interim DIP Order.

      L.    **Sections 506(c) and 552(b).**  In light of: (i) the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject to the Carve Out; (ii) the Prepetition Secured Parties' agreement that their liens shall be subject to the Carve Out and subordinate to the DIP Liens; and (iii) the payment of prepetition claims and/or expenses as set

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit documents, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit documents.  No facility or loan shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Challenge Deadline (i) the Challenge Deadline (as defined in paragraph 43 of this Interim DIP Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) with respect to the Prepetition Obligations and DIP Obligations, as applicable, the Prepetition Agent and other Prepetition Secured Parties, or DIP Lenders, as applicable, have received (i) a countersigned payoff letter in form and substance satisfactory to such party and (ii) releases in form and substance satisfactory to such party, each in its sole discretion.

forth in the Budget and first day motions in accordance with and subject to the terms and conditions of this Interim DIP Order and the DIP Documents, (a) subject to entry of a Final DIP Order, the Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final DIP Order, the DIP Secured Parties and the Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.     **Good Faith of the DIP Agents and DIP Lenders**.

(i)     *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) entry of this Interim DIP Order and the Final DIP Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Secured Parties are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests, and liens and other protections and releases granted pursuant to this Interim DIP Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code*.  The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and

at arms' length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, with the assistance and counsel of their respective advisors. Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code

N.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim DIP Order pursuant to Bankruptcy Rule 4001(c)(2).

O.     **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Senior Secured Noteholders; and (iv) all other parties entitled to notice under the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the DIP Motion, the Smith Declaration, the Second Smith Declaration, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.     The Emergency DIP Order is final.  The relief granted pursuant to the Emergency DIP Order is hereby approved on a final basis.

2.     Interim Financing Approved.  The DIP Motion is granted, the Interim Financing (as defined herein) and Interim Roll-Up Loans are authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim DIP Order.  Any objections to this Interim DIP

Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

**DIP Facility Authorization**

3.      <u>Authorization of the DIP Facility</u>.  The DIP Facility is hereby approved. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim DIP Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required, necessary or advisable for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim DIP Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim DIP Order (including paragraph 35 herein) and the DIP Documents, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and payable and without need to obtain further Court approval, including closing fees, administrative agent's fees, the reasonable and documented fees and disbursements of the DIP Lenders' and DIP Agents' attorneys, advisors, accountants, and other consultants, in such cases, reimbursable under the DIP Documents, whether or not such fees arose before or after the Petition Date, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim DIP Order or the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim DIP Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.      <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to

the Debtors' estates, from the entry of this Interim DIP Order through and including the earliest to occur of (i) entry of the Final DIP Order or (ii) the DIP Termination Date (as defined below), and subject to the terms, conditions, and limitations on availability (as applicable) set forth in the DIP Documents and this Interim DIP Order, the Debtors are hereby authorized to borrow the Interim DIP Term Loan.

5.      <u>DIP Obligations</u>.  The DIP Documents and this Interim DIP Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against the Debtors, their estates, and any successors thereto, including any trustee appointed in the Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim DIP Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim DIP Order, including all principal, accrued interest (at the rate set out in the DIP Facility), costs, fees, expenses and other amounts as provided in the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations, which shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the DIP Termination Date (as defined herein) in each case, except as provided in paragraph 31 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below), and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable

16

law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.      <u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim DIP Order and subject to the Carve Out, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Collateral Agent, for the benefit of itself and the DIP Secured Parties, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "<u>DIP Liens</u>") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "<u>DIP Collateral</u>"): (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt,

books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) the proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) subject to the marshalling provisions of paragraph 48 hereof, any commercial tort claims, (e) subject to the marshalling provisions of paragraph 48 hereof, the proceeds of any avoidance actions brought against any <u>insider</u> (as defined in section 101(31) of the Bankruptcy Code) of the Debtors pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (f) subject to the marshalling provisions of paragraph 48 hereof, the proceeds of any avoidance actions against any <u>non-insider</u>, which action is not listed in the Debtors' statements of financial affairs filed at ECF Nos. 99, 100, and 101; (g) proceeds of the Debtors' rights under sections 506(c) (solely to the extent such rights result from the use of the DIP Facility or the DIP Collateral and are, therefore, enforceable against parties other than the DIP Agents, DIP Lenders or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (g) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  The DIP Liens shall not attach to the avoidance actions against non-insiders listed in the Debtors' statement of financial affairs filed at ECF Nos. 99. 100 and 101 (collectively, the "<u>Scheduled Non-Insider Avoidance Actions</u>").  Nothing in this Order shall affect the rights of Utilities, as defined in the *Final Order providing Adequate Assurance of Utility Payments* [Docket No. 53] (the "<u>Utilities Order</u>"), pursuant to the Utilities Order, with respect to the Adequate Assurance Deposit (as defined in the Utilities Order) being held in the Adequate Assurance Account (as defined in the Utilities Order).

7.     <u>DIP Lien Priority</u>.   The DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien,

or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim DIP Order and shall otherwise be junior only to Permitted Prior Liens, if any.  Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.      DIP Superpriority Claims.  Upon entry of this Interim DIP Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations.  The DIP Superpriority Claims shall have priority over any and all other obligations, liabilities and indebtedness of each Debtor of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code, including, to the extent allowed under the Bankruptcy Code, any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 364, 503(a), 503(b), 507(a) (other than 507(a)(1)), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, to the extent provided under section 364(c)(1) of the Bankruptcy Code, other than the Carve Out.

No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claims. The DIP Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, other than the Carve Out. Notwithstanding the foregoing, the DIP Superpriority Claims shall (i) to the extent applicable pursuant to this Interim DIP Order, be subject to the marshalling provisions of paragraph 48 hereof; and (ii) not extend to any Scheduled Non-Insider Avoidance Actions.

9. <u>No Obligation to Extend Credit</u>. The DIP Secured Parties shall have no obligation to make any loan or advance, or to issue, amend, renew, or extend any letters of credit under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit or the issuance, amendment, renewal, or extension of such letter of credit or bankers' acceptance be deemed issued under and subject to the DIP Documents and this Interim DIP Order have been satisfied in full or waived by the DIP Secured Parties in accordance with the terms of the DIP Documents.

10. <u>Use of Proceeds of DIP Facility</u>. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility, in accordance with the Budget (subject to such variances as permitted in this Interim DIP Order and the DIP Credit Agreement), only for the purposes specifically set forth in this Interim DIP Order, the DIP Documents, and the Budget and in compliance with the terms and conditions in this Interim DIP Order and the DIP Documents.

11. <u>DIP Roll-Up Loans</u>. Upon entry of this Interim DIP Order, without any further action by the Debtors or any other party, and as a condition to the provision of liquidity under the DIP Facility, the Debtors shall use the Interim Roll-Up Loans to refinance and discharge

a portion of the Prepetition Obligations held by the Prepetition Secured Parties and, subject to and effective upon entry of the Final DIP Order, concurrently with the Debtors' incurrence of the Final DIP Term Loans and the Final Roll-Up Loans, the Debtors shall use the Final Roll-Up Loans to refinance and discharge on a one-to-one basis the Prepetition Obligations held by the Prepetition Secured Parties.  Notwithstanding anything to the contrary in this Interim DIP Order, all Roll-Up Loans are subject to Challenge of parties in interest to the extent set forth in paragraph 43 of this Interim DIP Order.

### Authorization to Use Cash Collateral

12.     _Authorization to Use Cash Collateral._  Subject to the terms and conditions of this Interim DIP Order, the DIP Facility, and the DIP Documents and in accordance with the Budget (subject to such variances as permitted in this Interim DIP Order and the DIP Documents), the Debtors are authorized to use Cash Collateral until the DIP Termination Date (as defined herein); _provided, however_, that, upon the Termination Declaration Date, the Carve-Out shall be funded and available to satisfy Allowed Professional Fees (as defined in paragraph 40 of this Interim DIP Order); _provided_, _further_, that during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral (subject to the Budget) to satisfy expenses that are critical to keeping the Debtors' business operating as approved by the DIP Lenders or approved by the Court. Nothing in this Interim DIP Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim DIP Order, the DIP Facility, the DIP Documents, and in accordance with the Budget (subject to such variances as permitted in this Interim DIP Order and the DIP Documents).

13.     _Prepetition Adequate Protection Liens._  Pursuant to sections 361, 363(e),

and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Adequate Protection Liens") on the DIP Collateral. Notwithstanding the foregoing, the Adequate Protection Liens shall (i) to the extent applicable pursuant to this Interim DIP Order, be subject to the marshalling provisions of paragraph 48 hereof; and (ii) not extend to any Scheduled Non-Insider Avoidance Actions.

14.     Priority of Adequate Protection Liens.  The Adequate Protection Liens shall be subject to the Carve Out as set forth in this Interim DIP Order and shall otherwise be junior only to: (i) the DIP Liens; and (ii) Permitted Prior Liens, if any.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under section 364 of the Bankruptcy Code or otherwise; *provided, however*, that the Debtors shall not create, incur or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to this Interim DIP Order; (ii) carriers', mechanics', operators', warehousemen's, repairmen's or other similar ordinary course liens arising in the ordinary course of business; (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation; and (iv) deposits to secure the

payment of any postpetition statutory obligations and performance bonds.  The Adequate

Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien

or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the

Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate

Protection Liens.  For the avoidance of doubt, notwithstanding anything contained in this Interim

DIP Order to the contrary, the Adequate Protection Liens and the Adequate Protection

Superpriority Claims (as defined below) shall not prime, affect, impair, or limit (A) any ad valorem

tax liens, (B) any properly perfected operators' or mechanics' liens or security interests securing

any claim against any of the Debtors, or (C) any right of offset or recoupment as against any of the

Debtors, in each case solely to the extent that such liens, security interests, or rights of offset or

recoupment were valid, senior, non-avoidable, and had priority over the Prepetition Liens as of the

Petition Date.  The right of any party (including, for the avoidance of doubt, ProEnergy) to assert

(or oppose) any such lien, right or interest is not impaired by this Order and is expressly preserved.

      15.    <u>Adequate Protection Superpriority Claims</u>.  As further adequate protection

of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any

Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Secured Parties

are hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an

allowed superpriority administrative expense claim in each of the Cases and any Successor Cases

(the "<u>Adequate Protection Superpriority Claims</u>").  Notwithstanding the foregoing, the Adequate

Protection Superpriority Claims shall (i) to the extent applicable pursuant to the this Interim DIP

Order, be subject to the marshalling provisions of paragraph 48 hereof; and (ii) not extend to any

Scheduled Non-Insider Avoidance Actions.

      16.    <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set

forth herein, the Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 503(a), 503(b), 507(a) (other than 507(a)(1), 506(c) (subject to entry of the Final DIP Order), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code; *provided*, *however*, the Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall otherwise have priority in the following order:  (a) the DIP Superpriority Claim, and (b) the Adequate Protection Superpriority Claims.

17.     <u>Adequate Protection Fees and Expenses and Protections for Prepetition Secured Parties</u>.  As further adequate protection (the "<u>Adequate Protection Fees and Expenses</u>"), the Debtors are authorized and directed to provide adequate protection to the Prepetition Secured Parties in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) immediately upon entry of this Interim DIP Order, payment of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Secured Parties (a) arising prior to the Petition Date and reimbursable under the Prepetition Senior Secured Note Documents including reasonable and documented fees and expenses of (1) Morgan, Lewis & Bockius LLP, (2) Gray Reed & McGraw LLP, and (3) FTI Consulting, Inc. (the "<u>Prepetition Senior Secured Noteholder Advisors</u>"); and counsel to the Prepetition Agent, Ballard Spahr LLP (together with the Prepetition Senior Secured Noteholder Advisors, the "<u>Prepetition Secured Party</u>

Advisors"), and (b) in accordance with the procedures set forth in paragraph 35 hereof, arising subsequent to the Petition Date and reimbursable under the Prepetition Senior Secured Note Documents, including reasonable and documented fees and expenses of the Prepetition Secured Party Advisors.

18.     For the avoidance of doubt, the Debtors shall (a) use commercially reasonable efforts to preserve the value of all of their assets, (b) comply with all applicable laws and regulations in the operation of their businesses, and (c) carry and maintain, at their own expense (through the use of cash collateral and the proceeds of the DIP Facility), valid and collectible insurance covering substantially all of their insurable assets.

19.     <u>Adequate Protection Reservation</u>.  Except as set forth in paragraphs 13 and 15 of this Interim DIP Order, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.  Further, this Interim DIP Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, and all parties in interests' rights are reserved with respect thereto.  The Committee reserves all rights to argue that the payment of amounts set forth in the Budget does not constitute a basis for Diminution in Value.

**Provisions Common to**
**DIP Financing and Use of Cash Collateral**

20.     <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the

Court if the amendment, modification, or supplement is (a) immaterial or non-adverse to the Debtors and their estates and (b) in accordance with the DIP Documents, with a copy of any such amendment, modification, or supplement to be provided promptly by the Debtors to the Committee.  In the case of a material amendment, modification, waiver, or supplement to the DIP Documents that is adverse to the Debtors, their estates or stakeholders, the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to counsel to the Committee and the U.S. Trustee at least five (5) business days prior to the proposed effectiveness of such amendment, modification, or supplement; *provided*, that executed waivers need only be provided to such parties substantially concurrently with the effectiveness thereof; *provided, further, however*, any such material or adverse amendment, modification, or supplement shall be filed with the Court, and waiver of compliance with any covenant or extension of the period for compliance shall not be deemed to be adverse to the Debtors or their estates.

21.    Budget Maintenance.  The use of borrowings under the DIP Facility and the use of Cash Collateral shall be in accordance with the Budget, subject in all respects to the variances set forth in the DIP Credit Agreement.  The Budget shall depict all line items required under the DIP Credit Agreement, and such Budget shall be approved by, and in form and substance satisfactory to the DIP Lenders, and the Prepetition Secured Parties, each in their sole discretion (it being acknowledged and agreed that the Budget attached hereto has been approved by the DIP Lenders and the Prepetition Secured Parties) and as otherwise required in accordance with the DIP Documents.  Other than as expressly provided in the DIP Documents, the Debtors shall not be permitted to update the Budget other than once in the sixth week following the entry of this Interim DIP Order.  The Budget shall be transmitted to the advisors to the Lender Advisors (as defined below).  Each such updated, modified, or supplemented budget shall be approved in writing

(including by email) by, and shall be in form and substance satisfactory to, the DIP Lenders and the Prepetition Secured Parties (each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so approved, and once so approved shall be deemed the Budget; *provided*, *however*, that in the event the parties cannot agree as to an updated, modified or supplemented budget within three (3) business days of such proposed updated, modified or supplemented budget's delivery to the Lender Advisors, such disagreement shall constitute an immediate DIP Event of Default (as defined below) once the period covered by the prior approved Budget has terminated, unless a new Budget has been approved by the end of such period, (and at all times thereafter such then-current approved Budget shall remain in effect unless and until a new Budget is approved by the DIP Lenders and the Prepetition Secured Parties).  Any updated Budget shall be promptly delivered to counsel and financial advisors to the Committee.  No revisions shall be made to the Budget with respect to the fees and expenses of the Committee's professionals absent express written consent of Committee's counsel.

   22. <u>Budget Compliance: Obligations of the Debtors to the DIP Secured Parties</u>. The Debtors shall at all times comply with the Budget, subject to the variances set forth in the DIP Credit Agreement.  The Debtors shall provide all reports and other information, including any Variance Reports (as defined in the DIP Credit Agreement) as required in the DIP Documents, and shall concurrently deliver such reporting to counsel and financial advisors for the Committee.  The Debtors' failure to comply with the Budget (including the variances set forth in the DIP Credit Agreement) or to provide the reports and other information required in the DIP Documents shall constitute a DIP Event of Default (as defined herein) following the expiration of any applicable cure period set forth in the applicable DIP Document unless waived in accordance with the terms of the DIP Documents.

23. <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim DIP Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agents, DIP Lenders, or Prepetition Secured Parties, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties, and the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim DIP Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim DIP Order.

24. <u>Perfection of DIP Liens and Adequate Protection Liens</u>. This Interim DIP Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to evidence or entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Collateral Agent and the Prepetition Agent, as applicable, is authorized to file, in the applicable registries of deeds and other appropriate public records, as it in its sole discretion deems necessary or advisable, such financing statements,

security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, leasehold mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Collateral Agent and the Prepetition Agent, as applicable, all such financing statements, deposit account control agreements, mortgages, leasehold mortgages, notices, and other documents and/or applicable amendments as the DIP Collateral Agent or the Prepetition Agent may reasonably request.  Each of the DIP Collateral Agent and the Prepetition Agent may file a copy of this Interim DIP Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.  To the extent that the Prepetition Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, financing statement, account control agreements, or any other Prepetition Senior Secured Note Documents or is listed as loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agent shall serve as agent for the DIP Collateral Agent for purposes of perfecting the DIP Collateral Agent's liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim DIP Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

25.   <u>Application of Proceeds of Collateral</u>.  As a condition to the entry of the DIP Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtors have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply all net proceeds of DIP Collateral, including whether sold in the ordinary course or otherwise, as provided in the DIP Documents (without a reduction in commitments thereunder); provided, however, that the net proceeds from the sale of any DIP Collateral that is subject to one or more Permitted Prior Liens shall be paid first to the holders of such Permitted Prior Liens.

26.   <u>Protections of Rights of the Prepetition Secured Parties</u>.

(a)   Without the prior written consent of each of the DIP Secured Parties and the Prepetition Secured Parties, unless all DIP Obligations and Prepetition Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been, or contemporaneously will be, Paid in Full and the lending commitments under the DIP Facility have terminated, in any of these Cases, any Successor Cases, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim DIP Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than as permitted in

the DIP Documents and this Interim DIP Order; or (iii) any modification of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights under this Interim DIP Order, the DIP Documents or the Prepetition Senior Secured Note Documents with respect any DIP Obligations or Prepetition Obligations.  Nothing in this paragraph shall prohibit the Committee from filing a motion seeking entry of a Court order authorizing the use of Cash Collateral.  It shall be an Event of Default under the DIP Documents under this Interim DIP Order if, in any of these Cases or any Successor Cases, the Debtors take or fail to take any of the actions contemplated with respect to provisions (i) through (iii) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iii) of the previous sentence.

(b)    No Debtor shall object to any DIP Secured Parties, or any Prepetition Secured Parties (subject to the rights preserved in paragraph 43), credit bidding up to the full amount of the applicable outstanding DIP Obligations and Prepetition Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

27.    <u>Credit Bidding</u>.   In connection with any sale process authorized by the Court, (a) the DIP Secured Parties (or any such party's designee), and (b) subject to the rights preserved in paragraph 43, the Prepetition Secured Parties (or any such party's designee) may credit bid, consistent with the applicable DIP Documents and/or Prepetition Senior Secured Note Documents, some or all of their claims for their respective priority collateral (each a "<u>Credit Bid</u>") to the extent permitted by section 363(k) of the Bankruptcy Code.  Each of the DIP Secured Parties (or any such party's designee) and, subject to the rights preserved in paragraph 43, the Prepetition

Secured Parties (or any such party's designee) shall each be considered a "Qualified Bidder" with respect to its respective rights to acquire all or any of the pledged assets by Credit Bid.

28.     <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code or in violation of the DIP Documents at any time prior to the DIP Obligations and Prepetition Obligations being Paid in Full, and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Secured Parties to be applied in accordance with this Interim DIP Order and the DIP Documents.

29.     <u>Cash Collection</u>.   From and after the date of the entry of this Interim DIP Order, all collections and proceeds of any DIP Collateral or Prepetition Collateral and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall, to the extent required by the DIP Documents, be promptly deposited in the account(s) designated in the DIP Documents (or in such other accounts as are designated by the DIP Lenders from time to time), which accounts (except as otherwise set forth in the applicable DIP Documents) shall be subject to the sole dominion and control of the DIP Collateral Agent in accordance with the applicable DIP Documents (and, for the avoidance of doubt, the DIP Collateral Agent shall be authorized to issue notices of exclusive control or similar notices under existing control agreements).   The Debtors shall maintain no accounts except those specifically authorized by the DIP Lenders.

30.  <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or the Prepetition Collateral other than in the ordinary course of business, without the prior written consent of the DIP Lenders and the Prepetition Secured Parties unless the DIP Obligations and the Prepetition Obligations will be Paid in Full from the proceeds of such transaction (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lenders, the Prepetition Secured Parties, or from any order of this Court), except as expressly provided for in the DIP Documents or otherwise ordered by the Court.

31.  <u>DIP Maturity Date</u>.  On the DIP Maturity Date: (a) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as may be required in paragraph 40 with respect to the Carve Out, (b) any treasury and cash management, hedging obligations and bank product obligations constituting Obligations (as defined in the DIP Credit Agreement) shall be cash collateralized, and such cash collateral shall not be subject to any right of offset or recoupment but shall be subject to the Carve Out; (c) all authority to use DIP Collateral shall cease, *provided, however*, that upon the DIP Maturity Date, the Carve Out shall be funded and available to satisfy Allowed Professional Fees (as defined in paragraph 40 of this Interim DIP Order) and (d) upon the expiration of the DIP Remedies Notice Period, the applicable DIP Agent, acting at the direction of the DIP Lenders, shall be entitled to otherwise exercise the rights and remedies under the DIP Documents in accordance with this Interim DIP Order (including paragraph 33).  For the purposes of this Interim DIP Order, the "<u>DIP Maturity Date</u>" shall mean the Maturity Date (as defined in the DIP Credit Agreement).

32.  <u>DIP Events of Default</u>.  The occurrence of any of the following events,

unless waived by the DIP Lenders in advance, in writing, and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "DIP Events of Default"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim DIP Order (regardless of whether such term, provision, condition, covenant or obligation expressly provides that such failure constitutes a DIP Event of Default); or (b) the occurrence of a "DIP Event of Default" under this Interim DIP Order or an "Event of Default" under the DIP Credit Agreement.

33. <u>Rights and Remedies Upon DIP Event of Default</u>.  Immediately upon the occurrence and during the continuation of a DIP Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim DIP Order (and the DIP Remedies Notice Period), the applicable DIP Agent, acting at the direction of the DIP Lenders, or the DIP Lenders, as applicable, may declare (any such declaration shall, upon delivery by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee, be referred to herein as a "DIP Termination Declaration") (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (c) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, (d) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (e) the delivery of the Carve Out Trigger Notice (as defined herein) to the Debtors (as applicable) has occurred, (the date which is the earliest to occur of the Maturity Date and any date a DIP Termination Declaration or Carve

Out Trigger Notice is delivered to the Debtors in accordance with this Interim DIP Order shall be referred to herein as the "DIP Termination Date"); *provided* that prior to the exercise of any right against the DIP Collateral, the applicable DIP Agent, acting at the direction of the DIP Lenders, or the DIP Lenders, as applicable, shall be required to file a motion with the Court using a CM/ECF emergency code seeking emergency relief from the automatic stay and set a hearing (the "Stay Relief Motion") on at least five (5) business days' written notice to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee of the DIP Secured Parties' intent to exercise their rights and remedies (the "DIP Remedies Notice Period") and, during the DIP Remedies Notice Period and at the hearing on the Stay Relief Motion, the Debtors, and/or the Committee may contest the relief requested in the Stay Relief Motion; *provided*, that the burden shall be on any party (other than the Committee, as to whom the burden will be in accordance with applicable law) opposing the exercise of such remedies and/or the Stay Relief Motion.

34.     Upon the Court's ruling with respect to the Stay Relief Motion, the Court may fashion an appropriate remedy including a determination that a DIP Event of Default occurred, including that the DIP Collateral Agent, acting at the direction of the DIP Lenders, shall be entitled to exercise all rights and remedies with respect to the DIP Collateral provided for in this Interim DIP Order, including the right to foreclose on, or otherwise exercise its rights with respect to all or any portion of the DIP Collateral, as permitted by the Court. In the event that no objections to the Stay Relief Motion are filed by any of the Debtors, the Committee or any party in interest with requisite standing within the DIP Remedies Notice Period and upon the filing of a certificate of no objection by the DIP Agents or DIP Lenders, then the DIP Termination Date shall be deemed to have occurred for all purposes and the automatic stay will automatically be modified such that: (a) the DIP Secured Parties shall be entitled to exercise their rights and remedies in

accordance with the DIP Documents and this Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claim, and DIP Liens, subject to the Carve Out (to the extent applicable) and Permitted Prior Liens, and (b) the Prepetition Secured Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition Senior Secured Notes Documents and this Interim DIP Order to satisfy the Prepetition Obligations and Adequate Protection Liens, subject to the Carve Out (to the extent applicable) and Permitted Prior Liens.  Subject to the terms and conditions of this Interim DIP Order, and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the DIP Termination Date; *provided*, *however*, that during the DIP Remedies Notice Period, the Debtors may use Cash Collateral solely in accordance with paragraph 12 hereof.  Notwithstanding the foregoing, neither any DIP Agent nor any DIP Lender will exercise remedies with respect to the DIP Collateral on less than five (5) days' written notice to the Debtors, the Committee, and the U.S. Trustee.

35.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim DIP Order.  The DIP Secured Parties and Prepetition Secured Parties have acted at arms' length in good faith in connection with this Interim DIP Order and are entitled to, and may rely upon, the protections granted herein and by section 364(e) of the Bankruptcy Code.

36.     DIP Fees, and Other Expenses.  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and out of pocket expenses of the DIP Agents and DIP Lenders in connection with the DIP Facility, including reasonable and documented attorneys' fees, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of reasonable and documented fees and expenses of (1) Morgan, Lewis & Bockius LLP, (2) Gray Reed & McGraw LLP, (3) FTI Consulting, Inc., and (4) and Ballard Spahr LLP (together with the Prepetition

Secured Parties Advisors, the "<u>Lender Advisors</u>"), subject to the review procedures set forth in this paragraph 36.  With respect to postpetition fees or expenses payable herein, invoices shall be in summary format with reasonably sufficient detail such that the nature and extent of the services can be evaluated (and shall not be required to contain specific time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, the Committee, and the U.S. Trustee (the "<u>Fee Notice Parties</u>"). If no objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "<u>Fee Objection Period</u>"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any case, within ten (10) business days after expiration of the Fee Objection Period.  If an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.  Payments of any amounts set forth in this paragraph 36 shall not be subject to recharacterization, subordination, or disgorgement, subject to the rights preserved in paragraph 43 and unless otherwise expressly provided herein.

37.     <u>Indemnification</u>.   The Debtors shall indemnify and hold harmless the DIP Secured Parties in accordance with the terms and conditions of the DIP Documents.

38.     <u>Proofs of Claim</u>.   Notwithstanding any order entered by this Court in

relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the DIP Documents, including under the Emergency DIP Facility, or the Prepetition Senior Secured Note Documents.   The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim DIP Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties and the Prepetition Secured Parties with regard to all claims arising under the DIP Documents, including the Emergency DIP Facility, or the Prepetition Senior Secured Note Documents, as the case may be.   Notwithstanding the foregoing, each of the Prepetition Secured Parties is authorized, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors).  Any proof of claim filed by any Prepetition Secured Party shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the DIP Secured Parties or the Prepetition Secured Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

39.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Secured Parties (under the DIP Documents) or the Prepetition

Secured Parties (under the Prepetition Senior Secured Note Documents), the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Secured Parties and representatives, agents, and/or employees of the Prepetition Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents and Prepetition Senior Secured Note Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their financial advisors, investment bankers and other financial consultants to provide to the DIP Secured Parties and the Prepetition Secured Parties all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors. Any customary or ongoing reporting provided by the Debtors to the DIP Secured Parties and the Prepetition Secured Parties also shall be concurrently provided by the Debtors to the Committee.

40. <u>Carve Out</u>.

(a) <u>Carve Out</u>. As used in this Interim DIP Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code pursuant to 31 U.S.C. § 3717 plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses set forth in the Budget, other than any restructuring, sale, success, or other transaction

fee of any investment bankers or financial advisors of the Debtors or the Committee[7] (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $350,000.00 incurred after the first business day following delivery by the DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of a DIP Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

   (b) <u>Carve-Out Reserves</u>.  For the avoidance of doubt, the DIP Secured Parties shall be entitled to maintain at all times a reserve (the "<u>Carve-Out Reserve</u>") in an amount (the "<u>Carve-Out Reserve Amount</u>") equal to the sum of (i) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph 40(a)(i) and

---

[7]  The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction.

40(a)(ii) above.  Promptly upon request by the DIP Lenders, and in no event later than two (2) Business Days after such request, the Debtors shall deliver to the DIP Lenders (and concurrently to counsel and financial advisors for the Committee) a report setting forth the Carve-Out Reserve Amount as of the date of such request, and the DIP Lenders shall be entitled to rely upon such reports in accordance with the DIP Documents.

(c)     Carve Out Reserves.   On the day on which a Carve Out Trigger Notice is given by the DIP Lenders to the Debtors with a copy to counsel to the Committee and the U.S. Trustee (the "Termination Declaration Date"), the Carve Out Trigger Notice (i) shall be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Documents in an amount equal to the sum of (x) the amounts set forth in paragraphs 40(a)(i) and 40(a)(ii) above, and (y) the then unpaid amounts of the Allowed Professional Fees pursuant to the Budget (any such amounts actually advanced shall constitute DIP Loans) and (ii) shall also constitute a demand to the Debtors, and authorization for the Debtors, to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs 40(a)(i) and 40(a)(ii), and unpaid amounts of the Allowed Professional Fees pursuant to the Budget (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Loans pursuant to clause (i) of this paragraph (c)).  The Debtors shall deposit and hold such amounts in an account designated by the DIP Lenders and, if applicable, the cash on hand exclusively to pay such unpaid Allowed Professional Fees (each, a "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice (iii) shall also be deemed a request by the Debtors for DIP Loans under the DIP Documents in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP

Loans), and (iv) shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Loans pursuant to clause (iii) of this paragraph (c)).  The Debtors shall deposit and hold such amounts in an account designated by the DIP Lenders under the DIP Documents in trust in respect of amounts funded by the DIP Lenders and, if applicable, cash on hand exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (each, a "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve(s), the "Carve Out Reserves") prior to any and all other claims.  On the first business day following the Termination Declaration Date and the deemed requests for the making of DIP Loans as provided in this paragraph (c), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to (1) the existence of a Default (as defined in the DIP Documents) or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for the making of any DIP Loan under the DIP Documents, (3) any termination of the Commitments (as defined in the DIP Credit Agreement) following an Event of Default, or (4) the occurrence of a DIP Termination Date, each DIP Lender with an outstanding Commitment shall make available such DIP Lender's *pro rata* share of such DIP Loans.

(d)      Application of Carve Out Reserves.

(i)      All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subparagraphs (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full.  If after payment in full of the Pre-Carve

42

Out Amounts, the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii) below, all remaining funds in the account funded by (x) the DIP Lenders and/or from proceeds of DIP Collateral shall be distributed (A) *first*, to the DIP Lenders on account of the DIP Obligations until such obligations have been Paid in Full, and (B) *second*, to the Prepetition Secured Parties on account of the Prepetition Obligations until such obligations have been Paid in Full.

(ii)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth in paragraph 40(a) above (the "Post-Carve Out Amounts").  If, after such application, the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii) below, all remaining funds in the account funded by the DIP Lenders and/or from proceeds of DIP Collateral shall be distributed (A) *first*, to the DIP Lenders on account of the DIP Obligations until such obligations have been Paid in Full and (B) *second*, to the Prepetition Secured Parties on account of the Prepetition Obligations until such obligations have been Paid in Full.

(iii)     Notwithstanding anything to the contrary in the DIP Documents or this Interim DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 40, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding prior to making any payments to the DIP Lenders.

(iv)     Notwithstanding anything to the contrary in the DIP Documents or this Interim DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Collateral Agent shall not sweep or foreclose on cash (including cash received as a result of the

sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in subparagraphs (i), (ii), and (iii) above of this paragraph 40(d).

(v)     Notwithstanding anything to the contrary in this Interim DIP Order, the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and, in no way shall any Budget, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim DIP Order, or in the DIP Documents, or in the Prepetition Senior Secured Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the obligations under the Prepetition Senior Secured Note Documents.

(e)     No Direct Obligation to Pay Allowed Professional Fees.  None of the DIP Secured Parties and the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim DIP Order or otherwise shall be construed to obligate the DIP Secured Parties or Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Allowed Professional Fees Prior to the Termination

44

Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)  Payment of Carve Out on or After the Termination Declaration Date.  Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim DIP Order, the DIP Documents, the Bankruptcy Code, and applicable law.

41.  Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out.  The DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with:  (a) subject to the provisions of Paragraph 25, paying any prepetition claim except in accordance with the Budget, (b) preventing, hindering, or delaying any of the DIP Secured Parties or the Prepetition Secured Parties' permitted enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (c) using or seeking to use Cash Collateral except as provided for in this Interim DIP Order and the DIP Documents; (d) selling or otherwise disposing of DIP Collateral without the consent of the DIP Collateral Agent, acting at the direction of the DIP Lenders, or Prepetition Collateral without the consent of the Prepetition Agent; (e) using or seeking to use any insurance proceeds constituting DIP Collateral except as provided for in this Interim DIP Order and the DIP Documents without the consent of the DIP Collateral Agent, acting

at the direction of the DIP Lenders, or the Prepetition Agent; (f) incurring Indebtedness (as defined in the applicable DIP Documents) without the prior consent of the DIP Lenders, except to the extent permitted under the DIP Documents; (g) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim DIP Order, the DIP Documents, or the Prepetition Senior Secured Note Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (h) objecting to or challenging in any way the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (i) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (j) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, Prepetition Obligations, or any other rights or interests of any of the DIP Secured Parties or the Prepetition Secured Parties; or (k) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations, or the Prepetition Obligations; *provided, however*, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $75,000 in the aggregate, incurred solely by the Committee, in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein), which amount is subject to adjustment pursuant to Court order or as otherwise

46

agreed in writing between the DIP Lenders, the Prepetition Secured Parties and the Committee.

42.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Secured Parties or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  The Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable.

43.     ProEnergy Services, LLC. For the avoidance of doubt, any lien on assets of the Debtors held by ProEnergy Services, LLC ("ProEnergy") that is valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date is included in Permitted Prior Liens.  The Debtors shall provide to ProEnergy a copy of the Monthly Report attached as Schedule 6.02(h) to the Credit Agreement on the same day it is provided to the DIP Lenders.  The Monthly Report shall be provided to ProEnergy through its counsel and shall be kept confidential by ProEnergy and its counsel.  Notwithstanding anything to the contrary, none of the Debtors' assets over which ProEnergy asserts a Permitted Prior Lien will be sold without at least three (3) business days' notice to ProEnergy and an opportunity to be heard.

44.     Notwithstanding any other provision of this Order, nothing in this Order shall limit or otherwise affect (a) the rights of ProEnergy to assert an entitlement to adequate protection as permitted under applicable law or, (b) the rights of any party to object to, or challenge, any such assertion of entitlement to adequate protection.  All such rights of all parties are hereby preserved.

45.     <u>Effect of Stipulations on Third Parties</u>.

(a)     *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim DIP Order (collectively, the "<u>Prepetition Lien and Claim Matters</u>") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including the Committee, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 43) challenging the Prepetition Lien and Claim Matters (including any challenge with respect to the Roll-Up Loans) (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than the earlier of (I) November 1, 2021, or (II) the deadline established by order of the Court for objections to any motion seeking the entry of an order confirming a plan of the Debtors or the sale of all or substantially all the assets of the Debtors (as applicable, the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time (email shall suffice) in the sole discretion of the Prepetition Secured Parties or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not

subject to any further review or appeal.  Notwithstanding anything contained herein to the contrary, the Challenge Deadline in subparagraph (I) above will be tolled for the Committee if it formally moves for an order of this Court conferring standing or authority (the "Standing Motion") prior to the Challenge Deadline, from the date the Committee so moves until five (5) business days from the date when standing is granted or denied pursuant to an order of the Court with regard to such Standing Motion; provided, that the Challenge Deadline: (a) will only be tolled if such Standing Motion attaches a proposed complaint identifying the specific Challenge(s) that the Committee proposes to assert and the defendant(s) against whom such Challenge(s) are proposed to be asserted, and (b) will only be tolled with respect to such Challenge(s) and defendant(s) specifically identified therein.  Notwithstanding anything to the contrary herein, if the Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 7 trustee shall have until the later of the Challenge Period or the sixtieth (60th) day after the conversion of the Cases to chapter 7 to commence a Challenge, subject to any further extension by order of the Court for cause.

        (b)    *Binding Effect*.  To the extent no Challenge is timely commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim DIP Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other

representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Senior Secured Note Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 43, the Court may fashion any appropriate remedy.

(c)       Nothing herein shall limit the Committee's ability to (x) file a timely Standing Motion in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "LLC Challenge Motion"), and (y) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge, provided that the Committee otherwise satisfies the requirements set forth in this paragraph 43.  In the event the Committee files a timely LLC Challenge Motion for which it cannot obtain standing, and provided that the Committee otherwise satisfies the requirements set forth in this paragraph 42, the expiration of the Challenge Deadline solely for the specific Challenge set forth in the LLC Challenge Motion, and solely as to the defendant(s) named therein, shall be tolled pending further order of the Court, and applicable parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of any such Challenge.  If timely notified of a

Challenge for which the Committee cannot gain standing because the applicable Debtor is a limited liability company, the Debtors (or a designated representative) shall, to the extent permitted by applicable law, retain the authority to prosecute such Challenge.

(d)     Notwithstanding anything to the contrary herein, any Challenge, Standing Motion, or LLC Standing Motion commenced by the Committee (the "Committee Action") may be pursued by any chapter 7 trustee in these cases (a "Chapter 7 Trustee"), appointed subsequent to the filing of the Committee Action, in the Chapter 7 Trustee's sole and exclusive discretion.  The filing of a *Notice of Substitution of Trustee* for and in the stead of the Committee in the Committee Action, shall be automatically effective upon filing, without further Order of the Court, and the Chapter 7 Trustee shall be deemed automatically substituted for the Committee, which substitution shall be deemed retroactive to the date of the filing of the Committee Action.

46.     No Third Party Rights.  Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

47.     Section 506(c) Claims.  Subject to entry of a Final DIP Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

48.     No Marshaling/Applications of Proceeds.  Subject to entry of a Final DIP Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim DIP Order and the DIP Documents, notwithstanding any other agreement or provision to the contrary; *provided, however*, that the DIP Agents and the Prepetition Secured Parties shall use commercially reasonable efforts to first use all DIP Collateral other than the proceeds of the avoidance actions and commercial tort claims under paragraph 6(c), (d), (e) and (f) hereof to repay the DIP Obligations and to satisfy the Adequate Protection Liens.

49.     <u>Section 552(b)</u>.  Subject to entry of a Final DIP Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

50.     <u>Access to DIP Collateral</u>.  Subject to the rights and procedures included in paragraphs 32 and 33 hereof and effective upon entry of a Final DIP Order, upon expiration of the Remedies Notice Period, the DIP Secured Parties and the Prepetition Secured Parties shall be permitted to (a) access and recover any and all DIP Collateral, and (b) enter onto any leased premises of any Debtor that constitutes DIP Collateral and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the DIP Collateral, *provided*, *however*, in the case of clause (b), the DIP Secured Parties and/or Prepetition Secured Parties can only enter upon a leased premises after expiration of the DIP Remedies Notice Period and/or DIP Event of Default in accordance with (i) a separate written agreement by and between the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the DIP Secured Parties or the Prepetition Secured

Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable DIP Secured Party or Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, solely with respect to rent due to a landlord of any such leased premises, the DIP Secured Parties and/or the Prepetition Secured Parties, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after delivery of the DIP Termination Declaration in accordance with paragraph 33 herein that is payable during the period of such occupancy by the DIP Secured Parties and/or Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of postpetition rent and other charges under any lease of non-residential real property through and including any assumption and/or rejection of any lease.  Nothing herein shall require the DIP Secured Parties or the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

51.     <u>Limits on Lender Liability</u>.  Subject to entry of a Final DIP Order, nothing in this Interim DIP Order, any of the DIP Documents, the Prepetition Senior Secured Note Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility or the Prepetition Senior Secured Note Documents or permitted the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or

"owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim DIP Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

52.    <u>Insurance Proceeds and Policies</u>.    Until all DIP Obligations and all Prepetition Obligations are Paid in Full, and the DIP Secured Parties' obligation to extend credit under the DIP Facility has terminated, the Debtors shall obtain and maintain insurance with respect to the DIP Collateral as required under the DIP Facility.  Upon entry of this Interim DIP Order and to the fullest extent provided by applicable law, the DIP Collateral Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (the "<u>DIP Collateral Insurance Policies</u>").  Notwithstanding the foregoing, upon entry of this Interim DIP Order, the Debtors shall take any and all steps necessary under the DIP Collateral Insurance Policies to name both the DIP Collateral Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) as additional insureds and loss payees on each DIP Collateral Insurance Policy.

53.    <u>Joint and Several Liability</u>.  Nothing in this Interim DIP Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations

hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

54.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Prepetition Senior Secured Note Documents: (a) the DIP Secured Parties' and Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Secured Parties and/or the Prepetition Secured Parties under the Bankruptcy Code or under any other applicable law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim DIP Order.

55.     No Waiver by Failure to Seek Relief.  The failure, or delay for any period, of the DIP Secured Parties or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim DIP Order, the DIP Documents, the Prepetition Senior Secured Note Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Secured Parties or the Prepetition

Secured Parties.

56.     <u>Binding Effect of Interim DIP Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim DIP Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Committee, or any other court appointed committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

57.     <u>No Modification of Interim DIP Order</u>.   Until and unless the DIP Obligations and the Prepetition Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) the Debtors shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Lenders, (i) any modification, stay, vacatur, or amendment to this Interim DIP Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the DIP Lenders, any order allowing use of Cash Collateral (other than as permitted during the DIP Remedies Notice Period) resulting from DIP Collateral or Prepetition Collateral in a manner inconsistent with this Interim DIP Order, provided that nothing in this paragraph shall prohibit the Committee from filing a motion seeking entry of a Court order authorizing the use of Cash Collateral, and if the Committee files such motion, the DIP Secured

Parties agree not to object to the such motion on the basis of the Committee's lack of standing but otherwise reserve their rights to raise any other arguments, claims or defenses; (c) without the prior written consent of the DIP Collateral Agent, acting at the direction of the DIP Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents, other than the Carve Out; or (d) without the prior written consent of the Prepetition Agent, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors shall not seek or consent to, directly or indirectly any amendment, modification, or extension of this Interim DIP Order without the prior written consent, as provided in the foregoing, of the DIP Lenders and/or the DIP Agents, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lenders and/or the DIP Agents, as applicable.

58.     <u>Interim DIP Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim DIP Order, the provisions of this Interim DIP Order shall govern and control.

59.     <u>Discharge</u>.  The DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all DIP Obligations be Paid in Full, and the payment of the Debtors' obligations with respect

to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Prohibited Plan or Sale") without the written consent of each of the DIP Secured Parties and the Prepetition Secured Parties, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute a DIP Event of Default hereunder and an Event of Default under the DIP Documents.

60.    Survival.  The provisions of this Interim DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim DIP Order, including the claims, liens, security interests, and other protections granted to the DIP Secured Parties and Prepetition Secured Parties granted pursuant to this Interim DIP Order and/or the DIP Documents, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim DIP Order until:  (x) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim DIP Order, have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); and (y) in respect of the Prepetition Financing, all of the Prepetition Obligations pursuant to the Prepetition Senior Secured Note Documents and this Interim DIP Order, have been Paid in Full.  The terms and provisions concerning the indemnification of the DIP Agents and DIP Lenders shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or

any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

61.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Facility is scheduled for September 21, 2021 at 11:00 a.m. **(prevailing Central Time)** before the Honorable Marvin Isgur, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of Texas.  On or before September 3, 2021, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim DIP<u> Order and of the </u>Final Hearing (the "Final Hearing Notice"), together with copies of this Interim DIP Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Committee; (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final DIP Order shall file written objections with the Clerk of the Court no later than on September 17, 2021 **at 4:00 p.m. (prevailing Central Time)**.

62.     This Order is effective on entry and is not stayed.

63.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the DIP Facility and/or this Interim DIP Order.

Signed: September 02, 2021

_____
Marvin Isgur
United States Bankruptcy Judge

# Exhibit 1

**DIP CREDIT AGREEMENT**

**SENIOR SECURED SUPERPRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of September __, 2021

among

**AGILON ENERGY HOLDINGS II, LLC,**
**VICTORIA PORT POWER LLC,**
**AND**
**VICTORIA CITY POWER LLC**
as the Borrowers,

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**,
as Administrative Agent

and,

**WILMINGTON TRUST, NATIONAL ASSOCIATION**,
as Collateral Agent,

and

The Lenders Party Hereto from Time to Time

# TABLE OF CONTENTS

DB1/ 123296677.18

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ............................................... 2

    1.01    Defined Terms ............................................................................................... 2

    1.02    Other Interpretive Provisions ..................................................................... 28

    1.03    Accounting Terms. ...................................................................................... 28

    1.04    Times of Day ............................................................................................... 29

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ................................. 29

    2.01    Loans. .......................................................................................................... 29

    2.02    Borrowings. ................................................................................................. 30

    2.03    Prepayments. ............................................................................................... 31

    2.04    Termination or Reduction of Commitments. ............................................... 32

    2.05    Repayment of Loans ................................................................................... 32

    2.06    Interest ......................................................................................................... 32

    2.07    Fees. ............................................................................................................ 33

    2.08    Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate ............................................................................................................. 33

    2.09    Evidence of Debt. ....................................................................................... 33

    2.10    Payments Generally; Administrative Agent's Clawback. ............................ 34

    2.11    Sharing of Payments by Lenders ............................................................... 34

    2.12    Benchmark Replacement Setting. ............................................................... 35

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ................................. 37

    3.01    Taxes .......................................................................................................... 37

    3.02    Increased Costs. .......................................................................................... 40

    3.03    Survival ....................................................................................................... 41

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ........................... 41

    4.01    Conditions to the Closing Date ................................................................... 41

    4.02    Conditions to all Credit Extensions ........................................................... 44

ARTICLE V REPRESENTATIONS AND WARRANTIES ............................................... 45

    5.01    Existence, Qualification and Power ............................................................ 45

    5.02    Authorization; No Contravention ............................................................... 45

    5.03    Governmental Authorization ...................................................................... 45

DB1/ 123296677.18

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.04 | Binding Effect ........................................................... | 45 |
| 5.05 | Financial Statements; No Material Adverse Effect. ........................................................... | 46 |
| 5.06 | Litigation ........................................................... | 46 |
| 5.07 | No Default ........................................................... | 46 |
| 5.08 | Ownership of Property; Liens; Leases; Investments ........................................................... | 46 |
| 5.09 | Environmental Matters........................................................... | 47 |
| 5.10 | Insurance ........................................................... | 48 |
| 5.11 | Taxes ........................................................... | 48 |
| 5.12 | Organization and Ownership of Interests in Borrower; Affiliates; Officers; No Subsidiaries | 48 |
| 5.13 | Margin Regulations; Status under Certain Statutes. ........................................................... | 49 |
| 5.14 | Disclosure ........................................................... | 49 |
| 5.15 | [Reserved] ........................................................... | 50 |
| 5.16 | Licenses, Permits, Etc ........................................................... | 50 |
| 5.17 | Casualty, Etc ........................................................... | 50 |
| 5.18 | Labor Relations; Force Majeure Events; Access to Utilities ........................................................... | 50 |
| 5.19 | Use of Proceeds........................................................... | 50 |
| 5.20 | Compliance with ERISA........................................................... | 50 |
| 5.21 | Material Project Documents ........................................................... | 51 |
| 5.22 | Bank Accounts ........................................................... | 52 |
| 5.23 | Collateral ........................................................... | 52 |
| 5.24 | Foreign Assets Control Regulations, Etc.........................................................  | 52 |
| ARTICLE VI AFFIRMATIVE COVENANTS ........................................................... | | 53 |
| 6.01 | Financial Statements ........................................................... | 53 |
| 6.02 | Certificates; Notices; Other Information ........................................................... | 54 |
| 6.03 | Officer's Certificate ........................................................... | 56 |
| 6.04 | Payment of Obligations........................................................... | 56 |
| 6.05 | Preservation of Existence, Etc ........................................................... | 57 |
| 6.06 | Title, Etc........................................................... | 57 |
| 6.07 | Maintenance of Insurance ........................................................... | 57 |
| 6.08 | Compliance with Laws ........................................................... | 57 |

DB1/ 123296677.18

# TABLE OF CONTENTS
(continued)

**Page**

| 6.09 | Books and Records | 57 |
|------|-------------------|-----|
| 6.10 | Inspection Rights | 57 |
| 6.11 | Use of Proceeds; Margin Regulations | 57 |
| 6.12 | Material Project Documents | 58 |
| 6.13 | Accounts | 58 |
| 6.14 | Further Assurances | 58 |
| 6.15 | [Reserved] | 58 |
| 6.16 | Material Contracts | 58 |
| 6.17 | Compliance with Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions | 58 |
| 6.18 | Filing with the PUCTX | 58 |
| 6.19 | Exempt Wholesale Generator Status | 58 |
| 6.20 | Emissions Credits | 59 |
| 6.21 | [Reserved]. | 59 |
| 6.22 | Cash Management Arrangements; Payment of Professional Fees | 59 |
| 6.23 | Weekly Lender Calls | 59 |
| ARTICLE VII | NEGATIVE COVENANTS | 59 |
| 7.01 | Liens | 59 |
| 7.02 | Indebtedness | 60 |
| 7.03 | Investments | 61 |
| 7.04 | Fundamental Changes | 61 |
| 7.05 | Dispositions | 61 |
| 7.06 | Restricted Payments | 61 |
| 7.07 | Change in Nature of Business | 61 |
| 7.08 | Transactions with Affiliates | 61 |
| 7.09 | Regulatory Standing | 62 |
| 7.10 | Margin Stock; Sanctions | 62 |
| 7.11 | Reporting Practices | 62 |
| 7.12 | Equity Capital | 62 |
| 7.13 | Amendments to Organization Documents | 63 |
| 7.14 | No Employees; No ERISA Plans | 63 |

DB1/ 123296677.18

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 7.15 | Prepayments, Etc. of Indebtedness | 63 |
| 7.16 | Amendment, Etc. of Related Documents and Indebtedness | 63 |
| 7.17 | No Subsidiaries | 63 |
| 7.18 | No Margin Stock | 63 |
| 7.19 | Accounts | 63 |
| 7.20 | Use of Proceeds | 63 |
| 7.21 | Lease Obligations | 64 |
| 7.22 | Material Project Documents | 64 |
| 7.23 | Case Matters | 64 |
| 7.24 | Amendments to Orders | 66 |
| 7.25 | Disbursements; DIP Budget Variance. | 66 |
| 7.26 | Material Contracts | 66 |
| ARTICLE VIII | EVENTS OF DEFAULT AND REMEDIES | 66 |
| 8.01 | Events of Default | 66 |
| 8.02 | Consequences of an Event of Default. | 70 |
| 8.03 | Application of Funds | 73 |
| ARTICLE IX | AGENTS | 74 |
| 9.01 | Appointment and Authority | 74 |
| 9.02 | Delegation of Duties. | 75 |
| 9.03 | Liability of the Agents | 75 |
| 9.04 | Reliance by Agent | 76 |
| 9.05 | Notice of Default or Event of Default | 76 |
| 9.06 | Credit Decision | 76 |
| 9.07 | Costs and Expenses; Indemnification | 77 |
| 9.08 | Administrative Agent in Individual Capacity | 78 |
| 9.09 | Successor Agent | 78 |
| 9.10 | Collateral Matters | 79 |
| 9.11 | Restrictions on Actions by Lenders; Sharing of Payments | 80 |
| 9.12 | Agency for Perfection | 81 |
| 9.13 | Payments by Administrative Agent to the Lenders | 81 |
| 9.14 | Concerning the Collateral and Related Loan Documents | 81 |

# TABLE OF CONTENTS
(continued)

DB1/ 123296677.18

**Page**

| | | |
|---|---|---|
| 9.15 | Reports and Information | 81 |
| 9.16 | Several Obligations; No Liability | 81 |
| ARTICLE X | JOINT AND SEVERAL OBLIGATIONS; ADMINISTRATIVE BORROWER | 82 |
| 10.01 | Joint and Several Obligations | 82 |
| 10.02 | Administrative Borrower | 82 |
| ARTICLE XI | MISCELLANEOUS | 83 |
| 11.01 | Amendments, Etc | 83 |
| 11.02 | Notices; Effectiveness; Electronic Communications | 84 |
| 11.03 | No Waiver; Cumulative Remedies; Enforcement | 85 |
| 11.04 | Expenses; Indemnity; Damage Waiver | 86 |
| 11.05 | Payments Set Aside | 87 |
| 11.06 | Successors and Assigns | 88 |
| 11.07 | Treatment of Certain Information; Confidentiality | 90 |
| 11.08 | Right of Setoff | 91 |
| 11.09 | Interest Rate Limitation | 91 |
| 11.10 | Counterparts; Integration; Effectiveness | 92 |
| 11.11 | Survival of Representations and Warranties | 92 |
| 11.12 | Severability | 92 |
| 11.13 | [Reserved.] | 92 |
| 11.14 | No Strict Construction | 92 |
| 11.15 | Governing Law; Jurisdiction; Etc. | 92 |
| 11.16 | WAIVER OF JURY TRIAL | 93 |
| 11.17 | No Advisory or Fiduciary Responsibility | 94 |
| 11.18 | Electronic Execution of Assignments and Certain Other Documents | 94 |
| 11.19 | USA PATRIOT Act; Anti-Money Laundering Laws | 94 |
| 11.20 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 94 |
| 11.21 | Incorporation of DIP Orders by Reference | 95 |
| ARTICLE XII | SECURITY AGREEMENT | 95 |
| 12.01 | Grant of Security Interest | 95 |
| 12.02 | No Filings Required; Perfection of Security Interests; Priority | 97 |

DB1/ 123296677.18

# TABLE OF CONTENTS
(continued)

**Page**

12.03   Certain Perfection Actions; Further Assurances..................................................... 98

12.04   Powers of Attorney. ................................................................................................ 98

12.05   Certain Waivers; Borrowers Not Discharged .................................................... 100

12.06   Adequate Protection............................................................................................ 100

DB1/ 123296677.18

SCHEDULES

| 1 | Acceptable Sale Provisions |
|---|---|
| 2 | Easements |
| 2.01 | Commitments and Applicable Percentages |
| 5.03 | Required Approvals |
| 5.05 | Audited Financial Statements |
| 5.06 | Litigation |
| 5.08 | Real Property; Liens; Leases; Investments |
| 5.11 | Taxes |
| 5.12 | Organization; Subsidiaries |
| 5.21 | Material Project Documents |
| 5.22 | Bank Accounts |
| 6.02(h) | Forms of Monthly Reports |
| 6.07 | Insurance |
| 7.02 | Indebtedness |
| 7.03 | Investments |
| 7.08 | Affiliate Transactions |
| 11.02 | Notices |
| 12.01(a) | Commercial Tort Claims |

EXHIBITS

***Form of***

| A | Committed Loan Notice |
|---|---|
| B | Note |
| C | Assignment and Assumption |

ANNEXES

| I | Milestones |
|---|---|
| II | Interim DIP Order |

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** ("Agreement") is entered into as of September __, 2021, among **AGILON ENERGY HOLDINGS II, LLC**, a Texas limited liability company ("Agilon" or "Administrative Borrower"), **VICTORIA PORT POWER, LLC**, a Texas limited liability company ("Victoria Port"), **VICTORIA CITY POWER LLC**, a Texas limited liability company ("Victoria City", together with Victoria Port, the "Project Companies" and the Project Companies, collectively with Agilon, the "Borrowers" and each a "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as administrative agent for the Secured Parties (in such capacity, the "Administrative Agent") and **WILMINGTON TRUST, NATIONAL ASSOCIATION**, as collateral agent for the Secured Parties (the "Collateral Agent").

## PRELIMINARY STATEMENTS:

WHEREAS, on June 27, 2021 (the "Petition Date"), the Borrowers commenced Chapter 11 case numbers 21-32156, 21-32157 and 21-32158, as jointly administered for procedural purposes as Chapter 11 case number 21-32156 (individually each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") voluntary petitions for relief under the Bankruptcy Code and have continued to operate their business as debtor-in-possession pursuant to section 1107 and 1108 thereof;

WHEREAS, on July 12, 2021, the Borrowers, the Lenders and the Agent entered into that certain Emergency Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet which was approved pursuant to an order of the Bankruptcy Court on July 15, 2021 (the "Emergency DIP Order" and such date, the "Emergency DIP Order Entry Date"), whereby the Lenders, committed to extend to the Borrowers, delayed draw term loans in an aggregate principal amount of up to $1,000,000 on terms and conditions described therein (the "Emergency DIP Facility" and each such loan a "Emergency DIP Loan" and collectively, the "Emergency DIP Loans").  On the date hereof, immediately prior to giving effect to any extensions of credit hereunder, the aggregate outstanding principal amount of the Emergency DIP Loans is $1,000,000;

WHEREAS, the Borrowers have requested and the Lenders have agreed to make loans to the Borrowers consisting of a priming, secured superpriority debtor-in-possession delayed draw term loan credit facility in the aggregate principal amount of up to $30,000,000 (inclusive of the Roll-Up (as defined below)), which shall be used (a) to refinance and repay in full, in cash, all outstanding obligations in connection with the Emergency DIP Facility, (b) for Adequate Protection Fees and Expenses, (c) for the Carve Out, (d) to roll-up a portion of the Prepetition Indebtedness, and (e) for working capital purposes of the Borrowers during the Case, in each case, in accordance with the DIP Budget, subject to the terms and conditions of this Agreement and, when entered, the Interim DIP Order or the Final DIP Order (each as defined herein), as applicable;

WHEREAS, the Lenders are willing to extend such credit to the Borrowers under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the Interim DIP Order or the Final DIP Order, as applicable.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01 <u>Defined Terms</u>. All terms defined in the UCC and used herein shall have the same definitions herein as specified therein. If, however, a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acceptable Sale Provisions</u>" means the provisions set forth on <u>Schedule 1</u>.

"<u>Adequate Protection Fees and Expenses</u>" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"<u>Adequate Protection Liens</u>" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"<u>Adequate Protection Superpriority Claims</u>" has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"<u>Administrative Agent</u>" means The Prudential Insurance Company of America in its capacity as administrative agent for the Secured Parties under any of the Loan Documents, or any successor administrative agent.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth in wire instructions provided by the Administrative Agent to the Administrative Borrower, or such other address or account as the Administrative Agent may from time to time notify in writing to the Administrative Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in form and substance approved by the Administrative Agent.

"<u>Affiliate</u>" " means, at any time, and with respect to any Person, any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person. Unless the context otherwise clearly requires, any reference to an "Affiliate" is a reference to an Affiliate of any of the Borrowers. Notwithstanding anything to the contrary in this definition, none of the Lenders shall be deemed to be an Affiliate of any Borrower.

"<u>Agent-Related Persons</u>" means each Agent, together with their respective Affiliates, successors and assigns and the officers, direct and indirect owners, directors, employees, agents, advisors, attorneys, controlling persons and members of each of the foregoing.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" has the meaning specified in the preamble hereto.

"<u>Anti-Corruption Laws</u>" means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding bribery or any other corrupt activity, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010.

"<u>Anti-Money Laundering Laws</u>" means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding money laundering, drug trafficking, terrorist-related activities or other money laundering

predicate crimes, including the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act) and the USA PATRIOT Act.

"Applicable Margin" means, (a) with respect to LIBOR Loans, 8.00% per annum, computed on the basis of the actual number of days elapsed over a year of 360 days or (b) with respect to Prime Loans, 7.00% per annum, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Facility represented by the sum of such Lender's Commitment at such time, plus the principal amount of such Lender's Loans at the relevant time of reference thereto.

"Approvals" means any and all approvals, permits, permissions, licenses, authorizations, consents, certifications, actions, orders, waivers, exemptions, variances, franchises, filings, declarations, rulings, registrations, applications and notices to, from or issued by any Person.

"Approved Accountant" is defined in Section 6.01.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit C or any other form approved by the Administrative Agent.

"Auction" means the sale of all or substantially all of any of the Borrowers' assets or Equity Interests in accordance with the requirements for the Sale Process.

"Audited Financial Statements" has the meaning specified in Section 5.05(a).

"Automatic Stay" means the automatic stay imposed under section 362 of the Bankruptcy Code.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then current Benchmark is a term rate or is based on a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(d), or (y) if the then current Benchmark is not a term rate nor based on a term rate, any payment period for interest calculated with reference to such Benchmark pursuant to this Agreement as of such date.

"Availability Period" means, the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitments pursuant to Section 2.04 and (c) the date of termination of the commitment of each Lender to make Loans pursuant to Section 8.02.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time, which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means 11 U.S.C. §101 *et seq.*

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Benchmark" means, initially, LIBO Rate; provided, that if a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to LIBO Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12(a) or Section 2.12(f).

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Required Lenders for the applicable Benchmark Replacement Date:

(1) the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

(2) the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(3) the sum of: (a) the alternate benchmark rate that has been selected by the Required Lenders as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment;

provided, that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Required Lenders in its reasonable discretion; provided, further, that, with respect to a Term SOFR Transition Event, on the applicable Benchmark Replacement Date, the "Benchmark Replacement" shall revert to and shall be determined as set forth in clause (1) of this definition. If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Transaction Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1) for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Required Lenders:

(a) the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Available Tenor that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b) the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Available Tenor that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2) for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar denominated syndicated credit facilities;

provided that, (x) in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Required Lenders in their reasonable discretion and (y) if the then-current Benchmark is a term rate, more than one tenor of such Benchmark is available as of the applicable Benchmark Replacement Date and the applicable Unadjusted Benchmark Replacement will not be a term rate, the Available Tenor of such Benchmark for purposes of this definition of "Benchmark Replacement Adjustment" shall be deemed to be the Available Tenor that has approximately the same length (disregarding business day adjustments) as the payment period for interest calculated with reference to such Unadjusted Benchmark Replacement.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Prime Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent and the Lenders in a manner substantially consistent with market practice (or, if the Required Lenders decide that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date determined by the Required Lenders, which date shall promptly follow the public statement or publication of information referenced therein;

(3) in the case of a Term SOFR Transition Event, the date that is set forth in the Term SOFR Notice provided to the Company pursuant to paragraph 2C(viii), which date shall be at least thirty (30) days from the date of the Term SOFR Notice; or

(4) in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Borrowers and the Lenders.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) above with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clause (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 2.12 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12.

"Bidding Procedures Order" means an order in form and substance satisfactory to the Required Lenders approving the Sale Process and including the Acceptable Sale Provisions.

"Blocked Person" means (i) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC, (ii) a Person, entity, organization, country or regime that is blocked or a target of sanctions that have been imposed under U.S. Economic Sanctions Laws or (iii) a Person that is an agent, department or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, any Person, entity, organization, country or regime described in clause (i) or (ii).

"Borrower" and "Borrowers" has the meaning specified in the preamble hereto.

"Borrowing" means the borrowing of a Loan pursuant to Article II hereof.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York or Texas.

"Capitalized Leases" means, at any time, a lease with respect to which the lessee is required concurrently to recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"Carve Out" has the meaning specified in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Cash Balance Report" has the meaning specified in Section 6.01(c).

"Cash Equivalents" means any of the following types of Investments, to the extent owned by any Borrower free and clear of all Liens (other than Liens created by Article XII or permitted by Section 7.01):

(a)  readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than three hundred sixty (360) days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)  time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof;

(c)  commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof; and

(d)  Investments, classified in accordance with GAAP as current assets of any Borrower, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either

Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this definition.

"<u>Cash Management Order</u>" means an order, in form and substance acceptable to the Required Lenders in their sole discretion, entered by the Bankruptcy Court with respect to the Borrowers' use of a cash management system in accordance with the terms of this Agreement and the DIP Orders.

"<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, implemented or issued.

"<u>Closing Date</u>" means the first date all the conditions precedent in <u>Section 4.01</u> are satisfied or waived in accordance with <u>Section 11.01</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"<u>Collateral</u>" has the meaning specified in <u>Section 12.01(a)</u>.

"<u>Collateral Agent</u>" means Wilmington Trust, National Association in its capacity as collateral agent for the Secured Parties under any of the Loan Documents, or any successor collateral agent.

"<u>Commitment</u>" means, as to each Lender, its obligation to make Loans to the Borrowers pursuant to <u>Section 2.01(a)</u> in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u> under the caption "Facility Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Commitments of the Lenders as of the date hereof is fifteen million dollars ($15,000,000), or such lesser amount as may be determined by the Bankruptcy Court; <u>provided</u>, <u>however</u>, prior to the Final Order Entry Date, such aggregate amount shall for all Lenders not exceed the Interim Commitment Amount.

"<u>Committed Loan Notice</u>" means a notice of Borrowing, converting, or continuing a Loan pursuant to <u>Section 2.02(a)</u>, which, if in writing, shall be substantially in the form of <u>Exhibit A</u>.

"<u>Committee</u>" means the official creditors' committee of creditors holdings unsecured claims, appointed by the Office of the United Stated Trustee of the Bankruptcy Court on July 30, 2021, in respect of the Cases pursuant to section 1102(a) of the Bankruptcy Code.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contractual Obligation" means, with respect to any Person, any provision of any document or undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controllable Costs" means fuel transportation costs, water costs and other fixed costs associated with operating the Projects, in each case, as indicated as "Controllable Costs" in the DIP Budget.

"Controlled Entity" means (a) any of the Borrower's respective Controlled Affiliates and (b) any of the Borrower's parent companies and their respective Controlled Affiliates. As used in this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Controlled Account" means each deposit account and securities account that is subject to a Lien and, from and after the Interim Order Entry Date, shall each be subject to an account control agreement in favor of the Collateral Agent and in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Credit Extension" means a Borrowing.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Required Lenders in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Required Lenders decide that any such convention is not administratively feasible for the Administrative Agent or the Lenders, then the Required Lenders may establish another convention in its reasonable discretion.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) with respect to any Obligation for which an interest rate is specified, an interest rate per annum equal to 2.0% in excess of the interest rate otherwise applicable thereto and (b) with respect to any Obligation for which an interest rate is not specified or available, an interest rate per annum equal to the Prime Rate plus the Applicable Margin with respect to Prime Loans plus 2.0%, in each case, to the fullest extent permitted by applicable Laws.

"Demand for Collateral" means a demand by a Project Party for additional cash or other collateral assets under a Material Project Document.

9

"DIP Budget" has the meaning specified in Section 6.01(c).

"DIP Orders" means the Interim DIP Order, the Final DIP Order and any amendment, modification or supplement thereto in form and substance acceptable to the Required Lenders in their sole discretion.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Distributions" means any (a) distribution of any nature or kind, either directly or indirectly, to any equity holder of any Borrower, including any dividend or distribution in cash or property of any kind and any "Tax Distributions" (as defined in any Borrower's limited liability company Operating Agreement); a purchase, redemption, reduction, return or any other payment of capital; or any repayment or reduction of Indebtedness owing to an equity holder of any Borrower or any Affiliate of any of them; (b) loans or other payments to an equity holder of any Borrower or any Affiliate of any of them; and (c) payment for or on behalf of an equity holder of any Borrower or any Affiliate of any of them by way of guaranty, indemnity or otherwise including in connection with any Indebtedness; but shall not include any payments made to a Project Party under a Material Project Document.

"Division/Series Transaction" means, with respect to any Person, a division of any such Person into two or more Persons pursuant to Section 18-217 of the Delaware Limited Liability Act (or any similar provision in any other applicable jurisdiction), or an allocation of assets of such person pursuant to such a division.

"Dollar" and "$" mean lawful money of the United States.

"Early Opt-in Election" means, if the then-current Benchmark is LIBO Rate, the occurrence of:

(1) a notification by the Required Lenders to each of the other parties hereto that at least five currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2) the joint election by the Required Lenders and the Administrative Borrower to trigger a fallback from LIBO Rate and the provision by the Required Lenders of written notice of such election to the Administrative Agent and the other Lenders.

"Easements" means (i) with respect to the Victoria Port Project, those easements listed on Part I of Schedule 2, and (ii) with respect to the Victoria City Project, those easements listed on Part II of Schedule 2, and, in each case, each additional easement that benefits a Project entered into after the Closing Date with the prior written consent of the Required Lenders.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any credit institution or investment firm established in any EEA Member Country.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Emergency DIP Facility" has the meaning specified in the recitals hereto.

"Emergency DIP Loan" has the meaning specified in the recitals hereto.

"Emergency DIP Obligations" means all advances to, and debts, liabilities, fees, obligations, indemnifications, covenants and duties of, any Borrower arising under the Emergency DIP Order or otherwise with respect to the Emergency DIP Facility, whether direct or indirect, absolute or contingent and due and owing as of the Closing Date.

"Emergency DIP Order" has the meaning specified in the recitals hereto.

"Emergency DIP Order Entry Date" has the meaning specified in the recitals hereto.

"Environmental Claim" means any and all administrative, regulatory or judicial actions, suits, demands, decrees, claims, liens, judgments, written warning notices, written notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages (foreseeable and unforeseeable, including consequential and punitive damages), penalties, fees, out-of-pocket costs, expenses, disbursements, attorneys' or consultants' fees, relating in any way to any actual or alleged breach or violation of any Environmental Law or any Required Approval issued under any such Environmental Law (hereafter "Environmental Proceedings"), including (a) any and all Environmental Proceedings by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Environmental Proceedings by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Material or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment, the treatment, use, generation, handling or storage of Hazardous Materials or the release of any Hazardous Materials.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and

whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERCOT" means Electric Reliability Council of Texas, Inc.

"ERCOT Protocols" means the document adopted, published and amended from time to time by ERCOT, and approved by the Texas Public Utility Commission, to govern electric transmission in ERCOT, including any attachments, exhibits or publications referenced in the document, and settlement policies, rules, guidelines, procedures, standards and criteria of ERCOT.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"ERISA Affiliate" means, with respect to any Borrower, any trade or business (whether or not incorporated) that is treated as a single employer together with any Borrower under section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor thereto), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Event of Eminent Domain" means any compulsory transfer or taking by condemnation, eminent domain or exercise of a similar power, or transfer or sale under threat of such compulsory transfer or taking, of any part of a Project, a Site or other Collateral, by any agency, department, authority, commission, board, instrumentality or political subdivision of the State of Texas, the United States or another Governmental Authority having jurisdiction.

"Excess Cash" means, as of any date of determination, the dollar amount of (a) the Borrowers' unrestricted cash and Cash Equivalents that are in Controlled Accounts that exceeds $300,000 *minus* (b) the sum of (i) amounts on deposit for any Demand for Collateral and (ii) the amount of forecasted disbursements in the DIP Budget projected to be made during the next four weeks after such date of determination.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Taxes" means, with respect to any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower, (a) net income taxes (including branch profits and similar taxes, if any) and franchise taxes imposed on any such recipient by the United States of America, any political subdivision thereof or therein, or any other country or any political subdivision of any country, in which any recipient is organized, or has its principal office or, in the case of any Lender, its applicable lending office, (b) in the case of any such recipient that is not a United States person (as defined in section 7701(a)(30) of the Code), any U.S. federal withholding tax that is imposed on amounts payable to such recipient pursuant to a law in effect on the date on which (i) such recipient becomes a party to the Agreement or designates a new lending office, except in each case to the extent that, pursuant to Section 11.06, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to such recipient's failure to comply with Section 3.01(e) hereof, and (d) any U.S. federal withholding Taxes attributable to FATCA.

"Exempt Wholesale Generator" means an "exempt wholesale generator" under Section 1262 of PUHCA and the implementing regulations of the FERC, at 18 C.F.R. §§ 366.1 and 366.7 (2017).

"Extraordinary Receipt" means any payments received by any Borrower of (i) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, (ii) indemnity payments, and (iii) tax refunds.

"Facility" means, at any time, (a) the aggregate amount of Commitments of all Lenders at such time, and (b) the aggregate principal amount of the Loans of all Lenders outstanding at such time.

"FATCA" means (a) sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), together with any current or future regulations or official interpretations thereof, (b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the United States of America and any other jurisdiction, which (in either case) facilitates the implementation of the foregoing clause (a), and (c) any agreements entered into pursuant to section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to JPMorgan Chase Bank, N.A. on such day on such transactions as determined by the L/C Issuing Bank.

"FERC" means the Federal Energy Regulatory Commission, or any successor agency to its duties and responsibilities and, in connection with Section 215 of the FPA, any national or regional electric reliability organization so certified or determined by the FERC.

"Final DIP Order" means, collectively, a final order of the Bankruptcy Court, in form and substance satisfactory to the Required Lenders in their sole discretion, entered in the Cases pursuant to section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents on a final basis, confirming the Interim DIP Order and authorizing (i) the Borrower to obtain credit as contemplated hereunder, (ii) the Borrowers to incur the Obligations and grant Liens under the Loan Documents and (iii) the Borrowers to use cash collateral.

"Final Order Entry Date" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"Final Roll-Up Loans" has the meaning set forth in Section 2.01(c).

"Floor" means 1.00% per annum.

"Force Majeure Event" means an event or circumstance beyond the reasonable control of the Person claiming the existence of a Force Majeure Event, that could not have been prevented by the exercise of reasonable care by such Person and that has a material effect on the ability of such Person to perform its obligations (assuming the foregoing conditions are satisfied), acts of God, strikes, lockouts or other industrial disturbances of a regional or national scope, acts of the public enemy, orders of a governmental authority, insurrection, riots, epidemics, civil disturbances, explosions, nuclear accidents, wars, or breakage of equipment due to a Force Majeure Event.

"Foreign Lender" means any Lender that is organized under the Laws of a jurisdiction other than that in which the Borrowers are resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FPA" means the Federal Power Act, 16 U.S.C. §§791 et seq., as amended, and the regulations of the FERC thereunder.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Governmental Authority" means (a) the government of (i) the United States or any State or other political subdivision thereof, or (ii) any other jurisdiction in which any Borrower conducts all or any part of its business, or which asserts jurisdiction over any properties of any Borrower, (b) any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government, or (c) ERCOT.

"Guarantee" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such Person: (a) to purchase such indebtedness or obligation or any property constituting security therefor, (b) to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation, (c) to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation, or (d) otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.  In any computation of the indebtedness or other liabilities of the obligor under any Guarantee, the indebtedness or other obligations that are the subject of such Guarantee shall be assumed to be direct obligations of such obligor.  The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" means any and all pollutants, toxic or hazardous wastes or other substances that might pose a hazard to health and safety, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any applicable law including, but not limited to, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"Indebtedness" with respect to any Person means, at any time, without duplication:

(a)    its liabilities for borrowed money and its redemption obligations in respect of mandatorily redeemable Preferred Stock;

(b) its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(c) (i) all liabilities appearing on its balance sheet in accordance with GAAP in respect of Capital Leases and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capital Leases;

(d) all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

(e) all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(f) the aggregate Swap Termination Value of all Swap Contracts of such Person; and

(g) any Guarantee of such Person with respect to liabilities of a type described in any of clauses (a) through (f) hereof.

Indebtedness of any Person shall include all obligations of such Person of the character described in clauses (a) through (g) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

"Indemnified Losses" is defined in Section 11.04(b).

"Indemnified Parties" is defined in Section 11.04(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Loan Document and (b) to the extent not described in (a), Other Taxes.

"Independent Engineer" means any independent engineering firm approved by the Required Lenders.

"Independent Manager" means Hugh Smith, who is engaged pursuant to the terms of that certain consulting agreement, dated as of December 8, 2020, by and between him and Parent, as the same may be amended or otherwise modified with the prior written consent of the Required Lenders.

"Information" has the meaning specified in Section 11.07.

"Initial DIP Budget" has the meaning specified in Section 4.01(d).

"Interest Payment Date" means, the last day of each calendar month (or, if such day is not a Business Day, the next succeeding Business Day) and the Maturity Date.

"Interest Period" means, as to each LIBOR Loan, the period commencing on the date such LIBOR Loan is disbursed or converted to or continued as a LIBOR Loan and ending on the date one (1) month

thereafter (subject to availability), as selected by the Administrative Borrower in its Committed Loan Notice; <u>provided</u>, that:

      (a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

      (b)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

      (c)      no Interest Period shall extend beyond the Maturity Date.

"<u>Interim Commitment Amount</u>" means an aggregate principal amount equal to six million dollars ($6,000,000.00), or such lesser amount as may be determined by the Bankruptcy Court.

"<u>Interim DIP Order</u>" means an interim order of the Bankruptcy Court, substantially in the form attached hereto as <u>Annex II</u> (or in the form and substance reasonably satisfactory to the Required Lenders in their sole discretion), entered in the Cases pursuant to section 364 of the Bankruptcy Code, approving this Agreement and the other Loan Documents on an interim basis and authorizing, among other things, (i) the Borrowers to obtain credit as contemplated hereunder, (ii) the Borrowers to incur the Obligations and grant Liens under the Loan Documents, and (iii) the Borrowers to use cash collateral.

"<u>Interim Order Entry Date</u>" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"<u>Interim Roll-Up Loans</u>" has the meaning set forth in <u>Section 2.01(c)</u>.

"<u>Investment</u>" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>Insurance Proceeds</u>" means all amounts and proceeds (including instruments) in respect of any Loss payable under any insurance policy maintained by or on behalf of any Borrower, other than proceeds received under business interruption insurance.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>ISDA Definitions</u>" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"<u>Laws</u>" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities,

including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Administrative Borrower and the Administrative Agent.

"LIBO Rate" means the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Required Lenders may designate from time to time) as of 11:00 a.m., London time, two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Loan requested (whether as an initial LIBOR Loan or as a continuation of a LIBOR Loan or as a conversion of a Prime Loan to a LIBOR Loan) by Borrowers in accordance with this Agreement (and, if any such published rate is below the Floor then in effect, then the rate shall be deemed to be the Floor). Each determination of the LIBO Rate shall be made by the Required Lenders and shall be conclusive in the absence of manifest error.  The LIBO Rate shall be no less than the Floor.

"LIBOR Loan" means any Loan that bears interest at a rate based on the LIBO Rate.

"Lien" means, with respect to any Person, any mortgage, lien, pledge, charge, security interest or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or Capital Lease, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements and all similar arrangements).

"Loan" has the meaning specified in Section 2.01(a).

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, (c) the DIP Orders and any Cash Management Order, and (d) each other agreement, certificate, document or instrument delivered by any Borrower in connection with any Loan Document, whether or not specifically mentioned herein or therein; provided that no Swap Contract shall constitute a Loan Document hereunder.

"Local Account" means with respect to Agilon, account no. 1004204226, established and maintained at Allegiance Bank.

"Loss" means any loss, theft, destruction, damage, casualty, Event of Eminent Domain, title defect or failure, zoning change, taking, condemnation, seizure, confiscation or requisition of or with respect to a Project or any part thereof.

"Loss Proceeds" means the aggregate amount of all Insurance Proceeds (including, without limitation, title insurance proceeds), other than proceeds received under business interruption insurance, and any other proceeds paid to, or for the benefit of, any Borrower in connection with any Loss.

"Material Adverse Effect" means a material adverse effect on one or more of the following: (a) the business, operations or condition of any Borrower or the Borrowers (financial or otherwise) of any Borrower; (b) the ability of any Borrower to perform its obligations under any of the Loan Documents or

Material Project Documents to which it is a party; (c) the rights or remedies of the Agents or any Lender; or (d) the validity, enforceability or priority of the Liens granted to the Collateral Agent to secure the Obligations; provided that, the filing of the Cases, the events leading to the filing of the Cases, the events that typically result from the filing of a case under Chapter 11 of the Bankruptcy Code shall not constitute a Material Adverse Effect.

"Material Contract" means (a) any energy purchase or sale agreement or heat rate call option or other energy hedge arrangement entered into after the Closing Date, (b) any other Contractual Obligation of any Borrower that is material to development, financing, construction, operation or maintenance of a Project or (c) any Contractual Obligation pursuant to which the aggregate payments to be made by any Borrower or the aggregate liabilities to be incurred by such Borrower thereunder exceed $100,000 in any year.

"Material Project Documents" each of the documents and agreements that were or are material to the operation of any of the Debtors businesses as set forth on Schedule 5.21, in each case, as in effect on or after January 1, 2021, as amended, restated, supplemented or otherwise modified (including the status of each such document and agreement, whether terminated or in effect), together with any document or agreement that amends, supplements or replaces any of the foregoing with the prior written consent of the Required Lenders.

"Maturity Date" means, the earliest of (a) March 1, 2022, (b) the earlier of the date (i) the Borrowers enter into (or file a motion with the Bankruptcy Court or otherwise support another Person taking action to pursue the Bankruptcy Court for approval of) a purchase agreement, unless such purchase agreement is entered into in connection with the Auction conducted pursuant to the Bidding Procedures Order, and (ii) the Borrowers file a motion or otherwise support another person taking action to pursue the Bankruptcy Court for approval of a sale (other than an Auction conducted pursuant to the Bidding Procedures Order), (c) the consummation of a sale of all or substantially all of the assets of any of the Borrowers or any Equity Interests of a Borrower pursuant to section 363 of the Bankruptcy Code or otherwise, (d) the effective date of a Plan of Reorganization or liquidation in the Cases, (e) the date of filing or support by the Borrowers of a Plan of Reorganization that (i) does not provide for indefeasible payment in full in cash of all Obligations in connection with the Facility and all obligations in connection with the Prepetition Senior Secured Note Documents and (ii) is not otherwise acceptable to the Required Lenders, (f) the filing of a motion by the Borrowers seeking dismissal of any Cases, the dismissal of any of the Cases, the filing of a motion by the Borrowers seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code or the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (g) the acceleration of the Obligations under the Facility following the occurrence of an Event of Default under the Loan Documents, and (h) the appointment of a Chapter 11 trustee.

"Milestones" means each of the milestones set forth in Annex I.

"Moody's" means Moody's Investors Service, Inc., or any successor entity.

"Multiemployer Plan" means any Plan that is a "multiemployer plan" (as such term is defined in Section 4001(a)(3) of ERISA).

"MW" means a megawatt (or 1,000 kilowatts) of electric capacity.

"Net Cash Proceeds" means:

(a)    with respect to any Disposition by any Borrower, or any Extraordinary Receipt received or paid to the account of any Borrower, the excess, if any, of (i) the sum of cash and Cash

18

Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Borrower in connection with such transaction and (C) income taxes reasonably estimated to be actually payable within one year of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided that, if the amount of any estimated taxes pursuant to subclause (C) exceeds the amount of taxes actually required to be paid in cash within one year of the date of the relevant transaction, the aggregate amount of such excess shall constitute Net Cash Proceeds; and

(b)      with respect to the sale or issuance of any Equity Interest by any Borrower, or the incurrence or issuance of any Indebtedness by any Borrower, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) reasonable underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Borrower in connection therewith.

"Note" means a promissory note made by the Borrowers in favor of a Lender evidencing Loans made by such Lender, substantially in the form of Exhibit B.

"NOx" is defined in Section 6.20.

"Obligations" means all advances to, and debts, liabilities, fees, obligations, indemnifications, covenants and duties of, any Borrower arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"OFAC Sanctions Program" means any economic or trade sanction that OFAC is responsible for administering and enforcing.   A list of OFAC Sanctions Programs may be found at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx.

"Operator" means a provider of management, operations, maintenance, and repair services for energy generation facilities acceptable to the Required Lenders.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any

other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent" means Agilon Energy II, LLC, a Texas limited liability company.

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(e).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor thereto.

"Permitted Investment" means any (a) marketable direct obligation of the United States of America, (b) marketable obligation directly and fully guaranteed as to interest and principal by the United States of America, (c) demand deposit in any Controlled Account, or time deposit, certificate of deposit and banker's acceptance issued by any member bank of the Federal Reserve System which is organized under the laws of the United States of America or any state thereof or any United States branch of a foreign bank, in each case whose equity capital is in excess of $500,000,000 and whose long-term debt securities are rated "A" or better by S&P and "A2" or better by Moody's, (d) commercial paper or tax exempt obligations given the highest rating by Moody's and S&P, (e) obligations of a commercial bank described in clause (c) above, in respect of the repurchase of obligations of the type as described in clauses (a) and (b) hereof, *provided* that such repurchase obligation shall be fully secured by obligations of the type described in said clauses (a) and (b) and the possession of such obligation shall be transferred to, and segregated from other obligations owned by, any such bank, (f) money market instruments rated "AAA" by S&P and "Aaa" by Moody's, (g) Eurodollar certificates of deposit issued by any bank described in clause (c) above, and (h) marketable securities rated not less than "A-1" by S&P or not less than "Prime-1" by Moody's.  In no event shall Permitted Investments include any obligation, certificate of deposit, acceptance, commercial paper or instrument which by its terms matures more than one hundred eighty (180) days after the date of investment, unless a bank meeting the requirements of clause (c) above shall have agreed to repurchase such obligation, certificate of deposit, acceptance, commercial paper or instrument at its purchase price plus earned interest within no more than ninety (90) days after its purchase thereunder.

"Permitted Lien" means: (a) Liens created pursuant to the Loan Documents; (b) Liens for taxes, assessments or governmental charges or levies not yet due and payable or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established and which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien; (c) Liens in respect of property or assets of any Borrower arising by operation of law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business which in each such circumstance (i) do not individually or in the aggregate materially detract from the value of the property or assets of any Borrower and do not materially impair the use thereof in the operation of the business of any Borrower or (ii) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or asset subject to such Lien and for which adequate reserves have been established; (d) easements, rights-of-way, restrictions (including zoning restrictions),

encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies, in each case whether now or hereafter in existence, not securing Indebtedness and not materially interfering with the conduct of the business of any Borrower; (e) Liens specified on Schedule B to each Title Policy; and (f) customary banker's and similar Liens in respect of deposit accounts that are subject to satisfactory account control agreements in favor of the Collateral Agent.

"<u>Permitted Prior Liens</u>" has the meaning given to such term under the DIP Orders.

"<u>Person</u>" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"<u>Petition Date</u>" has the meaning specified in the recitals hereto.

"<u>Plan</u>" means an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA that is or, within the preceding six years, has been established or maintained, or to which contributions are or, within the preceding six years, have been made or required to be made, by any Borrower or any ERISA Affiliate or with respect to which any Borrower or any ERISA Affiliate may have any liability.

"<u>Plan of Reorganization</u>" means a Chapter 11 plan of reorganization submitted by the Borrowers, or any of the Borrowers, to the Bankruptcy Court in connection with the Cases, or any Case, as applicable, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Platform</u>" has the meaning specified in <u>Section 11.02(c)</u>.

"<u>Pledged Debt</u>" means any promissory notes or tangible chattel paper.

"<u>Pledged Equity</u>" has the meaning specified in <u>Section 12.01(d)</u>.

"<u>Preferred Stock</u>" means any class of capital stock of a Person that is preferred over any other class of capital stock (or similar Equity Interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

"<u>Prepetition Agent</u>" means Wilmington Trust, National Association, as collateral agent for the Prepetition Noteholders and depositary under the Prepetition Senior Secured Note Documents.

"<u>Prepetition Collateral</u>" means any and all "Collateral" (as defined under the Prepetition Senior Secured Note Documents) that any Borrower has pledged, or purported to have pledged, to secure the Prepetition Indebtedness.

"<u>Prepetition Indebtedness</u>" means the Obligations as defined in the Prepetition Senior Secured NPA.

"<u>Prepetition L/C Issuing Bank</u>" means Manufacturers and Traders Trust Company, as letter of credit issuing bank under the Prepetition Senior Secured NPA.

"<u>Prepetition Letters of Credit</u>" means the letters of credit issued by the Prepetition L/C Issuing Bank under the Prepetition Senior Secured NPA prior to the Petition Date.

"<u>Prepetition Liens</u>" means the Liens in the Prepetition Collateral securing the Prepetition Indebtedness pursuant to the Prepetition Senior Secured Note Documents as in effect prior to the Petition Date.

"<u>Prepetition Noteholders</u>" means the "holders" under and as defined in the Prepetition Senior Secured NPA.

"<u>Prepetition Revolving Notes</u>" means the "Revolving Notes" as defined in the DIP Orders.

"<u>Prepetition Secured Parties</u>" means the Prepetition Agent, the Prepetition Noteholders and the Prepetition L/C Issuing Bank.

"<u>Prepetition Senior Secured Note Documents</u>" means the Prepetition Senior Secured NPA and the "Financing Documents" under and as defined in the Prepetition Senior Secured NPA as in effect on the date hereof, as such Prepetition Senior Secured Note Documents have been amended, restated, supplemented or otherwise modified on or before the Petition Date, as in effect on such date.

"<u>Prepetition Senior Secured NPA</u>" means that certain Senior Secured Note Purchase Agreement, dated as of February 23, 2018, among Agilon, the Prepetition Noteholders and Manufacturers and Traders Trust Company as letter of credit issuing bank, as the same has been amended, restated, supplemented or otherwise modified on or before the Petition Date, as in effect on such date.

"<u>Prepetition Term Notes</u>" means the "Term Notes" as defined in the DIP Orders.

"<u>Prime Rate</u>" means a fluctuating rate per annum (based on the actual number of days elapsed over a year of 365 or 366 days) equal on any given day to the rate of interest most recently displayed on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Required Lenders (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen), or if there shall at any time, for any reason, no longer exists a Bloomberg Screen BTMM (or any substitute screen), a comparable replacement rate determined by the Required Lenders at such time (which determination shall be conclusive absent manifest error) (the "<u>Reference Rate</u>"); the Prime Rate shall automatically fluctuate, without special notice to any Borrower or any other Person, upward and downward as and in the amount by which the Reference Rate shall fluctuate.  The Reference Rate is set by Bloomberg L.P. as a general reference rate of interest, taking into account such factors as Bloomberg L.P. may deem appropriate.  The Reference Rate is not necessarily the lowest or best rate actually charged to any customer, and such rate may not correspond with future increases or decreases in interest rates charged by other lenders or market rates in general. Bloomberg L.P. may make various business or other loans at rates of interest having no relationship to the Reference Rate.  Without notice to any Borrower or any other Person, the Reference Rate shall change automatically from time to time, as determined by Bloomberg L.P.

"<u>Prime Loan</u>" means any Loan that bears interest at a rate based on the Prime Rate.

"<u>Project Companies</u>" means Victoria Port and Victoria City.

"<u>Project Party</u>" means each Person party to the Material Project Documents other than a Borrower.

"<u>Projects</u>" means (a) the Victoria Port Project and (b) the Victoria City Project.

"property" or "properties" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"Proposed DIP Budget" has the meaning specified in Section 6.01(c).

"Professional Fees" means all accrued and unpaid claims for fees and expense reimbursements of Professional Persons retained by the Borrowers.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Borrower pursuant to section 327, 328 or 363 of the Bankruptcy Code or by any committee pursuant to section 1103 of the Bankruptcy Code.

"Prudent Industry Practices" means "Good Utility Practice" as such term is defined in Rule 25.5 of the Substantive Rules of the Public Utility Commission of Texas or its successor.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"PUCTX" means the Public Utility Commission of Texas or any successor agency.

"PUHCA" means the Public Utility Holding Company Act of 2005, as amended, and all rules and regulations of the FERC adopted thereunder.

"PURA" means the Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001 - 66.017 (Vernon 1998 & Supp. 2005) and the regulations of the PUCTX thereunder.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any Obligation of any Borrower hereunder or under any other Loan Document.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not LIBO Rate, the time determined by the Required Lenders in their reasonable discretion.

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Remedies Notice Period" has the meaning specified in Section 8.02(a).

"Required Approval" means all Approvals required in connection with the execution, delivery and performance of the Transaction Documents or the operation and maintenance of the Project, and the

generation, transmission and sale of energy generated by the Project as contemplated under the Transaction Documents.

"Required Lenders" means, as of any date of determination Lenders holding more than 50% of the sum of (i) Loans outstanding on such date and (ii) the Commitments.

"Responsible Officer" means, with respect to a Borrower, the Independent Manager and any other officer of a Borrower with responsibility for the administration of the relevant portion of this Agreement.

"Roll-Up" means the substitution and exchange of Prepetition Indebtedness into Roll-Up Loans and the principal amount due as of the date of the applicable DIP Order in respect of, and as a result of, the Prepetition Indebtedness rolled into the Obligations, in each case, as set forth in Section 2.01(c).

"Roll-Up Loans" has the meaning set forth in Section 2.01(c).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor thereto.

"Sale Process" means the implementation of bidding and sale procedures in respect of all of the Borrowers' assets and property, approved by an order of the Bankruptcy Court (including the Bidding Procedures Order) and in accordance with the Acceptable Sale Provisions, in form and substance satisfactory to the Required Lenders.

"Sanctions" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority with jurisdiction over any Lender, any Borrower or any of its Affiliates.

"Sanctioned Country" means at any time, a country or territory which is itself the subject or target of any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including, without limitation, OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in clauses (a) and (b), including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Peron(s).

"Secondary Term SOFR Conversion Date" has the meaning set forth in Section 2.12(f).

"Secured Parties" means, collectively, the Collateral Agent, Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Collateral Agent or the Administrative Agent from time to time pursuant to Section 9.02, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral hereunder or under any Loan Document.

"Securities" or "Security" shall have the meaning specified in Section 2(1) of the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"Securities Purchase Agreement" means the Securities Purchase Agreement, dated as of February 23, 2018 among Agilon and the purchasers of the securities party thereto.

"Site Leases" means the Victoria Port Site Lease and the Victoria City Site Lease.

"Sites" means (a) the Victoria Port Site and (b) the Victoria City Site.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding Business Day.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Sponsors" means Castleman Power Investment II, LLC, a Texas limited liability company, and Castleman Power Development, LLC, a Texas limited liability company.

"State Sanctions List" means a list that is adopted by any state Governmental Authority within the United States of America pertaining to Persons that engage in investment or other commercial activities in Iran or any other country that is a target of economic sanctions imposed under U.S. Economic Sanctions Laws.

"Subordinated Debt" means all Indebtedness of the Borrowers under the Subordinated Notes and all other obligations of the Borrowers under the Subordinated Note Documents.

"Subordinated Note Documents" means the Securities Purchase Agreement, the Subordinated Notes and the other "Financing Documents" (as defined in the Securities Purchase Agreement).

"Subordinated Notes" means the 15.00% Senior Subordinated Notes due November 30, 2025 issued pursuant to the Securities Purchase Agreement.

"Subsidiary" means, as to any Person, any other Person in which such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries owns sufficient equity or voting interests to enable it or them (as a group) ordinarily, in the absence of contingencies, to elect a majority of the directors (or Persons performing similar functions) of such second Person, and any partnership or joint venture if more than a 50% interest in the profits or capital thereof is owned by such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries (unless such partnership or joint venture can and does ordinarily take major business actions without the prior approval of such Person or one or more of its Subsidiaries).

"Swap Contract" means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions,

currency options, spot contracts or any other similar transactions or any of the foregoing (including, but without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to-market values(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"<u>Synthetic Lease</u>" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"<u>TCEQ</u>" is defined in <u>Section 6.20</u>.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"<u>Term SOFR Notice</u>" means a notification by the Required Lenders to the Administrative Agent, the other Lenders and the Administrative Borrower of the occurrence of a Term SOFR Transition Event.

"<u>Term SOFR Transition Event</u>" means the determination by the Required Lenders that (a) Term SOFR has been recommended for use by the Relevant Governmental Body, and is determinable for each Available Tenor, (b) the administration of Term SOFR is administratively feasible for the Administrative Agent and the Lenders and (c) a Benchmark Transition Event has previously occurred resulting in a Benchmark Replacement in accordance with <u>Section 2.12</u> that is not Term SOFR.

"<u>Test Date</u>" is defined in <u>Section 7.25(b)</u>.

"<u>Threshold Amount</u>" means $75,000.

"<u>Title Policy</u>" means the T-2 Loan Policy of Title Insurance with respect to each Site, together with such endorsements as are required by the Lenders, issued in connection with the Prepetition Indebtedness.

"<u>Transaction</u>" means collectively, (a) the entering into by the Borrowers of the Loan Documents, (b) the extension of the Facility by the Lenders to the Borrowers and (c) the payment of all fees and expenses incurred in connection with the foregoing.

"<u>Transaction Documents</u>" means, collectively, the Loan Documents and the Material Project Documents.

"Type" means, with respect to a Loan, its character as a Prime Loan or a LIBOR Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"USA PATRIOT Act" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"U.S. Economic Sanctions Laws" means those laws, executive orders, enabling legislation or regulations administered and enforced by the United States pursuant to which economic sanctions have been imposed on any Person, entity, organization, country or regime, including the Trading with the Enemy Act, the International Emergency Economic Powers Act, the Iran Sanctions Act, the Sudan Accountability and Divestment Act and any other OFAC Sanctions Program.

"United States" and "U.S." mean the United States of America.

"Variable Costs" means the cost of fuel and other variable operations and maintenance costs incurred when power is generated by the Projects, in each case, as indicated as "Variable Costs" in the DIP Budget.

"Variance Report" has the meaning specified in Section 6.01(c).

"Victoria City" means Victoria City Power LLC, a Texas limited liability company.

"Victoria City Project" means Victoria City's approximately 100 MW gas-fired power generating station, to be developed, constructed, located and operated on the Victoria City Site.

"Victoria City Site" means the real property on which the Victoria City Project is to be located, the legal description of which is set forth in the Victoria City Site Lease, and all related easements, rights-of-way and other rights and interests.

"Victoria City Site Lease" means the Ground Lease Agreement, dated February 23, 2018, between Victoria City, LLC and Victoria City.

"Victoria Port" means Victoria Port Power LLC, a Texas limited liability company.

"Victoria Port Master Lease" means the Ground Lease, dated November 21, 2017, between Victoria County Navigation District and Victoria Bloomington, LLC, as amended by First Amendment to Ground Lease dated as of February 23, 2018.

"Victoria Port Project" means Victoria Port's approximately 100 MW gas-fired power generating station, to be developed, constructed, located and operated on the Victoria Port Site.

"Victoria Port Site" means the real property on which the Victoria Port Project is to be located, the legal description of which is set forth in the Victoria Port Site Lease, and all related easements, rights-of-way and other rights and interests.

"Victoria Port Site Lease" means the Sublease Agreement, dated February 23, 2018, between Victoria Bloomington, LLC and Victoria Port.

"Weekly Lender Call Date" has the meaning specified in Section 6.23.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with,

GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)     <u>Changes in Accounting Treatment</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Administrative Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Administrative Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  If any change in GAAP or application thereof would require that leases treated as operating leases hereunder prior to such change shall be treated as Capitalized Leases hereunder.

(c)     <u>Consolidation of Variable Interest Entities</u>.  All references herein to consolidated financial statements of the Borrowers or to the determination of any amount for the Borrowers on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrowers are required to consolidate pursuant to FASB Interpretation No. 46 – Consolidation of Variable Interest Entities: an interpretation of ARB No. 51 (January 2003) as if such variable interest entity were a Subsidiary as defined herein.

(d)     <u>Valuation of Indebtedness and Financial Instruments</u>.  Notwithstanding any other provision herein or in any other Loan Document, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrowers shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

1.04    <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

2.01    <u>Loans</u>.

(a)     Subject to the terms and conditions set forth herein or in any DIP Order, each Lender severally, and not jointly, agrees to make loans to the Borrowers (A) on and after the Closing Date but prior to the Final Order Entry Date, two (2) Borrowings which shall be at least seven (7) days apart and in accordance with the DIP Budget, in an aggregate amount not to exceed such Lender's Applicable Percentage of the Interim Commitment Amount, and (B) after the Final Order Entry Date until the last day of the Availability Period, from time to time but no more frequently than once every seven (7) days and in accordance with the DIP Budget, in an amount not to exceed such Lender's remaining Commitment (collectively, the "<u>Loan</u>").  The Loans extended on the applicable Borrowing date shall be used in accordance with <u>Section 6.11</u>. Notwithstanding anything to the contrary, the principal amount of the Loans to be made shall be subject to reduction (but not increase) to any lesser such amount approved by the Bankruptcy Court pursuant to the Interim DIP Order.

(b)     Amounts borrowed under this <u>Section 2.01(a)</u> and repaid or prepaid may not be reborrowed.

(c)     Subject to the terms and conditions set forth herein and in the DIP Order, (i) upon entry of the Interim DIP Order, a portion of the Prepetition Indebtedness held by the Prepetition Noteholders which are also Lenders (or are Affiliates of Lenders) hereunder shall be automatically substituted and exchanged for (and repaid by) Loans hereunder in an aggregate principal amount equal to six million dollars ($6,000,000.00), constituting for each Lender $1.00 of Prepetition Indebtedness of such Lender (or its Affiliate) for each $1.00 of such Lender's Applicable Percentage of the Interim Commitment Amount, which substitution and exchange shall be on a pro rata basis of the Prepetition Secured Parties' holdings of the Prepetition Term Notes and Prepetition Revolving Notes (the "Interim Roll-Up Loans"), and such Interim Roll-Up Loans shall be deemed funded on the Closing Date, and shall constitute and be deemed to be Loans hereunder as of such date, and (ii) upon the Final Order Entry Date, a portion of the Prepetition Indebtedness held by the Prepetition Noteholders which are also Lenders (or Affiliates of Lenders) hereunder shall be automatically substituted and exchanged for (and repaid by) Loans hereunder in an aggregate principal amount equal to nine million dollars ($9,000,000.00), constituting for each Lender $1.00 of Prepetition Indebtedness of such Lender (or its Affiliate) for each $1.00 of such Lender's Applicable Percentage of an amount equal to the difference between the remaining Commitment and the Interim Commitment Amount, which substitution and exchange shall be on a pro rata basis of the Prepetition Secured Parties' holdings of the Prepetition Term Notes and Prepetition Revolving Notes (the "Final Roll-Up Loans"; together with the Interim Roll-Up Loans, collectively, the "Roll-Up Loans"), and such Final Roll-Up Loans shall be deemed funded on the Final Order Entry Date, and shall constitute and shall be deemed to be Loans for all purposes hereunder and under the other Loan Documents as of such date. Without limiting the foregoing, such Roll-Up Loans shall be allocated among the Lenders based on each Lender's Applicable Percentage, in each case without constituting a novation or satisfaction of the exchanged Prepetition Indebtedness. The parties hereto acknowledge and agree that, upon entry of the applicable DIP Order, the applicable principal amount of the Prepetition Indebtedness shall be rolled into the DIP Facility and deemed to constitute Obligations.

2.02     Borrowings.

(a)     Each Loan Borrowing, each conversion of Loans from one Type to another Type, and each continuation of LIBOR Loans shall be made upon the Administrative Borrower's irrevocable delivery of a Committed Loan Notice to the Administrative Agent. Each Committed Loan Notice must be received by the Administrative Agent not later than 1 p.m. one (1) Business Day prior to the requested date of any Loan Borrowing, conversion, or continuation; *provided* that no such notice shall be required for the deemed funding of the Roll-Up Loans pursuant to Section 2.01(c). Each Borrowing, conversion, or continuation of Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof unless otherwise agreed to by the Lenders. Each Committed Loan Notice shall specify (i) the requested date of the Borrowing, conversion, or continuation (which shall be a Business Day), (ii) the principal amount of Loans to be Borrowed, converted, or continued, and (iii) the Type of Loans to be Borrowed or to which existing Loans are to be converted.

(b)     Following receipt of a Committed Loan Notice that is appropriately completed and signed by a Responsible Officer of the Administrative Borrower, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the Facility. Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is on the Closing Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Administrative Borrower.

(c)     Except as otherwise provided herein, a LIBOR Loan may be continued or converted only on the last day of an Interest Period for such LIBOR Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as LIBOR Loans without the consent of the Required Lenders, and the Required Lenders may demand that any or all of the outstanding LIBOR Loans be converted immediately to Prime Loans.

2.03    Prepayments.

(a)     Optional.  The Borrowers may, upon notice to the Lenders, at any time or from time to time voluntarily prepay Loans in whole or in part; provided that (A) such notice must be received by each Lender not later than 11:00 a.m. one (1) Business Day prior to any date of prepayment of Loans; and (B) any prepayment of Loans shall be in a principal amount of $250,000 or a whole multiple of $50,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Lenders will promptly notify the Administrative Agent of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage).  If such notice is given by the Administrative Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of each of the relevant Facilities.

(b)     Mandatory.

(i)      The entire principal amount of all outstanding Loans shall be repaid in full on the Maturity Date.

(ii)     If any Borrower Disposes (other than such Dispositions expressly permitted pursuant to Section 7.05) of any property, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds immediately upon receipt thereof by such Borrower.

(iii)    Upon receipt by any Borrower of any cash capital contribution to such Borrower, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Borrower.

(iv)    Upon the incurrence or issuance by any Borrower of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.02), the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Borrower.

(v)     Upon any Extraordinary Receipt received by or paid to or for the account of any Borrower, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Borrower.

(vi)    At any time the amount of the Borrowers' Excess Cash on any Interest Payment Date is greater than $0, the Borrowers shall first immediately pay any accrued but unpaid interest in cash until the amount of such accrued but unpaid interest is $0 in accordance with Section 2.06(c). If the balance of the Excess Cash is greater than $0 after giving effect to the payment of any accrued but unpaid interest in accordance with Section 2.06(c), the Borrowers shall then prepay an aggregate principal amount of the Loans equal to 100% of such remaining Excess Cash on such Interest Payment Date.

(c)    Effect on Swap Contracts.  Any prepayment shall be without prejudice to any Borrower's obligations under any Swap Contract, which shall remain in full force and effect subject to the terms of such Swap Contract (including provisions that may require a reduction, modification or early termination of a swap transaction, in whole or in part, in the event of such prepayment, and may require the Borrowers to pay any fees or other amounts for such reduction, modification or early termination), and no such fees or amounts shall be deemed a penalty hereunder or otherwise.

2.04    Termination or Reduction of Commitments.

(a)    Mandatory.

(i)    All of the Commitments, if not sooner terminated, shall terminate on the earlier to occur of the Maturity Date and the last day of the Availability Period.

(ii)    Upon each Borrowing of a Loan, the aggregate amount of Commitments outstanding at the time of such Borrowing shall be reduced by the aggregate amount of Loans funded on the date of such Borrowing.

2.05    Repayment of Loans.  The Borrowers shall repay to the Lenders the principal amount of the Loans on the Maturity Date.

2.06    Interest.  (a) Subject to the provisions of Section 2.06(b), (i) each LIBOR Loan under the Facility shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable Borrowing date at a rate per annum equal to the LIBO Rate for such Interest Period plus the Applicable Margin and (ii) each Prime Loan under the Facility shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Prime Rate plus the Applicable Margin.

(b)    (i)  If any amount payable by the Borrowers is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    While any Event of Default exists, the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; provided that while any delinquent amount is accruing interest at the Default Rate pursuant to Section 2.06(b)(i) above, such delinquent amount shall not also accrue interest at the Default Rate under this Section 2.06(b)(ii).

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest and interest accruing at the Default Rate) shall be due and payable upon demand.

(c)    (a)    Interest on each Loan shall be due and payable in cash in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein and shall be due on the Maturity Date; provided that subject to the immediately following proviso, the Administrative Borrower may elect to not make such payment of interest in cash on any Interest Payment Date and such interest shall continue to accrue; provided, however, that notwithstanding the foregoing, at any time the amount of the Borrowers' Excess Cash on any Interest Payment Date is greater than $0, the Borrowers shall immediately pay any accrued but unpaid interest in cash as set forth in Section 2.03(b)(vi).  Payments in cash with respect

to accrued interest shall be applied in the order as elected by the Lenders. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

2.07    Fees.

(a)    Upfront Fee. The Borrowers will pay to the Administrative Agent, for the account of each Lender, an upfront fee (the "Upfront Fee") equal to 2.0% of the amount of the Commitment, to be distributed to each Lender on a pro rata basis based on such Lender's Applicable Percentage of the Commitments. The entire amount of the Upfront Fee shall be fully earned, due and owing on the Closing Date and shall be payable in cash on the Maturity Date.

(b)    Unused Line Fee. The Borrowers will pay to the Administrative Agent for the account of each Lender, on a pro rata basis based on such Lender's Applicable Percentage, an unused line fee equal the actual daily amount by which the Commitments exceed the outstanding principal amount of the Loans times 0.50% per annum (the "Unused Line Fee"). The Unused Line Fee shall be fully earned, due and owing on the first day after the end of each fiscal month and on the Maturity Date and shall be payable in cash on the Maturity Date.   The unused line fee shall accrue at all times from the Closing Date until the Maturity Date, including at any time during which one or more of the conditions in Article IV is not met.

(c)    Agency Fee.  The initial agency fee of $50,000 per annum (the "Agency Fee") will be paid to the Collateral Agent on the Closing Date, to the extent not previously paid with the proceeds of the Initial Emergency DIP Loan (pursuant to and as defined in the Emergency DIP Order). A subsequent Agency Fee shall be due and payable by the Borrower to the Collateral Agent on each annual anniversary of the Closing Date.

(d)    Fees Generally. All fees will be payable in U.S. dollars in immediately available funds to the Administrative Agent or as directed by the Required Lenders, free and clear of, and without deduction for, any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (with appropriate gross-up for withholding taxes). Once paid, no fee will be refundable under any circumstances and will not be subject to counterclaim setoff or otherwise affected.

2.08    Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Required Lenders of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.09    Evidence of Debt.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender a Note, which shall evidence such Lender's Loans in addition to such accounts or records.

Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.10   <u>Payments Generally; Administrative Agent's Clawback</u>.

(a)   <u>General</u>.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)   <u>Failure to Satisfy Conditions Precedent</u>.   If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c)   <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint.  The failure of any Lender to make any Loan or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 11.04(c)</u>.

(d)   <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(e)   <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

2.11   <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (x) Obligations in respect of the Facility due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (y) Obligations in respect of any of the

Facility owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facility then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, <u>provided</u> that:

 (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

 (ii) the provisions of this Section shall not be construed to apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to any Borrower (as to which the provisions of this Section shall apply).

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

2.12 <u>Benchmark Replacement Setting</u>.

(a) Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document.

(b) In connection with the implementation of a Benchmark Replacement, the Required Lenders will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     The Administrative Borrower (at the direction of the Required Lenders) will promptly notify the other Lenders of (i) any occurrence of a Benchmark Transition Event (other than the Benchmark Transition Event that occurred prior to March 30, 2021), a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Required Lenders pursuant to this Section 2.12, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.12.

(d)     Notwithstanding anything to the contrary herein or in any other Transaction Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBO Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Required Lenders in their reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Required Lenders may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Required Lenders may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Upon the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any request for a Loan bearing interest based on the LIBO Rate, conversion to or continuation of LIBOR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to Prime Rate Loans.

(f)     Notwithstanding anything to the contrary herein or in any other Loan Document and subject to the proviso below in this paragraph, if a Term SOFR Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (i) the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Transaction Document in respect of such Benchmark setting (the "Secondary Term SOFR Conversion Date") and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; and (ii) Loans outstanding on the Secondary Term SOFR Conversion Date bearing interest based on the then-current Benchmark shall be deemed to have been converted to Loans bearing interest at the Benchmark Replacement with a tenor approximately the same length as the interest payment period of the then-current Benchmark; provided that, this Section 2.12(f) shall not be effective unless the Required Lenders have delivered to the Administrative Borrower a Term SOFR Notice.

(g)     This Section 2.12 provides a mechanism for determining an alternative rate of interest in the event that the London interbank offered rate is no longer available or in certain other circumstances. The Lenders and the Administrative Agent do not warrant or accept any responsibility for and shall not

have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of LIBO Rate or with respect to any alternative or successor rate thereto, or replacement rate therefor.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.  For purposes of this Section 3.01, the term "applicable law" includes FATCA.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.  (i) Any and all payments by or on account of any obligation of any Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Laws require any Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by any Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below, and the full amount so deducted or withheld shall be timely paid to the relevant Governmental Authority in accordance with applicable law.

(ii)    If any Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the any Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Borrowers.  Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Tax Indemnifications.  (i)  Without limiting the provisions of subsection (a) or (b) above, the Borrowers shall, and do hereby, jointly and severally, indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by the Borrowers or the Administrative Agent or paid by or required to be withheld or deducted from a payment to such Recipient, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The Borrowers shall also, and do hereby, jointly and severally, indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required by clause (ii) of this subsection.  A certificate as to the amount of any such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent),

or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Without limiting the provisions of <u>subsection (a)</u> or <u>(b)</u> above, each Lender shall, and does hereby, severally indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for (x) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrowers have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (y) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.06</u> relating to the maintenance of a Participant Register, and (z) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>clause (ii)</u>.  The agreements in this <u>clause (ii)</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)     <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Borrower or the Administrative Agent to a Governmental Authority as provided in this <u>Section 3.01</u>, the Borrowers shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrowers, as the case may be, a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrowers or the Administrative Agent, as the case may be.

(e)     <u>Status of Lenders; Tax Documentation</u>.  (i)  Each Lender shall deliver to the Borrowers and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrowers or the Administrative Agent, as the case may be, to make such payments without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable Laws or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation (other than such documentation set forth in <u>clauses (ii)(A)</u> and <u>(ii)(B)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, if any Borrower is resident for tax purposes in the United States,

(A)     any Lender that is a "United States person" within the meaning of section 7701(a)(30) of the Code shall deliver to the Borrowers and the Administrative Agent executed copies of Internal Revenue Service Form W-9 certifying that such Lender is not subject to backup withholding tax; and

(B)　　each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(I)　　in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(II)　　executed originals of Internal Revenue Service Form W-8ECI,

(III)　　executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation, or

(IV)　　in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of section 871(h)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) executed originals of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable;

(C)　　any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)　　Each Lender shall promptly update any form or certification it previously delivered that expires or becomes or obsolete or inaccurate in any respect, or promptly notify the Administrative Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)　　_Treatment of Certain Refunds_.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall pay to

the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection (f), the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     Survival.  Each party's obligations under this Section 3.01 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

3.02     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such other Recipient, the Borrowers will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into

consideration such Lender's and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Administrative Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Recipient to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Recipient's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Recipient pursuant to the foregoing provisions of this Section for any increased costs or reductions suffered more than nine months prior to the date that such Recipient notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Recipient's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.03     Survival.  All of the Borrowers' obligations under this Article III shall survive termination of the Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

4.01     Conditions to the Closing Date.  The obligation of each Lender to make its initial Loans hereunder, including the deemed funding of the Roll-Up Loans pursuant to Section 2.01(c) is subject to satisfaction of the following conditions precedent:

(a)     Each Lender's receipt of the following, each of which shall be originals or copies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Borrower, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to each of the Lenders:

(i)     executed counterparts of this Agreement;

(ii)     a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)     duly executed counterparts of each other Loan Document, if any, together with:

(A)     confirmation that the Collateral Agent is in receipt of all certificates representing the Pledged Equity accompanied by undated stock or membership interest powers executed in blank and instruments evidencing any Pledged Debt pursuant to Section 12.01 indorsed in blank,

(B)     confirmation that the Administrative Agent has received acknowledgement copies of proper financing statements duly filed on or before the Closing Date under the UCC of all jurisdictions that the Required Lenders may deem necessary or desirable in order to perfect the Liens created pursuant to the DIP Orders and/or hereunder;

(C)    results of searches or other evidence reasonably satisfactory to the Required Lenders (in each case dated as of a date reasonably satisfactory to the Required Lenders), and

(D)    evidence of the completion of all other actions, recordings and filings of or with respect to this Agreement that the Required Lenders may deem necessary or desirable in order to perfect the Liens created pursuant to the DIP Orders and/or hereunder;

(iv)    certificates executed by a Responsible Officer of each Borrower (i) attaching such documents and certifications as the Required Lenders may reasonably require to evidence that each Borrower is duly organized or formed, including without limitation the Organization Documents for such Borrower, and that each Borrower is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification; (ii) attaching resolutions or other action authorizing the actions of such Borrower under the Loan Documents; and (iii) evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Borrower is a party or is to be a party;

(v)    a certificate executed by a Responsible Officer of the Borrowers certifying that all governmental and third-party consents, licenses and approvals, if any, necessary in connection with the DIP Facility, the operation of each Debtors' business and the Transactions hereunder have been obtained and remain in effect;

(vi)    a certificate executed by a Responsible Officer of the Borrowers certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied, and (B) since the Emergency DIP Order Entry Date, no change, occurrence or development shall have occurred or become known to the Borrowers that has had or could reasonably be expected to have a Material Adverse Effect;

(vii)    certificates of insurance and endorsements reasonably satisfactory to the Required Lenders demonstrating the Borrowers' compliance with Section 6.07;

(viii)    [reserved]; and

(ix)    such other assurances, certificates, documents or consents as any Lender reasonably may require.

(b)    The Borrowers shall have filed an application with the Bankruptcy Court to retain each of Grant Thornton LLP, as their financial advisor and ERM as their investment banker in connection with the Cases and the Sale Process, such applications to be satisfactory to the Required Lenders.

(c)    The Borrowers shall have delivered to the Agents account control agreements in favor of the Collateral Agent and in form and substance satisfactory to the Required Lenders for each of the Borrowers' deposit accounts located at Allegiance Bank.

(d)    The Required Lenders shall have received the initial DIP Budget (the "Initial DIP Budget") in form and substance acceptable to the Required Lenders in their sole discretion, certified by a Responsible Officer of the Borrowers, certifying that the projections therein have been prepared in good faith based on reasonable assumptions, and that such projections contain no statements or conclusions (and there are no omissions of information) which are based upon or include information known to the Borrowers to be

misleading in any material respect or which fail to take into account information known to the Borrowers regarding materials reported therein.

(e)    All fees required to be paid to the Administrative Agent, Collateral Agent and the Lenders on or before the Closing Date, shall have been paid.

(f)    The Borrowers shall have paid all reasonable and documented fees, charges and disbursements of counsel to the Lenders, the Collateral Agent and the Administrative Agent (directly to such counsel if requested by the Lenders, the Collateral Agent or Administrative Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Administrative Agent, Collateral Agent and/or the Lenders).

(g)    The Collateral Agent shall have a valid first priority perfected Lien on the Collateral, subject only to the Carve Out and the Permitted Prior Liens.

(h)    Each Lender, the Collateral Agent and the Administrative Agent shall have received, to the extent applicable, not less than five (5) days prior to the Closing Date, all documentation and other information that the Administrative Agent requests in order to comply with requirements of Anti-Money Laundering Laws, including, without limitation, the USA PATRIOT Act and any applicable "know your customer" rules and regulations.

(i)    Bankruptcy Matters.

(i)    Entry of Interim DIP Order.  The Bankruptcy Court shall have approved and entered the Interim DIP Order no later than September 2, 2021, in form and substance satisfactory to the Required Lenders in their sole discretion.  The Interim DIP Order shall not have been reversed, stayed or vacated and shall have not been amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay; provided that no Lender shall be required to fund any Borrowing to the extent that the Interim DIP Order does not approve the Roll-Up that is to be consummated pursuant to Section 2.01(c)(i).

(ii)    Cash Management. The Borrowers shall have established or shall maintain a cash management systems acceptable to the Required Lenders and if requested by the Required Lenders, the entry by the Bankruptcy Court of a Cash Management Order shall be a condition to the funding by the Lenders of the initial Loan hereunder. To the extent a Cash Management Order has been entered by the Bankruptcy Court prior to the Closing Date, the Borrowers shall have taken all steps necessary to comply with such Cash Management Order. Any Cash Management Order  shall not have been reversed, stayed or vacated and shall have not been amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay.

(iii)    First Day Pleadings and First Day Orders.  All "first day" orders shall not have been amended or supplemented in any manner that could be adverse to the Agents' or the Lenders' interests or be inconsistent, in any material respect, with the terms hereof or with the Interim DIP Order unless such amendment or supplement shall have been approved in advance in writing by the Required Lenders.

(iv)     Control Over Collateral.   No trustee, examiner, or receiver shall have been appointed or designated with respect to the Borrowers' business, properties or assets and the Bankruptcy Court shall not have entered any order granting any party, other than the Borrowers and the Agents, control over any Collateral.

Without limiting the generality of the provisions of Section 9.06, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.02     Conditions to all Credit Extensions.   The obligation of each Lender to honor any Committed Loan Notice is subject to the following conditions precedent:

(a)     The representations and warranties of each Borrower contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to the extent that any representation or warranty is already qualified or modified by materiality or subject to any dollar threshold in the text thereof) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b), respectively.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof and the making of such Credit Extension shall not violate any requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently.

(c)     Except with respect to the Roll-Up Loans deemed funded pursuant to Section 2.01(c), the Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)     With respect to any Credit Extension requested after the Final Order Entry Date, the Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on the date that is on or before twenty-one (21) calendar days after the Interim Order Entry Date, (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned or modified in any respect without the written consent of the Required Lenders in their sole discretion, and shall not have been reversed, stayed or vacated and shall have not been amended, supplemented or otherwise modified absent prior written consent of the Required Lenders or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay, and (iii) shall approve the Roll-Up.

(e)     Each Borrowing shall demonstrate prospective compliance with the DIP Budget and the applicable Variance Report for such period.

Each Committed Loan Notice submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and the Lenders that:

5.01    Existence, Qualification and Power.  Each Borrower (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the Transaction subject to the entry of the DIP Orders, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  No Borrower is an EEA Financial Institution.

5.02    Authorization; No Contravention.  Subject to the entry of the DIP Orders, the execution, delivery and performance by each Borrower of each Loan Document to which such Borrower is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Borrower's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation (other than any applicable anti-assignment provisions in effect as of the Petition Date) to which such Borrower is a party or affecting such Borrower or the properties of such Borrower or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Borrower or its property is subject; or (c) violate any Law.

5.03    Governmental Authorization.  Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with (other than the filings required by the Loan Documents and the DIP Orders), any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Borrower of this Agreement or any other Loan Document or for the consummation of the Transaction, (b) the grant by any Borrower of the Liens granted by it pursuant to Article XII hereof, (c) the perfection or maintenance of the Liens created pursuant to Article XII hereof (including the first priority nature thereof, subject only to the Carve Out and the Permitted Prior Liens) or (d) the exercise by the Agents or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to Article XII hereof, except for the Required Approvals listed on Part I of Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect, and each Required Approval listed in Part II of Schedule 5.03 is not required to be obtained until after the Closing Date, and such Required Approvals can be obtained when required without material expense or for aggregate fees and costs not exceeding the amounts budgeted therefor in the DIP Budget.

5.04    Binding Effect.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Borrower that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Borrower, enforceable against each Borrower that is party thereto in accordance with its terms, subject to the entry of the DIP Orders and further subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the Cases, and further subject to general principles of equity regardless of whether considered in a proceeding in equity or at law.

5.05    <u>Financial Statements; No Material Adverse Effect</u>.

(a)    [Reserved].

(b)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)    [Reserved].

(d)    Each DIP Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such DIP Budget, and represented, at the time of delivery, the Borrowers' good faith estimate of its future financial condition and performance.

5.06    <u>Litigation</u>.  To the knowledge of the Borrowers after due inquiry, other than the Cases and as set forth on <u>Schedule 5.06</u>, there are no actions, suits, investigations or proceedings pending or threatened against or affecting any Borrower or any property of any Borrower, including either Project, in any court or before any arbitrator of any kind or before or by any Governmental Authority that (x) could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (y) or that questions the validity of any of the Transaction Documents.

5.07    <u>No Default</u>. No Borrower is (a) in "Default" or "Event of Default" under the Loan Documents, (b) in default under any material agreement or instrument to which it is a party or by which it is bound (excluding the Material Project Documents which are addressed in <u>Section 5.21</u>), which  has not been waived or cured within any applicable notice and cure period, (c) in default or in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority in any material respect, or (d) in violation of any applicable law, ordinance, rule or regulation (including without limitation the USA PATRIOT Act but excluding Environmental Laws which are addressed in <u>Section 5.09</u>) of any Governmental Authority in any material respect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by the Agreement or any other Loan Document.

5.08    <u>Ownership of Property; Liens; Leases; Investments</u>.

(a)    The Borrowers have good and sufficient title to their respective properties that individually or in the aggregate are material to its business, in each case free and clear of Liens other than Permitted Liens and other Liens permitted under <u>Section 7.01</u>.

(b)    To the best of the Borrowers' knowledge after due inquiry, <u>Schedule 5.08(b)</u> sets forth a complete and accurate list of all Liens on the property or assets of each Borrower on the date hereof (other than the Liens in favor of the Collateral Agent securing the Obligations hereunder), showing as of the date hereof the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Borrower subject thereto.  To the best of the Borrowers' knowledge after due inquiry, the property of each Borrower is subject to no Liens, other than Liens set forth on <u>Schedule 5.08(b)</u>, and as otherwise permitted by <u>Section 7.01</u>.

(c)    Subject to <u>Section 6.14</u> and except as set forth on <u>Schedule 5.08(c)</u>, each Project Company has good, valid, marketable and indefeasible leasehold and easement interests in such Project Company's Site and the improvements thereon and the portions of its Project that constitute real property, and other real property rights and interest necessary for the construction, ownership, operation and maintenance of its Project, in each case free and clear of Liens (other than Permitted Liens and other Liens permitted under <u>Section 7.01</u>).  Each Site Lease is valid and subsisting and in full force and effect and has not been

terminated.  The real property interests, easements and other rights of each Project Company set forth in the applicable Title Policy and encumbered by the applicable Prepetition Senior Secured Note Document and the Loan Documents:

        (i)  Except as set forth on <u>Schedule 5.08</u>, comprise all of the real property interests necessary to secure any right required with respect to (1) the use, operation or maintenance of its Project in accordance with all requirements of law, including all Required Approvals, and (2) the generation, transmission and sale of energy generated by its Project up to the point of interconnection with the electric grid in accordance with all requirements of law, including all Required Approvals;

        (ii)  Except as set forth on <u>Schedule 5.08(c)</u>, are sufficient to enable its Project to be located, used, operated and routinely maintained on its Site through December 31, 2028; and

        (iii)  provide adequate ingress and egress for any reasonable purpose in connection with the use, leasing, operation and routine maintenance of its Project through December 31, 2028.

(d)     [Reserved].

(e)     [Reserved].

(f)     The Project Companies have no knowledge (after due inquiry) of any gas, oil or mineral rights with respect to the Sites, the exercise of which could interfere with the Project Companies' use of the surface of the Sites or the Projects.

(g)     <u>Schedule 5.08(g)</u> sets forth a complete and accurate list of all Investments held by any Borrower on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

     5.09   <u>Environmental Matters</u>.

(a)     The Borrowers have no knowledge (after due inquiry) of any Environmental Claim and there is no pending proceeding that has been instituted raising any Environmental Claim, in each case, against any Borrower or a Site, alleging any damage to the environment or violation of any Environmental Laws that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrowers have no knowledge (after due inquiry) of any facts which would give rise to any Environmental Claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to either Site that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Except to the extent that could not reasonably be expected to result in a Material Adverse Effect, neither Project Company has stored any Hazardous Materials on its Site or has disposed of any Hazardous Materials in a manner contrary to any Environmental Laws.

(d)     All buildings on either Site (if any) are in compliance with applicable Environmental Laws, except to the extent that failure to be in compliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)     No Lien has been recorded pursuant to any Environmental Law with respect to either Site.

(f)     To the extent available, the Borrowers have provided to the Lenders copies of all environmental audits, reports, assessments, Required Approvals obtained pursuant to Environmental Laws, and any other material environmental document related to either Project or either Site.

(g)     Neither Project Company will be considered the owner or operator under applicable laws for any pre-existing structure, device, equipment, tankage, or waste management unit or similar improvements not used in operations represented in any application made by the Project Company for an Approval existing or which may have existed at the applicable Site.

(h)     There is no aboveground or underground storage tankage regulated under applicable law that is not described in an application for an Approval.

(i)     Emissions associated with neither of the Projects will be aggregated with the emissions from other sources under applicable laws.

(j)     Neither Project, as built and operated, will include sources of air emissions that are not specifically identified in the relevant application for Approval.

(k)     To the Borrowers' knowledge after due inquiry, no navigable waters or waters of the United States, as defined under applicable law or described by judicial authority are present on either Site that are not reflected on the most recent National Wetlands Inventory Map, and the construction and operation of neither Project will involve the discharge of fill into any such waters.

(l)     To the Borrowers' knowledge after due inquiry, no species or habitat of a species listed as endangered or threatened under applicable law will be affected by the operation of either Project and is present on either Site.

(m)     To the Borrowers' knowledge after due inquiry, no sites listed on or eligible for listing on the National Register of Historic Places, or otherwise having historical, archeological or cultural significance, are present at either Site.

5.10    Insurance.  The properties of the Borrowers are insured with financially sound and reputable insurance companies not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Borrower operates.

5.11    Taxes.  The Borrowers have filed all tax returns that are required to have been filed in any jurisdiction, and except as set forth on Schedule 5.11, have paid all Taxes shown to be due and payable on such returns and all other Taxes and assessments levied upon any Borrower or their respective properties, assets, income or franchises, to the extent such Taxes and assessments have become due and payable and before they have become delinquent, except for any Taxes and assessments the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings without thereby incurring any material risk of the imposition or enforcement of any Lien and with respect to which such Borrower has established adequate reserves in accordance with GAAP.  No Borrower knows of any basis for any other Tax or assessment that could reasonably be expected to have a Material Adverse Effect.

5.12    Organization and Ownership of Interests in Borrower; Affiliates; Officers; No Subsidiaries.

(a)     To the best of the Borrowers' knowledge after due inquiry, Schedule 5.12(a) contains a complete and correct list and description of (i) the Sponsors' and any other Person's ownership interests in

the Parent and the Parent's ownership interests in Agilon and Agilon's ownership interests in each Project Company, and (ii) each Borrower's directors, managers, and officers, as applicable.

(b)      Set forth on <u>Schedule 5.12(b)</u> is a complete and accurate list of each Borrower, showing as of the Closing Date (as to each Borrower), the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number.

(c)      The limited liability company membership interests of each Project Company are validly issued, are fully paid and nonassessable and are owned solely by Agilon free and clear of any Lien (except the Carve Out, the Permitted Prior Liens and the Liens created pursuant to <u>Article XII</u> hereof).

(d)      Agilon does not own any Equity Interests in any Person other than the Project Companies, and the Project Companies do not own any Equity Interests in any Person.

5.13      <u>Margin Regulations; Status under Certain Statutes</u>.

(a)      No Borrower is engaged, nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and is not otherwise engaged and will not otherwise engage in any activity in violation of Regulations T, U or X issued by the FRB.

(b)      No Borrower is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or an "investment adviser" within the meaning of the Investment Advisers Act of 1940, as amended.

(c)      To the best of the Borrowers' knowledge after due inquiry, each Material Project Document is effective pursuant to the terms thereof and has received all approvals, authorizations, and acceptances required to be effective from every applicable Governmental Authority.

(d)      Each Borrower is in compliance with all and are not in violation of any applicable requirements and rules of the PUCTX, ERCOT or FERC, including but not limited to all requirements applicable to any Borrower under Section 215 of the FPA.  No Borrower requires permission or authorization from, or is required to deliver any notice to, FERC or the PUCTX in order to execute and deliver the Transaction Documents to which it is a party or to enter into and perform the transactions contemplated thereby.

(e)      Solely as a result of the execution and delivery of the Loan Documents and the entering into and performance of the Transactions contemplated thereby, none of the Secured Parties nor any Affiliates thereof shall become subject to, or not exempt from, regulation either by the FERC (under either of the FPA or PUHCA) or by the PUCTX under PURA, except by the exercise by the Secured Parties of certain remedies allowed under the Loan Documents.  No prior authorization, approval, registration, filing, or notice by or with the PUCTX or any other Governmental Authority is required for the execution and delivery of any Loan Documents and the granting of the Liens under the Loan Documents, or the performance of payment obligations under any Loan Documents.

5.14      <u>Disclosure</u>.  Each Borrower has disclosed to the Lenders  all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information, including any DIP Budget, furnished by or on behalf of any Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement

or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or, when taken as a whole, omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to projected financial information, other forward-looking information and information of a general economic or general industry nature, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that such projected financial information is not to be viewed as facts and that the actual results may vary materially from such projected financial information).

5.15    [Reserved].

5.16    <u>Licenses, Permits, Etc</u>.  Except as set forth in <u>Part II</u> of <u>Schedule 5.03</u> and <u>Part II</u> of <u>Schedule 5.21</u> or where failure to do so could not reasonably be expected to result in a Material Adverse Effect:

(a)    The Borrowers own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, that individually or in the aggregate are material to the construction and operation of the Projects, without known conflict with the rights of others.

(b)    To the knowledge of the Borrowers after due inquiry, no product or service of any Borrower infringes in any material respect any license, permit, franchise, authorization, patent, copyright, proprietary software, service mark, trademark, trade name or other right owned by any other Person.

(c)    To the knowledge of the Borrowers after due inquiry, there is no violation by any Person of any right of any Borrower with respect to any material license, permit, franchise, authorization, patent, copyright, proprietary software, service mark, trademark, trade name or other right owned or used by such Borrower.

5.17    <u>Casualty, Etc</u>.  Neither the businesses nor the properties of any Borrower are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.18    <u>Labor Relations; Force Majeure Events; Access to Utilities</u>.  No strike, slowdown or stoppage is pending or, to any Borrower's knowledge after due inquiry, threatened, against any Borrower, their contractors or either Project. None of any Borrower or a Project or any other Project Party has suffered any Force Majeure Event that is continuing.  All utility services (including electricity) necessary for the construction, development, ownership, operation and maintenance of each Project for its intended purposes are available at the applicable Site or can reasonably be expected to be commercially available as and when required upon commercially reasonable terms and consistent with the schedule and budget for the Projects.

5.19    <u>Use of Proceeds</u>.  The proceeds of the Loans will be used exclusively to pay expenditures set forth in the DIP Budget, expressly permitted by the DIP Orders and by <u>Sections 6.11</u> and <u>7.20</u> of this Agreement.

5.20    <u>Compliance with ERISA</u>.

(a)    Either (i) each Borrower and each of its ERISA Affiliates (A) do not maintain, contribute to or are obligated to maintain or contribute to, any Plans and (B) are not, or have not ever been at any time

within the past six years, a "party in interest" (as defined in section 3(14) of ERISA) or a "disqualified person" (as defined in section 4975 of the Code) with respect to any Plan or (ii) each Borrower and each of its ERISA Affiliates have operated and administered each Plan in compliance in all material respects with all applicable laws.  No Borrower nor any of its ERISA Affiliates has incurred any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could, individually or in the aggregate, reasonably be expected to result in the incurrence of any such liability by any Borrower or any of its ERISA Affiliates, or in the imposition of any Lien on any of the rights, properties or assets of any Borrower or any of its ERISA Affiliates, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such penalty or excise tax provisions under the Code or federal law or section 4068 of ERISA or by the granting of a security interest in connection with the amendment of a Plan, other than such liabilities or Liens as would not be individually or in the aggregate material.

(b)      Either (i) each Borrower and each of its ERISA Affiliates (A) do not maintain, contribute to or are obligated to maintain or contribute to, any Plans and (B) are not, or have not ever been at any time within the past six years, a "party in interest" (as defined in section 3(14) of ERISA) or a "disqualified person" (as defined in section 4975 of the Code) with respect to any Plan or (ii) the present value of the aggregate benefit liabilities under each of the Plans (other than Multiemployer Plans), determined as of the end of such Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such Plan allocable to such benefit liabilities.  The term "benefit liabilities" has the meaning specified in section 4001 of ERISA and the terms "current value" and "present value" have the meaning specified in section 3 of ERISA.

(c)      Each Borrower and its ERISA Affiliates, if any, have not incurred withdrawal liabilities (and are not subject to contingent withdrawal liabilities) under section 4201 or 4204 of ERISA in respect of Multiemployer Plans.

(d)      The expected postretirement benefit obligation, if any, of each Borrower (determined as of the last day of the Borrowers' most recently ended fiscal year in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code or similar state law) is not material to the Borrowers.

(e)      The execution and delivery of this Agreement and the extensions of credit hereunder will not involve any transaction that is subject to the prohibitions of section 406 of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.

5.21    Material Project Documents.  The Material Project Documents listed on Schedule 5.21 constitute and include all contracts and agreements that are material to the ownership, operation and maintenance of the Projects and the generation, transmission and sale of energy generated by the Projects, other than contracts for consumables and non-material services that are readily available and do not involve material expense.  Each Material Project Document identified on Part I of Schedule 5.21 is in full force and effect.  Each Material Project Document listed in Part II of Schedule 5.21 is not required to be obtained until after the Closing Date and shall be subject to the advance approval of the Required Lenders.  Other than defaults disclosed in writing to the Lenders prior to the date hereof that existed as of the Petition Date, no Borrower is in default under any of the Material Project Documents as described in Schedule 5.21, nor has an event or omission occurred which with the giving of notice or lapse of time, or both, would constitute a default by any Borrower, under any of the Material Project Documents.

5.22    Bank Accounts.  The account numbers, names of the applicable financial institutions, and locations of all bank accounts, deposit accounts, and investment accounts of the Borrowers are set forth on Schedule 5.22 hereto, which Schedule identifies all such accounts (if any) used as tax accounts, to hold any amounts with respect to a Demand for Collateral or payroll accounts.

5.23    Collateral.  The Collateral, as described in the Loan Documents, as applicable, includes all of the real and personal property of each Borrower (other than those items of property specifically excluded as Collateral by the terms thereof in such Loan Documents), and all Equity Interests in each Project Company, and constitutes all assets reasonably necessary for the operation and maintenance of the Projects. The security interests in the Collateral granted to the Collateral Agent (for the benefit of the Secured Parties) pursuant to the Loan Documents: (a) constitute as to personal property included in the Collateral and, with respect to subsequently acquired personal property included in the Collateral, will constitute, upon entry of the DIP Orders, a perfected first-priority security interest and Lien (subject in priority only to the Carve Out and the Permitted Prior Liens), and (b) upon entry of the DIP Orders, are, and, with respect to such subsequently acquired property, will be, as to Collateral perfected pursuant to the DIP Orders, superior and prior to the rights of all third Persons now existing or hereafter arising whether by way of mortgage, Lien, security interests, encumbrance, assignment or otherwise (subject in priority only to the Carve Out and the Permitted Prior Liens).  Subject to entry of the DIP Orders, all action as is necessary has been taken to establish and perfect the Collateral Agent's rights in and to, and the first lien priority (subject in priority only to the Carve Out and the Permitted Prior Liens) of its Lien on, the Collateral for the benefit of the Secured Parties.  The applicable DIP Order has been entered by the required date hereunder and, upon such entry, shall be effective to create and perfect the Lien and security interest described above and with the priority thereof.

5.24    Foreign Assets Control Regulations, Etc.

(a)    No Borrower nor any Controlled Entity (i) is a Blocked Person, (ii) has been notified that its name appears or may in the future appear on a State Sanctions List or (iii) is a target of sanctions that have been imposed by the United Nations or the European Union.

(b)    No Borrower nor any Controlled Entity (i) has violated, been found in violation of, or been charged or convicted under, any applicable U.S. Economic Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws or (ii) to the Borrowers' knowledge after due inquiry, is under investigation by any Governmental Authority for possible violation of any U.S. Economic Sanctions Laws, Anti-Money Laundering Laws or Anti-Corruption Laws.

(c)    No proceeds of any Credit Extension have been used, directly or indirectly, by any Borrower or an of their respective directors, officers, employees and agents that:

(i)    constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by the Borrowers or any Controlled Entity, directly or indirectly, (A) in connection with any investment in, or any transactions or dealings with, any Blocked Person, (B) for any purpose that would cause any Secured Party to be in violation of any U.S. Economic Sanctions Laws or (C) otherwise in violation of any U.S. Economic Sanctions Laws;

(ii)    will be used, directly or indirectly, in violation of, or cause any Secured Party to be in violation of, any applicable Anti-Money Laundering Laws;

(iii)    will be used, directly or indirectly, for the purpose of making any improper payments, including bribes, to any Governmental Authority or commercial counterparty in order to obtain, retain or direct business or obtain any improper advantage, in each case which would be

in violation of, or cause any Secured Party to be in violation of, any applicable Anti-Corruption Laws; or

(iv)     will be in violation of Section 7.10.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Borrower shall:

6.01     Financial Statements.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Required Lenders:

(a)     as soon as available, but in any event within one-hundred twenty (120) days after the end of each fiscal year of the Borrowers, (i) a balance sheet of Agilon (and a consolidated balance sheet with each Project Company) as at the end of such year and (ii) a statement of income, profit and loss statement and cash flows statement for Agilon (and consolidating statements with each Project Company) for such year, in each case, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP, or accompanied by GAAP reconciliations;

(b)     as soon as available, but in any event within forty-five (45) days after the end of each quarterly fiscal period in each fiscal year of the Borrowers, (i) an unaudited balance sheet of each Borrower as at the end of such quarter and (ii) an unaudited profit and loss statement and cash flows statement for each Borrower for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter, in each case, setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to quarterly financial statements generally, or accompanied by GAAP reconciliations, and certified by a Responsible Officer of the Borrowers as fairly presenting the financial position and results of operations and cash flows of the Borrowers, subject to changes resulting from year-end adjustments and the absence of footnotes;

(c)     on a weekly basis and by no later than 1:00 p.m. on Friday of each week thereafter,

(i)     an updated thirteen week cash flow forecast setting forth all sources and uses of cash and beginning and ending cash balances, and with a reasonable disclosure of the key assumptions and drivers with respect to such forecast, and a written update regarding material operational, business and financial developments relating the Borrowers (such forecast as of any date, the "Cash Flow Forecast"),

(ii)     a cash balance report showing the aggregate cash balance amount held in all accounts of the Borrowers as of close of business on Wednesday of such week (such report as of any date, the "Cash Balance Report"), and

(iii)     a variance report reconciling the most recent DIP Budget for the prior week to the actual sources and uses of cash for such prior week on an aggregate basis, along with a line-by-line reconciliation and detailed explanation of variances in excess of the greater of 5% and $10,000 from such DIP Budget (the "Variance Report"), in each case, in form and detail acceptable to the Required Lenders and certified by a Responsible Officer of the Borrowers to the effect that the DIP Budget contains good faith estimates (utilizing assumptions believed to be reasonable at the time of delivery of such DIP Budget) and with respect to the Cash Flow Forecast, Cash Balance Report

and Variance Report, that such reports are accurate and complete in all material respects and that the Variance Report is in compliance with Section 7.23; and

(d)      DIP Budget.  no later than the last week of the then in effect DIP Budget, a proposed DIP Budget for the following rolling 13-week period (the "Proposed DIP Budget"), which shall be consistent in form and subject (other than dollar amounts) with the Initial DIP Budget, and that shall be subject to the approval of the Required Lenders in their sole discretion. If such Proposed DIP Budget is approved it shall then become the "DIP Budget" then in effect; provided, however, that if such Proposed DIP Budget is not approved by the Required Lenders, then the last approved DIP Budget will be rolled forward on a week-to-week basis. Notwithstanding the foregoing, the Borrowers may submit a Proposed DIP Budget to the Administrative Agent and the Lenders during the sixth week of the Initial DIP Budget for approval.  If the Required Lenders approve such Proposed DIP Budget (which may be withheld or granted in the Required Lenders' sole discretion), such Proposed DIP Budget shall replace and supersede the Interim DIP Budget for all purposes hereunder.  If such Proposed DIP Budget is not approved, the Initial DIP Budget delivered on the Closing Date shall remain in effect until replaced or rolled-forward as set forth in the first sentence of this clause (d).

6.02    Certificates; Notices; Other Information.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Required Lenders:

(a)      promptly upon becoming available, one copy of each regular or periodic report and filing (without exhibits except as expressly requested by a Lender) made by any Borrower to or with any State or federal regulatory body;

(b)      promptly, and in any event within five (5) Business Days after a Responsible Officer of any Borrower becoming aware of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 8.01(e) or Section 8.01(k), a written notice specifying the nature and period of existence thereof and what action the Borrowers are taking or proposes to take with respect thereto;

(c)      promptly, and in any event within five (5) Business Days after receipt, the results of any audit reports relating to any Borrower;

(d)      promptly, and in any event within five (5) Business Days after a Responsible Officer becoming aware of any of the following, a written notice setting forth the nature thereof and the action, if any, that the Borrowers or an ERISA Affiliate proposes to take with respect thereto:

(i)      with respect to any Plan, any reportable event, as defined in section 4043(c) of ERISA and the regulations thereunder, for which notice thereof has not been waived pursuant to such regulations as in effect on the date hereof; or

(ii)      the taking by the PBGC of steps to institute, or the threatening by the PBGC of the institution of, proceedings under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan; or

(iii)      any event, transaction or condition that could reasonably be expected to result in the incurrence of any liability by any Borrower or any ERISA Affiliate pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (within

the meaning of section 3(3) of ERISA), or in the imposition of any Lien on any of the rights, properties or assets of any Borrower or any ERISA Affiliate pursuant to Title I or IV of ERISA or such penalty or excise tax provisions, if such liability or Lien, taken together with any other such liabilities or Liens then existing, could reasonably be expected to have a Material Adverse Effect.

(e)       promptly, and in any event within thirty (30) days of receipt thereof, copies of any material notice to any Borrower from any federal or State Governmental Authority;

(f)       (i) promptly, and in any event within three (3) Business Days of receipt thereof, any Demand for Collateral or any notice (other than ordinary course notices), including any notice that a Demand for Collateral will be made, received from or delivered under any Material Project Document and (ii) a biweekly report of the Option Provider's market-to-market exposure with respect to any Material Project Document,

(g)       promptly, and in any event within five (5) Business Days of receipt thereof, a copy of the monthly report provided to the Borrowers by Tateswood Energy Company, LLC or any successor asset management service approved by the Required Lenders;

(h)       promptly, and in any event within thirty (30) days after the end of each month after the Closing Date, a monthly operating report with respect to such Project substantially in the form attached hereto as Schedule 6.02(h) or such other form as is acceptable to the Administrative Agent;

(i)       promptly, and in any event within thirty (30) days of the end of each fiscal year of the Borrowers, commencing with the fiscal year ending December 31, 2021 and upon the reasonable request of the Required Lenders, evidence of insurance in effect that meets the requirements of Section 6.07;

(j)       promptly, and in any event within two (2) Business Days of receipt thereof, copies of any certificates, reports or other documentation delivered by Borrower to the holders of the Subordinated Notes in connection with the Subordinated Notes pursuant to the Securities Purchase Agreement;

(k)       promptly, such additional information regarding the business, financial, legal or corporate affairs of any Borrower, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request;

(l)       promptly, and in any event within two (2) Business Days of receipt thereof, copies of any material documentation or notices received under or with respect to the Prepetition Indebtedness or the Subordinated Debt not otherwise provided to the Administrative Agent under this Agreement and/or the other Loan Documents;

(m)       promptly, and in any event within two (2) Business Days after any delivery thereof, copies of all material written reports and presentations delivered by or on behalf of any Borrower to the Committee or any other party in interest in the Cases that have not been filed publicly on the Bankruptcy Court's docket within such period;

(n)       promptly, and in any event within five (5) Business Days of receipt (or knowledge) thereof:

(i)       any press releases and other public statements about a Project made available generally by the Borrowers;

(ii)       notice of the occurrence of any condition or event that could reasonably result in a Material Adverse Effect;

(iii)    copies of any notice of or other correspondence regarding a violation, breach or event of default under any Material Project Document;

(iv)    any actual termination or rescission or any written threat of termination or rescission of any Material Project Document, any notice of exercise of a right of termination or suspension of a Material Project Document and any proposed amendment (after such proposal has been reviewed by and is determined to be substantially acceptable to the Administrative Borrower) or final amendment of any Material Project Document;

(v)    notice of any material pending or threatened adversarial or contested proceeding of or before a Governmental Authority relating to the Project and any correspondence and documentation related thereto;

(vi)    notice of any termination, suspension or other loss of any Required Approval;

(vii)    any claim of Force Majeure Event under any Material Project Document;

(viii)    verification of the results of each relative accuracy test audit (RATA); and

(o)    with reasonable promptness, such other data and information then in any Borrower's possession relating to the business, operations, affairs, financial condition, assets or properties of any Borrower or relating to the ability of any Borrower to perform its obligations hereunder and under the Loan Documents (including the DIP Budget) as from time to time may be reasonably requested by any Lender.

6.03    Officer's Certificate.  Each set of financial statements delivered to the Lenders pursuant to Section 6.01(a) or Section 6.01(b) shall be accompanied by a certificate of a Responsible Officer of the Borrowers setting forth a statement that such Responsible Officer has reviewed the relevant terms hereof and has made, or caused to be made, under his or her supervision, a review of the transactions and conditions of the Borrowers from the beginning of the annual or quarterly period covered by the statements then being furnished to the date of the certificate and that such review shall not have disclosed the existence during such period of any condition or event that constitutes a Default or an Event of Default or, if any such condition or event existed or exists (including, without limitation, any such event or condition resulting from the failure of any Borrower to comply with any Environmental Law), specifying the nature and period of existence thereof and what action such Borrower shall have taken or proposes to take with respect thereto.

6.04    Payment of Obligations.  Subject to Section 7.23 and the DIP Orders, pay and discharge as the same shall become due and payable, all its obligations and liabilities constituting post-petition obligations that constitute administrative expenses in the Cases under the Bankruptcy Code or otherwise permitted to be paid (whether as ordinary course obligations or otherwise) or required to be paid pursuant to an effective order issued by the Bankruptcy Court, including (a) all tax liabilities (including sales tax), assessments and governmental charges or levies upon it or its properties or assets; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness; unless, in the case of clause (a) above or mechanics' Liens, materialmen's Liens or other similar Liens in the case of clause (b) above, the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Borrower.

6.05    Preservation of Existence, Etc.  Preserve and keep in full force and effect its limited liability company existence and maintain all rights, privileges and franchises necessary in the normal conduct of its business.

6.06    Title, Etc.  Maintain good, valid, marketable and insurable title to, or leasehold interests in, the Projects and the other Collateral described in the Loan Documents, subject to Permitted Liens and other Liens permitted under Section 7.01, and will at all times warrant and defend the title to such property and such Collateral against all claims that do not constitute Permitted Liens or other Liens permitted under Section 7.01.

6.07    Maintenance of Insurance.  Maintain, with financially sound and reputable insurers, insurance meeting the requirements of Schedule 6.07.

6.08    Compliance with Laws.  Comply in all material respects with all laws, ordinances or governmental rules or regulations to which it is subject, including, without limitation, ERISA, the USA PATRIOT Act and Environmental Laws.  Each Borrower will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties, the conduct of their businesses and the operation and financing of the Projects, and will promptly pay when due all necessary license, franchise and other fees and charges due and payable thereunder (*provided* that the Borrowers need not pay any such license, franchise and other fees and charges if (a) the amount, applicability or validity thereof is contested by such Borrower on a timely basis in good faith and in appropriate proceedings, and such Borrower has established adequate reserves therefor in accordance with GAAP on its books, (b) the nonpayment of all such license, franchise and other fees and charges during the pendency of such contest could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect), or (c) to the extent such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court.  Each Project Company shall abide by all ERCOT Protocols when transacting business with ERCOT.

6.09    Books and Records.  Maintain proper books of record and accounts in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over such Borrower and in a manner consistent with Prudent Industry Practices.

6.10    Inspection Rights.    At the expense of the Borrowers, permit representatives of Administrative Agent or the Required Lenders to: (i) visit the principal executive office of each Borrower and examine all their books of account, records, reports and other papers and make copies and extracts therefrom, (ii) discuss the affairs, finances and accounts of any Borrower with such Borrower's officers, directors and managers, and their independent public accountants and other professional advisors, and (iii) visit the other offices and properties of the Borrowers; in each case, from time to time, with reasonable prior written notice to the Administrative Borrower and during normal business hours and subject to reasonable requirements of safety; provided, however, that, if no Default or Event of Default has occurred and is continuing, visits to the Borrowers shall be limited to three (3) in any 12-month period.

6.11    Use of Proceeds; Margin Regulations.  Use the proceeds of the Credit Extensions hereunder solely for the purposes set forth in Section 5.19.  No part of the proceeds of Loans will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221), or for the purpose of buying or carrying or trading in any securities under such circumstances as to involve any Borrower in a violation of Regulation X of said Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of said Board (12 CFR 220).  As used in this Section, the terms "margin stock" and "purpose of buying or carrying" shall have the meanings assigned to them in Regulation U.

6.12    Material Project Documents.  Subject to the DIP Orders, the DIP Budget and any necessary order or authorization of the Bankruptcy Court, (a) perform and observe in all material respects all of the terms, covenants, provisions and agreements of such Borrower under the Material Project Documents, (b) perform and observe in all material respects all of the terms covenants, provisions and agreements of such Borrower under all other material agreements to which it is a party, and (c) take reasonable actions to enforce all rights and obligations under the Material Project Documents and other agreements.

6.13    Accounts.  Establish and maintain all deposit accounts of the Borrowers as Controlled Accounts.

6.14    Further Assurances.  Promptly upon request by the Administrative Agent, or any Lender or the Collateral Agent through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by this Agreement or the DIP Orders, (iii) perfect and maintain the validity, effectiveness and priority of any of the Liens intended to be created hereunder or under any of the DIP Orders and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Borrower is or is to be a party. No Borrower shall form or acquire or permit to exist any Subsidiary, whether direct or indirect, after the Closing Date. Each Borrower shall take such additional actions as may be necessary or desirable to ensure a valid first priority perfect Lien over the assets of each Borrower (subject only to the Carve Out and the Permitted Prior Liens) including filing a copy of the DIP Orders in the real property records in the county where the Projects are located.

6.15    [Reserved].

6.16    Material Contracts.  Subject to the DIP Budget, the DIP Orders and any necessary order or authorization of the Bankruptcy Court, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Borrower is entitled to make under such Material Contract, except, in any case, to the extent such Material Contract may not be enforced solely as a result of the filing of the Cases.

6.17    Compliance with Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions. Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrowers and their respective directors, officers, employees and agents with all Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions.

6.18    Filing with the PUCTX.   Each Project Company is qualified as a "Power Generation Company" under the rules and regulations of the PUCTX and has filed with PUCTX for "Power Generation Company" status for a generating facility.

6.19    Exempt Wholesale Generator Status.  Each Project Company has filed with the FERC a notice of self-certification in accordance with 18 C.F.R. § 366.7 demonstrating that the applicable Project

satisfies the definition of an Exempt Wholesale Generator and the FERC shall not have issued a notice or order that removes such self-certification.

6.20    Emissions Credits.  No later than (a) December 31 of each calendar year of operations for each Project, the Borrowers will purchase a sufficient amount of nitrogen oxide ("NOx") allowances as required by the Texas Commission on Environmental Quality ("TCEQ") to offset the actual amount of each Project's NOx emissions for such calendar year; and (b) December 31 of each calendar year of operations for each Project, each Project Company shall transfer to the Administrator the amount of NOx allowances required pursuant to 40 CFR Part 97, Subpart EEEEE for CSAPR NOx Ozone Season Group 2 Trading Program.  No later than (c) December 31 of each calendar year of operations for each Project, the Borrowers will purchase a sufficient amount of NOx allowances as required by the TCEQ to offset the actual amount of the each Project's NOx emissions for such calendar year; and (d) December 31 of each calendar year of operations for the each Project, each Project Company shall transfer to the Administrator the amount of NOx allowances required pursuant to 40 CFR Part 97, Subpart EEEEE for CSAPR NOx Ozone Season Group 2 Trading Program.

6.21    [Reserved].

6.22    Cash Management Arrangements; Payment of Professional Fees.  (a) Maintain, and cause each of the other Borrowers to maintain, all deposit accounts and securities accounts as Controlled Accounts, (b) deposit all receivables, securities, cash and Cash Equivalents into a Controlled Account, and (c) otherwise maintain a cash management system in accordance with any Cash Management Order and as satisfactory to the Required Lenders. Upon the occurrence and during the continuation of an Event of Default, subject to Section 8.02, all deposits in such Controlled Accounts shall be transferred to an account designated by the Required Lenders on each Business Day and applied to repay the outstanding Obligations in accordance with  Section 8.03. The cash management system of the Borrowers shall be otherwise maintained in a manner satisfactory to the Required Lenders. All Professional Fees at any time paid by the Borrowers, or any of them, shall be paid by the Borrowers pursuant to an order of the Bankruptcy Court, including, without limitation the DIP Orders and pursuant to the DIP Budget.

6.23    Weekly Lender Calls.  Upon the request of Required Lenders, on a date to be mutually agreed upon by the Administrative Borrower and the Required Lenders (a "Weekly Lender Call Date"), commencing with the first full calendar week ending after the Closing Date, hold a conference call (at a time mutually agreed upon by the Administrative Borrower and the Required Lenders) with all Lenders who choose to attend such conference call, during which conference call the Borrowers shall discuss the Cases, the Sale Process, the financial condition and results of operations of the Borrowers, including the DIP Budget and the Variance Reports.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Borrower shall:

7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC of any jurisdiction a financing statement that names any Borrower as debtor, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)      Permitted Liens;

(c)      Liens created pursuant to Capitalized Leases or purchase money Indebtedness permitted pursuant to this Agreement;

(d)      Liens securing the Prepetition Indebtedness, including without limitation, the Prepetition Letters of Credit;

(e)      Permitted Prior Liens;

(f)      Adequate Protection Liens; and

(g)      to the extent validly existing prior to the Petition Date, the Liens (including a description of the assets) set forth on Schedule 5.08(b) that are not Permitted Prior Liens; provided that such Liens shall be subject to the priority and treatment set forth in the DIP Orders all rights of the Lenders and the Borrower to challenge such Liens are preserved;

provided, further, that, all Permitted Liens (other than the Carve Out and Permitted Prior Liens), while any portion of the Obligations remain outstanding, shall at all times be junior and subordinate to the Liens granted under the Loan Documents and the DIP Orders, which prohibition specifically restricts, without limitation, any Borrower, the Committee, or any other party-in-interest in the Cases or any successor case, from priming or creating Liens senior to or *pari passu* with any Liens of the Collateral Agent, the Lenders or any other Secured Party (other than the Carve Out and Permitted Prior Liens) irrespective of whether such Liens may be "adequately protected" without the prior written approval, which may be withheld in the sole and absolute discretion, of the Lenders.

7.02    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      obligations (contingent or otherwise) existing or arising under any Swap Contract entered into prior to the Petition Date in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates, provided that such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligations to make payments on outstanding transactions to the defaulting party;

(b)      Indebtedness under the Loan Documents;

(c)      Indebtedness outstanding as of the Petition Date in respect of Capitalized Leases and purchase money obligations for fixed or capital assets as set forth on Schedule 7.02;

(d)      to the extent constituting Indebtedness, the obligations of the Borrowers outstanding as of the Petition Date under the Material Project Documents as set forth on Schedule 7.02;

(e)      the Subordinated Debt, and any guarantee of the Subordinated Debt by the Borrowers, in each case subject to the subordination provisions set forth in the Subordinated Note Documents, and in a principal amount not to exceed $22,00,000.00, plus accrued and capitalized interest thereon, in accordance with the terms thereof as in effect and as outstanding as of the Petition Date;

(f)      the Prepetition Indebtedness; and

(g)      the Indebtedness purported to be secured by the Liens described in Section 7.01(g) pursuant to the agreements and in the amounts set forth in Schedule 7.02; provided that such Indebtedness shall be

subject in all respects to the DIP Orders and all rights of the Lenders and the Borrowers to challenge such Indebtedness are preserved.

7.03    Investments.  Make or hold any Investments, except Investments described on Schedule 7.03 and Investments held by a Borrower in the form of Cash Equivalents, provided, that such Cash Equivalents are maintained in a Controlled Account.

7.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions and including by way of a Division/Series Transaction) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)    Dispositions pursuant to Section 7.05 shall be permitted; and

(b)    Dispositions in accordance with the Sale Process shall be permitted.

7.05    Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete or worn out equipment that is no longer used or useful in connection with the operation of the applicable Project in the ordinary course of business or that is replaced promptly;

(b)    Dispositions of equipment to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such transfer or other Disposition are reasonably promptly applied to the purchase price of such replacement property;

(c)    Distributions permitted under Section 7.06;

(d)    Dispositions permitted by Section 7.04; and

(e)    Permitted Investments, as contemplated by the DIP Orders and any Cash Management Order;

provided, however, that any Disposition pursuant to Section 7.05(b) shall be for fair market value and shall be on arm's length terms.

7.06    Restricted Payments.  The Borrowers will not, directly or indirectly, make or declare any Distribution except that each Project Company may make Distributions to the Administrative Borrower.

7.07    Change in Nature of Business.  No Borrower shall engage in any material business other than the direct or indirect development, financing, construction, ownership, operation and maintenance of the Projects and sale of the Projects' electrical output at wholesale and businesses incidental or ancillary thereto.

7.08    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of a Borrower after the date hereof, except in the ordinary course and pursuant to the reasonable requirements of any Borrower's business and upon fair and reasonable terms no less favorable to such Borrower than would be obtainable in a comparable arm's-length transaction with a Person not an Affiliate. Affiliate transactions currently in existence are set forth on Schedule 7.08.  No Borrower shall amend or waive any provision of a Material Project Document to which an Affiliate of any Borrower is a party except with the

prior written consent of the Required Lenders (such consent not to be unreasonably withheld, delayed or conditioned).

7.09    Regulatory Standing.  Take or cause to be taken any action which could reasonably be expected to result in either (a) any Borrower becoming a "public utility" under the FPA, (b) Agilon becoming a "public-utility company" under PUHCA or subject to regulation as a "holding company" under PUHCA, (c) a Project Company becoming a "holding company" under PUHCA, losing its Exempt Wholesale Generator status, or otherwise becoming subject to regulation under PUHCA, except for maintaining Exempt Wholesale Generator status, (d) any disapproval, rejection, suspension, other action adverse to the continued effectiveness of any applicable Material Project Document by the FERC or the PUCTX, as applicable, (e) any Secured Party or any "affiliate" (as that term is defined in PUHCA) of any Secured Party, solely as a result of any Borrower's or any of its Affiliates' actions relating to the development, construction, ownership, leasing, operation or maintenance of the Project, the sale of electricity therefrom or the entering into of any Loan Document or any transaction contemplated thereby, becoming subject to, or not exempt from regulation by the FERC under PUHCA or the FPA or by the PUCTX under PURA, other than any such regulation that may result from the exercise by any Secured Party of its remedies under the Loan Documents, or (f) a Project Company losing its "Power Generation Company" status for a generating facility under Texas law or losing its status as a "Generation Resource" or a "Quick Start Generator Resource" under the ERCOT Protocols.

7.10    Margin Stock; Sanctions.

(a)    Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b)    Request any Credit Extension, or use or permit any of its respective subsidiaries, directors, managers, officers, employees and agents to use, the proceeds of any Credit Extension, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

(c)    Will not, and will not permit any Controlled Entity to, (x) become (including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person or (y) directly or indirectly have any investment in or engage in any dealing or transaction (including any investment, dealing or transaction involving the proceeds of the Loans) with any Person if such investment, dealing or transaction (i) would cause any Lender or any of their Affiliates to be in violation of, or subject to sanctions under, any law or regulation applicable to such Lender, or (ii) is prohibited by or subject to sanctions under any U.S. Economic Sanctions Laws.

7.11    Reporting Practices.  Make any change in reporting practices, except as may be required or permitted by GAAP, without the prior written consent of the Required Lenders.

7.12    Equity Capital.  Directly or indirectly, by the issuance of rights or options for, or securities convertible into such interests, or otherwise, issue, sell or dispose of any of its membership interests or other equity interests, other than the membership and other Equity Interests pledged to the Collateral Agent pursuant to the Loan Documents.

7.13   <u>Amendments to Organization Documents</u>.  Amend any of its Organization Documents.

7.14   <u>No Employees; No ERISA Plans</u>.  (a) Hire or become the employer of any employees, other than the retention of independent contractors with the consent of the Required Lenders, or (b) maintain or be a participating employer in any Plan, or enter into any indemnity agreement or similar arrangement with, or assume any liability or obligation with respect to, any ERISA Affiliate in connection with any Plan maintained at any time by such ERISA Affiliate or in connection with any Plan to which any ERISA Affiliate may at any time contribute, except as may be required by ERISA or the Code.

7.15   <u>Prepayments, Etc. of Indebtedness</u>.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness for borrowed money except (a) [reserved], (b) the repayment of the Emergency DIP Obligations with the proceeds of the initial Loan on the Closing Date in accordance with this Agreement and the DIP Orders, (c) prepayments of the Credit Extensions permitted under and made in accordance with the terms of this Agreement, (d) the roll-up of a portion of the Prepetition Indebtedness in accordance with <u>Section 2.01(c)</u> and the DIP Orders, and (e) any other payments expressly permitted under and made in accordance with this Agreement, the DIP Budget and the DIP Orders.

7.16   <u>Amendment, Etc. of Related Documents and Indebtedness</u>.

(a)   Amend, modify or waive in any manner any term, provision or condition of any Subordinated Note Document, without the prior written consent of the Required Lenders; or

(b)   Amend, modify or waive in any manner any term, provision or condition of any Material Contract or any Prepetition Senior Secured Note Document, without the prior written consent of the Required Lenders.

7.17   <u>No Subsidiaries</u>.  Agilon will not have any Subsidiary entities other than the Project Companies, and the Project Companies shall not have any Subsidiary entities.

7.18   <u>No Margin Stock</u>.  Make or authorize any investment in, or otherwise purchase or carry, any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221).

7.19   <u>Accounts</u>.  Maintain, establish or use any deposit or securities accounts, other than the Controlled Accounts at Allegiance Bank in existence and as in effect on the Closing Date.

7.20   <u>Use of Proceeds</u>.  Use any proceeds from the Loans or any cash collateral, directly or indirectly, for any purposes other than to pay or fund:

(a)   The Emergency DIP Obligations;

(b)   Adequate Protection Fees and Expenses;

(c)   The roll-up of certain Prepetition Indebtedness in accordance with <u>Section 2.01(c)</u> and the DIP Orders,

(d)   the Carve Out; and

(e)   the working capital needs of the Borrowers during the Case;

in each case, solely in accordance with the DIP Budget and the DIP Orders.

Notwithstanding anything to the contrary contained in any Loan Document, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve Out may be used for the following purposes: (i) to object, contest or raise any defense to, the validity or priority of the Prepetition Indebtedness or the Prepetition Senior Secured Note Documents, the Obligations, the Loan Documents or the liens, security interests or claims granted under the Interim DIP Order, the Final DIP Order, this Agreement, the other Loan Documents or the Prepetition Senior Secured Note Documents, (ii) investigate, initiate or prosecute any claims and defenses or causes of action against any of the Administrative Agent, the Collateral Agent, the Lenders, the Prepetition Noteholders, the Prepetition Secured Parties, or their respective agents, affiliates, representative, attorneys, or advisors under or relating to the Prepetition Indebtedness, the Prepetition Senior Secured Note Documents, the Prepetition Collateral, the Collateral, the Obligations or the Loan Documents, (iii) prevent, hinder or otherwise delay the Collateral Agent's or any Lender's assertion, enforcement or realization on the cash collateral or the Collateral in accordance with the Loan Documents, (iv) seek to modify any of the rights granted to the Collateral Agent, the Lenders, the Prepetition Noteholders or the Prepetition Secured Parties hereunder or under the Loan Documents or the Prepetition Senior Secured Note Documents, in each of the foregoing cases without such parties' prior written consent, (v) seek to sell or otherwise dispose of the Collateral (other than as permitted under Section 7.05) without the prior written consent of the Required Lenders,  or (vi) pay any amount on account of any claims arising prior to the Petition Date, to fund acquisitions, capital expenditures, capital lease, or any other expenditure, unless such payments or expenditures are (A) approved by an order of the Bankruptcy Court and (B) in accordance with this Agreement and any relevant DIP Budget; provided that, advisors to the Committee may investigate the Prepetition Indebtedness and the Liens on the Prepetition Collateral at an expense for such investigation not to exceed $75,000 in the aggregate.

7.21    Lease Obligations.  Except for the Site Leases, create or suffer to exist any obligations for the payment under operating leases or agreements to lease (but excluding any obligations under leases required to be classified as capital leases under GAAP) if the rental obligations under such operating leases or agreements to lease would exceed $40,000 in the aggregate in any fiscal year.

7.22    Material Project Documents.   Subject to Section 7.26, enter into, amend, modify, supplement, vary, waive, cancel, terminate, agree to terminate or agree or purport to do any of the foregoing in relation to, any other Material Project Document, except with the prior written consent of the Required Lenders.

7.23    Case Matters.  Shall, or shall support any other Person, in any of the following:

(a)    assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, the Collateral, the Carve Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature of kind), or other contested matter (including any of the foregoing the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief) for the purpose of:

(i)    avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, of the Obligations, the DIP Liens, the Loan Documents, the Prepetition Indebtedness, the Prepetition Senior Secured Note Documents or the

Prepetition Liens; reversing, modifying, amending, staying, or vacating the DIP Orders, without the prior written consent of the Required Lenders;

(ii)      granting priority for any administrative expense, secured claim or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 327, 328, 330, 331, 503(b)m 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Collateral Agent and the Lenders in respect of the Obligations, except as provided under the Carve Out or to the extent expressly permitted under the DIP Orders;

(iii)     granting or imposing under sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Liens except to the extent expressly permitted under the DIP Orders;

(iv)     permitting the use of cash collateral as defined in section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders and this Agreement; or

(v)      modifying, altering or impairing in any manner any part of the DIP Liens or the Prepetition Liens, or any of the Administrative Agent's, the Collateral Agent's, the Lenders' or the Prepetition Secured Parties' rights or remedies under the DIP Orders, any of the Loan Documents, or any of the Prepetition Senior Secured Note Documents or any documents related thereto (including the right to demand payment of all Obligations and Adequate Protection Fees and Expenses, as applicable, and to enforce its Liens and security interests in the Collateral and the Prepetition Collateral, as applicable), whether by plan of reorganization or liquidation, order of confirmation or any financings of, extensions of credit to, or incurring of debt by any Borrower or otherwise, whether pursuant to section 364 of the Bankruptcy Code or otherwise;

(b)      without the prior written consent of the Required Lenders, seek or consent to any order (i) dismissing any of the Cases under sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding;

(c)      make any payments or transfer any property on account of claims asserted by any vendors of any Borrower for reclamation in accordance with section 2-702 of any applicable UCC and section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Lenders or unless otherwise consented to by the Required Lenders;

(d)      return any inventory or other property to any vendor pursuant to section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with section 546(g) of the Bankruptcy Code upon prior notice to the Lenders or unless otherwise consented to by the Required Lenders;

(e)      propose to the Bankruptcy Court, or otherwise, any Plan of Reorganization that does not provide for the payment in full in cash of the Obligations and the obligations in connection with the Prepetition Senior Secured Note Documents on the effective date of such Plan of Reorganization and is otherwise acceptable to the Required Lenders; and

(f)      propose to Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, other than in accordance with the Sale Process.

7.24    <u>Amendments to Orders</u>.  Amend, modify, or waive (or make any payment consistent with an amendment, modification or waiver of), or apply to the Bankruptcy Court for authority to make an amendment, modification or waiver of, any provision of any Cash Management Order, the Interim DIP Order or the Final DIP Order without, in each case the prior written consent of the Required Lenders.

7.25    <u>Disbursements; DIP Budget Variance.</u>

(a)      Make any disbursements other than those set forth in the DIP Budget (or as otherwise permitted in accordance with the terms of the DIP Orders); or

(b)      As of the fourth (4th) Business Day of every calendar week after the Closing Date (each such date, a "<u>Test Date</u>"), with the first Test Date being the fourth (4th) Business Day of the first full calendar week after the Closing Date, cause or permit the actual amounts for such initial period and thereafter (with such week period ending on the preceding Sunday), each four-week rolling period, to be (i) for any week during which any Borrower collects receipts, on an aggregate basis, less than (x) with respect to the first four (4) weeks after the Closing Date, 0%, and (y) for any week thereafter, 5%, in each case with respect the gross margin calculated by dividing (A) the sum of net receipts *minus* Variable Costs by (B) net receipts and (ii) on an aggregate basis, greater than (x) with respect to the first four weeks after the Closing Date, 15% and (y) for any week thereafter 10%, in each case with respect to the amount of cash disbursements for Controllable Costs (provided, however, that (I) notwithstanding anything herein to the contrary, costs associated with the operation of the Projects for purposes other than the generation of power for sale into the relevant market shall not be included for purposes of measuring compliance with the variance tests hereunder, (II) the Borrowers may reserve budgeted professional fees on a weekly basis with such fees to be reconciled with actual professional fees upon actual billing, and (III) notwithstanding anything herein to the contrary, the disbursements for the professional fees and expenses incurred by any of the Administrative Agent, the Collateral Agent, the Lenders, the Prepetition Agent and the Prepetition Noteholders shall not be included for purposes of measuring compliance with the variance test hereunder), in each case, as projected for such period as set forth in the applicable DIP Budget as certified to the Administrative Agent and the Lenders by a Responsible Officer of the Borrowers in the applicable Variance Report; provided that, if a Proposed DIP Budget becomes the DIP Budget pursuant to <u>Section 6.01(d)</u> then the applicable DIP Budget for the weeks preceding the first week of such Proposed DIP Budget shall be the DIP Budget that preceded such Proposed DIP Budget.

7.26    <u>Material Contracts</u>.  File motions seeking entry of an order approving procedures for the rejection, negotiation or assumption, as applicable, of any Material Contracts without the prior written consent of the Required Lenders, which such motions shall be in form and substance reasonably satisfactory to the Required Lenders and may not be amended or otherwise modified without the prior written consent the Required Lenders.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01    <u>Events of Default</u>.  Any of the following shall constitute an Event of Default:

(a)      <u>Non-Payment</u>.  Any Borrower fails to (i) pay when and as required to be paid herein, any amount of principal of or interest on any Loan, or any fee due hereunder, or (ii) pay within three (3) days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)      Specific Covenants.  (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.17, 6.22, 6.23, or Article VII, Article X or Article XII; or

(c)      Other Defaults.  Any Borrower fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days; or

(d)      Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; or

(e)      Cross-Default.  (i) Any Borrower (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-petition Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such post-petition Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such post-petition Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such post-petition Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such post-petition Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Borrower is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Borrower is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Borrower as a result thereof is greater than the Threshold Amount; or (iii) any Borrower fails to pay any Adequate Protection Fees and Expenses; or

(f)      Judgments.  There is entered against any Borrower (i) one or more final judgments or orders that are not subject to the Automatic Stay for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not pursuant to an order of the Bankruptcy Court or covered by independent third-party insurance as to which the insurer is rated at least "A-" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or the Automatic Stay or otherwise, is not in effect; or

(g)      Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Borrower or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Borrower denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(h)    [Reserved]; or

(i)    <u>Liens and Super-Priority Claims</u>.   Any Lien or super-priority claims granted to the Collateral Agent for the benefit of the Secured Parties with respect to any material portion of the Collateral intended to be secured thereby (i) ceases to be, or is not at any time, valid, perfected and prior to all other Liens and claims (other than Liens and claims granted in respect of the Carve Out and the Permitted Prior Liens) or (ii) is terminated, revoked, or declared void (unless released or terminated pursuant to the terms of this Agreement); or

(j)    <u>Subordination</u>.   (i)   The subordination provisions (including, without limitation, the provisions set forth in the Subordinated Note Documents) of the documents evidencing or governing any subordinated Indebtedness (including the Subordinated Debt) (collectively, the "<u>Subordination Provisions</u>") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable subordinated Indebtedness; or (ii) any Borrower or any holder of subordinated Indebtedness shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Prepetition Secured Parties or the Agents and the Lenders, as applicable or (C) that all payments of principal of or premium and interest on applicable subordinated Indebtedness, or realized from the liquidation of any property of any Borrower, shall be subject to any of the Subordination Provisions; or

(k)    <u>Default under Material Contracts</u>.   There occurs any "default", "event of "default", other breach or termination or words of similar import under (i) any Material Contract or (ii) any other contract. license or agreement which, in the case of clause (ii) only, (x) individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (y) enforcement under which is not subject to the Automatic Stay; or

(l)    <u>Licenses and Permits</u>.   There occurs the loss, suspension or revocation of, or failure to renew, any license (including liquor licenses) or permit now held or hereafter acquired by any Borrower which loss could be reasonably expected to result in a Material Adverse Effect; or

(m)    <u>Material Uninsured Loss</u>.   Any Borrower shall suffer a loss or casualty of any of its assets exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A-" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage); or

(n)    other than as a result of the filing of the Cases, any Borrower is enjoined, restrained or in any way prevented by an order of any court or any Governmental Authority from conducting all or any material part of its business; or

(o)    an order shall be entered in any of the Cases appointing, or any Borrower shall file an application for an order with respect to any of the Cases seeking the appointment of, in either case without the prior written consent of the Required Lenders, (i) a trustee under section 1104 of the Bankruptcy Code or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; or

(p)    the filing of a motion by any of the Borrowers seeking dismissal of any of the Cases, the dismissal of any of the Cases, the filing of a motion by any of the Borrowers seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code or the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code; or

(q)      an order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of a Borrower (other than the Agents or the Lenders) with respect to any claim against any property; or

(r)      any Borrower's board of directors (or equivalent governing body) shall authorize the liquidation of such Borrower's business pursuant to one or more sales pursuant to section 363 of the Bankruptcy Code or otherwise, or shall file any motion under section 363 of the Bankruptcy Code seeking approval to liquidate all or substantially all of the assets of the Borrowers, other than in accordance with the Sale Process and as consented to by the Required Lenders; or

(s)      failure of the Final DIP Order to be entered in the Cases within twenty-one (21) calendar days after the Interim Order Entry Date; or

(t)      an order shall be entered terminating or reducing the Borrowers' exclusivity period for proposing a Plan of Reorganization (to the extent such motion is not made by Administrative Agent or any Lender) or any party in interest other than the Borrowers shall have the right to file a plan in the Cases, including but not limited under section 1121(c) or (d) of the Bankruptcy Code; or; or

(u)      (i) the amendment, modification, reversal, revocation, issuance of a stay or order to vacate, or supplementing of any Cash Management Order, the Interim DIP Order, the Final DIP Order, any Loan Document or any other order of the Bankruptcy Court, in any way  adversely affecting or relating to the Facility or the claims of the Collateral Agent, the Administrative Agent and the Lenders, in a manner not satisfactory to the Lenders (ii) the waiver of any condition of the Sale Process in any manner not reasonably acceptable to any Lender or (iii) an order shall be entered with respect to the Case or Cases, without the prior written consent of the Required Lenders (A) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Collateral Agent and Lenders in respect of the Obligations other than the Carve Out, (B) terminating or denying the use of cash collateral, or authorizing the use of cash collateral, or (C) granting or permitting the grant of a lien that is equal in priority with or senior to the liens securing the Obligations other than the Carve Out and the Permitted Prior Liens; or

(v)      failure of the Borrowers to satisfy any of the Milestones by the date set forth on Annex I; provided that the Required Lenders may agree to an extension of any of the Milestone dates in their sole discretion; or

(w)      the solicitation, filing and/or seeking or entry of an order by the Bankruptcy Court confirming a Plan of Reorganization or liquidation in any of the Cases which (i) does not contain a provision for termination of the Commitments and indefeasible payment in full in cash of all Obligations hereunder and under the other Loan Documents on or before the effective date of such plan upon entry thereof and (ii) is not otherwise reasonably acceptable to the Required Lenders; or

(x)      the failure by any Borrower to comply with any provisions of any of the DIP Orders and any Cash Management Order; or

(y)      any Borrower rejects an unexpired lease or other contract that is projected to give rise to a prepetition damages claim or an administrative expense claim, other than with the prior written consent of the Required Lenders,

(z)      the commencement of any adversary proceeding, contested matter or other action by any Borrower, or by any of their Affiliated or Related Parties or any other person if such action is supported by any Borrower, asserting any claims and defenses or otherwise against any of the Prepetition Agent or the

Prepetition Noteholders with respect to the obligations of any Borrower under the Prepetition Senior Secured NPA or the other Prepetition Senior Secured Note Documents or the Prepetition Liens (including any motion or order), except as may be expressly permitted under the DIP Orders; or

(aa)     unless consented to by the Required Lenders, any Borrower shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date other than, in each case, as expressly permitted under this Agreement or the DIP Orders; or

(bb)     any Material Project Document is declared by any Governmental Authority to be null and void or otherwise unenforceable, or any party thereto claims that any Material Project Document is null, void or unenforceable or otherwise repudiates any Material Project Document, and such Material Project Document is not replaced within ninety (90) days with a valid, binding and enforceable agreement that has substantially the same or more favorable terms to the Borrowers than the Material Project Document being replaced; or

(cc)     Victoria Bloomington, LLC fails to deliver a renewal notice pursuant to section 3.01 of the Victoria Port Master Lease at least fifteen (15) months prior to expiration of the existing term.

8.02     Consequences of an Event of Default.

(a)     Remedies.  If an Event of Default exists, the Administrative Agent may, or shall at the request of the Required Lenders, at any time or times and in any order, without notice to or demand on any Borrower (except for such notice or consent that is expressly provided for hereunder, under the Interim DIP Order or the Final DIP Order, or required by applicable Laws): (i) restrict the amount of or refuse to permit any Lender to make any Loan, (ii) terminate all or any portion (ratably as among the Lenders) of the Commitments, and thereupon such Commitments shall terminate immediately, (iii) [reserved], (iv) after providing five (5) Business Days' prior notice to the Borrowers, the United States Trustee, the Committee and any other official committee (but this shall not serve as a consent to the use of the Loans hereunder to pay professional fees incurred by any other such official committee), (A) direct the Collateral Agent to exercise the right to realize on all Collateral, (B) charge the Default Rate, and (C) declare the Obligations then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be immediately due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be immediately due and payable, together with accrued interest thereon and all fees and other Obligations of the Borrowers accrued hereunder and under the other Loan Documents, shall become due and payable immediately, in each case under this clause (iv), without the necessity of obtaining any further relief or order from the Bankruptcy Court, subject to the right of the Borrowers to seek continuation of the automatic stay during such five (5) Business Day period (such period referred to in this Section 8.02 as the "Remedies Notice Period") solely on the basis that no Event of Default has occurred; (v) assume control over the use of cash in any accounts; *provided* that the Borrowers shall be permitted to use cash during the Remedies Notice Period to the extent necessary to preserve their business; and (vi) pursue its other rights and remedies under the Loan Documents, the DIP Orders and/or applicable law. Except as otherwise provided in the DIP Orders, the foregoing remedies may be exercised without demand and without further application to or order of the Bankruptcy Court. In any hearing regarding any exercise of remedies under this Section 8.02 (which hearing must take place within the Remedies Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Borrowers, any committee and all other parties in interest shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Administrative Agent, the Collateral Agent or the Lenders set forth in the DIP Order, this Agreement or the Loan Documents, as applicable. If no such order is entered during the Remedies Notice Period, all use of

the Collateral shall cease and the Administrative Agent, the Collateral Agent and the Lenders shall be entitled to enforce the remedies hereunder.

(b)     Sales; UCC.

(i)     Sales. Each Borrower recognizes that the Agents may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the Laws of any jurisdiction outside the United States or in applicable federal or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of Lenders who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof. Each Borrower acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by applicable Law, the Agents shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal or state securities laws, even if such issuer would agree to do so. Each Borrower further agrees to do or cause to be done, to the extent that such Borrower may do so under the Law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all Laws at the Borrowers' expense. Each Borrower further agrees that a breach of any of the covenants contained in this Section 8.02 will cause irreparable injury to the Agents and the Lenders for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 8.02  shall be specifically enforceable against such Borrower, and each Borrower hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Borrower's failure to perform such covenants will not cause irreparable injury to the Agents and the Lenders or (ii) the Agents or the Lenders have an adequate remedy at law in respect of such breach. Each Borrower further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Agents and the Lenders by reason of a breach of any of the covenants contained in this Section 8.02  and consequently, agrees that, if such Borrower shall breach any of such covenants and the Agents or the Lenders shall sue for damages for such breach, such Borrower shall pay to the Agents, for the benefit of the Agents and the Lenders, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Agent shall demand compliance with this Section 8.02(b).

(ii)     UCC. If an Event of Default has occurred and is continuing, the Collateral Agent shall have for the benefit of the Lenders, in addition to all other rights of the Agents and the Lenders, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Collateral Agent shall be empowered and entitled to, subject to the terms of the DIP Orders: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Borrower's premises at any time, at no cost to the Agents or any Lender, or remove any part of it to such other place or places as the Administrative Agent (at the direction of the Required Lenders) may determine, or the Borrowers shall, upon the Administrative Agent's or Required Lender's demand, at the Borrowers' cost, assemble the Collateral and make it available to the Collateral Agent at a place convenient to the Collateral Agent; (ii) sell and deliver any Collateral at public or private sales, for cash, upon credit, or otherwise, at such prices and upon such terms as the Administrative Agent and the Required Lenders deem advisable, in their sole discretion, and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of

sale or of such postponed or adjourned sale; (iii) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Borrower with respect to the Collateral, whether in the name of such Borrower or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Administrative Agent under the Loan Documents, (iv) employ consultants to inspect the Collateral and to assure compliance by each Borrower of the terms and conditions of the Loan Documents and (v) take any other actions, as may be necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Borrowers. Upon demand from the Collateral Agent (at the direction of the Required Lenders), the applicable Borrower shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Collateral Agent, for the benefit of and on behalf of the Lenders, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Borrower and the performance of such Borrower thereunder and, in such event, without further notice or demand and at the Borrowers' cost and expense, the Collateral Agent, for the benefit of and on behalf of the Lenders (at the direction of the Required Lenders), may exercise all rights of such Borrower arising under such agreements. Without in any way requiring notice to be given in the following manner, each Borrower agrees that any notice by the Administrative Agent of sale, disposition, or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Borrower if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least ten (10) Business Days prior to such action to the Borrowers' address in accordance with Section 11.02 of this Agreement. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Administrative Agent or the Lenders receive payment, and if the buyer defaults in payment, the Collateral Agent may resell the Collateral. In the event the Collateral Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Borrower irrevocably waives: (A) the posting of any bond, surety, or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Collateral Agent retain possession and not dispose of any Collateral until after trial or final judgment. Each Borrower agrees that the Collateral Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. The proceeds of sale shall be applied as set forth in the DIP Orders. The Administrative Agent will return any excess to the applicable Borrower or as directed by a court of competent jurisdiction and the Borrowers shall remain liable for any deficiency.

(c)     Relief. An Event of Default shall occur as set forth in this Agreement even if an act or circumstance which gives rise, directly or indirectly, to such Event of Default has been authorized by the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases. Neither the Administrative Agent, the Collateral Agent nor any Lender shall have any obligation whatsoever to object to any relief requested by any Borrower from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases if and because such relief would or may constitute, or would or may lead to, an Event of Default, or the Administrative Agent's, the Collateral Agent's or any Lender's failure to object to such relief shall not limit the Events of Default under this Agreement, constitute a waiver or release of rights and remedies under this Agreement, estop or preclude the Administrative Agent, the Collateral Agent or any Lender from fully enforcing the same, or have any res judicata effect on whether an Event of Default has occurred under this Agreement. Each Borrower shall be fully responsible for determining whether any relief it seeks from

the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases would or may constitute, or would or may lead to, an Event of Default under this Agreement, and authorization for such relief shall not limit in any manner whatsoever such Borrower's obligation to fully comply with all of the terms and conditions of this Agreement.

(d)     Secured Parties' Rights and Remedies. The rights, remedies, powers, privileges, and discretions of the Agents and the Lenders hereunder (herein, the "Secured Parties' Rights and Remedies") shall be cumulative and not exclusive of any rights or remedies which they would otherwise have. No delay or omission by the Agents or any Lender in exercising or enforcing any of the Secured Parties' Rights and Remedies shall operate as, or constitute, a waiver thereof. No waiver by the Administrative Agent or the Lenders of any Default or Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement. No single or partial exercise of any of the Secured Parties' rights or remedies, and no express or implied agreement or transaction of whatever nature entered into between an Agent and any person, at any time, shall preclude the other or further exercise of the Secured Parties' Rights and Remedies. No waiver by an Agent or the Lenders of any of the Secured Parties' Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver. All of the Secured Parties' Rights and Remedies and all of the Agents' and Lenders' rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative, and not alternative or exclusive, and may be exercised by the Agents and the Lenders, as applicable, at such time or times and in such order of preference as the Lenders in their sole discretion may determine. The Secured Parties' Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Obligations.

8.03     Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied in the following order:

First, to payment of all amounts owing to and all costs and expenses incurred by the Administrative Agent and the Collateral Agent, pursuant to the terms of the Loan Documents or in connection with any enforcement of rights or exercise of remedies pursuant thereto, including all court costs and the fees and expenses of agents and legal counsel and, in each case, including all costs and expenses incurred in enforcing its rights to obtain such payment;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Agents and the Lenders (including fees, charges and disbursements of counsel to the respective Agents and Lenders (including fees and time charges for attorneys who may be employees of any Lender) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting interest on the Loans and other Obligations arising under the Loan Documents with respect thereto, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders, in proportion to the respective amounts described in this clause Fourth held by them;

and

Fifth, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Law and the DIP Orders.

# ARTICLE IX
# AGENTS

9.01    Appointment and Authority. Each Lender hereby designates and appoints the Administrative Agent as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes the Administrative Agent to execute and deliver each of the other Loan Documents (where required) on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Each Lender hereby designates and appoints the Collateral Agent as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes the Collateral Agent to execute and deliver each of the other Loan Documents (where required) on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Each Agent agrees to act as agent for and on behalf of the Lenders on the conditions contained in this Article IX. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, neither Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall either Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against such Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to the Administrative Agent or Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. In this connection, the Agents, and any co-agents, sub-agents and attorneys-in-fact appointed by either Agent for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under any Loan Document, or for exercising any rights and remedies thereunder at the direction of the Required Lenders, shall be entitled to the benefits of all provisions of this Article IX.  Except as expressly otherwise provided in this Agreement, the Administrative Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that the Administrative Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to the Agents, Lenders agree that the applicable Agent shall have the right, but not the obligation, to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, or to take any other action with respect to any Collateral or Loan Documents which may be necessary to perfect, and maintain perfected, the security interests and Liens upon Collateral pursuant to the Loan Documents, (c) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (d) open and maintain such bank accounts and cash management arrangements as the Administrative Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (e) perform, exercise, and enforce any and all other rights and remedies of the Secured Parties with respect to any Borrower, the Obligations, the Collateral, or otherwise

related to any of same as provided in the Loan Documents, and (f) incur and pay such expenses as the Administrative Agent or the Collateral Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

9.02    Delegation of Duties.  Each Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither Agent shall be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made with due care.

9.03    Liability of the Agents.  None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except in the case of gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and non-appealable judgment), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Borrower or any of its Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent or the Collateral Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Borrower or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Borrower. No Agent-Related Person shall have any liability to any Lender, any Borrower or any of their respective Affiliates if any request for any Loan or other extension of credit was not authorized by the Borrowers. Neither Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law or regulation.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Borrower or any Affiliate thereof.  Neither Agent shall be liable for any action taken, or errors in judgment made, in good faith by it or any of its officers, employees or agents.  The permissive rights of the Agents to do things enumerated in this Agreement shall not be construed as a duty and, with respect to such permissive rights, neither Agent shall be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the applicable Agent's gross negligence or willful misconduct.  Nothing in this Agreement shall require either Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.  Notwithstanding anything herein or in any other Loan Document to the contrary, neither Agent shall have an obligation to give, execute, deliver, file, record, authorize or obtain any financing statements, notices, mortgages, instruments, documents, agreements, consents or other papers as shall be necessary to (i) create, preserve, perfect (or continue the perfection) or validate the security interest granted to the Collateral Agent for the benefit of the Secured Parties pursuant to this Agreement or (ii) enable the Collateral Agent to exercise and enforce its rights under this Agreement with respect to such pledge and security interest.  Neither Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications

service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

9.04    Reliance by Agents.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, judgment, order, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Borrowers or counsel to any Lender), independent accountants and other experts selected by such Agent. Each Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless the applicable Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, the applicable Agent shall act, or refrain from acting, as it deems advisable. If either Agent so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in and shall not be liable for acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request, instruction or consent of the Required Lenders and such request, instruction and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders. The Agents may treat each institution that is party to this Agreement as a "lender" as an obligor hereunder until the Agents receive written notice of the assignment or transfer of the Loans owed to such Lender or the Commitments of such Lender in form and substance satisfactory to the Administrative Agent.

9.05    Notice of Default or Event of Default.  The Agents shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except, in the case of the Administrative Agent, with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to the Administrative Agent for the account of the Lenders and, except with respect to Events of Default of which the Administrative Agent has actual knowledge, unless the Administrative Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default."  The Administrative Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which the Administrative Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and the Administrative Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any.  Subject to Section 9.04, the Administrative Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Article VIII; provided, that unless and until the Administrative Agent has received any such request, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

9.06    Credit Decision.  Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by either Agent hereinafter taken, including any review of the affairs of any Borrower and its Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision

to enter into this Agreement and to extend credit to the Borrowers.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by the Administrative Agent, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrowers or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons, it being understood that the Administrative Agent shall deliver to each Lender each notice, report, request, demand, communication and other document the Administrative Agent receives hereunder. Each Lender acknowledges that the Administrative Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender with any credit or other information with respect to the Borrowers, their Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into the Administrative Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement.

9.07    Costs and Expenses; Indemnification.  The Administrative Agent and the Collateral Agent may incur and pay costs, expenses and disbursements to the extent each of the Administrative Agent and the Collateral Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not the Borrowers are obligated to reimburse the Administrative Agent, the Collateral Agent or Lenders for such expenses pursuant to this Agreement or otherwise. The Administrative Agent and the Collateral Agent are authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by the Administrative Agent or the Collateral Agent to reimburse the Administrative Agent and the Collateral Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders.  In the event the Administrative Agent and the Collateral Agent are not reimbursed for such costs and expenses by the Borrowers, each Lender hereby agrees that it is and shall be obligated to pay promptly to the Administrative Agent and the Collateral Agent such Lender's ratable share thereof.  Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of the Borrowers and without limiting the obligation of the Borrowers to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for such Lender's ratable share of any fees, costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by the Administrative Agent and the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that the Borrowers are required to pay or reimburse the Administrative Agent and the Collateral Agent for such fees, costs and expenses and the Administrative Agent and the Collateral Agent are not paid or reimbursed promptly for such fees, costs and expenses by or on behalf of the

Borrowers.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of the Administrative Agent and the Collateral Agent.

9.08     <u>Administrative Agent in Individual Capacity</u>.  The Administrative Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide bank products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Borrower or its Affiliates and any other Person party to any Loan Document as though it were not the Administrative Agent hereunder, and, in each case, without notice to or consent of the other Secured Parties. The other Secured Parties acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding a Borrower or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Borrower or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver the Administrative Agent will use its reasonable best efforts to obtain), the Administrative Agent shall not be under any obligation to provide such information to them. With respect to its Loans (if any), Administrative Agent shall have the same rights and powers under the Loan Documents as each other Lender, and may exercise the same as though it were not Administrative Agent.

9.09     <u>Successor Agent</u>.  Each Agent may resign as the Administrative Agent or Collateral Agent, as applicable, upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders), and the Administrative Borrower (unless such notice is waived by the Administrative Borrower or a Default or Event of Default has occurred and is continuing).  Each Agent may also be removed at the direction of the Required Lenders.  If either Agent resigns or is removed under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of the Administrative Borrower (such consent not to be unreasonably withheld, delayed, or conditioned), to appoint a successor Collateral Agent or Administrative Agent, as applicable, for the Lenders.  If no successor Collateral Agent or Administrative Agent is appointed prior to the effective date of the resignation of the Collateral Agent or Administrative Agent, the applicable Agent may appoint, after consulting with the Lenders and the Administrative Borrower, a successor Agent. If the Administrative Agent or Collateral Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace the Administrative Agent or Collateral Agent, as applicable, with a successor Administrative Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of the Administrative Borrower (such consent not to be unreasonably withheld, delayed, or conditioned).  In any such event, upon the acceptance of its appointment as successor Administrative Agent or Collateral Agent, as applicable, hereunder, such successor Administrative Agent or Collateral Agent shall succeed to all the rights, powers, and duties of the retiring Administrative Agent or Collateral Agent and the term "Administrative Agent" or "Collateral Agent", as applicable, shall mean such successor Administrative Agent or Collateral Agent and the retiring Administrative Agent's or Collateral Agent's appointment, powers, and duties as the Administrative Agent or Collateral Agent shall be terminated. After any retiring Administrative Agent's or Collateral Agent's resignation or removal hereunder as the Administrative Agent or Collateral Agent, the provisions of this <u>Article IX</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent or Collateral Agent under this Agreement.  If no successor Administrative Agent or Collateral Agent has accepted appointment as the Administrative Agent or Collateral Agent, as applicable, by the date which is thirty (30) days following a retiring Administrative Agent's or Collateral Agent's notice of resignation, the retiring Administrative Agent's or Collateral Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Administrative Agent or Collateral Agent hereunder until such time, if any, as the Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above.  Any corporation or

association into which the Administrative Agent or Collateral Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative Agent or Collateral Agent is a party, will be and become the successor of the Administrative Agent or the Collateral Agent, as applicable, under this Agreement and will have and succeed to the rights, duties, benefits, privileges, protections, indemnities and immunities as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

9.10    Collateral Matters.

(a)    The Lenders hereby irrevocably authorize the Collateral Agent to release any Lien on any Collateral (i) upon the payment and satisfaction in full by the Borrowers of all of the Obligations, (ii) constituting property being sold or disposed of (to a person which is not a Borrower) if a release is required or desirable in connection therewith and if the Borrowers certify to the Administrative Agent and the Collateral Agent that the sale or disposition is permitted under Section 7.05 (and the Administrative Agent and the Collateral Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Borrower owned any interest at the time the Collateral Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to a Borrower under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 9.10. The Borrowers and the Lenders hereby irrevocably authorize the Collateral Agent, based upon the instruction of the Required Lenders, to (I) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including section 363 of the Bankruptcy Code, (II) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Bankruptcy Code, including pursuant to sections 9-610 or 9-620 of the UCC, or (III) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by the Collateral Agent at the direction of the Required Lenders in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of the Collateral Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of the Collateral Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) the Collateral Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith the Administrative Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration. Except as provided above, the Collateral Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by the Collateral Agent or the Administrative Borrower at any time, the Lenders will confirm in writing the Collateral Agent's authority to release any such Liens on particular

types or items of Collateral pursuant to this Section 9.10; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, the Collateral Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in the Collateral Agent's opinion, could expose the Collateral Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of the Borrowers in respect of) any and all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     The Agents shall have no obligation whatsoever to any of the Lenders (i) to verify or assure that the Collateral exists or is owned by a Borrower or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, it being understood that the Borrowers shall be responsible for such verifications and assurances, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to either Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, each Agent may act in any manner it may deem appropriate, in its sole discretion, and each Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise expressly provided herein.

9.11    Restrictions on Actions by Lenders; Sharing of Payments.

(a)     Each of the Lenders agrees that it shall not, without the express written consent of the Administrative Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of the Administrative Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by the Administrative Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from the Administrative Agent pursuant to the terms of this Agreement, or (ii) payments from the Administrative Agent in excess of such Lender's Applicable Percentage of all such distributions by the Administrative Agent, such Lender promptly shall (A) turn the same over to the Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to the Administrative Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their respective Applicable Percentage; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the

extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

9.12    Agency for Perfection.  The Collateral Agent hereby appoints each Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Collateral Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the UCC can be perfected by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver possession or control of such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.

9.13    Payments by Administrative Agent to the Lenders.  All payments to be made by the Administrative Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to the Administrative Agent. Concurrently with each such payment, the Administrative Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

9.14    Concerning the Collateral and Related Loan Documents.  Each Secured Party authorizes and directs the Collateral Agent to enter into this Agreement and the other Loan Documents. Each Secured Party agrees that any action taken by the Collateral Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Collateral Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

9.15    Reports and Information.  The Administrative Agent shall provide to each Lender a copy of any report, notice, request, document, or other information or communications provided by any Borrower to the Administrative Agent that has not been contemporaneously provided by such Borrower to such Lender. By becoming a party to this Agreement, each Lender may to the extent that the Administrative Agent is entitled, under any provision of the Loan Documents, to request additional reports, documents, notices or information from any Borrower, from time to time, reasonably request the Administrative Agent to exercise such right as specified in such Lender's notice to the Administrative Agent, whereupon the Administrative Agent promptly shall request of the Borrowers the additional reports, documents, notices or information reasonably specified by such Lender, and, upon receipt thereof from such Borrower, the Administrative Agent promptly shall provide a copy of same to such Lender.

9.16    Several Obligations; No Liability.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of the Administrative Agent or the Collateral Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of the Administrative Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 9.07, no Secured Party shall have any liability for the acts of any other Secured Party. No Lender shall be responsible to the Borrowers or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for such Lender or on its behalf,

nor to take any other action on behalf of such Lender hereunder or in connection with the financing contemplated herein.

# ARTICLE X
# JOINT AND SEVERAL OBLIGATIONS; ADMINISTRATIVE BORROWER

10.01    Joint and Several Obligations.  All Obligations shall constitute joint and several obligations of Borrowers and shall be secured by the Collateral Agent's Lien upon all of the Collateral, and by all other Liens heretofore, now or at any time hereafter granted by each Borrower to the Collateral Agent to the extent provided in the Loan Documents under which such Lien arises.  Each Borrower expressly represents and acknowledges that it is part of a common enterprise with the other Borrowers and that any financial accommodations by Administrative Agent, Collateral Agent and the other Lenders to any other Borrower hereunder and under the other Loan Documents are and will be of direct and indirect interest, benefit and advantage to all Borrowers.  Each Borrower acknowledges that any notice or request given by any Borrower to the Administrative Agent or any Lender shall bind all Borrowers, and that any notice given by the Administrative Agent or any Lender to any Borrower shall be effective with respect to all Borrowers.  Each Borrower acknowledges and agrees that each Borrower shall be liable, on a joint and several basis, for all of the Loans and other Obligations, regardless of which Borrower actually may have received the proceeds of any of such Loan or other extensions of credit or the amount of such Loan received or the manner in which the Administrative Agent or any Lender accounts among the Borrowers for such Loan or other extensions of credit on its books and records, and further acknowledges and agrees that the Loans and other extensions of credit to any Borrower inure to the mutual benefit of all of the Borrowers and that the Administrative Agent and the Lenders are relying on the joint and several liability of the Borrowers in extending the Loans and other financial accommodations hereunder.  Each Borrower shall be entitled to subrogation and contribution rights from and against the other Borrowers to the extent any Borrower is required to pay to any Lender any amount in excess of the Loans advanced directly to, or other Obligations incurred directly by, such Borrower or as otherwise available under applicable law; provided, however, that such subrogation and contribution rights are and shall be subject to the terms and conditions of this Section 10.01.

In the event any Borrower shall make any payment or payments under the Loan Documents or shall suffer any loss as a result of any realization upon any Collateral granted by it to secure its obligations hereunder, such Borrower shall have the right to seek contribution payments from each other Borrower to the extent permitted by applicable law.  Nothing in this Section 10.01 shall affect any Borrower's joint and several liability to the Administrative Agent and the Lenders for the entire amount of its Obligations.  Each Borrower covenants and agrees that its right to receive any contribution hereunder from a contributing Borrower shall be subordinate and junior in right of payment, in full, in cash, to all Obligations of the Borrowers to the Agents and the Lenders under the Loan Documents.  No Borrower will exercise any rights that it may acquire by way of subrogation hereunder or under any other Loan Document or at law by any payment made hereunder or otherwise, nor shall a Borrower seek or be entitled to seek any contribution or reimbursement from any other Borrower in respect of payments made by such Borrower hereunder or under any other Loan Document.  If any amounts shall be paid to a Borrower on account of such subrogation or contribution rights at any time, such amount shall be held by such Borrower in trust for the Administrative Agent and the Lenders segregated from other funds of such Borrower, and shall, forthwith upon receipt by such Borrower, be turned over to the Administrative Agent in the exact form received by such Borrower (duly endorsed by such Borrower to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, as provided for herein.

10.02    Administrative Borrower.  Each Borrower hereby irrevocably appoints Agilon as the borrowing agent and attorney-in-fact for all Borrowers ("Administrative Borrower") which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior

written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes Administrative Borrower (a) to provide the Administrative Agent and the Lenders with all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from the Administrative Agent or any Lender (and any notice or instruction provided by the Administrative Agent or any Lender to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that the Lenders shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

## ARTICLE XI
## MISCELLANEOUS

11.01    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Borrower therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers, as the case may be, and acknowledged by the Administrative Agent and the Collateral Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive, change or otherwise modify any provision  set forth in Sections 11.06(b)(ii), (iii). (v) or (vi) without the written consent of each Lender;

(b)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(c)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(d)    reduce the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (iv) of the second proviso to this Section 11.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(e)    change (i) Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans among the Facility from the application thereof set forth in the applicable provisions of Section 2.05 or 2.06(b), respectively, in any manner that materially and adversely affects the Lenders without the written consent of all Lenders;

(f)     change any provision of this Section 11.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder (other than the definitions specified in clause (ii) of this Section 11.01(g)), without the written consent of each Lender;

(g)     release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(h)     impose any greater restriction on the ability of any Lender to assign any of its rights or obligations hereunder without the written consent of the affected Lender;

and provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document, and no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document.

Notwithstanding anything in this Agreement to the contrary, each Lender hereby irrevocably authorizes the Administrative Agent on its behalf, and without further consent of any Lender (but with the consent of the Administrative Borrower and the Administrative Agent), to (x) amend and restate this Agreement if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated, such Lender shall have no other commitment or other obligations hereunder and shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement, and (y) enter into amendments or modifications to this Agreement (including, without limitation, amendments to this Section 11.01) or any of the other Loan Documents.

11.02   Notices; Effectiveness; Electronic Communications.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by electronic mail or facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrowers or the Administrative Agent or the Collateral Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)      Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      [Reserved].

(d)      Change of Address, Etc.  Each Borrower and each Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Lender agrees to cause at least one individual at or on behalf of such Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Lender or its delegate, in accordance with such Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrowers or their securities for purposes of United States Federal or state securities laws.

(e)      Reliance by Agents and Lenders.  Each Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify the Agents, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers.  All telephonic notices to and other telephonic communications with either Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

11.03    No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or either Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein

provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Borrowers or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) either Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as an Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.10), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Borrower under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent or Collateral Agent, as applicable, pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.10, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

11.04    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.    Whether or not the transactions contemplated hereby are consummated, the Borrowers will pay all documented costs and expenses (including documented attorneys' fees of a special counsel and, if reasonably required by the Required Lenders, local or other counsel) incurred by the Agents and the Lenders in connection with such transactions and in connection with any amendments, waivers or consents under or in respect of this Agreement or the other Loan Documents (whether or not such amendment, waiver or consent becomes effective) including, without limitation: (a) the costs and expenses incurred in enforcing or defending (or determining whether or how to enforce or defend) any rights under this Agreement or any other Loan Document or in responding to any subpoena or other legal process or informal investigative demand issued in connection with this Agreement or any other Loan Document, or by reason of being an Agent or a Lender, (b) the costs and expenses, including financial advisors' fees and other consultant's fees, incurred in connection with the Cases, the Sale Process or in connection with any work-out or restructuring of the transactions contemplated hereby and the other Loan Documents and (c) the costs and expenses incurred in connection with the filing of this Agreement any the Loan Documents and all related documents.  In addition, the Borrowers will pay the fees and disbursements of the FTI Consulting, Inc., the Independent Engineer and other consultants retained by the Administrative Agent and/or the Lenders from time to time in connection with this Agreement and the transactions contemplated hereby.

(b)    Indemnification by the Borrowers.  The Borrowers will pay, and will save each Lender, each Agent and each of their respective Affiliates, officers, directors, representatives, employees, advisors and agents (collectively, the "Indemnified Parties") harmless from, all claims in respect of any fees, costs or expenses, if any, of brokers and finders and any judgment, liability, claim, order, decree, cost, fee, expense, loss, action or obligation, other than Excluded Taxes, resulting from the consummation of the transactions contemplated hereby, including the use of the proceeds of the Loans by the Borrowers and any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, claims, expenses or disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnified Party in any way relating to, arising out of or incurred in respect of either Project, this Agreement, any other Loan Document or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or the enforcement of any of the terms hereof

or thereof or of any such other documents, including any Environmental Claims, arising in connection with the release or presence of any Hazardous Material at a Project or a Site, whether foreseeable or unforeseeable, including all costs of removal and disposal of such Hazardous Material, all costs required by any Governmental Authority or under any applicable law to be incurred in determining whether a Project or a Site is in compliance, and causing the Project or the Site to be in compliance, with all applicable requirements of law, all costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and court costs (collectively, the "Indemnified Losses"), except to the extent that any Indemnified Loss is finally determined by a court of competent jurisdiction to be the direct result from the gross negligence or willful misconduct of the party seeking indemnification (and, upon any such determination by such court, any indemnification payments with respect to such losses, claims, damages, liabilities or related costs and expenses previously received by such Indemnified Party shall be subject to reimbursement by such Indemnified Party if provided by such court).

(c)     Reimbursement by Lenders.  To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) and (b) of this Section to be paid by it to the Agents (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agents (or any such sub-agent), or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agents (or any sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agents (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).  Paragraph (c) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, each Borrower shall not assert, and hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the Cases, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments.  All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)     Survival.  The agreements in this Section 11.04 shall survive the resignation of the Administrative Agent or Collateral Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations, and shall continue in the Cases and in any successor cases, following the dismissal of the Cases of any successor cases.

11.05   Payments Set Aside.  To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent, the Collateral Agent or any Lender, or the Administrative Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required

(including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent and the Collateral Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

11.06    Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that none of the Borrowers may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 11.06(b), (ii) by way of participation in accordance with the provisions of Section 11.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each Agent and each of the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility and the Loans at the time owing to it under the Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $500,000, unless the Administrative Agent otherwise consents; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)      _Proportionate Amounts_. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)     _Required Consents_. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section.

(iv)      _Assignment and Assumption_. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 with respect to assignments to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund with respect to such Lender; _provided_, _however_, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)       _No Assignment to Borrower_. No such assignment shall be made to any Borrower, the Sponsor, any such Person's respective Affiliates or Subsidiaries, or any other Person with a direct or indirect ownership interest in any Borrower.

(vi)      _No Assignment to Natural Persons_. No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.03 and 11.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.06(d).

(c)       _Register_. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)       _Participations_. Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or any Borrower or any of the Borrowers' Affiliates) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans; _provided_ that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such

Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 3.01(c)(ii) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 11.01 that affects such Participant. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 and 3.02 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 3.06 as if it were an assignee under subsection (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 3.01, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(e)     Participant Register. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except solely to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

11.07     Treatment of Certain Information; Confidentiality. Each of Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have

jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process including the Bankruptcy Court or in connection with the Cases, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or any Swap Contract or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) with the consent of the Administrative Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to either Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than a Borrower.

For purposes of this Section, "Information" means all information received from any Borrower relating to any Borrower or their respective businesses, other than any such information that is available to the Administrative Agent, the Collateral Agent, or any Lender on a nonconfidential basis prior to disclosure by any Borrower, provided that, in the case of information received from a Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Collateral Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning a Borrower, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws. The confidentiality requirements under this Section 11.07 shall expire one year after the Maturity Date.

11.08   Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law and the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all of the obligations of such Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Administrative Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

11.09   Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the

Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

11.10    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

11.11    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

11.12    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.13    [Reserved].

11.14    No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other Loan Documents.  In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any Loan Document, this Agreement or such other Loan Document shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement or any other Loan Document.

11.15    Governing Law; Jurisdiction; Etc.

(a)    GOVERNING LAW.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, INCLUDING THE VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT THEREOF

(INCLUDING ANY CLAIMS SOUNDING IN CONTRACT OR TORT LAW ARISING OUT OF THE SUBJECT MATTER THEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST).

(b)      SUBMISSION TO JURISDICTION.   EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT ABSTAINS FROM HEARING OR REFUSES TO EXERCISE JURISDICTION, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT OR NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.      EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION (B) OF THIS SECTION.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

11.16   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS

AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11.17   <u>No Advisory or Fiduciary Responsibility</u>.   In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Borrowers and their Affiliates, on the one hand, and the Administrative Agent on the other hand, (B) each Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers or any of their Affiliates, or any other Person and (B) neither the Administrative Agent, nor any of the Lenders has any obligation to the Borrowers or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers and their Affiliates, and neither the Administrative Agent nor any of the Lenders has any obligation to disclose any of such interests to the Borrowers or any of their Affiliates.  To the fullest extent permitted by law, the Borrowers hereby waive and release any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

11.18   <u>Electronic Execution of Assignments and Certain Other Documents</u>.   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.19   <u>USA PATRIOT Act; Anti-Money Laundering Laws</u>.  The Administrative Agent and each Lender hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act or any other Anti-Money Laundering Laws, each of them is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow the Administrative Agent and/or such Lender to identify each Borrower in accordance with the USA PATRIOT Act or such Anti-Money Laundering Laws.

11.20   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions.</u>  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

11.21    <u>Incorporation of DIP Orders by Reference</u>.  Each of the Borrowers, the Agents and the Lenders agrees that any reference contained herein to (i) the Interim DIP Order shall include all terms, conditions and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (ii) the Final DIP Order shall include all terms, conditions and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of either the Interim DIP Order of the Final DIP Order, the terms of the Interim DIP Order and the Final DIP Order, as applicable, shall govern.

**ARTICLE XII**
**SECURITY AGREEMENT**

12.01    <u>Grant of Security Interest</u>.

(a)     Each Borrower hereby grants to the Collateral Agent, for the benefit of the Secured Parties, to secure the payment and performance in full of all of the Obligations, a Lien on and a security interest in and pledges and collaterally assigns to the Collateral Agent, for the benefit of the Secured Parties, all right, title and interest of such Borrower in all of its assets ad properties (real and personal), wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, in each case subject to the DIP Orders (all of the same being hereinafter called the "<u>Collateral</u>") including: (i) all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), (ii) documents (including, if applicable, electronic documents) and accounts, (iii) chattel paper (whether tangible or electronic), (iv) deposit accounts. (v) letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), (vi) actions brought under section 549 of the Bankruptcy Code, (vii) proceeds of avoidance actions, (viii) leases, (ix) commercial tort claims (including, without limitation, those set forth on <u>Schedule 12.01(a)</u> attached hereto), (x) securities accounts, securities and all other investment property, (xi) supporting obligations, (xii) any other contract rights or rights to the payment of money, receivables (including credit card receivables), (xiii) insurance claims, (xiv) all general intangibles (including all payment intangibles), (xv) money, cash and cash equivalents, (xvi) intellectual property, (xvii) software, books, records, ledger cards, files, correspondence, computer programs, tapes, disks, and related data processing software, (xviii) real property, (xix) proceeds of the Borrowers' rights under sections 506(c) and 550 of the Bankruptcy Code; (xx) all other personal, fixture and real property of every kind and nature and all to the extent not otherwise included, and (xxi) all accessions, proceeds and products of any and all of the foregoing.

(b)     Notwithstanding anything to the contrary contained herein, as and to the extent provided in this <u>Section 12.02</u>, the Collateral shall not include, and the Lien of this Agreement shall not attach to, the following:

(i)       any item of, tangible or intangible, property to the extent and only for so long as the creation, attachment or perfection of the security interest granted herein by any Borrower in its right, title and interest in such item of property is prohibited by applicable Law or is permitted only with the consent (that has not been obtained) of a Governmental Authority and such restriction, prohibition and/or requirement of consent is not rendered ineffective by applicable Law (including pursuant to sections 9-406, 9-407, 9-408 or 9-409 of the UCC);

(ii)      any property subject to a Lien permitted under <u>Subsection 7.02(f)</u> of this Agreement to the extent and only for so long as the applicable purchase money security agreement, Capital Lease or other applicable documentation contains a term that restricts, prohibits or requires a consent (that has not been obtained) of a Person (other than such Borrower or any other Borrower) to, the creation, attachment or perfection of the security interest granted herein and such restriction, prohibition and/or requirement of consent is not rendered ineffective by applicable Law (including pursuant to sections 9-406, 9-407, 9-408 or 9-409 of the UCC); and

(iii)     any lease, license, contract, property rights or agreement to which a Borrower is a party or any of such Borrower's rights or interests thereunder, in any case if and for so long as and to the extent that the grant of such security interest or lien shall constitute or result in (a) the abandonment, invalidation or unenforceability of any material right, title or interest of such Borrower therein or (b) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than, in the case of the above <u>clauses (a)</u> and <u>(b)</u>, to the extent that any such abandonment, invalidation, unenforceability, breach, termination or default would be rendered ineffective pursuant to sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity); <u>provided</u>, <u>however</u>, that to the extent Liens and consents to assignments are not permitted pursuant to the foregoing each Borrower hereby grants to the Collateral Agent for the benefit of the Secured Parties (A) consent rights with respect to the rejection of leases, (B) rights to select replacement lessees for rejected leases, and (C) rights to compel assumption and assignment (regardless of prior assumption) or the sale of leases upon an Event of Default.

If at any time the creation, attachment or perfection of the security interest granted herein in any of property subject to <u>clauses (b)(i)</u> through <u>clauses (b)(iii)</u> of this <u>Section 12.01(b)</u> shall be permitted or consent in respect thereof shall have been obtained, then the applicable Borrower shall at such time be deemed to have granted a security interest in such property (and such security interest will attach immediately without any further action).  Notwithstanding anything to the contrary set forth above, the rights to receive, and any interest in, all proceeds of, or monies or other consideration received or receivable from or attributable to the sale, transfer, assignment or other disposition of, any of the property subject to this <u>Section 12.01(b)</u> (to the extent a direct security interest in such property proceeds from the sale or disposition of such property shall not have already been granted) shall attach immediately and be subject to the security interest granted pursuant to <u>Section 12.01</u>.

(c)       Subject to the Carve Out and subject to the scheme of priority set forth in the DIP Order, pursuant to Bankruptcy Code Section 364(c)(1) the Collateral Agent and the Secured Parties have been granted a superpriority administrative claim over any and all administrative claims of the type specified in Bankruptcy Code sections 503(b) and 507(b). As collateral for the Loans and security for the full and timely payment and performance of all Obligations when due (whether at stated maturity, by acceleration or otherwise), the Collateral Agent, for the benefit of the Secured Parties, is hereby granted (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on the Collateral that is otherwise unencumbered as of the commencement of the Cases; (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected Lien on all Collateral of the Secured Parties, junior only to (A) Permitted Prior Liens,

and (B) valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; and (iii) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected senior priming Lien on all of the Borrowers' Collateral that is subject only to the Carve Out.

(d)    Pledged Equity.    As security for the Obligations, each of the Borrowers pledges, hypothecates, assigns, transfers, sets over and delivers unto the Collateral Agent, its successors and assigns, for the benefit of the Lenders, and grants to the Collateral Agent, its successors and assigns, for the benefit of the Lenders, a continuing security interest in and to the following (hereinafter collectively called the "Pledged Equity"):

(i)    Subject to Section 12.01(b), all of the Equity Interests now held and hereafter acquired by such Borrower at any time, and any certificates representing such Equity Interests, all of the right, title and interest of such Borrower in, to and under its percentages interest, shares or units as an owner thereof, and all investment property in respect thereof, including, without limitation, such Borrower's interests in (or allocations of) the profits, losses, income, gains, deductions, credits or similar items in respect of any Equity Interests now held or hereafter acquired by such Borrower, and the right to receive dividends or distributions in respect thereof, cash, other property, assets, and all options and warrants for the purchase of Equity Interests, all of such Borrower's right, title and interest to receive payments of principal and interest on any loans and/or other extensions of credit made by such Borrower to any other Borrower, all of such Borrower's voting rights, whether now existing or hereafter arising, whether arising under the terms of the other Organization Documents of each Person in which it holds or acquires any Equity Interests, at law or in equity, or otherwise and any and all of the proceeds thereof, and all distributions, cash, instruments, investment property and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Equity;

(ii)    all other property hereafter delivered to the Collateral Agent by such Borrower in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof; and

(iii)    all products and proceeds of all of the foregoing.

TO HAVE AND TO HOLD the Pledged Equity, together with all rights, titles, interests, privileges and preferences appertaining or incidental thereto, unto the Collateral Agent forever, subject, however, to the terms, covenants and conditions hereafter set forth.

12.02    No Filings Required; Perfection of Security Interests; Priority. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Orders. The Collateral Agent shall not be required (but shall have the option and authority) to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders. The DIP Liens in the Collateral will not be junior in priority to any Lien other than the Carve Out and the Permitted Prior Liens (to the extent, and only to the extent, set forth in the DIP Orders).

12.03    Certain Perfection Actions; Further Assurances.

(a)      Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Borrower shall, as applicable, at such Person's expense, perform all steps requested by the Agents or the Lenders to perfect, maintain, protect, and enforce the DIP Liens including, upon request by the Required Lenders, delivering to the Collateral Agent (who shall hold on behalf of the Lenders), the originals of all Pledged Debt, certificated investment property, instruments, documents and chattel paper and all other Collateral of which the Required Lenders determine that the Collateral Agent should have physical possession of in order to perfect and protect the security interest of the Secured Parties therein, duly pledged, endorsed or assigned to the Collateral Agent without restriction. To the fullest extent permitted by applicable law, the Collateral Agent may, and at the direction of the Required Lenders, shall, file (i) one or more financing statements disclosing the DIP Liens on the Collateral and (ii) a copy of the DIP Orders (including this Agreement attached thereto) in real property records, in each case disclosing the DIP Liens on the Collateral.

(b)      To the extent any Borrower owns any investment property, such Borrower agrees as follows with respect to such investment property:

(i)      All cash dividends, cash distributions, and other cash or cash equivalents in respect of such investment property at any time payable or deliverable to such Borrower shall be deposited a Controlled Account; and

(ii)     Such Borrower will not acknowledge any transfer or encumbrance in respect of such investment property to or in favor of any Person other than the Collateral Agent or a Person designated by the Collateral Agent in writing.

(c)      The Collateral Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Collateral Agent or its nominee any Equity Interest in any Project Company. In addition, the Collateral Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Equity Interests of such Project Company for certificates or instruments of smaller or larger denominations.

(d)      Subject to Section 12.03(a), each Borrower agrees, at its expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent or any Lender may from time to time reasonably request for the perfection and preserving of the security interests and the rights and remedies created hereby, including but not limited to, the execution and delivery of such additional conveyances, assignments, agreements, instruments and endorsements, the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the security interests created hereby and the execution, filing and recordation of any financing statements (including fixture filings or real property filings) or other documents as Collateral Agent may deem reasonably necessary or desirable for the perfection of the security interests granted hereunder.

12.04    Powers of Attorney.

(a)      Each Borrower hereby irrevocably appoints Collateral Agent (and any officer or agent of Collateral Agent), on behalf of and for the benefit of the Lenders, as its true and lawful proxy and attorney-in-fact, with power of substitution for and in the name of Collateral Agent or otherwise, which power of attorney shall be coupled with an interest, for the use and benefit of Administrative Agent to, effective upon the occurrence and during the continuance of an Event of Default and subject to the DIP Orders: (i) receive, endorse the name of such Borrower upon and deliver any notes, acceptances, checks, drafts, money orders

or other evidences of payment that may come into the possession of Collateral Agent with respect to the Collateral; (ii) cause such Borrower's mail to be transferred to Collateral Agent's own offices and to receive and open all mail addressed to such Borrower for the purposes of removing any such notes, acceptances, checks, drafts, money orders or other evidences of payment; (iii) demand, collect and receive payment in respect of the Collateral and to apply any such payments directly to the payment of the Obligations in accordance with this Agreement; (iv) receive and give discharges and releases of all or any of the Collateral; (v) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction, to collect or otherwise realize on all or any part of the Collateral or to enforce any rights in respect thereof; (vi) sign the name of such Borrower on any invoice or bill of lading relating to any of the Collateral; (vii) send verification of any accounts to any account debtor or customer; (viii) notify any account debtor or other obligor of such Borrower with respect to any Collateral to make payment to Administrative Agent; (ix) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating or pertaining to all or any of the Collateral; (x) take any action for purposes of carrying out the terms of this Agreement; (xi) enforce all of such Borrower's rights and powers under and pursuant to any and all agreements with respect to the Collateral; (xii) to effectuate the transfer of the Pledged Equity on the books of the issuer thereof to the name of the Collateral Agent or to the name of the Collateral Agent's nominee, designee or assignee; (xiii) to exercise all voting rights or any other ownership or consensual rights (including (x) the right to remove and appoint directors and officers or the equivalent thereof and  (y) dividend and distribution rights ) and to exercise all rights, powers and privileges and remedies which any holder of any of the Pledged Equity would be entitled including giving or withholding consents of members, calling and attending special or regularly scheduled meeting of members and voting at such meetings and (xiv) generally, to sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out this Agreement, as fully and completely as though Collateral Agent were the absolute owner of the Collateral for all purposes; provided, however, nothing herein contained shall be construed as requiring or obligating Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken by Collateral Agent or omitted to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of such Borrower or to any claim or action against Collateral Agent. It is understood and agreed that the power of attorney granted to Collateral Agent for the purposes set forth above in this Section 12.04 is coupled with an interest and is irrevocable and shall be effective automatically without any action or notice upon an Event of Default.  Such appointment as proxy and attorney-in-fact shall be valid and irrevocable notwithstanding any limitations to the contrary set forth in the organizational documents of any Borrower or any issuer of the Pledged Equity. All prior proxies given by any Borrower with respect to any of the Pledged Equity (other than to the Collateral Agent), are hereby revoked, and no subsequent proxies (other than to the Collateral Agent) will be given with respect to any of the Pledged Equity, unless the Administrative Agent at the direction of the Required Lenders otherwise subsequently agrees in writing. To the fullest extent permitted by applicable law, the Collateral Agent shall have no agency, fiduciary, or other implied duties to any Borrower or any other Person when acting in its capacity as such proxy or attorney-in-fact.  Each Borrower hereby waives and releases to the fullest extent permitted by applicable law any claims that it may otherwise have against the Collateral Agent or any other Secured Party with respect to any breach or alleged breach of any such agency, fiduciary, or other duty.  Each Borrower hereby ratifies and approves all acts of such attorney-in-fact made in accordance with this Agreement and agrees that such attorney-in-fact will not be liable for any such acts, omissions, errors of judgment or mistakes of law or fact other than by such Person's gross negligence or willful misconduct. The provisions of this Section 12.04 shall in no event relieve any Borrower of any of its obligations hereunder with respect to the Collateral or any part thereof or impose any obligation on Collateral e Agent to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by Collateral

Agent of any other or further right which it may have on the date of this Agreement or hereafter, whether hereunder, by law or otherwise.

(b)        Beyond the duty of Collateral Agent to exercise reasonable care in the custody of any Collateral in its possession, Collateral Agent shall not, under any circumstance or in any event whatsoever, have any liability for any part of the Collateral, nor shall Collateral Agent have any liability for any error or omission or delivery of any kind incurred in the good faith settlement, collection or payment of any of the Collateral or any monies received in payment therefor or for any damages resulting therefrom, nor shall this Agreement impose upon Collateral Agent any obligation to perform any obligation with respect to the Collateral. The costs of collection, notification and enforcement, including but not limited to, reasonable attorneys' fees and reasonable out-of-pocket expenses, shall be borne by the Borrowers, whether the same are incurred by a Lender or Collateral Agent.

12.05   Certain Waivers; Borrowers Not Discharged. Each Borrower expressly and irrevocably waives (to the extent permitted by applicable law) presentment, demand of payment and protest of nonpayment in respect of its Obligations under this Agreement. The obligations and duties of each Borrower hereunder are irrevocable, absolute, and unconditional and shall not be discharged, impaired or otherwise affected by (a) the failure of either Agent to assert any claim or demand or to enforce any right or remedy against any Borrower or any grantee under the provisions of this Agreement or any waiver, consent, extension, indulgence or other action or inaction in respect thereof, (b) any extension or renewal of any part of the Obligations, (c) any rescission, waiver, amendment or modification of any of the terms or provisions of any agreement related to this Agreement, (d) the release of any liens on or security interests in any part of the Collateral or the release, sale or exchange of or failure to foreclose against any security held by or for the benefit of Collateral Agent for payment or performance of the Obligations, (e) the bankruptcy, insolvency or reorganization of any Borrower or any grantee or any other Persons, (f) any change, restructuring or termination of the organization structure or existence of any Borrower or any grantee or any restructuring or refinancing of all or any portion of the Obligations, or (g) any other event that under law would discharge the obligations of a surety other than payment and satisfaction in full of all Obligations.

12.06   Adequate Protection. The Prepetition Secured Parties have been granted adequate protection in accordance with the DIP Orders to the extent of any diminution in the value of the Collateral as of the Petition Date, including but not limited to any diminution in value resulting from (i) the use, sale or lease of Collateral pursuant to Bankruptcy Code section 363(c) or (ii) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a), in the form of Adequate Protection Liens, the Adequate Protection Superpriority Claim and Adequate Protection Fees and Expenses.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow.*]

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**AGILON ENERGY HOLDINGS II, LLC**

By:_____
    Name:
    Title:

**VICTORIA PORT POWER, LLC**

By:_____
    Name:
    Title:

**VICTORIA CITY POWER LLC**

By:_____
    Name:
    Title:

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Administrative Agent

By: _____
    Name:
    Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Collateral Agent

By:_____
    Name:
    Title:

_____,
as a Lender


By:_____
    Name:
    Title:

[Agilon – Signature Page to Senior Secured Superpriority Debtor-in-Possession Credit Agreement]

SCHEDULES

# Schedule 1

## Acceptable Sale Provisions

The Sale Process shall incorporate the following Acceptable Sale Provisions:

1. The Sale Process may be a public auction or a private sale process;

2. The Borrowers shall, as soon as reasonably practicable, upon any information becoming available to the Borrowers, provide the Prepetition Agent and the Administrative Agent with: (a) (i) copies of any informational packages provided to potential bidders; (ii) any draft order pertaining to the Auction, (iii) any draft and final agency or sale agreements; (iv) the proposed deadlines established as to receipt of bids and other customary dates related to the Auction; (iv) copies of any indications of interest in acquiring or bids submitted to acquire any of the Borrowers' assets; (v) access to any dataroom compiled in respect of the Auction; and, (b) upon request of the Prepetition Agent or the Administrative Agent, (i) a status report and updated information relating to such motions and copies of any bids received from any proposed bidder for all or any portion of the Borrowers' assets and (ii) any updates, modifications or supplements to such information and materials. Notwithstanding the foregoing, in the event the Prepetition Agent and/or the Administrative Agent submits an indication of interest or bid for any of the Debtors' assets, the Debtors shall only be required to provide such information as is provided to other interested parties or bidders, consistent with the order approving bidding procedures;

3. The Sale Process will require that any bid (other than a Credit Bid as defined below) contain a cash component or other form of consideration acceptable to the Required Lenders, in their sole discretion, sufficient to repay all amounts outstanding under the Facility;

4. The right of the Prepetition Agent (on behalf of the Prepetition Noteholders) (subject to the Challenge Period (as defined in the Interim DIP Order) and, at their option, the Administrative Agent (on behalf of the Lenders), to credit bid, whether as the stalking horse or otherwise (the "Credit Bid"), up to the full amount of their claims under the Prepetition Senior Secured Note Documents and the Facility, respectively, on terms and conditions satisfactory to (i) the Prepetition Agent with respect to a Credit Bid by the Prepetition Noteholders and (ii) each Lender with respect to a Credit Bid by the Administrative Agent on behalf of the Lenders, shall be fully preserved in all circumstances; and

5. Stalking horse bid protections acceptable to the Prepetition Noteholders.

**SCHEDULE 2**

**EASEMENTS**

**Part I - Victoria Port Power LLC**

1.  Water Line Easement (Blanket) dated February 23, 2018 from Victoria County Navigation District in favor of Victoria Bloomington, LLC and Victoria Port Power LLC.

2.  Wastewater discharge casements from Victoria County Navigation District in favor of Victoria Bloomington, LLC and Victoria Port Power LLC as described in Victoria Port Master Lease.

3.  Electric High Voltage Line Easement from Victoria County Navigation District in favor of Victoria Port Power LLC.

4.  Metering Station Easement Agreement (with access easement) from Victoria County Navigation District in favor of Tennessee Gas Pipeline Co. affecting the Victoria Port Site.

**Part II - Victoria City Power LLC**

1.  Access Easement elated February 23, 2018 from Victoria Willow, LLC in favor of Victoria City Power LLC.

2.  Groundwater & Wastewater Discharge Easement from Victoria Willow, LLC in favor of Victoria City Power LLC.

3.  Easement from the City of Victoria, Texas along E. Wharf Street, Willow Street and Bottom Street in the City of Victoria, Texas in favor of Victoria Willow, LLC and Victoria City Power LLC to run high-voltage cables to connect the Victoria City Site to the ERCOT grid at the existing AEP Victoria Substation.

4.  Easement from the City of Victoria, Texas along E. Wharf Street, Willow Street and Bottom Street in the City of Victoria, Texas in favor of Victoria Willow, LLC and Victoria City Power LLC to run natural gas supply piping to connect to existing various natural gas metering stations situated adjacent to the above-mentioned streets.

5.  First Amendment to Easements and Rights of Way between Victoria Willow, LLC and AEP-related entity for purposes of locating with specificity four existing blanket casements in favor of AEP-related entities affecting the Victoria City Site.

6.  Metering Station Easement Agreement (with access casement) from Victoria Willow, LLC in favor of Kinder Morgan affecting the Victoria City Site.

## SCHEDULE 2.01

## COMMITMENTS AND APPLICABLE PERCENTAGES

| Lender | Facility Commitment | | Applicable Percentage |
|---|---|---|---|
| | New Money Facility | Roll-Up Loans | |
| The Prudential Insurance Company of America | $9,332,622.38 | $9,332,622.38 | 62.2174825% |
| Prudential Legacy Insurance Company of New Jersey | $3,093,146.85 | $3,093,146.85 | 20.6209790% |
| Prudential Retirement Insurance and Annuity Company | $2,574.230.77 | $2,574.230.77 | 17.1615385% |
| **Total** | **$15,000,000.00** | **$15,000,000.00** | **100.000000000%** |

**SCHEDULE 5.03**

**REQUIRED APPROVALS**

| Permit/Approval | Responsible Agency |
|---|---|
| **Federal** | |
| Exempt Wholesale Generator Certificate | FERC |
| Spill Prevention Control and Countermeasures Plan | EPA |
| **State** | |
| EGU Standard Air Permit | TCEQ |
| General Construction Storm Water Discharge Permit | TCEQ |
| Wastewater Discharge Authorization | TCEQ |
| Acid Rain Permit | TCEQ |
| Title V Operating Permit | TCEQ |
| Groundwater Permit | Victoria County Groundwater Conservation District (VCGCD) |
| Permits-By-Rule ("PBR") for the following emissions:<br><br>• Soldering, Welding (PBR 106.227)<br>• Hand-held and Manually-operated machines (PBR 106.265)<br>• MSS emissions (PBR 106.263 or de minimis by 30 TAC 116.119)<br>• Fuel and oil transfers (PBR 106.472)<br>• Diesel black start generator (PBR 106.511) | TCEQ |

| | |
|---|---|
| • Wastewater treatment (PBR 106.532) | |
| Industrial Waste Generation | TCEQ |
| Aboveground Storage Tanks | TCEQ |
| Power Generation Company Registration | PUCT |
| Standard Generation Interconnection Agreement (SGIA) | ERCOT |
| Resource Entity Registration | ERCOT |
| Resource Asset Registration Form (RARF) | ERCOT |
| Qualified Scheduling Entity (QSE) Registration | ERCOT |
| Standard Form Market Participant Agreement | ERCOT |
| Entity Registration Form | TRE |

## SCHEDULE 5.06

| Ref No. | Case Name | Case Number | Court Name |
|---|---|---|---|
| 1 | AEROVENT vs. VICTORIA CITY POWER LLC | 202123556 | Harris County District Court |
| 2 | Bay Ltd. vs. Castleman Power Development, LLC, et al | 21-06-87378-B | Victoria County District Court |
| 3 | CASTLEMAN POWER DEVELOPMENT LLC vs. FLUOR ENTERPRISES INC | 201990427 | Harris County District Court |
| 4 | CORMETECH INC vs. CASTLEMAN POWER DEVELOPMENT LLC | 202036547 | Harris County District Court |
| 5 | Fluor Enterprises Inc vs. Castleman Power Development, LLC, et al | 20-01-85391-C | Victoria County District Court |
| 6 | NEXUS CONTROLS LLC VS. VICTORIA PORT POWER LLC | 202102094 | Harris County District Court |
| 7 | ProEnergy Services, LLC vs. Victoria Port Power, LLC, et al | 19-09-85036-D | Victoria County District Court |
| 8 | SOUTHWEST ENERGY L P vs. VICTORIA CITY POWER LLC | 202139515 | Harris County District Court |
| 9 | TURNER, RANDY vs. NRG TEXAS POWER | 202124797 | Harris County District Court |
| 10 | Ultimate Industrial Group LLC vs. Castleman Power Development LLC, et al | 21-04-87062-B | Victoria County District Court |

**SCHEDULE 5.08(b)**

**LIENS**

| Ref No. | Borrower | Lien Claimant | Amount Asserted | Property listed in Claim |
|---|---|---|---|---|
| 1 | Agilon Energy Holdings II, LLC | The Prudential Insurance Company of America | $24,136,694.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 2 | Agilon Energy Holdings II, LLC | The Prudential Insurance Company of America | $12,853,337.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 3 | Agilon Energy Holdings II, LLC | Prudential Legacy Insurance Company of New Jersey | $16,563,330.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 4 | Agilon Energy Holdings II, LLC | Prudential Retirement Insurance and Annuity Company | $13,784,613.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 5 | Victoria City Power LLC | Allied Fire Protection, LP | $4,769.50 | Fire sprinkler system |
| 6 | Victoria City Power LLC | American Moistening Company | $301,162.60 | Real property and improvements |
| 7 | Victoria City Power LLC | ProEnergy Services LLC | $7,000,000.00 | Real property and improvements |
| 8 | Victoria City Power LLC | Prudential Legacy Insurance Company of New Jersey | $16,563,330.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the |

| | | | | Issuer and each Project Company |
|---|---|---|---|---|
| 9 | Victoria City Power LLC | Prudential Retirement Insurance and Annuity Company | $13,784,613.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 10 | Victoria City Power LLC | The Prudential Insurance Company of America | $24,136,694.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 11 | Victoria City Power LLC | The Prudential Insurance Company of America | $12,853,337.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 12 | Victoria City Power LLC | The Ultimate Industrial Group | $201,918.03 | Real property and improvements thereon at Victoria County property |
| 13 | Victoria Port Power LLC | Bay Ltd | $640,422.43 | Real property and improvements |
| 14 | Victoria Port Power LLC | Byron Albers; Fluor Enterprises Inc. | $823,798.78 | Real property and improvements |
| 15 | Victoria Port Power LLC | McHale Performance | $29,370.07 | Real property and improvements |
| 16 | Victoria Port Power LLC | ProEnergy Services LLC | $7,000,000.00 | Real property and improvements |
| 17 | Victoria Port Power LLC | Prudential Legacy Insurance Company of New Jersey | $16,563,330.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |

| 18 | Victoria Port Power LLC | The Prudential Insurance Company of America | $24,136,694.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
|----|----|----|----|----|
| 19 | Victoria Port Power LLC | Saber Power Services, LLC | $406,945.00 | Real property and improvements |
| 20 | Victoria Port Power LLC | Prudential Retirement Insurance and Annuity Company | $13,784,613.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 21 | Victoria Port Power LLC | The Prudential Insurance Company of America | $12,853,337.00 | All real and personal property of the Issuer and each Project Company and all equity interest in the Issuer and each Project Company |
| 22 | Victoria Port Power LLC | The Ultimate Industrial Group | $201,918.03 | Real property and improvements thereon at Victoria County property |

## SCHEDULE 5.08(c)

### LEASES

| Ref No. | Borrwer | Lessor | Property Location |
|---------|---------|--------|-------------------|
| 1 | Victoria City Power LLC | Victoria Willow LLC | 1301 Willow St.<br>Victoria, TX 77901 |
| 2 | Victoria Port Power LLC | Victoria Bloomington LLC (Sublessor) | 2100 Old Bloomington Rd.<br>Victoria, TX 77905, |

**<u>SCHEDULE 5.08(g)</u>**

**INVESTMENTS**

| Ref No. | Borrower | Investment | Ownership |
|---|---|---|---|
| 1 | Agilon Energy Holdings II, LLC | Victoria City Power LLC | 100% |
| 2 | Agilon Energy Holdings II, LLC | Victoria Port Power LLC | 100% |

**SCHEDULE 5.11**

**TAXES**

| Ref No. | Borrower | Taxing Entity | Basis for Claim | Amount |
|---|---|---|---|---|
| 1 | Victoria City Power LLC | Victoria County, Texas | 2020 Property Taxes | $669,365.78 |
| 2 | Victoria Port Power LLC | Victoria County, Texas | 2020 Property Taxes | $438,655.92 |

## SCHEDULE 5.12(a)

## ORGANIZATION AND OWNERSHIP OF INTERESTS IN BORROWER

| Ref No. | Entity | Owner | Ownership |
|---|---|---|---|
| 1 | Agilon Energy II LLC | Castleman Power Development LLC | 18.3% Class A Common Units |
| 2 | Agilon Energy II LLC | Castleman Power Investment II LLC | 81.7% Class A Common Units |
| 3 | Agilon Energy II LLC | Castleman Power Development LLC | 100% Class B Common Units |
| 4 | Agilon Energy II LLC | Prudential Capital Energy Partners, L.P. | 100% Class C Common Units |
| 5 | Agilon Energy Holdings II, LLC | Agilon Energy II LLC | 100% |
| 6 | Victoria City Power LLC | Agilon Energy Holdings II, LLC | 100% |
| 7 | Victoria Port Power | Agilon Energy Holdings II, LLC | 100% |

## OFFICERS

| Ref No. | Borrower | Name | Position |
|---|---|---|---|
| 1 | Agilon Energy Holdings II, LLC | Hugh Smith | Sole Manager |
| 2 | Victoria City Power LLC | Hugh Smith | Sole Manager |
| 3 | Victoria Port Power LLC | Hugh Smith | Sole Manager |

## SCHEDULE 5.12(b)

### BORROWERS

| Ref No. | Debtor | Jurisdiction | Address | US Taxpayer ID |
|---------|--------|--------------|---------|----------------|
| 1 | Agilon Energy Holdings II, LLC | Texas | 480 Wildwood Forest Drive Suite 475 Spring, Texas 77380 | 82-3633389 |
| 2 | Victoria City Power LLC | Texas | 480 Wildwood Forest Drive Suite 475 Spring, Texas 77380 | 82-0684169 |
| 3 | Victoria Port Power LLC | Texas | 480 Wildwood Forest Drive Suite 475 Spring, Texas 77380 | 82-0694894 |

**SCHEDULE 5.21**

**MATERIAL PROJECT DOCUMENTS**

| Ref No. | Borrower | Agreement With | Agreement Name |
|---|---|---|---|
| 1 | N/A | Castleman Power Development, LLC and Agilon Energy II, LLC | Asset Management Agreement [1] |
| 2 | Victoria City Power LLC | AEP Texas Inc. | ERCOT Standard Generation Interconnection Agreement |
| 3 | Victoria City Power LLC | Kinder Morgan Tejas Pipeline LLC | Facilities Agreement |
| 4 | Victoria City Power LLC | NAES Corporation | O&M Services Agreement |
| 5 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Master Power Purchase and Sale Agreement |
| 6 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Energy Marketing & QSE Services Agreement |
| 7 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Mutual Netting/Closeout Agreement |
| 8 | Victoria City Power LLC | Southwest Energy, LP | Fuel Management Services Agreement |
| 9 | Victoria City Power LLC | Southwest Energy, LP | Base Contract for Sale and Purchase of Natural Gas |
| 10 | Victoria City Power LLC | Victoria Midstream LLC | Pipeline Construction, Operation and Gas Transportation Agreement |
| 11 | Victoria City Power LLC | Victoria Willow, LLC | Ground Lease Agreement |
| 12 | Victoria Port Power LLC | AEP Texas Inc. | ERCOT Standard Generation Interconnection Agreement |
| 13 | Victoria Port Power LLC | NAES Corporation | O&M Services Agreement |
| 14 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Master Power Purchase and Sale Agreement |

---

[1] The inclusion of this agreement on this Schedule 5.21 does not constitute an admission that such agreement is in effect or that the Borrowers are currently obligated to perform under this agreement in any way, including but not limited to the payment of postpetition management fees.

| 15 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Energy Marketing & QSE Services Agreement |
|----|--------------------------|----------------------------------------|-------------------------------------------|
| 16 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Mutual Netting/Closeout Agreement |
| 17 | Victoria Port Power LLC | Southwest Energy, LP | Fuel Management Services Agreement |
| 18 | Victoria Port Power LLC | Southwest Energy, LP | Base Contract for Sale and Purchase of Natural Gas |
| 19 | Victoria Port Power LLC | Tennessee Gas Pipeline Company, L.L.C. | Balancing Agreement |
| 20 | Victoria Port Power LLC | Victoria Bloomington, LLC | Sublease Agreement |
| 21 | Victoria Port Power LLC | Victoria Midstream LLC | Pipeline Construction, Operation and Gas Transportation Agreement |
| 22 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Electricity) |
| 23 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Gas) |
| 24 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Water) |
| 25 | Agilon Energy Holdings II, LLC | Tateswood Energy Company, LLC | Asset Management Agreement |
| 26 | Agilon Energy Holdings II, LLC | Hugh Smith Advisors, LLC | Consulting Agreement |
| 27 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Energy Marketing & QSE Services Agreement |
| 28 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Base Contract for Sale and Purchase of Natural Gas |
| 29 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Transaction Confirmation |
| 30 | Victoria City Power LLC | Shell Energy North America (US), L.P. | Mutual Netting/Closeout Agreement |
| 31 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Energy Marketing & QSE Services Agreement |

| 32 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Base Contract for Sale and Purchase of Natural Gas |
|----|--------------------------|--------------------------------------|----------------------------------------------------|
| 33 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Transaction Confirmation |
| 34 | Victoria Port Power LLC | Shell Energy North America (US), L.P. | Mutual Netting/Closeout Agreement |

**SCHEDULE 5.22**

**BANK ACCOUNTS**

| Ref No. | Borrower | Financial Institution | Account Number | Location |
|---|---|---|---|---|
| 1 | Agilon Energy Holdings II, LLC | Allegiance Bank | x4226 | United States |
| 2 | Agilon Energy Holdings II, LLC | Allegiance Bank | x4234 | United States |
| 3 | Victoria City Power | Allegiance Bank | x4291 | United States |
| 4 | Victoria City Power | Wilmington Trust | x7541-006 | United States |
| 5 | Victoria Port Power | Allegiance Bank | x4325 | United States |
| 6 | Victoria Port Power | Wilmington Trust | x7541-007 | United States |

<u>**SCHEDULE 6.02(h)**</u>

**FORM OF MONTHLY OPERATING REPORT**

*Monthly Operations
Report for [date]*

*Highlights:*

[To be completed]

**1.  Safety Performance & Process**

**[To be completed]**

**2.  Environmental & Regulatory Compliance**

|  | **Current Month** | **12 Month Rolling Total** | **12 Month Rolling Permit** | **Total % of Permit** |
|---|---|---|---|---|
| **VOC Tons (calculated)** | | | | |
| **CO Tons (calculated)** | | | | |
| **NOx Tons (actual)** | | | | |
| **SO2 Tons (calculated)** | | | | |
| **Diesel Usage Usage (Gallons)** | | | | |

**3. Operational Highlights**

**[To be completed]**

    Operating Hours =

    Monthly Equivalent Starts =

**4. Maintenance Highlights**

**[To be completed]**

**5.  Inventory / Spare Parts**

**[To be completed]**

**6. Capital Projects**

**[To be completed]**

**7. Corporate & Technical Support:**

**[To be completed]**

**8. Personnel & Training:**

**[To be completed]**

9. Monthly Statistics:

|  | Monthly Actual | Petition Date to Date Actual |
|---|---|---|
| Energy (MWh) |  |  |
| Gas Consumption |  |  |
| Net Plant Heat Rate (BTU/KWh) |  |  |
| Fired Hours |  |  |
| Requested Starts |  |  |
| Actual Starts |  |  |

**SCHEDULE 6.07**

**INSURANCE**

Section 1.1    General Requirements.  The Borrowers shall, without cost to the Secured Parties, maintain or cause to be maintained on its behalf in effect at all times on and after the Closing Date the types of insurance required by the following provisions together with any other types of insurance required hereunder or pursuant to the Material Project Documents with respect to each Project, in such form reasonably acceptable to the Required Lenders, with insurance companies rated "A-" or better, with a minimum size rating of "VIII" by Best's Insurance Guide and Key Ratings (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if Best's Insurance Guide and Key Ratings shall no longer be published) or other companies reasonably satisfactory to the Required Lenders and the Borrowers, until all Obligations have been paid in full and fully discharged, other than contingent indemnification and reimbursement obligations for  which no claim has been asserted.

(a)    All-Risk Property / Machinery Breakdown.  "All-Risk property," as such term is used in the insurance industry, in an amount of not less than the replacement cost value of the Projects, including coverage for mechanical and electrical breakdown plus resulting or ensuing damage and the perils of flood, earthquake, windstorm (named or unnamed), hail, lightning, riot and civil commotion, theft, vandalism and malicious mischief, subject to terms that are consistent with current industry practice, insuring all real and personal property of the Borrowers whether at a fixed (including non-owned location for off-Site repair or refurbishment), off-Site storage or a warehouse location or while in the course of inland transit, for an amount of not less than the full replacement cost value of such property and equipment at each location, or as set forth in the sublimits below or such other amount as agreed by the Required Lenders and that is sufficient to comply with the insurance requirements, if any, of all Material Project Documents.  All responsibility for verification of compliance with the Material Project Documents shall rest solely with the Borrowers.

Sublimits are permitted with respect to the following perils:

- (i)    off-Site property, to the extent exposures exist, in an amount not less than $1,000,000;

- (ii)    inland transit in the amount of $10,000,000 or an amount adequate to cover the replacement cost of items in transit;

- (iii)    earthquake, in an amount not less than the replacement value of a single location in the annual aggregate, shared for each site, including business interruption insurance required in Section 1.1(d) below;

- (iv)    flood, in an amount not less than the replacement value of a single location in the annual aggregate and aggregate limits of $10,000,000 for High Hazard Zones, shared for each site, including business interruption insurance required in Section 1.1(b) below with a deductible of 5% of the total insured value at time of loss, minimum $500,000;

- (v) windstorm, (named or unnamed), including tornadoes, in an amount not less than a project replacement value of a single location in the annual aggregate shared for each Site including the amount of business interruption insurance required in Section 1.1(b) below but in no event less than the Obligations per occurrence and in the annual aggregate for the Projects, or such other amount required or agreed by the Required Lenders; with deductible of 5% of the total insured value a time of loss, minimum $500,000 and;

- (vi) such other coverages that are customarily sub-limited and/or aggregated or restricted in reasonable amounts consistent with current industry practice with respect to similar risks and acceptable to the Required Lenders. Sublimits and deductibles under (i)-(v) are subject to review upon request based on industry practice and market availability.

Such policy shall include: (a) an automatic reinstatement of limits following each loss (except for the perils of earthquake, pollution cleanup, flood and named windstorm) unless otherwise agreed by the Required Lenders, (b) a replacement cost valuation endorsement with no deduction for depreciation and no coinsurance clauses (or a waiver thereof) and (c) coverage for physical damage that is not covered by warranty or guaranty to the extent normally insured.

All such policies may have per occurrence deductibles of not greater than $500,000 for all perils, except $1,000,000 for turbines and generator and 5% / $500,000 minimum for flood, 5% / $500,000 minimum for named windstorm (provided that tornadoes and windstorms other than hurricanes, tropical storms, cyclones and typhoons are not included) and 5% / $500,000 for earthquake unless otherwise approved by the Required Lenders.

(b) <u>Business Interruption Insurance.</u> The Borrowers shall maintain or cause to be maintained, with respect to each Project, business interruption insurance following all perils required and insured above under the all risk property / machinery breakdown required above with limits of not less than the projected equivalent of 12 months gross revenues, less non-continuing expenses and other standard business interruption allowances. If coverage is subject to an indemnification period, such period shall not be less than 12 months. Contingent business interruption limit of $1,000,000 shall be included with respect to covered loss or damage to the first non-owned substation. The deductible or waiting period shall not exceed 60 days on a per occurrence basis.

(c) <u>Commercial General Liability Insurance.</u> Commercial general liability insurance covering the Borrowers and all operations of the Projects, written on an "occurrence" policy form, including coverage for premises/operations, products/completed operations, , blanket contractual liability, and personal injury, with no exclusions for explosion, collapse and underground perils, or fire with primary coverage limits of no less than $1,000,000 per occurrence and $2,000,000 annual aggregate for injuries or death to one or more persons or damage to property resulting from any one occurrence. The commercial general liability policy shall include a severability of interest clause with no exclusions or limitations on cross liability to the extent insurable and allowed by law. Deductibles in excess of $10,000 shall be subject to review and approval by the Required Lenders.

(d)   <u>Automobile Liability Insurance.</u>  Automobile liability insurance covering the Borrowers, including coverage for owned (if any), leased, non-owned and hired automobiles for both bodily injury and property damage in accordance with statutory legal requirements, with combined single limits of no less than $1,000,000 per accident with respect to bodily injury, property damage or death.  To the extent that the Borrowers do not own any automobiles, contingent liability for hired, leased and non-owned automobiles may be obtained through endorsement to the general liability policy required in Section 1.1(c) above.  Deductibles in excess of $1000 shall be subject to review and approval by the Required Lenders.

(e)   <u>Workers' Compensation / Employers Liability Insurance.</u>  Workers' compensation insurance in accordance with statutory and/or provincial requirements <u>at any time in which the Borrowers have employees,</u> including coverage for employer's liability with a limit of not less than $1,000,000 and such other forms of insurance which the Borrowers are required by law to provide for loss resulting from injury, sickness, disability or death of each of their employees.  To the extent applicable, insurance shall cover Jones Act, Longshore and Harbor Workers Act (as such Acts are commonly understood in the insurance industry).  Deductibles in excess of $5,000 shall be subject to review and approval by the Required Lenders.

(f)   <u>Umbrella or Excess Liability Insurance.</u>  Umbrella or excess liability insurance of not less than $20,000,000 per occurrence and annual aggregate (inclusive of the requirements and in addition to the limits in Sections 1.1(c), (d) and (e)) of this <u>Schedule 6.07.</u>  Such coverages shall be on an occurrence policy forms or AEGIS claims-made form (or other acceptable claims-made form) and over and above coverage provided by the policies described in Sections 1.1(c), (d) and (e) of this <u>Schedule 6.07</u> with respect to employer's liability, if applicable.  If the policy or policies provided under this Section 1.1(f) contain(s) aggregate limits, and such limits are diminished below $1,000,000 during the applicable policy term by any one or more incident, occurrence, claim, settlement or judgment against such insurance which has caused the insurer to establish a reserve, the Borrowers shall, within ten (10) Business Days after obtaining knowledge of such event, inform the Secured Parties in writing of such reduction and the events giving rise thereto, and within 30 Business Days purchase an additional umbrella/excess liability insurance policy satisfying the requirements of this Section 1.1(f).  Per occurrence deductibles for the types of liability coverages required to be maintained herein shall not be greater than $10,000, unless otherwise approved by the Required Lenders.

(g)   <u>Pollution Liability Insurance.</u>  Pollution liability insurance with a limit commensurate with industry practice for similar operations but not less than $5,000,000 per occurrence and in the annual aggregate and as otherwise required by the Material Project Documents.  Coverage will provide for property damage and bodily injury to third parties arising out of "sudden and accidental" pollution conditions as a result of either Project's operations.  All such coverages can be included in the commercial general liability and umbrella or excess liability policies or provided under a separate pollution liability policy.  Claims made coverage forms are acceptable.  Deductibles in excess of $25,000 shall be subject to review and approval by the Required Lenders.

(h)   <u>Contractors and Subcontractors.</u>  Borrowers shall use commercially reasonable efforts to require the operator and other contractors or subcontractors with which they have a direct contractual relationship, if any, that will be performing construction, operations and

maintenance or other on-Site work on the Borrowers' behalf (as applicable), to obtain and maintain the basic "types" of insurance required in Sections 1.1(c), (d), and (e) above in amounts that are customary for contractors and subcontractors performing similar work and operations.

    1.2    <u>Special Insurance Provisions</u>.

    (a)    <u>Lender Loss Payable Endorsement.</u>  All property related policies of insurance required herein (including all risk property, business interruption, machinery breakdown, etc.) to be maintained pursuant to Section 1.1(a) of this <u>Schedule 6.07</u>, shall name The Prudential Insurance Company of America, 655 Broad Street, 16th Floor, Newark, NJ 07102, in its capacity as the Administrative Agent on behalf of the Secured Parties, and its successors and/or assigns in such capacity, as the "sole" loss payee for all losses insured thereunder pursuant to a lender loss payable endorsement, its equivalent or other lender loss payable form approved by the Required Lenders (such approval not to be unreasonably withheld, conditioned or delayed).

    (b)    <u>Non-Vitiation.</u>  All property related policies of insurance required herein shall insure the interests of the Administrative Agent and the Secured Parties regardless of any breach or violation by any of the Borrowers, any Affiliate of the Borrowers or of any Secured Party or others acting on their behalf of any warranties, declarations or conditions contained in such policies, any action or inaction, or any foreclosure relating to either Project or any change in ownership of all or any portion of either Project (the foregoing may be accomplished by the use of an approved lender loss payable endorsement, acceptable mortgagee clause or multiple insureds clause).

    (c)    <u>Additional Insured & Waiver of Subrogation.</u>  All polices of insurance required above other than workers compensation and employers liability that are maintained by the Borrowers or on behalf of the Borrowers shall include the Administrative Agent and the Secured Parties and each of their successors or assigns as additional insureds (with the exception of workers' compensation and professional/pollution liability) and provide a waiver of subrogation in their favor.

    (d)    <u>Severability of Interest, Primary and Non-Contributory.</u>  All liability policies required above that are maintained by the Borrowers or on behalf of the Borrowers shall expressly provide that all provisions thereof, except the limits of liability (which shall be applicable to all insureds as a group) shall operate in the same manner as if there were a separate policy covering each such insured.  All policies required herein shall be considered primary and non-contributory with any other policies the Administrative Agent or the Secured Parties may hold;

    (e)    <u>Notice of Cancellation.</u>  All polices of insurance required herein shall provide  thirty (30) days written notice of cancellation to the Administrative Agent and the Secured Parties, with the exception of ten (10) days' notice for nonpayment of premium, to the extent commercially available.  To the extent endorsement of the required policies to provide such written notice of cancellation is not commercially available, the Borrowers shall be obligated to provide written notice of cancellation to the Administrative Agent and the Secured Parties.  The Borrowers shall provide prompt notice of material change in policy conditions to the Administrative Agent and the Secured Parties.  For purposes of this section, material change is considered to be any

modification or reduction in coverage that would cause the Borrowers' insurance policies to be out of compliance with the terms of this <u>Schedule 6.07</u>.

(f)     <u>Claims-Made Forms.</u>  If any liability insurance required under the provisions of this <u>Schedule 6.07</u> is permitted to be written on a "claims made" basis, then such insurance shall include (i) a retroactive date (as such term is specified in each of such policies) that is no later than the Closing Day; and (ii) each time any policy written on a "claims made" basis is not renewed or the retroactive date of such policy is to be changed, the Borrowers shall obtain or shall cause to be obtained for each such policy or policies the broadest extended reporting period coverage, or "tail", reasonably available in the commercial insurance market for each such policy or policies.  In the alternative, the Borrowers can have the policy endorsed to provide "prior acts" coverage from a subsequent insurance carrier.

(g)     <u>Loss Notification</u>.  The Borrowers shall promptly notify the Administrative Agent and the Secured Parties of any single loss or event likely to give rise to a property or liability insurance claim in an amount in excess of $100,000 whether or not covered by insurance.

(h)     <u>Loss Adjustment and Settlement</u>.  Any loss insured by the inland transit, operational physical damage, machinery damage or business interruption or other first party insurance policies or coverages shall be adjusted with the respective insurance companies, including the filing in a timely manner of appropriate proceedings, by the Borrowers, in consultation with the Required Lenders if such loss is in excess of $250,000.  In addition, the Borrowers may, in their reasonable judgment, consent to the settlement of any loss, provided that in the event that the amount of the loss exceeds $250,000 the terms of such settlement is agreed in writing by the Required Lenders.

(i)     <u>Acceptable Policy Terms and Conditions</u>.  All policies of insurance required to be maintained herein shall contain terms and conditions reasonably acceptable to the Required Lenders.

(j)     <u>Reports/Documentation</u>.  Concurrently with the furnishing of the certification referred to in Section 1.4 of this <u>Schedule 6.07</u>, the Borrowers shall deliver to the Administrative Agent, a report from the Borrowers' insurance broker, signed by an authorized representative of such broker, stating that in the opinion of such broker, the insurance then carried or to be renewed or procured is in accordance with the terms of this <u>Schedule 6.07</u>, or at the discretion of the Required Lenders, the Borrowers may provide insurance documentation in sufficient detail such that insurance coverages required in this insurance schedule can be individually verified.  To the extent that insurance is split among multiple independent brokers, and such confirmation cannot be obtained, an officer of the Borrowers may produce a letter of compliance.  Upon request from the Required Lenders or Administrative Agent, the Borrowers will promptly furnish it with additional evidence each of the requirements pursuant to this <u>Schedule 6.07</u> including the name of the insurance company, policy number, type of insurance, major limits of liability and expiration date of the required insurance policies along with the following additional policy information.

Policy declarations page detailing limits, sub-limits and deductibles
Schedule of forms and endorsements or table of contents as applicable

Insuring agreement (physical damage and business interruption)
Policy exclusions
Copies of actual policy endorsements/policy working for the following:
- Property*

  Additional Insured
  Waiver of Subrogation
  Lender Loss Payable wording
  Valuation clauses (e.g., replacement cost with no-coinsurance)
  o *if certificates are used to add parties as additional insureds/lender loss payees/mortgagees then the certificates must specifically reference the required parties, the applicable agreement and that the provisions of the lender loss payable endorsement apply to the designated loss payee.

- Liability

  Additional Insured
  Waiver of Subrogation
  Primary and non-contributory
  Severability of interest (confirmation of no exclusions for cross liability or named insured vs. named insured)
  Notice of cancellation

(k)     Failure to Maintain Insurance.  In the event the Borrowers fail to take out or maintain the full insurance coverage required by this Schedule 6.07, the Administrative Agent (acting at the direction of the Required Lenders) may (but shall not be obligated to), upon 30 days' prior notice (unless the aforementioned insurance would lapse within such period, in which event notice should be given as soon as reasonably possible) to the Borrowers of any such failure, take out the required policies of insurance and pay the premiums on the same.

(l)     Failure to Collect.  In the event that the Borrowers fail to respond in a timely and appropriate manner to take any steps necessary or reasonably requested by the Required Lenders to collect from any insurers for any loss covered by any insurance required to be maintained by this insurance schedule, and such failure continues for five Business Days, the Required Lenders shall have the right to make all proofs of loss, negotiate all claims and/or receive all or any part of the proceeds of the foregoing insurance policies, either in its own name or the name of the Borrowers; provided, however, that the Borrowers shall, upon the request of the Required Lenders and at the Borrowers' own cost and expense, make all proofs of loss and take all other steps necessary or reasonably requested by the Required Lenders to collect from insurers for any loss covered by any insurance required to be obtained by this insurance schedule.

1.3     Other Insurance Requirements.  In addition to the other requirements of this insurance schedule, such other or additional insurance (as to risks covered, policy amounts, policy provisions or otherwise) as the Required Lenders may reasonably request from time to time provided that such other insurance and amounts are then commonly insured against with respect

to similar properties in similar regions with similar exposures and which are available on commercially reasonable terms.

1.4     Certification of Compliance.  The Borrowers shall deliver to the Administrative Agent and the Secured Parties, within ten (10) Business Days after each annual policy renewal date for each policy, (1) certificates of insurance or binders, in form and substance reasonably satisfactory to the Required Lenders, evidencing all of the insurance required by the provisions of this Schedule 6.07.  Such certificates of insurance/binders shall be executed by each insurer or by an authorized representative of each insurer where it is not practical for such insurer to execute the certificate itself.  Such certificates of insurance/binders shall identify underwriters, the type of insurance, the insurance limits and the policy term and shall specifically list the special provisions enumerated for such insurance required by this insurance schedule.  Upon reasonable request, the Borrowers will promptly furnish the Administrative Agent and the Secured Parties with copies of all insurance policies (except in the case of corporate insurance programs where detailed insurance summaries shall be acceptable), binders and cover notes or other evidence of such insurance relating to the insurance required to be maintained by the Borrowers.  The schedule of insurance shall include the name of the insurance company, policy number, type of insurance, major limits of liability and expiration date of the insurance policies.

1.5     No Duty to Verify Insurance Compliance.  The Administrative Agent and any Secured Party shall be entitled, upon reasonable advance notice, to review the Borrowers' (or other appropriate party's) books and records regarding all insurance policies maintained with respect to the Projects and the Borrowers' obligations under this Schedule 6.07.  Notwithstanding the foregoing, no provision of this Schedule 6.07 or any other provision of this Agreement or any other Financing Document shall impose on the Administrative Agent or any Secured Party any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by the Borrowers, nor shall the Administrative Agent or the Secured Parties be responsible for any representations or warranties made by or on behalf of the Borrowers, or any other party to any insurance company or underwriter.  Any failure on the part of the Administrative Agent or the Secured Parties to pursue or obtain the evidence of insurance required herein from the Borrowers or any other party and/or failure of the Administrative Agent or any Secured Party to point out any non-compliance of such evidence of insurance shall not constitute a waiver of any of the insurance requirements in the Financing Documents, including without limitation this Schedule 6.07.

1.6     Waiver of Insurance Requirements.

(a)     Notwithstanding any of the foregoing provisions of this Schedule 6.07, any insurance required to be maintained pursuant to this Schedule 6.07 (including the limits or deductibles or any other terms under policies for such insurance or any additional insurance requested pursuant to this Schedule 6.07) is not available on a commercially reasonable basis at the time of renewal or request, as applicable, the Borrowers shall provide written notice to the Administrative Agent and the Secured Parties accompanied by a letter from the Borrowers' insurance broker stating that, in its opinion, such insurance is unavailable on a commercially reasonable basis and recommending such replacement insurance (or replacement additional insurance in respect of the insurance being requested pursuant to this Schedule 6.07) therefore that is available on a commercially reasonable basis. Such notice shall be given not less than 60 days prior to the scheduled date for renewal of any such policy or within 30 days after any request for

additional insurance is received by the Borrowers pursuant to this <u>Schedule 6.07</u>. Upon receipt of such notice by the Administrative Agent and the Secured Parties, the Required Lenders, shall, not less than 30 days before the date for renewal of such insurance (or not more than 30 days after receipt of any notice with respect to any request for additional insurance), indicate to the Borrowers whether or not the Required Lenders concur with the opinion of the Borrowers' insurance broker. If the Required Lenders do concur with such opinion, the Borrowers shall obtain the replacement insurance recommended in such opinion prior to the date for renewal of such insurance (and in respect of any additional insurance requested pursuant to this <u>Schedule 6.07</u>, within 30 days after the Required Lenders have notified the Borrowers that they concur with the Borrowers' broker), and the Required Lenders shall issue a waiver to the Borrower for a period of one year with respect to the insurance not available on a commercially reasonable basis; and,

(b)       Should the Required Lenders not concur, the Required Lenders shall choose an independent insurance expert from an internationally recognized insurance brokerage firm to conduct a review of the relevant insurance requirements of this <u>Schedule 6.07</u> and the insurance market for such insurance at the time. Upon conclusion of such review, the insurance expert shall issue a written report stating whether such insurance is available or unavailable on a commercially reasonable basis; and,

(c)       If the insurance expert concludes that such insurance is not available on a commercially reasonable basis, the insurance expert shall provide a written recommendation for replacement insurance not less than 30 days before the date for renewal of such insurance (and in respect of any additional insurance requested pursuant to this <u>Schedule 6.07</u>, within 30 days after the Required Lenders have notified the Borrowers that they do not concur with the Borrowers' broker concerning whether such additional insurance is commercially available at the time of request) which shall be conclusive and binding on both the Borrowers and the Secured Parties. The Required Lenders shall issue a waiver to the Borrowers for a period of one year upon the insurance expert certifying that the relevant insurance is not available on a commercially reasonable basis and the Borrowers having implemented the recommendation of the insurance expert for such replacement insurance prior to the scheduled date of renewal of the insurance being replaced (and in respect of any additional insurance requested pursuant to this <u>Schedule 6.07</u>, implementing the insurance expert's recommendation within 30 days after the insurance expert has provided its written recommendation as provided in this Section 1.6); and,

(d)       If the insurance expert concludes that such insurance is available on a commercially reasonable basis, such insurance expert and the Borrowers' insurance broker shall choose a mutually agreeable independent insurance expert from an internationally recognized insurance brokerage firm reasonably to conduct a review of the relevant insurance requirements of this <u>Schedule 6.07</u> and the insurance market for such insurance at the time. Upon conclusion of such review, the independent insurance expert shall issue a written report stating whether, in its opinion, such insurance is available or unavailable on a commercially reasonable basis and, if unavailable, a written recommendation for such replacement insurance (or in respect of any request for additional insurance pursuant to this <u>Schedule 6.07</u>, replacement additional insurance) therefor that is available on a commercially reasonable basis. The determination of the independent insurance expert shall be conclusive and binding on both the Borrowers and the Secured Parties. If the independent insurance expert concludes that the insurance required by this <u>Schedule 6.07</u> is not available on a commercially reasonable basis, the Required Lenders shall issue a waiver to the

Borrowers for a period of one year upon the Borrowers having implemented the recommendation of such insurance expert for such replacement insurance therefor that is available on a commercially reasonable basis prior to the scheduled date of renewal of the insurance being replaced; provided, that if the review is not concluded prior to such scheduled date of renewal (or not more than 30 days after receipt of any such notice of unavailability on a commercially reasonable basis with respect to any request for additional insurance), the Borrowers will obtain the replacement insurance recommended by the Borrowers' insurance broker in clause (a) of this Section 1.6 prior to such scheduled date of renewal (or expiration of such 30-day period) and thereafter comply with the recommendation of the independent insurance expert no later than 30 days after its report is delivered pursuant to this Section 1.6(d) and, so long as the Borrowers comply with their obligations set forth herein, no Default or Event of Default shall be deemed to exist as a result of this Section 1.6(d); and,

(e)     All fees, costs and expenses associated with the review by the Borrowers' insurance broker and any insurance experts shall be for the sole account of the Borrowers.

(f)     All time frames in section 1.6 regarding Issuer notification shall be waived based on marketplace circumstance and notification to the Issuer shall be made the soonest possible from time of known deficiency or required change for a notice of Waiver or Replacement Insurance request.

## Schedule of Required Lenders/Secured Parties

## Lenders

The Prudential Insurance Company of America
c/o Prudential Capital Group
655 Broad Street, 16th Floor
Newark, NJ 07102
Attention:  Managing Director, Energy Finance Group – Power

Prudential Legacy Insurance Company of New Jersey
c/o Prudential Capital Group
655 Broad Street, 16th Floor
Newark, NJ 07102
Attention:  Managing Director, Energy Finance Group – Power

Prudential Retirement Insurance and Annuity Company
c/o Prudential Capital Group
655 Broad Street, 16th Floor
Newark, NJ 07102
Attention:  Managing Director, Energy Finance Group – Power

## Administrative Agent

The Prudential Insurance Company of America
c/o Prudential Capital Group

655 Broad Street, 16th Floor
Newark, NJ 07102
Attention: Managing Director, Energy Finance Group – Power

**<u>Collateral Agent</u>**

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE  19890

## **SCHEDULE 7.02**

## **INDEBTEDNESS**

**None.**

## SCHEDULE 7.03

### INVESTMENTS

| Ref No. | Borrower | Investment | Ownership |
|---------|----------|------------|-----------|
| 1 | Agilon Energy Holdings II, LLC | Victoria City Power LLC | 100% |
| 2 | Agilon Energy Holdings II, LLC | Victoria Port Power LLC | 100% |

**SCHEDULE 7.08**

**AFFILIATE TRANSACTIONS**

| Ref No. | Borrower | Agreement With | Agreement Name |
|---|---|---|---|
| 1 | Victoria City Power LLC | Victoria Willow, LLC | Lease Agreement |
| 2 | Victoria Port Power LLC | Victoria Bloomington, LLC | Sublease Agreement |
| 3 | Victoria Port Power LLC | Victoria Midstream LLC | Pipeline Construction, Operation and Gas Transportation Agreement |
| 4 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Electricity) |
| 5 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Gas) |
| 6 | Victoria Port Power LLC | Victoria Port Power II, LLC | Co-Tenancy and Common Facilities Agreement (Water) |
| 7 | Agilon Energy Holdings II, LLC | Agilon Energy II LLC | Assignment Instrument |
| 8 | Agilon Energy Holdings II, LLC | Agilon Energy II LLC | Assignment and Assumption Agreement |

## SCHEDULE 11.02

## NOTICES

**Administrative Agent:**

The Prudential Insurance Company of America
655 Broad Street, 16th Floor
Newark, NJ 07102
Attn: Paul Procyk
Email: cpw@prudential.com
      paul.procyk@prudential.com

with a copy to:

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Attn: Kristen Campana
Telephone: 212-309-6030
Fax: 212-309-6001
Email: kristen.campana@morganlewis.com

**Collateral Agent:**

Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE  19890
Attn: Marion Zinowski
Telephone: 212-941-4421
Email: mzinowski@wilmingtontrust.com
and
Attn: Steve Barone
Email: sbarone@wilmingtontrust.com

with a copy to:

Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
Attn: George Singer
Telephone: 612-371-2493
Fax: 612-371-3207
Email: singerg@ballardspahr.com

**Borrowers:**

Agilon Energy Holdings II LLC
480 Wildwood Forest Drive, Suite 475
Spring, TX 77380
Attn: Hugh Smith
Telephone: 480-319-2178
Email: hugh.smith@readisuite.com

with a copy to:

Locke Lord LLP
600 Travis St., Suite 2800
Houston, TX 77002
Attn: Elizabeth Guffy
Telephone: 713-226-1328
Email: eguffy@lockelord.com

## SCHEDULE 12.01(a)

### COMMERCIAL TORT CLAIMS

**None.**

EXHIBITS

**EXHIBIT A**

**FORM OF COMMITTED LOAN NOTICE**

Date:  _____, _____

To:     The Prudential Insurance Company of America, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of September 2, 2021 (as amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time, the "DIP Credit Agreement", the terms defined therein being used herein as therein defined), by and among Agilon Energy Holdings II, LLC, a Texas limited liability company ("Administrative Borrower" or "Agilon"), Victoria Port Power LLC, a Texas limited liability company ("Victoria Port"), Victoria City Power LLC, a Texas limited liability company ("Victoria City", together with Agilon and Victoria Port, the "Borrowers"), each lender from time to time party thereto (collectively, the "Lenders" and individually, a "Lender"), The Prudential Insurance Company of America, as administrative agent for the Secured Parties (in such capacity, the "Administrative Agent"), and Wilmington Trust, National Association, as collateral agent for the Secured Parties (in such capacity, the "Collateral Agent").

The undersigned hereby requests (select one):

☐  A Borrowing of Loans

1.      On _____ (a Business Day).

2.      In the amount of $_____

3.      As a [LIBOR Loan][Prime Loan].

☐  A conversion of Loans

1.      On _____ (a Business Day).

2.      In the amount of $_____

3.      Converting from a [LIBOR Loan]/[Prime Loan] to a [Prime Loan]/[LIBOR Loan].

☐  A continuation of LIBOR Loans

1.      On _____ (a Business Day).

2.      In the amount of $_____

The Administrative Borrower hereby represents and warrants that the conditions specified in <u>Section 4.02</u> shall be satisfied on and as of the date of any applicable Borrowing.

IN WITNESS WHEREOF, the Administrative Borrower has caused this Committed Loan Notice to be duly executed as of the date first above written.

**AGILON ENERGY HOLDINGS II, LLC**

By:_____
    Name:
    Title:

[Agilon - Signature Page to Committed Loan Notice]

**EXHIBIT B**

**FORM OF NOTE**

        **THIS NOTE ("NOTE") AND THE OBLIGATIONS EVIDENCED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE DIP CREDIT AGREEMENT REFERRED TO BELOW. TRANSFERS OF THIS NOTE AND THE OBLIGATIONS EVIDENCED HEREBY MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF SUCH DIP CREDIT AGREEMENT.**

$[_____]

_____, 20__

        FOR VALUE RECEIVED, the undersigned, Agilon Energy Holdings II, LLC, a Texas limited liability company ("Administrative Borrower" or "Agilon"), Victoria Port Power LLC, a Texas limited liability company ("Victoria Port"), Victoria City Power LLC, a Texas limited liability company ("Victoria City", together with Agilon and Victoria Port, the "Borrowers"), hereby promises to pay to _____ or registered assigns (the "Lender"), in accordance with the provisions of the DIP Credit Agreement (as hereinafter defined), the principal amount of $[_____] ([_____]) made by the Lender to the Borrowers under that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of September 2, 2021 (the "DIP Credit Agreement", the terms defined therein being used herein as therein defined), by and among the Borrowers, each lender from time to time party thereto, The Prudential Insurance Company of America, as administrative agent for the Secured Parties (in such capacity, the "Administrative Agent"), and Wilmington Trust, National Association, as collateral agent for the Secured Parties (in such capacity, the " Collateral Agent"). Reference is hereby made to the DIP Credit Agreement and Loan Documents for a description of the Collateral in which a security interest has been granted, the nature and extent of the security and the guarantees, the terms and conditions upon which the security interests and each guarantee were granted and the rights of the holder of this Note in respect thereof. Each holder hereof, by its acceptance of this Note, agrees to the terms of, and to be bound by and to observe the provisions applicable to the Lenders contained in, the DIP Credit Agreement and the Loan Documents. Capitalized terms used herein which are defined in the DIP Credit Agreement shall have such defined meanings unless otherwise defined herein or unless the context otherwise requires.

        The Borrowers promise to pay interest on the unpaid principal amount of this Note made by the Lender from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the DIP Credit Agreement.  All payments of principal and interest shall be made to the Administrative Agent for the account of the Lenders in Dollars in immediately available funds at the Administrative Agent's Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the DIP Credit Agreement.

This Note is one of the Notes referred to in the DIP Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also secured by the Collateral pursuant to the terms of the Loan Documents. Upon the occurrence and continuation of one or more of the Events of Default specified in the DIP Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the DIP Credit Agreement. The Loan made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loan and payments with respect thereto.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind under this Note.

The Borrowers waive presentment; demand; notice of dishonor; notice of default or delinquency; notice of acceleration; notice of protest and nonpayment; notice of costs, expenses or losses and interest thereon; notice of late charges; and diligence in taking any action to collect any sums owing under this Note or in proceeding against any of the rights or interests in or to properties securing payment of this Note. No previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note or the Loan Documents shall constitute a waiver of any breach, default, or failure of condition under this Note. A waiver of any term of this Note must be made in writing and shall be limited to the express written terms of such waiver.

*[Remainder of Page Intentionally Left Blank.]*

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**AGILON ENERGY HOLDINGS II, LLC**

By:_____
    Name:
    Title:

**VICTORIA PORT POWER LLC**

By:_____
    Name:
    Title:

**VICTORIA CITY POWER LLC**

By:_____
    Name:
    Title:

## LOANS AND PAYMENTS WITH RESPECT THERETO

| Date | Amount of Loan Made | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|------|------|------|------|
|      |      |      |      |      |

B-4
Form of Note

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Senior Secured Superpriority Debtor-in-Possession Credit Agreement identified below (as amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time, the "DIP Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the DIP Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the DIP Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the DIP Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

C - 1

Form of Assignment and Assumption

1.    <u>Assignor[s]</u>:    _____

        _____

2.    <u>Assignee[s]</u>:    _____

        _____

[for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.    <u>Borrowers</u>:    Agilon Energy Holdings II, LLC, a Texas limited liability company, Victoria Port Power LLC, a Texas limited liability company, and Victoria City Power LLC, a Texas limited liability company.

4.    <u>Administrative Agent</u>: The Prudential Insurance Company of America, as administrative agent for the Secured Parties under the DIP Credit Agreement.

5.    <u>Collateral Agent</u>: Wilmington Trust, National Association, as collateral agent for the Secured Parties under the DIP Credit Agreement.

6.    <u>DIP Credit Agreement</u>:    Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of September 2, 2021, by and among the Borrowers, the Lenders from time to time party thereto, The Prudential Insurance Company of America, as Administrative Agent, and Wilmington Trust, National Association, as Collateral Agent.

7.    Assigned Interest:

| Assignor[s][5] | Assignee[s][6] | Aggregate Amount of Commitment/Loans for all Lenders[7] | Amount of Commitment /Loans Assigned | Percentage Assigned of Commitment/ Loans[8] |
|---|---|---|---|---|
| | | $ | $ | % |
| | | $ | $ | % |
| | | $ | $ | % |

[8.    Trade Date:    _____]9

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[8] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[9] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

Form of Assignment and Assumption

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

Form of Assignment and Assumption

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**


By: _____
    Name:
    Title:

**ASSIGNEE:**

**[NAME OF ASSIGNEE]**


By: _____
    Name:
    Title:

[Consented to and]¹⁰ Accepted:

**[THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**,
as Administrative Agent]

By:_____
Name:
Title:

---

¹⁰ To be removed only if the consent of the Administrative Agent is not required pursuant to Sections 11.06(b)(i)(B) and 11.06(b)(iii) of the DIP Credit Agreement.

[Agilon – Signature Page to Form of Assignment and Assumption]

### ANNEX 1 TO ASSIGNMENT AND ASSUMPTION

### STANDARD TERMS AND CONDITIONS FOR

### ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim (other than, to the extent applicable, the Pre-Petition Priority Liens) and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the DIP Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Loan Parties, any of their Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Loan Parties, any of their Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the DIP Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 11.06(b)(iii), (v) and (vi) of the DIP Credit Agreement (subject to such consents, if any, as may be required under Sections 11.06(b)(i)(B) and 11.06(b)(iii) of the DIP Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the DIP Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the DIP Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the DIP Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan

Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.   Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.   This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflict of law principles thereof (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law).

# ANNEX I

## Milestones

The DIP Orders shall expressly authorize and require the Borrowers to comply with the following milestones (collectively, the "Milestones"), which may be extended from time to time with the consent of the Administrative Agent (in its sole discretion).

1.      On or before [September 22, 2021][1], the Final DIP Order authorizing and approving the Facility and the transactions contemplated thereby, in form and substance satisfactory to the Required Lenders shall have been entered by the Bankruptcy Court;

2.      On or before November 30, 2021, the Borrowers shall have filed a motion seeking entry of an order (the "Bidding Procedures Order") approving the Sale Process and including the Acceptable Sale Provisions and an asset purchase agreement in form and substance acceptable to the Required Lenders;

4.      On or before December 21, 2021, the Bidding Procedures Order shall have been approved by order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders;

5.      On or before February 10, 2022, an auction (to the extent necessary) for the sale of substantially all of the Borrowers' assets shall have occurred in accordance with the requirements for the Sale Process (as defined below), including, without limitation, the Acceptable Sale Provisions (such process, the "Auction");

6.      On or before February 15, 2022, the Bankruptcy Court shall have approved the results of the Auction and an agreement or agreements for the sale of the assets (the "Approved Sale(s)"), which order and agreements shall be in form and substance acceptable to the Required Lenders;

7.      The Approved Sale(s) shall be consummated within 2 days of Bankruptcy Court approval of such Approved Sale(s);

"Sale Process" shall mean the implementation of bidding and sale procedures in respect of all of the Borrowers' assets and property, approved by an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent at the direction of the Required Lenders in all respects, and which at a minimum includes compliance with the Acceptable Sale Provisions and the Milestones.

---

[1] 21 days after the Closing Date of the DIP facility.

**<u>Exhibit 2</u>**

**BUDGET**

DRAFT - Subject to Change

**Agilon Energy Holdings II LLC**
**13 Week Cash Flow Forecast**
**6/27/2021 (Petition Date)**
*Revised 08.31.21*

| | Forecast 9/5/2021 Week 1 | Forecast 9/12/2021 Week 2 | Forecast 9/19/2021 Week 3 | Forecast 9/26/2021 Week 4 | Forecast 10/3/2021 Week 5 | Forecast 10/10/2021 Week 6 | Forecast 10/17/2021 Week 7 | Forecast 10/24/2021 Week 8 | Forecast 10/31/2021 Week 9 | Forecast 11/7/2021 Week 10 | Forecast 11/14/2021 Week 11 | Forecast 11/21/2021 Week 12 | Forecast 11/28/2021 Week 13 | Forecast TOTAL 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| **Total NET Receipts** | $ - | $ - | $ - | $ 489,958 | $ - | $ - | $ - | $ - | $ 813,526 | $ - | $ - | - | 560,621 | $ 1,864,105 |
| Fuel Supply | | | | (288,055) | - | - | - | - | (532,190) | - | - | - | (466,789) | **(1,287,034)** |
| Other Variable Costs | - | - | - | (34,608) | - | - | - | - | (44,392) | - | - | - | (39,216) | **(118,216)** |
| **Total Variable Costs** | - | - | - | (322,663) | - | - | - | - | (576,582) | - | - | - | (506,005) | **(1,405,250)** |
| **Gross Margin** | - | - | - | 167,294 | - | - | - | - | 236,944 | - | - | - | 54,616 | 458,855 |
| **Disbursements** | | | | | | | | | | | | | | |
| Gas Transport (Kinder for VC) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas Transport (Tennessee for VP) | (13,000) | - | - | - | (26,000) | - | - | - | - | (13,000) | - | - | - | **(52,000)** |
| Gas Transport (Victoria Midstream) | (37,716) | - | - | - | (37,716) | - | - | - | - | (37,716) | - | - | - | **(113,148)** |
| Water | (11,000) | - | - | - | (11,000) | - | - | - | - | (11,000) | - | - | - | **(33,000)** |
| IntelleTrace Communications | - | - | - | - | - | - | (5,813) | - | - | - | (5,813) | - | - | **(11,626)** |
| **Total Fixed Costs** | **(61,716)** | - | - | - | **(74,716)** | - | **(5,813)** | - | - | **(61,716)** | **(5,813)** | - | - | **(209,774)** |
| Telecommunications | (600) | - | - | - | - | (600) | - | - | - | (600) | - | - | - | **(1,800)** |
| Insurance | - | (7,004) | (508,389) | - | - | - | - | - | - | - | - | - | - | **(515,393)** |
| Permit Fees | - | - | - | - | - | - | - | - | (50,000) | - | - | - | - | **(50,000)** |
| Energy Management (QSE) Costs | - | - | - | - | - | - | - | - | - | (20,000) | - | - | - | **(20,000)** |
| Plant Management | (120,526) | - | - | - | (136,331) | - | - | - | - | (136,331) | - | - | - | **(393,189)** |
| Asset Management | - | (117,000) | - | - | (55,000) | - | - | - | - | (55,000) | - | - | - | **(227,000)** |
| Contract Employee | - | - | (1,625) | - | - | - | (6,500) | - | - | - | - | - | (6,500) | **(14,625)** |
| Plant Rent/Lease | (23,617) | - | - | - | (23,617) | - | - | - | - | (23,617) | - | - | - | **(70,851)** |
| Utility Electricity | (8,808) | - | - | - | (8,808) | - | - | - | - | (8,808) | - | - | - | **(26,425)** |
| Property Tax/Franchise Tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Waste/Trash | (550) | - | - | - | (550) | - | - | - | - | (550) | - | - | - | **(1,650)** |
| Plant Maintenance | (28,835) | (28,835) | (28,835) | (14,417) | (14,417) | (14,417) | (9,612) | (9,612) | (9,612) | (9,612) | (9,612) | (9,612) | (4,806) | **(192,231)** |
| Other NAES Expenses | - | - | (21,175) | (6,925) | - | - | - | - | (6,925) | - | - | - | (2,175) | **(37,200)** |
| Other Expenses | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | **(195,000)** |
| **Total Other Disbursements** | **(197,936)** | **(167,839)** | **(575,024)** | **(36,342)** | **(253,724)** | **(30,017)** | **(31,112)** | **(24,612)** | **(81,537)** | **(269,518)** | **(24,612)** | **(31,112)** | **(21,981)** | **(1,745,364)** |
| **Total Operating Disbursements** | **(259,652)** | **(167,839)** | **(575,024)** | **(36,342)** | **(328,440)** | **(30,017)** | **(36,925)** | **(24,612)** | **(81,537)** | **(331,234)** | **(30,425)** | **(31,112)** | **(21,981)** | **(1,955,138)** |
| **Operating Cash Flow** | **(259,652)** | **(167,839)** | **(575,024)** | **130,952** | **(328,440)** | **(30,017)** | **(36,925)** | **(24,612)** | **155,408** | **(331,234)** | **(30,425)** | **(31,112)** | **32,635** | **(1,496,283)** |

DRAFT - Subject to Change

**Agilon Energy Holdings II LLC**
**13 Week Cash Flow Forecast**
**6/27/2021 (Petition Date)**
*Revised 08.31.21*

| | Forecast 9/5/2021 Week 1 | Forecast 9/12/2021 Week 2 | Forecast 9/19/2021 Week 3 | Forecast 9/26/2021 Week 4 | Forecast 10/3/2021 Week 5 | Forecast 10/10/2021 Week 6 | Forecast 10/17/2021 Week 7 | Forecast 10/24/2021 Week 8 | Forecast 10/31/2021 Week 9 | Forecast 11/7/2021 Week 10 | Forecast 11/14/2021 Week 11 | Forecast 11/21/2021 Week 12 | Forecast 11/28/2021 Week 13 | Forecast TOTAL 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major Project Outlays** | | | | | | | | | | | | | | |
| GE Turbine Repair | - | (180,000) | (40,000) | - | - | (212,000) | - | - | - | - | - | - | - | (432,000) |
| RATA Testing | - | (40,000) | - | - | - | - | - | - | - | - | - | - | - | (40,000) |
| Other repair/maintenance | - | - | (400,000) | - | - | (100,000) | - | - | - | (250,000) | - | - | - | (750,000) |
| **Major Project Outlays** | - | (220,000) | (440,000) | - | - | (312,000) | - | - | - | (250,000) | - | - | - | (1,222,000) |
| *Controllable Costs (per Credit Agmt)* | (259,652) | (387,839) | (1,015,024) | (36,342) | (328,440) | (342,017) | (36,925) | (24,612) | (81,537) | (581,234) | (30,425) | (31,112) | (21,981) | (3,177,138) |
| **Net Operating Cash Flow** | (259,652) | (387,839) | (1,015,024) | 130,952 | (328,440) | (342,017) | (36,925) | (24,612) | 155,408 | (581,234) | (30,425) | (31,112) | 32,635 | (2,718,283) |
| **Non-Recurring Expense** | | | | | | | | | | | | | | |
| Collateral - Gas | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Collateral - QSE | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-recurring expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Non-Recurring Expense** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Lender Advisors (Legal and FA) | (734,843) | (175,000) | - | (345,000) | - | - | - | - | (345,000) | - | - | - | (235,000) | (1,834,843) |
| Grant Thornton (FA) | - | (122,793) | - | (136,000) | - | - | - | - | (32,000) | - | - | - | (24,000) | (314,793) |
| Locke Lord (Legal) | - | (189,745) | - | (200,000) | - | - | - | - | (144,000) | - | - | - | (120,000) | (653,745) |
| Porter Hedges (Legal - conflict counsel) | - | - | - | - | (40,000) | - | - | - | (64,000) | - | - | - | (64,000) | (168,000) |
| Hugh Smith Associates (CRO) | - | (33,333) | - | (29,200) | - | - | - | - | (29,200) | - | - | - | (29,200) | (120,933) |
| ERM Capital (IB) | - | - | (15,484) | - | (28,000) | - | - | - | (24,750) | - | - | - | (24,750) | (92,984) |
| UCC Advisors | - | - | - | (140,000) | - | - | - | - | (140,000) | - | - | - | (140,000) | (420,000) |
| US Trustee | - | - | - | - | - | - | - | (38,365) | - | - | - | - | - | (38,365) |
| Claims Agent | (22,893) | - | - | (40,000) | - | - | - | - | (10,000) | - | - | - | (10,000) | (82,893) |
| Other | (25,406) | - | - | - | - | - | - | - | - | - | - | - | - | (25,406) |
| **Restructuring Costs** | (783,142) | (520,871) | (15,484) | (890,200) | (68,000) | - | - | (38,365) | (788,950) | - | - | - | (646,950) | (3,751,962) |
| **Net Cash Flow before DIP Financing** | (1,042,794) | (908,709) | (1,030,508) | (759,248) | (396,440) | (342,017) | (36,925) | (62,976) | (633,542) | (581,234) | (30,425) | (31,112) | (614,315) | (6,470,245) |
| **Beginning Cash** | 350,651 | 1,257,857 | 349,148 | 1,068,640 | 309,392 | 412,952 | 70,935 | 534,011 | 471,034 | 637,492 | 56,258 | 825,833 | 794,722 | 350,651 |
| Net Change in Cash | (1,042,794) | (908,709) | (1,030,508) | (759,248) | (396,440) | (342,017) | (36,925) | (62,976) | (633,542) | (581,234) | (30,425) | (31,112) | (614,315) | (6,470,245) |
| Interim DIP Draw (Repayment) | 200,000 | - | - | - | - | - | - | - | - | - | - | - | - | 200,000 |
| New DIP Draw (Repayment) | 1,750,000 | - | 1,750,000 | - | 500,000 | - | 500,000 | - | 800,000 | - | 800,000 | - | 300,000 | 6,400,000 |
| **Ending Cash Balance** | 1,257,857 | 349,148 | 1,068,640 | 309,392 | 412,952 | 70,935 | 534,011 | 471,034 | 637,492 | 56,258 | 825,833 | 794,722 | 480,407 | 480,407 |

DRAFT - Subject to Change

**Agilon Energy Holdings II LLC**
**13 Week Cash Flow Forecast**
**6/27/2021 (Petition Date)**
*Revised 08.31.21*

| | Forecast 9/5/2021 Week 1 | Forecast 9/12/2021 Week 2 | Forecast 9/19/2021 Week 3 | Forecast 9/26/2021 Week 4 | Forecast 10/3/2021 Week 5 | Forecast 10/10/2021 Week 6 | Forecast 10/17/2021 Week 7 | Forecast 10/24/2021 Week 8 | Forecast 10/31/2021 Week 9 | Forecast 11/7/2021 Week 10 | Forecast 11/14/2021 Week 11 | Forecast 11/21/2021 Week 12 | Forecast 11/28/2021 Week 13 | Forecast TOTAL 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Interim DIP Balance** | 800,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | **800,000** |
| Interim DIP Draw/(Paydown) | 200,000 | - | - | - | - | - | - | - | - | - | - | - | - | **200,000** |
| Agency Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Ending Interim DIP Balance** | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | **1,000,000** |
| **Interim DIP Commitment/ Availability** 1,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Beginning DIP Balance** | - | 2,757,588 | 2,757,588 | 4,507,588 | 4,507,588 | 5,007,588 | 5,007,588 | 5,507,588 | 5,507,588 | 6,307,588 | 6,307,588 | 7,107,588 | 7,107,588 | **-** |
| Interim DIP Rollover plus cash interest | 1,007,588 | | | | | | | | | | | | | **1,007,588** |
| DIP Draw/(Paydown) | 1,750,000 | - | 1,750,000 | - | 500,000 | - | 500,000 | - | 800,000 | - | 800,000 | - | 300,000 | **6,400,000** |
| Agency Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Ending DIP Balance** | 2,757,588 | 2,757,588 | 4,507,588 | 4,507,588 | 5,007,588 | 5,007,588 | 5,507,588 | 5,507,588 | 6,307,588 | 6,307,588 | 7,107,588 | 7,107,588 | 7,407,588 | **7,407,588** |
| **DIP Availability** | | *Interim* | | | | | | | | | | | | |
| DIP Commitment | $ 6,000,000 | $ 6,000,000 | $ 6,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | **$ 15,000,000** |
| Less: Outstanding Borrowings | (2,757,588) | (2,757,588) | (4,507,588) | (4,507,588) | (5,007,588) | (5,007,588) | (5,507,588) | (5,507,588) | (6,307,588) | (6,307,588) | (7,107,588) | (7,107,588) | (7,407,588) | **(7,407,588)** |
| **Ending Availability** | $ 3,242,413 | $ 3,242,413 | $ 1,492,413 | $ 10,492,413 | $ 9,992,413 | $ 9,992,413 | $ 9,492,413 | $ 9,492,413 | $ 8,692,413 | $ 8,692,413 | $ 7,892,413 | $ 7,892,413 | $ 7,592,413 | **$ 7,592,413** |
| **DIP Lender Claim** | | | | | | | | | | | | | | |
| DIP Borrowings | 2,757,588 | 2,757,588 | 4,507,588 | 4,507,588 | 5,007,588 | 5,007,588 | 5,507,588 | 5,507,588 | 6,307,588 | 6,307,588 | 7,107,588 | 7,107,588 | 7,407,588 | **7,407,588** |
| Add: Accrued Interest | 4,826 | 9,652 | 17,540 | 25,428 | 34,191 | 42,955 | 52,593 | 62,231 | 73,270 | 84,308 | 96,746 | 109,184 | 122,148 | **122,148** |
| Add: Commitment Fee | 120,000 | 120,000 | 120,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | **300,000** |
| Add: Unused Fee | 225 | 540 | 685 | 1,706 | 2,677 | 3,649 | 4,571 | 5,494 | 6,339 | 7,185 | 7,952 | 8,719 | 9,457 | **9,457** |
| **Total DIP Lender Claim** | $ 2,882,638 | $ 2,887,779 | $ 4,645,813 | $ 4,834,721 | $ 5,344,456 | $ 5,354,191 | $ 5,864,752 | $ 5,875,313 | $ 6,687,196 | $ 6,699,080 | $ 7,512,285 | $ 7,525,491 | $ 7,839,192 | **$ 7,839,192** |
| **Liquidity** | | | | | | | | | | | | | | |
| Ending Cash Balance | 1,257,857 | 349,148 | 1,068,640 | 309,392 | 412,952 | 70,935 | 534,011 | 471,034 | 637,492 | 56,258 | 825,833 | 794,722 | 480,407 | **480,407** |
| DIP Availability | 3,242,413 | 3,242,413 | 1,492,413 | 10,492,413 | 9,992,413 | 9,992,413 | 9,492,413 | 9,492,413 | 8,692,413 | 8,692,413 | 7,892,413 | 7,892,413 | 7,592,413 | **7,592,413** |
| **Total Liquidity** | $ 4,500,270 | $ 3,591,560 | $ 2,561,053 | $ 10,801,805 | $ 10,405,365 | $ 10,063,348 | $ 10,026,423 | $ 9,963,447 | $ 9,329,905 | $ 8,748,670 | $ 8,718,246 | $ 8,687,134 | $ 8,072,819 | **$ 8,072,819** |
| **DIP Roll-Up (1x)** | | | | | | | | | | | | | | |
| Interim Roll-Up Loan | 6,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | **6,000,000** |
| Final Roll-Up Loan | - | - | - | 9,000,000 | - | - | - | - | - | - | - | - | - | **9,000,000** |
| **Total Roll-Up Loans** | 6,000,000 | 6,000,000 | 6,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | **15,000,000** |
| DIP Commitment Balance | 6,000,000 | 6,000,000 | 6,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | **15,000,000** |
| **Secured Superiority DIP Outstanding** | $ 12,000,000 | $ 12,000,000 | $ 12,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | $ 30,000,000 | **$ 30,000,000** |
| Memo: Total Accrued Interest [1] | $ 15,326 | $ 30,652 | $ 49,040 | $ 83,178 | $ 118,191 | $ 153,205 | $ 189,093 | $ 224,981 | $ 262,270 | $ 299,558 | $ 338,246 | $ 376,934 | $ 416,148 | **$ 416,148** |

[1] Cumulative accrued interest on both outstanding DIP borrowings and prepetition roll-up amount