UNITED STATES BANKRUPTCY COURT

SOUTHERN  DISTRICT OF  TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In Re. AGILON ENERGY HOLDINGS II LLC | § | Case No.  21-32156 |
| | § | |
| | § | Lead Case No.  21-32156 |
| Debtor(s) | § | |
| | | ☒ Jointly Administered |

# Monthly Operating Report

Chapter 11

Reporting Period Ended: 08/31/2021                                    Petition Date: 06/27/2021

Months Pending: 2                                    Industry Classification: 2 2 1 1

Reporting Method:                Accrual Basis ⦿                Cash Basis ○

Debtor's Full-Time Employees (current):                          0

Debtor's Full-Time Employees (as of date of order for relief):                0

**Supporting  Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒        Statement of cash receipts and disbursements
☒        Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒        Statement of operations (profit or loss statement)
☒        Accounts receivable aging
☒        Postpetition liabilities aging
☒        Statement of capital assets
☒        Schedule of payments to professionals
☒        Schedule of payments to insiders
☒        All bank statements and bank reconciliations for the reporting period
☒        Description of the assets sold or transferred and the terms of the sale or transfer

/s/ *Hugh Smith*
Signature of Responsible Party

09/20/2021
Date

Hugh Smith
Printed Name of Responsible Party

480 Wildwood Forest Drive Suite 475
Spring, Texas 77380
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (06/07/2021)                1

Debtor's Name  AGILON ENERGY HOLDINGS II LLC                                    Case No.  21-32156

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. | Cash balance beginning of month | $222,397 | |
| b. | Total receipts (net of transfers between accounts) | $374,985 | $728,217 |
| c. | Total disbursements (net of transfers between accounts) | $16,695 | $150,887 |
| d. | Cash balance end of month (a+b-c) | $580,687 | |
| e. | Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. | Total disbursements for quarterly fee calculation (c+e) | $16,695 | $150,887 |

| Part 2:  Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | |
|---|---|---|
| a. | Accounts receivable (total net of allowance) | $0 | |
| b. | Accounts receivable over 90 days outstanding (net of allowance) | $0 | |
| c. | Inventory     (Book ◉  Market ○  Other ○   (attach explanation)) | $0 | |
| d | Total current assets | $595,687 | |
| e. | Total assets | $90,518,510 | |
| f. | Postpetition payables (excluding taxes) | $1,071,542 | |
| g. | Postpetition payables past due (excluding taxes) | $0 | |
| h. | Postpetition taxes payable | $0 | |
| i. | Postpetition taxes past due | $0 | |
| j. | Total postpetition debt (f+h) | $1,071,542 | |
| k. | Prepetition secured debt | $67,337,974 | |
| l. | Prepetition priority debt | $0 | |
| m. | Prepetition unsecured debt | $30,721,730 | |
| n. | Total liabilities (debt) (j+k+l+m) | $99,131,246 | |
| o. | Ending equity/net worth (e-n) | $-8,612,736 | |

| Part 3:  Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. | Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. | Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. | Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4:  Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. | Gross income/sales (net of returns and allowances) | $0 | |
| b. | Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. | Gross profit (a-b) | $0 | |
| d. | Selling expenses | $0 | |
| e. | General and administrative expenses | $76,695 | |
| f. | Other expenses | $0 | |
| g. | Depreciation and/or amortization (not included in 4b) | $0 | |
| h. | Interest | $6,875 | |
| i. | Taxes (local, state, and federal) | $0 | |
| j. | Reorganization items | $0 | |
| k. | Profit (loss) | $-83,570 | $-213,475 |

UST Form 11-MOR (06/07/2021)                                    2

Debtor's Name AGILON ENERGY HOLDINGS II LLC          Case No. 21-32156

## Part 5:  Professional Fees and Expenses

|  |  |  | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | $0 | $0 | $0 | $0 |
|  | *Itemized Breakdown by Firm* | | | | | |
|  | Firm Name | Role | | | | |
|  | i | Locke Lord LLP | Lead Counsel | $0 | $0 | $0 | $0 |
|  | ii | Grant Thornton LLP | Financial Professional | $0 | $0 | $0 | $0 |
|  | iii | Hugh Smith Advisors, LLC | Other | $0 | $0 | $0 | $0 |
|  | iv | ERM Capital | Financial Professional | $0 | $0 | $0 | $0 |
|  | v | Stretto | Other | $0 | $0 | $0 | $0 |

|  |  |  | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | $0 | $0 | $0 | $0 |
|  | *Itemized Breakdown by Firm* | | | | | |
|  | Firm Name | Role | | | | |
|  | i | | | $0 | $0 | $0 | $0 |
|  | ii | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $0 | $0 | $0 | $0 |

## Part 6:  Postpetition Taxes

|  |  | Current Month | Cumulative |
|---|---|---|---|
| a. | Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. | Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. | Postpetition employer payroll taxes accrued | $0 | $0 |
| d. | Postpetition employer payroll taxes paid | $0 | $0 |
| e. | Postpetition property taxes paid | $0 | $0 |
| f. | Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. | Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

## Part 7: Questionnaire – During this reporting period:

| a. | Were any payments made on prepetition debt?  (if yes, see Instructions) | Yes ○  No ● |
|---|---|---|
| b. | Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions) | Yes ○  No ● |
| c. | Were any payments made to or on behalf of insiders? | Yes ○  No ● |
| d. | Are you current on postpetition tax return filings? | Yes ●  No ○ |
| e. | Are you current on postpetition estimated tax payments? | Yes ●  No ○ |
| f. | Were all trust fund taxes remitted on a current basis? | Yes ●  No ○ |
| g. | Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions) | Yes ●  No ○ |
| h. | Were all payments made to or on behalf of professionals approved by the court? | Yes ○  No ○  N/A ● |

Debtor's Name  AGILON ENERGY HOLDINGS II LLC                          Case No.  21-32156

i.  Do you have:          Worker's compensation insurance?                    Yes ○  No ⦿
                              If yes, are your premiums current?              Yes ○  No ○  N/A ⦿  (if no, see Instructions)
                          Casualty/property insurance?                       Yes ⦿  No ○
                              If yes, are your premiums current?              Yes ⦿  No ○  N/A ○  (if no, see Instructions)
                          General liability insurance?                       Yes ⦿  No ○
                              If yes, are your premiums current?              Yes ⦿  No ○  N/A ○  (if no, see Instructions)
j.  Has a plan of reorganization been filed with the court?                  Yes ○  No ⦿
k.  Has a disclosure statement been filed with the court?                    Yes ○  No ⦿
l.  Are you current with quarterly U.S. Trustee fees as                      Yes ⦿  No ○
    set forth under 28 U.S.C. § 1930?

## Part 8: Individual Chapter 11 Debtors (Only)

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |

l.  Are you required to pay any Domestic Support Obligations as defined by 11    Yes ○  No ⦿
    U.S.C § 101(14A)?
m.  If yes, have you made all Domestic Support Obligation payments?             Yes ○  No ○  N/A ⦿

| Debtor's Name AGILON ENERGY HOLDINGS II LLC | Case No. 21-32156 |
| --- | --- |

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107.  The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6).  The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith.  This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm.  Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee.  11 U.S.C. § 1112(b)(4)(F).

**<u>I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.</u>**

/s/ *Hugh Smith*

Signature of Responsible Party

Sole Manager

Title

Hugh Smith

Printed Name of Responsible Party

09/20/2021

Date

**AGILON ENERGY HOLDINGS II**
**BALANCE SHEET**
**AUGUST 31, 2021**

**Assets:**

| | |
|---|---:|
| Checking | 574,098 |
| Revenue cash account | 6,589 |
| Deposit - Restricted cash | 15,000 |
| Accounts receivable | - |
| Current Assets | 595,687 |
| | |
| Other long term assets | 1,394,888 |
| AR - related parties | 13,200 |
| AR - other debtors | 88,514,735 |
| Long term assets | 89,922,823 |
| | |
| **Total assets** | **$    90,518,510** |

**Liabilities & equity:**

Post-Petition Liabilities:

| | |
|---|---:|
| Accounts payable - Post-petition | 64,667 |
| Accrued interest - DIP | 6,875 |
| DIP Facility | 1,000,000 |
| Total Post-Petition | 1,071,542 |

Pre-Petition Liabilities:

| | |
|---|---:|
| Accounts payable - pre-petition | 2,848,007 |
| Revolver | 400,000 |
| Accrued expenses | 94,396 |
| Accrued interest | 3,750,725 |
| AP - related parties | 1,428,834 |
| Arbitration claims | 301,163 |
| Total Pre-Petition | 8,823,125 |
| | |
| Current liabilities | 9,894,667 |
| | |
| Senior debt | 48,500,000 |
| Subordinated debt | 27,160,898 |
| Less:  debt issuance costs | (4,321,233) |
| Long term debt | 71,339,665 |
| | |
| Equity | 9,284,178 |
| | |
| **Total liabilities & equity** | **$    90,518,510** |

**AGILON ENERGY HOLDINGS II**
**STATEMENT OF OPERATIONS**
**FOR THE PERIOD ENDING AUGUST 31, 2021**

|  | MTD | Petiton TD | YTD |
|---|---|---|---|
| Capacity revenue | - | - | - |
| Energy revenue | - | - | - |
| Net ERCOT sales | - | - | - |
| Revenue | - | - | - |
|  |  |  |  |
| Gas Cost | - | - | - |
| Gas Transport | - | - | - |
| Variable O&M charge | - | - | - |
| Energy management fee | - | - | - |
| Cost of sales | - | - | - |
|  |  |  |  |
| Gross Margin | - | - | - |
|  |  |  |  |
| Operating expenses: |  |  |  |
| Insurance | 7,004 | 85,093 | 314,335 |
| Legal & professional fees | - | - | 1,372,439 |
| Project management | 60,000 | 96,774 | 96,774 |
| Information technology | 9,639 | 19,703 | 73,077 |
| Office supplies | - | 25 | 25 |
| Bank charges | 52 | 88 | 88 |
| Interest expense - DIP | 6,875 | 6,875 | 6,875 |
| Interest expense | - | - | 751,748 |
|  | 83,570 | 208,558 | 2,615,361 |
|  |  |  |  |
| Operating loss | (83,570) | (208,558) | (2,615,361) |
|  |  |  |  |
| Non-recurring expenses | - | 4,917 | 4,917 |
|  |  |  |  |
| Net loss | (83,570) | (213,475) | (2,620,278) |

**AGILON ENERGY HOLDINGS II**
**STATEMENT OF CASH**
**FOR THE PERIOD ENDING AUGUST 31, 2021**

| | Check # | Date | Allegiance x4226 | Wilmington Revenue | Total |
|---|---|---|---|---|---|
| Balance per financials | | 8/1/2021 | 215,808.37 | 6,588.61 | 222,396.98 |
| | | | | | |
| Prudential - DIP facility | | 8/13/2021 | 250,000.00 | - | 250,000.00 |
| Prudential - DIP facility | | 8/31/2021 | 250,000.00 | - | 250,000.00 |
| Total receipts | | | 500,000.00 | - | 500,000.00 |
| | | | | | |
| Victoria Port Power | | | (95,015.00) | - | (95,015.00) |
| Victoria City Power | | | (30,000.00) | - | (30,000.00) |
| Total intercompany transfers | | | (125,015.00) | - | (125,015.00) |
| | | | | | |
| VOID | 5 | | - | - | - |
| BankDirect Finance | Wire | 8/11/2021 | (7,003.91) | - | (7,003.91) |
| Allegiance Bank | Fee | 8/11/2021 | (15.00) | - | (15.00) |
| Intelletrace Inc | 6 | 8/12/2021 | (9,639.34) | - | (9,639.34) |
| Allegiance Bank | Fee | 8/13/2021 | (6.00) | - | (6.00) |
| Allegiance Bank | Fee | 8/31/2021 | (25.00) | - | (25.00) |
| Allegiance Bank | Fee | 8/31/2021 | (6.00) | - | (6.00) |
| Total disbursements | | | (16,695.25) | - | (16,695.25) |
| | | | | | |
| Balance per financials | | 8/31/2021 | 574,098.12 | 6,588.61 | 580,686.73 |

**AGILON ENERGY HOLDINGS II LLC**
**OTHER STATEMENTS**
**As of July 31, 2021**

**Post petition liabilities**

|  | <30 days | 30 - 60 days | Total |
|---|---|---|---|
| Hugh Smith | - | 4,666.67 | 4,666.67 |
| Tateswood Energy Company | 60,000.00 | - | 60,000.00 |
|  | $   60,000.00 | $   4,666.67 | $   64,666.67 |

**Statement of Capital Assets**

n/a

**Schedule of payments to professionals**

n/a

**Schedule of payments to insiders**

n/a

**Assets sold or transferred**

n/a

**Accounts receivable aging**

n/a

| Date: | Wednesday, September 8, 2021 | | | | | | **Agilon Energy Holdings II LLC** | Page: | 1 of 1 |
|---|---|---|---|---|---|---|---|---|---|
| Time: | 04:36PM | | | | | | <u>**Bank Reconciliation - Detail**</u> | Report: | 20630D.rpt |
| User: | HC | | | | | | As of :           **8/31/2021** | Company: | AEII |

| Batch Nbr | Ref Nbr | Create Date | Tran Date | Pd to Post | JL TP | TR TP | Description | Amount |
|---|---|---|---|---|---|---|---|---|
| | **Bank Account:** | **Allegiance Bank** | | | | | **1002001 0000000000** | |
| | **Statement Balance:** | | | | | | | **574,098.12** |
| | **Plus : Deposits in Transit** | | | | | | | |
| | **Less : Outstanding Checks** | | | | | | | |
| | Total Deposits in Transit | | | | | | | 0.00 |
| | Total Outstanding Checks | | | | | | | 0.00 |
| | Adjusted Balance | | | | | | | 574,098.12 |
| | Cash Manager Balance: | | | | | | | 574,098.12 |
| | Out Of Balance: | | | | | | | 0.00 |
| | General Ledger Balance: | | | | | | | 574,098.12 |
| | Out Of Balance | | | | | | | 0.00 |

**AllegianceBank**

MEMBER FDIC · EQUAL HOUSING LENDER

P.O. Box 41314
Houston, TX 77241-1314

Return Service Requested
00020370 TA093D09012104484300 01 000000000 0000000 004

Agilon Energy Holdings II LLC
Debtor in Possession Case #21-32156
480 Wildwood Forest Dr Ste 475
Spring TX 77380-3491



| | |
|---|---|
| Account Number | ████4226 |
| Statement Date | 08/31/2021 |
| Statement Thru Date | 08/31/2021 |
| Checks/Items Enclosed | 4 |
| Page | 1 |

## Customer Service Information

| | | |
|---|---|---|
| 📱 | **Customer Care** | 281-894-3200 |
| 💳 | **Lost/Stolen Debit Card** | 800-500-1044 |
| 🌐 | **Visit Us Online** | allegiancebank.com |

## Relationship Summary

| Account Type | Balance |
|---|---|
| DEPOSIT ACCOUNTS | $574,098.12 |

## BUSINESS CHECKING PLUS

Account Number: ████4226

### Balance Summary

| | |
|---|---|
| **Beginning Balance as of 08/01/2021** | **$293,058.37** |
| + Deposits and Credits  (3) | $560,000.00 |
| - Withdrawals and Debits  (14) | $278,960.25 |
| **Ending Balance as of 08/31/2021** | **$574,098.12** |
| Maintenance Fees for Period | $0.00 |
| Average Collected for Period | $289,729.00 |
| Minimum Balance for Period | $0.00 |

### DEPOSITS AND OTHER CREDITS

| Date | Description | Deposits |
|---|---|---|
| Aug 13 | DEPOSIT | 60,000.00 |
| Aug 13 | WIRE XFR IN DOM THE PRUDENTIAL INSURANCE COMPANY OF | 250,000.00 |
| Aug 31 | WIRE XFR IN DOM THE PRUDENTIAL INSURANCE COMPANY OF | 250,000.00 |

### DEBITS AND OTHER WITHDRAWALS

| Date | Description | Withdrawals |
|---|---|---|
| Aug 02 | REF 9H6TWQL TO *4291 | 7,000.00 |
| Aug 02 | REF 9H6TWPQ TO *4325 | 70,000.00 |
| Aug 06 | REF 9MS9VM5 TO *4291 | 30,000.00 |
| Aug 06 | REF 9MS9VIX TO *4325 | 36,000.00 |
| Aug 11 | WIRE XFR OUT DOM BANKDIRECT CAPITAL FINA NCE LLC | 7,003.91 |
| Aug 11 | WIRE XFR OUT DOM FEE | 15.00 |
| Aug 13 | WIRE XFR IN DOM FEE | 6.00 |
| Aug 17 | REF A2LHCPJ TO *4325 | 35,015.00 |
| Aug 31 | REF AMLOAUU TO *4325 | 24,000.00 |
| Aug 31 | WIRE XFR IN DOM FEE | 6.00 |

To change your address, please complete and sign the form below.

**AllegianceBank**
Houston, Texas 77241-1314
281-894-3200
www.allegiancebank.com

Name_____

Physical Address_____

City_____State_____Zip_____

Mailing Address_____

City_____State_____Zip_____

Social Secirity
or Tax ID Number_____

Phone Number(s)
Home_____Work_____Cellular_____

Customer
Signature_____Date_____

Please list all accounts.

☐ Checking      No. _____  No. _____

☐              No. _____  No. _____

☐ Savings       No. _____  No. _____

☐ CD/IRA        No. _____  No. _____

☐ Loans         No. _____  No. _____

☐ Safe deposit box

☐ Other services  _____

_ _ _ _ _ _ _ _ _ _ _ Customer must sign here to initiate address change _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Clip and return to bank _ _ _ _ _ _ _ _ _

## HOW TO BALANCE YOUR ACCOUNT USING THE FORM TO THE RIGHT

(1) Subtract any service, miscellaneous, or automatic charge(s) posted on this statement from your check rgister.
(2) Mark (✓) each check listed on your register that also appears on your statement.
(3) Check off deposits shown in your check register against those shown on the statement.
(4) The final "balance" in the form to the right should agree with your check register balance.

## HINTS FOR FINDING DIFFERENCES

(1) Verify all addition, subtraction, or corrections.
(2) Confirm the carryover blance from page to page in your check register.
(3) Ensure you have subtracted the service or miscellaneous charge(s) from your check register balance.

## IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC  TRANSFERS

**REGULATION E ERROR RESOLUTION IS ONLY APPLICABLE TO CONSUMER ACCOUNTS. A CONSUMER ACCOUNT IS USED PRIMARILY FOR PERSONAL, FAMILY, AND HOUSEHOLD PURPOSES.**

Please write us or call, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.

Write us at P.O. Box 41314, Houston, TX 77241-1314
or call us at 281-894-3200

We must hear from you no later than 60 days after we sent you the first statement on which the problem or error appeared.

(1) Please identify your name and account number (if any).
(2) Describe the error of the transfer and clearly explain why you believe it is an error or why you need more information.
(3) List the dollar amount of the suspected error.

If you tell us by phone or in person, we may require that you submit your complaint or question in writing within 10 business days. We will determine whether an error occured within 10 business days (20 business days if  the transfer occured within 30 days after the first deposit to the account was made) after your notification and will promply correct any error. However, if more time is needed, it may take up to 45 days (90 days if the transfer involved a point of  sale transaction, a foreign-initiated transaction, or occured within 30 days after the first deposit to the account was made) to investigate your complaint or question. If the additional time is needed, your account will be credited within 10 business days (20 days if the transaction occured within 30 days after the first deposit to the account was made) for the amount you think is an error,, during the time it takes us to complete our investigation. If you are asked to submit your complaint or question in the writing and we do not receive it within 10 business days, your account may not be credited.

We will tell you the results within three business days after completingv our investigation. If we determine there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

## NOTICE FOR BALANCE PLUS ACCOUNTS

We determine the finance charge on your account by applying the periodic rate to the "average daily balance" of your account (including current transactions). We find the "average daily balance" by using the beginning balance of each day, add any new advances, and subtract any payments or credits. Then, we add all daily balances for billing cycle and divide the total by the number of days in the billing cycle. This determines the "average daily balance."

| NEW BALANCE TRANSFER AMOUNT FROM OTHER SIDE | | | |
|---|---|---|---|
| ADD | DEPOSITS MADE SINCE ENDING DATE ON STATEMENT | | |
| SUB TOTAL | | | |
| CHECKS NO LISTED ON THIS OR PRIOR STATEMENTS | | | |
| NUMBER | AMOUNT | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total Checks Not Listed | | | |
| SUBTRACT TOTAL CHECKS NOT LISTED FROM SUB - TOTAL ABOVE → BALANCE $ | | | |

THIS SHOULD AGREE WITH YOUR CHECK REGISTER BALANACE

## IN CASE OF ERRORS OR QUESTIONS ABOUT TRANSACTIONS

If believe your bil is wrong or if you need more information about a transaction on your bill, please write us using the information previously shared, as soon as you can. We must hear from you no later than 60 days after we sent you the first bill on which the problem or error appeared. You can call us, but doing so will not preserve your rights. In writing your letter, please identify:

(1) Your name and account number (if any).
(2) Describe the error of the transfer and clearly explain why you believe it is an error or why you need more information.
(3) List the dollar amount of the suspected error.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or  take any action to collect the amount you question.

2/21

| | |
|---|---|
| Account Number | ████4226 |
| Statement Date | 08/31/2021 |
| Statement Thru Date | 08/31/2021 |
| Page | 2 |



## DEBITS AND OTHER WITHDRAWALS (Continued)

| Date | Description | Withdrawals |
|---|---|---|
| Aug 31 | SB - ACH ORIGINATION MONTHLY FEE | 25.00 |

## CHECKS PAID                               * Indicates a Skip in Check Number(s)

| Date | Check No. | Amount | Date | Check No. | Amount | Date | Check No. | Amount |
|---|---|---|---|---|---|---|---|---|
| Aug 10 | 4 | $250.00 | Aug 09 | 5 | $60,000.00 | Aug 18 | 6 | $9,639.34 |

## FEE RECAP

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

## DAILY BALANCE SUMMARY

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| Aug 02 | $216,058.37 | Aug 10 | $89,808.37 | Aug 17 | $357,768.46 |
| Aug 06 | $150,058.37 | Aug 11 | $82,789.46 | Aug 18 | $348,129.12 |
| Aug 09 | $90,058.37 | Aug 13 | $392,783.46 | Aug 31 | $574,098.12 |



# CHECK IMAGES





08/13/2021      Check 0      $60,000.00



08/09/2021      Check 5      $60,000.00



08/10/2021      Check 4      $250.00



08/18/2021      Check 6      $9,639.34



| Date: | Wednesday, September 8, 2021 | | **Agilon Energy Holdings II LLC** | | | Page: | 1 of 1 |
| Time: | 04:38PM | | **Bank Reconciliation - Detail** | | | Report: | 20630D.rpt |
| User: | HC | | As of : | 8/31/2021 | | Company: | AEII |

| Batch Nbr | Ref Nbr | Create Date | Tran Date | Pd to Post | JL TP | TR TP | Description | Amount |
|---|---|---|---|---|---|---|---|---|
| | **Bank Account:** | **Adequate Assurance** | | | | | **1021001 0000000000** | |
| | Statement Balance: | | | | | | | **15,000.00** |
| | **Plus : Deposits in Transit** | | | | | | | |
| | **Less : Outstanding Checks** | | | | | | | |
| | Total Deposits in Transit | | | | | | | 0.00 |
| | Total Outstanding Checks | | | | | | | 0.00 |
| | Adjusted Balance | | | | | | | 15,000.00 |
| | Cash Manager Balance: | | | | | | | 15,000.00 |
| | Out Of Balance: | | | | | | | 0.00 |
| | General Ledger Balance: | | | | | | | 15,000.00 |
| | Out Of Balance | | | | | | | 0.00 |

# Allegiance Bank

MEMBER
**FDIC**

P.O. Box 41314
Houston, TX 77241-1314

| | |
|---|---|
| Account Number | ███4234 |
| Statement Date | 08/31/2021 |
| Statement Thru Date | 08/31/2021 |
| Checks/Items Enclosed | 0 |
| Page | 1 |

Return Service Requested
00014901 TA093D09012104484300 01 000000000 0000000 002

Agilon Energy Holdings II LLC
Adequate Assurance Acct.
Debtor in Possession Case #21-32156
480 Wildwood Forest Dr Ste 475
Spring TX 77380-3491

## Customer Service Information

| | | |
|---|---|---|
| 📱 | **Customer Care** | 281-894-3200 |
| 💳 | **Lost/Stolen Debit Card** | 800-500-1044 |
| 🖱 | **Visit Us Online** | allegiancebank.com |

## Relationship Summary

| Account Type | Balance |
|---|---|
| DEPOSIT ACCOUNTS | $15,000.00 |

## BUSINESS CHECKING PLUS

**Account Number:** ███4234

### Balance Summary

| | |
|---|---|
| **Beginning Balance as of 08/01/2021** | **$15,000.00** |
| + Deposits and Credits  (0) | $0.00 |
| - Withdrawals and Debits  (0) | $0.00 |
| **Ending Balance as of 08/31/2021** | **$15,000.00** |
| Maintenance Fees for Period | $0.00 |
| Average Collected for Period | $15,000.00 |
| Minimum Balance for Period | $0.00 |

### FEE RECAP

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |



To change your address, please complete and sign the form below.

**AllegianceBank**
Houston, Texas 77241-1314
281-894-3200
www.allegiancebank.com

Name_____

Physical Address_____

City_____ State_____ Zip_____

Mailing Address_____

City_____ State_____ Zip_____

Social Securiry
or Tax ID Number_____

Phone Number(s)
Home_____ Work_____ Cellular_____

Customer
Signature_____ Date_____

Please list all accounts.

| | | | | |
|---|---|---|---|---|
| ☐ Checking | No. | _____ | No. | _____ |
| ☐ | No. | _____ | No. | _____ |
| ☐ Savings | No. | _____ | No. | _____ |
| ☐ CD/IRA | No. | _____ | No. | _____ |
| ☐ Loans | No. | _____ | No. | _____ |
| ☐ Safe deposit box | | | | |
| ☐ Other services | _____ | | | |

_ _ _ _ _ _ _ <u>Customer must sign here to initiate address change</u> _ _ _ _ _ _ _ _ _ _ _ _ _ _ <u>Clip and return to bank</u> _ _ _ _ _ _

## HOW TO BALANCE YOUR ACCOUNT USING THE FORM TO THE RIGHT

(1) Subtract any service, miscellaneous, or automatic charge(s) posted on this statement from your check rgister.
(2) Mark ( ✓ ) each check listed on your register that also appears on your statement.
(3) Check off deposits shown in your check register against those shown on the statement.
(4) The final "balance" in the form to the right should agree with your check register balance.

## HINTS FOR FINDING DIFFERENCES

(1) Verify all addition, subtraction, or corrections.
(2) Confirm the carryover blance from page to page in your check register.
(3) Ensure you have subtracted the service or miscellaneous charge(s) from your check register balance.

## IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC  TRANSFERS

**REGULATION E ERROR RESOLUTION IS ONLY APPLICABLE TO CONSUMER ACCOUNTS. A CONSUMER ACCOUNT IS USED PRIMARILY FOR PERSONAL, FAMILY, AND HOUSEHOLD PURPOSES.**

Please write us or call, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.

Write us at P.O. Box 41314, Houston, TX 77241-1314
or call us at 281-894-3200

We must hear from you no later than 60 days after we sent you the first statement on which the problem or error appeared.

(1) Please identify your name and account number (if any).
(2) Describe the error of the transfer and clearly explain why you believe it is an error or why you need more information.
(3) List the dollar amount of the suspected error.

If you tell us by phone or in person, we may require that you submit your complaint or question in writing within 10 business days. We will determine whether an error occured within 10 business days (20 business days if  the transfer occured within 30 days after the first deposit to the account was made) after your notification and will promply correct any error. However, if more time is needed, it may take up to 45 days (90 days if the transfer involved a point of  sale transaction, a foreign-initiated transaction, or occured within 30 days after the first deposit to the account was made) to investigate your complaint or question. If the additional time is needed, your account will be credited within 10 business days (20 days if the transaction occured within 30 days after the first deposit to the account was made) for the amount you think is an error,, during the time it takes us to complete our investigation. If you are asked to submit your complaint or question in the writing and we do not receive it within 10 business days, your account may not be credited.

We will tell you the results within three business days after completingv our investigation. If we determine there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

## NOTICE FOR BALANCE PLUS ACCOUNTS

We determine the finance charge on your account by applying the periodic rate to the "average daily balance" of your account (including current transactions). We find the "average daily balance" by using the beginning balance of each day, add any new advances, and subtract any payments or credits. Then, we add all daily balances for billing cycle and divide the total by the number of days in the billing cycle. This determines the "average daily balance."

| NEW BALANCE TRANSFER AMOUNT FROM OTHER SIDE | | | |
|---|---|---|---|
| ADD | DEPOSITS MADE SINCE ENDING DATE ON STATEMENT | | |
| SUB TOTAL | | | |
| CHECKS NO LISTED ON THIS OR PRIOR STATEMENTS | | | |
| NUMBER | AMOUNT | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Total Checks Not Listed | | | |
| SUBTRACT TOTAL CHECKS NOT LISTED FROM SUB - TOTAL ABOVE → BALANCE $ | | | |

THIS SHOULD AGREE WITH YOUR CHECK REGISTER BALANACE

## IN CASE OF ERRORS OR QUESTIONS ABOUT TRANSACTIONS

If believe your bil is wrong or if you need more information about a transaction on your bill, please write us using the information previously shared, as soon as you can. We must hear from you no later than 60 days after we sent you the first bill on which the problem or error appeared. You can call us, but doing so will not preserve your rights. In writing your letter, please identify:

(1) Your name and account number (if any).
(2) Describe the error of the transfer and clearly explain why you believe it is an error or why you need more information.
(3) List the dollar amount of the suspected error.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or  take any action to collect the amount you question.

2/21

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date: | Thursday, September 9, 2021 | | | | **Agilon Energy Holdings II LLC** | | Page: | 1 of 1 |
| Time: | 01:43PM | | | | **Bank Reconciliation - Detail** | | Report: | 20630D.rpt |
| User: | HC | | | | As of : 8/31/2021 | | Company: | AEII |

| Batch Nbr | Ref Nbr | Create Date | Tran Date | Pd to Post | JL TP | TR TP | Description | Amount |
|---|---|---|---|---|---|---|---|---|
| | **Bank Account:** | **Wilmington** | | | | | **1020001 0000000000** | |
| | **Statement Balance:** | | | | | | | **6,588.61** |
| | **Plus : Deposits in Transit** | | | | | | | |
| | **Less : Outstanding Checks** | | | | | | | |
| | Total Deposits in Transit | | | | | | | 0.00 |
| | Total Outstanding Checks | | | | | | | 0.00 |
| | Adjusted Balance | | | | | | | 6,588.61 |
| | Cash Manager Balance: | | | | | | | 6,588.61 |
| | Out Of Balance: | | | | | | | 0.00 |
| | General Ledger Balance: | | | | | | | 6,588.61 |
| | Out Of Balance | | | | | | | 0.00 |



Corporate Headquarters
1100 North Market Street
Wilmington, DE 19890-0001

# Accounting Statement

■■■■ 1-000 - AGILON II - ISSUER REVENUE AC
August 01, 2021 - August 31, 2021

## Your Portfolio at a Glance

| | |
|---|---|
| Opening Market Value w/Accrued Income | $6,588.61 |
| Net of Contributions & Withdrawals | - |
| Net Investment Change | - |
| **Closing Market Value w/Accrued Income** | **$6,588.61** |

## Accounts Included

WILMINGTON TRUST, NA WTNA AS DEPOSITARY UNDER A DEPOSITAR
& SECURITY AGREEMENTD DTD 2/23/18 WITH AGILON HOLDINGS II, LLC AS THE
ISSUER
■■■■ 1-000

## Your Relationship Team

**MARION ZINOWSKI**                                        **(212) 941-4421**
Relationship Manager
mzinowski@wilmingtontrust.com

ROSS  BELSOME
AGILON ENERGY HOLDINGS LLC
5850 SAN FELIPE DRIVE
HOUSTON, TX 77057



**Accounting Statement**

**■■■■■1-000 - AGILON II - ISSUER REVENUE AC**

August 01, 2021 - August 31, 2021

## Table of Contents

**Relationship Summary**

Asset Allocation ....................................................................3

Accrued Income by Asset Class Summary ...............................3

Portfolio Valuations & Activity Summary ................................4

**Asset Allocation**

Asset & Sub Asset Allocation ..................................................5

**Holdings Detail**

Cash & Equivalents ................................................................6

**Activity Detail**

Transaction Activity Detail ......................................................7

**Disclosures**

Statement Disclosures ............................................................8

**Glossary**

Glossary..................................................................................9

Please see Glossary for descriptions of key fields depicted in this statement.

www.wilmingtontrust.com   20210901 03.01.59 : 2031259 : 6062409



# Relationship Summary
**█████1-000 - AGILON II - ISSUER REVENUE AC**
August 01, 2021 - August 31, 2021

## Asset Allocation

| Asset Class | Total Market Value | Allocation (%) |
|---|---|---|
| Cash & Equivalents | $6,588.61 | 100% |
| **TOTAL** | **$6,588.61** | **100%** |

## Accrued Income by Asset Class Summary

| Asset Class | Market Value | Accrued Income | Market Value + Accrued Income | Estimated Annual Income | Yield (%) |
|---|---|---|---|---|---|
| Cash & Equivalents | $6,588.61 | - | $6,588.61 | - | - |
| **TOTAL** | **$6,588.61** | **-** | **$6,588.61** | **-** | **-** |

Market Values may be generated using market quotations, closing price, mean bid or ask, or estimated market value obtained from quotation services. Mutual fund balances are incorporated into appropriate asset classifications. Derivative instruments are classified based upon the corresponding underlying security and does not represent a comprehensive risk assessment of your account.
Asset values will fluctuate. **Estimated Annual Income** is provided for comparison purposes only. Estimated Annual Income is based on historical data or other assumptions and is not a guarantee of future results. This report should not be used to prepare tax documents.
Yield for Cash & Equivalents is calculated based on Market Value of investments and does not include Uninvested Cash (Cash Balance) or Cash Payables and Receivables for pending trades.

www.wilmingtontrust.com                    20210901 03.01.59 : 2031259 : 6062409



## Portfolio Valuations & Activity Summary

| Category | Current Period | Year-to-Date |
|---|---|---|
| **Opening Market Value** | **$6,588.61** | **$80,743.62** |
| Accrued Income | - | - |
| **Opening Market Value w/Accrued Income** | **$6,588.61** | **$80,743.62** |
| **Contributions** | | |
| Cash Receipts | - | 944,280.70 |
| Intra-Account Transfers | - | - |
| Other Receipts | - | 617,312.25 |
| Securities Transferred In | - | - |
| Tax Refunds | - | - |
| **Total Contributions** | - | **$1,561,592.95** |
| **Withdrawals** | | |
| Cash Disbursements | - | - |
| Intra-Account Transfers | - | - |
| Other Disbursements | - | -1,635,747.96 |
| Other Fees | - | - |
| Securities Transferred Out | - | - |
| Tax Payments | - | - |
| Taxes Withheld | - | - |
| Wilmington Trust Fees | - | - |
| **Total Withdrawals** | - | **-$1,635,747.96** |
| **Net Contributions & Withdrawals** | - | **-$74,155.01** |
| Closing Market Value | 6,588.61 | 6,588.61 |
| Accrued Income | - | - |
| **Closing Market Value w/Accrued Income** | **$6,588.61** | **$6,588.61** |
| **Net Investment Change** | - | - |

## Net Investment Change Detail

| | Current Period | Year-to-Date |
|---|---|---|
| **Net Investment Change** | - | - |
| **Income Earned** | | |
| Dividends | - | - |
| Net Interest | - | - |
| Other Income | - | - |
| Change in Accrual | - | - |
| **Total Income Earned** | - | - |
| **Market Appreciation** | - | - |

Management and advisory fees charged through accounts not listed under the Market Value Summary will not be shown in this schedule. Transactions classified in Other (Receipts, Fees, and Disbursements) categories are identified in the Transaction Activity Detail.

Market Appreciation reflects your Closing Market Value w/Accrued Income, less the net of contributions, withdrawals, and income earned, less your Opening Market Value w/Accrued Income.

...



# Asset Allocation

**1-000 - AGILON II - ISSUER REVENUE AC**
August 01, 2021 - August 31, 2021

## Asset & Sub Asset Allocation

| Asset Class | Total Market Value (%) | Closing Market Value | Cost | Unrealized Gain/Loss | Accrued Income | Market Value w/ Accrued Income |
|---|---|---|---|---|---|---|
| **■ Cash & Equivalents** | | | | | | |
| Taxable | 100.00% | $6,588.61 | $6,588.61 | - | - | $6,588.61 |
| **Total Cash & Equivalents** | **100.00%** | **$6,588.61** | **$6,588.61** | - | - | **$6,588.61** |
| **TOTAL ASSETS** | **100%** | **$6,588.61** | **$6,588.61** | - | - | **$6,588.61** |



**Holdings Detail**
███1-000 - AGILON II - ISSUER REVENUE AC
August 01, 2021 - August 31, 2021

## 🟧 Cash & Equivalents

| Security Name | Quantity | Market Price | Market Value | Cost | Unrealized Gain/Loss | Accrued Income | Estimated Annual Income | Effective Duration | Yield to Worst (%) | Market Value (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Taxable** | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | |
| US DOLLAR CURRENCY | | | $6,588.61 | $6,588.61 | - | - | - | - | - | 100% |
| **Total Cash Balance** | | | **$6,588.61** | **$6,588.61** | - | - | - | - | - | **100%** |
| **Total Taxable** | | | **$6,588.61** | **$6,588.61** | - | - | - | - | - | **100%** |
| **TOTAL CASH & EQUIVALENTS** | | | **$6,588.61** | **$6,588.61** | - | - | - | - | - | **100%** |
| | | | | | | | | | | |
| **Grand Total** | | | **$6,588.61** | **$6,588.61** | - | - | - | | | **100%** |
| Accrued Income | | | - | | | | | | | |
| | | | | | | | | | | |
| **Grand Total Market Value w/ Accrued Income** | | | **$6,588.61** | | | | | | | |

20210901 03.01.59 : 2031259 : 6062409



## Activity Detail

███1-000 - AGILON II - ISSUER REVENUE AC
August 01, 2021 - August 31, 2021

## Transaction Activity Detail

| Trade Date Settlement Date | Transaction Type | Transaction Description | Quantity | Price | Cash Value |
|---|---|---|---|---|---|
| No activity for this statement period. | | | | | |



# Disclosures

**█████1-000 - AGILON II - ISSUER REVENUE AC**
August 01, 2021 - August 31, 2021

## Statement Disclosures

### Statement Review; Limitations on Actions
Please carefully review your statements and retain them for your records as they may contain notices, disclosures and other important information in addition to the summary of the transactions in your account for the reporting period, including contributions, distributions, transfers, and purchases and sales of securities.  Summary data is also provided for off-setting investment option transfers or other transfers made between accounts.

Please report promptly any material inaccuracy or discrepancy in this information to your Relationship Manager. If revised data becomes available to Wilmington Trust after these reports are generated, we may update our records accordingly; however, revised data typically will not result in the generation of a new report.

### Fee Arrangements
Wilmington Trust and its affiliates may earn additional compensation from uninvested cash in the form of earnings, which Wilmington Trust expects will be generated at the prevailing federal funds rate.  Such earnings may be generated between the time the moneys are received by Wilmington Trust and actually forwarded to implement investment instructions, or between the time a distribution is issued and presented.

### Affiliated Advisers
"Wilmington Trust" is a service mark encompassing the trust and investment business of Manufacturer's & Trader's Trust Company ("M&T Bank") in providing services to this account, and of some of M&T Bank's subsidiaries and affiliates, serving individual and institutional clients. Subsidiaries and affiliates include, but are not limited to, Wilmington Trust Company (operating in Delaware only); Wilmington Trust, N.A., a national association; and Wilmington Funds Management Corp., Wilmington Trust Investment Advisors, Inc., and other registered investment adviser affiliates. For additional information regarding the Wilmington Trust brand, underlying entities, and products and services offered, please visit our web site at www.wilmingtontrust.com.

### Pricing and Valuation
Details of transaction charges and commissions are displayed on transaction confirmations, which have been mailed or made available separately to you. Wilmington Trust will also send you this information upon request. To the extent Wilmington Trust has custody of assets but no investment authority over your account, you have the right at any time to receive, at no additional cost to you, written confirmations of securities transactions that occur in your account. These confirmations will be mailed in the timeframe required by applicable regulations. Even if you previously waived your right to receive these confirmations, you may at any time ask to receive such confirmations going forward. Please contact your Relationship Manager if you wish to have written trade confirmations mailed to you.

The investment values and estimated income information reported herein reflect the securities in your account on a trade date basis as of the close of your statement period. Pricing may reflect market price quotations, closing price, mean bid / ask price, or estimated market values obtained from various third-party quotation services which we believe to be reliable and which were available when the report was prepared. If an investment did not have a readily determinable value, then reported values are based on the last valuation available to us at the time the report was generated. For assets not custodied at Wilmington Trust, prices and values are provided by the custodian, the issuer or their administrator, and Wilmington Trust is not responsible for this information, nor can Wilmington Trust guarantee its accuracy or timeliness. Valuation for Private Equity, Private Real Estate and Other asset classes reflect the most recent information available, but are typically illiquid and may have irregular reporting. Consult your Relationship Manager for details regarding valuations for your illiquid holdings.

Reported values may not equal market value or fair value and may include accruals. Asset values will fluctuate. This report should not be used to prepare tax documents or financial statements. Information for tax reporting purposes will be reflected in your annual Wilmington Trust Tax Information Letter. Please contact your Relationship Manager if you have any questions.

**Basis and limitations on use for Cost, Gains, and Losses.** This is not a tax document. This information is being provided for your review of transactions and balances in your account for the reporting period. For tax reporting, you should rely on your official tax documents. Transactions requiring tax consideration should be reviewed with your tax advisor. Unrealized Gain and Loss data is reliant upon accurate cost basis information and represents the current value of a security less the adjusted cost basis for that security. If the current value is greater than the adjusted cost basis, that position has an unrealized gain. Conversely, if value is less than cost, the position carries an unrealized loss.

The cost basis of record for securities transferred into your Wilmington Trust account may have been provided to us by a delivering firm, a transfer agent, or another adviser on a best efforts basis. Cost basis data provided through delivering firms is reliant upon for this report but should be reviewed for accuracy by each client. Cost basis on fixed income securities are adjusted for amortization, accretion, or principal paydowns and the method of calculation is based upon the type of fixed income security and certain attributes, obtained from sources believed to be reliable. Where no cost basis is available for a security as of the last day of the reporting period, that security will reflect zero as the cost basis.

> **Investments: • Are NOT FDIC-Insured • Have NO Bank Guarantee • May Lose Value**



## Glossary

**Accrued Dividend** represents dividends declared by the issuer which have not yet been paid.

**Accrued Income** represents income payments accumulated with a security (i.e., "priced in" to the security value) since the last payment date but not yet received. Income accrues daily and is reset every time accruals are paid.

**Cost** represents the reported original value of an asset adjusted for corporate actions, including stock splits, dividends, and return of capital distributions. Tax cost basis on fixed income securities are adjusted for amortization, accretion or principal paydowns. The method of calculation is based upon the type of fixed income security and certain attributes, obtained from sources believed to be reliable. This information is used to estimate capital gains and losses; however, this is not a tax document. This information is being provided for your convenience and is for informational purposes only. For tax reporting, you should rely on your official tax documents. Transactions requiring tax consideration should be reviewed with your tax advisor.

Securities acquired before 2011 are generally not subject to the new cost basis reporting rules set forth by the Internal Revenue Service Code in the Emergency Economic Stabilization Act of 2008 and are, therefore, considered "noncovered" under the new cost basis reporting rules. All other securities in this section are securities which are "covered" under the new cost basis reporting rules. Securities which are "covered" under the new cost basis reporting rules are defined as securities which have been acquired on or after their applicable dates at which they are subject to the cost basis reporting rules and the adjusted basis will be reported to the IRS on form 1099-B for the applicable tax year in which the security is disposed.

**Credit ratings** are used to evaluate the likelihood of default by a bond issuer. Independent rating agencies, such as Moody's Investors Service, analyze the financial strength of each bond's issuer. Moody's ratings range from Aaa (highest quality) to C (lowest quality). Bonds rated Baa3 and better are considered "Investment Grade". Bonds rated Ba1 and below are "Speculative Grade" (also "High Yield"). The **Weighted Average Credit Rating** reflects a portfolio-weighted average of ratings on individual rated bonds – non-rated bonds are excluded – it does not represent a rating of the portfolio as a whole. The weighted average is intended only as an aggregate illustration of the portfolio holdings rather than as an indication of their respective risks, as certain risks –including the risk of default of individual issues– may be underrepresented by this measure.

**Duration** is a measure of a bond's sensitivity to changes in interest rates and is calculated as the average percentage change in a bond's value under parallel shifts of the yield curve. Thus a bond with

duration of 4 would be expected to lose 1% in value (price) in the event of a 25 basis point (0.25%) increase in market rates, represented by the yield curve. Conversely, that bond would be expected to appreciate 1% in value with a 25 basis point decrease in market rates.

**Estimated Annual Income** is an indication of income return expected from security positions over the next 12 months assuming that the position quantities, interest /dividend rates, and prices remain constant. For U.S. government, corporate, and municipal bonds it is calculated by multiplying the coupon rate by the face value of the security. For common stocks, ADRs, REITs and mutual funds it is calculated using an indicated (projected) annual dividend. They are provided for illustrative purposes only, are not a forecast or guarantee of future results, and they should not be relied on for making investment, trading, or tax decisions.

**Estimated Yield** compares the anticipated earnings on investments (Estimated Annual Income) to the current price of the investments. Changes in the price of a security over time or in the amount of the investment held in your account will cause the estimated yield to vary. The actual yield may be higher or lower than the estimated amounts.

**Net Interest** represents the receipt of interest earned less the purchase of accrued interest on securities.

**Taxable** versus **Tax-exempt** status is determined at the security level, and not at the account type level. Thus accounts that carry a tax exemption, such as IRAs or various charitable trusts, often have holdings that are categorized as Taxable for this report. Conversely, securities classified as Tax-exempt for this report are held in taxable account types. Securities may be deemed Tax-exempt based on a tax-advantaged treatment, typically for interest payments on municipal bonds, which may not be available equally to all investors. Additionally, alternative tax treatments may mitigate or offset tax advantages reflected in this report. This report is not a tax document and should not be used for tax preparation.

**Term (Long or Short)** reflects the holding period of the security. Long term indicates a holding period one year or greater, while Short indicates a holding period less than one year.

**Trade Date** accounting is used throughout this report, unless otherwise identified, and records the purchase or sale of an asset as of the date on which an agreement to purchase/sell was entered, or a market trade executed, rather than on the settlement date (the actual delivery of the asset in exchange for payment). Thus, trades executed but pending settlement are treated as already present in the account in reliance upon successful settlement. Trade date treatment serves as a better



## Glossary *(continued)*

reflection of actual decisions to buy/sell than settlement date, which can occur days later.

**Unit Cost** is the reported cost per share of an equity position, or cost per bond for debt securities. It reflects the price paid, adjusted for corporate actions such as stock splits and return of capital distributions. It is used to estimate capital gains and losses; however, you should rely only on your official tax documents for tax reporting purposes. All cost basis information is derived from transactions in the account or information supplied by you or other sources and is provided for your convenience and is for informational purposes only. There is no guarantee as to the accuracy of third-party cost basis information and it is not intended for tax reporting purposes. Please inform us in the event that a cost basis is not accurate.

**Unrealized Gain/Loss** is the difference between the current value of a security and the adjusted cost basis of that security. If the current value is greater than the original cost, that position has an unrealized gain. Conversely, if the current value is less than the original cost, that position has an unrealized loss.

**Yield to Worst** assumes the "worst case" yield to investors within the terms of the issue's provisions, such as use of prepayment, call, or sinking fund options that may be available to the issuer on some bonds.

## PART 7: QUESTIONNAIRE

### QUESTION g: POSTPETITION BORROWING

See attached: *Emergency Order (I) Authorizing the Debtors to Obtain Post Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* entered July 15, 2021 [Dkt 49]



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
07/15/2021

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **AGILON ENERGY HOLDINGS II, LLC,** *et al.* | § | **Case No. 21-32156 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## EMERGENCY ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

The Court has considered the *Motion for Entry of an Order (i) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (ii) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (iv) Granting Related Relief* (the "DIP Motion")[2] filed by Agilon Energy Holdings II, LLC ("Agilon") Victoria Port Power, LLC, and Victoria City Power, LLC each as a debtor and debtor in possession (collectively, with Agilon, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an order (this "Emergency Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II, LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 5850 San Felipe, Ste 601, Houston, Texas 77057.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the DIP Motion or the Term Sheet, each as defined herein, as applicable.

Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules") and Rules 1075-1, 4002-1 and 9013-1 of the Bankruptcy Local Rules
for the Southern District of Texas (the "Local Rules") *inter alia*:

(i)     authorizing the Debtors to obtain a senior secured, superpriority, priming debtor-in-possession single draw term loan in the aggregate principal amount of up to $1,000,000 on an interim basis (the "Emergency DIP Facility"), pursuant to the terms and conditions of that certain Emergency Debtor in Possession Financing Term Sheet dated as of July 12, 2021 (the "Term Sheet"),[3] substantially in the form attached hereto as **Exhibit 1**, by and among the Debtors, each as a "Borrower," Wilmington Trust, National Association, as collateral agent under the DIP Documents (in such capacity, the "DIP Agent"), and the lenders party thereto (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties");

(ii)    authorizing the Debtors to execute and deliver the Term Sheet and any other related documents (as amended, restated, supplemented, waived, and/or modified from time to time, and together, with the Term Sheet, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   granting the Emergency DIP Facility and all obligations owing thereunder and all obligations under, or secured by, the DIP Documents (collectively, including all obligations described in the DIP Documents, the "Emergency DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any successor cases;

(iv)    granting to the DIP Agent, for the benefit of the DIP Secured Parties under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(vi)    authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Senior Secured Note Documents (each as defined herein or the Term Sheet, as applicable);

---

[3] The Debtors, the DIP Agent and the DIP Lenders intend to enter into a Replacement Facility, DIP credit agreement and other Definitive Documentation (as defined in the Term Sheet).

(vii)     providing adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral (if any), for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value"); and

(viii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Emergency Order.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Hugh Smith in Support of Chapter 11 Petitions, First Day Motions, and Debtors' Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Granting Related Relief* (the "Smith Declaration"), the DIP Documents, and the evidence submitted and argument made at the emergency hearing (the "Emergency Hearing"); and notice of the Emergency Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Emergency Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the Term Sheet is a sound and prudent exercise of the Debtors' business

judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE EMERGENCY HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

        A.      **Prepetition Senior Secured NPA.**[5]  The Debtors assert that as of the Petition Date, the Debtors' prepetition secured debt included the Notes issued by Agilon pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (the "Prepetition Senior Secured NPA"), including up to $73 million in aggregate principal amount comprised of Senior Secured Term Notes in the initial aggregate principal amount of $50,000,000 and Senior Secured Revolving Notes in the aggregate principal amount of $23,000,000 (collectively, together with accrued and unpaid interest, and all other amounts payable pursuant to the Prepetition Senior Secured Note Documents, and all other interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Obligations").  The Debtors assert that, prior to the Petition Date, they granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties,[6] a first priority security interest in and continuing lien (the "Prepetition Liens") on substantially all of their assets and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or

---

[4]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[5]  This Emergency Order does not contain any binding stipulations with respect to the assertions set forth in this Paragraph A or any associated challenge period. The Debtors reserve all rights to include stipulations and appropriate challenge periods in the Interim Replacement Facility Order (as defined herein).

[6]  The "Prepetition Secured Parties" means the Prepetition Noteholders, the Prepetition L/C Issuing Bank, and the Prepetition Agent (each as defined in the Term Sheet).

existing or thereafter acquired or arising, including all cash, wherever located, which constitutes Cash Collateral of the Prepetition Secured Parties. (collectively, the "Prepetition Collateral"), subject in priority only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Senior Secured Note Documents (the "Permitted Prior Liens").[7]

B.    **Findings Regarding Emergency Postpetition Financing**

(i)    *Request for Emergency Postpetition Financing*.  The Debtors seek authority to (a) enter into, and borrow under, the Emergency DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein, to administer their Chapter 11 Cases and fund their operations.

(ii)    *Need for Emergency Postpetition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to use Cash Collateral and obtain credit on an emergency basis pursuant to the Emergency DIP Facility in order to administer and preserve the value of their estates.

(iii)    *No Credit Available on More Favorable Terms*.  The Emergency DIP Facility is the best and most favorable source of debtor in possession financing available to the Debtors.

(iv)    *Use of Proceeds of the Emergency DIP Facility*.  The DIP Secured Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of

---

[7]  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.

the Emergency DIP Facility and the Cash Collateral shall be used in a manner consistent with the terms and conditions of this Emergency Order, the Term Sheet and the other DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of this Emergency Order and the DIP Documents, the "Approved Budget"), including paying obligations arising from or related to the Carve Out.[8]

C. **Adequate Protection**. Until such time as the Prepetition Obligations are Paid in Full,[9] the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection to the extent of any Diminution in Value of its respective interests in the Prepetition Collateral as set forth in this Emergency Order.

Based upon the foregoing findings and conclusions, the DIP Motion, the Smith Declaration, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. <u>Emergency Financing Approved</u>. The DIP Motion is granted on an interim basis as set forth in this Emergency Order and the Emergency DIP Facility is approved. The Debtors are authorized to request extensions of credit up to an aggregate outstanding principal amount of not greater than $1,000,000 in accordance with the Emergency DIP Facility

---

[8] A copy of the initial Approved Budget is attached hereto as **Exhibit 2**.

[9] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility. No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, and (b) with respect to the Prepetition Obligations, the Prepetition Secured Parties or the DIP Lenders, as applicable, have received (i) a countersigned payoff letter in form and substance satisfactory to such party and (ii) releases in form and substance satisfactory to such parties, each in their sole discretion.

(the "Emergency DIP Financing"). The Emergency DIP Financing is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Emergency Order. Any objections to this Emergency Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled. The Debtors will seek final approval of the relief set forth in this Emergency Order through the Interim Order (as defined in the Term Sheet) approving the Replacement Facility (as defined in the Term Sheet) (the "Interim Replacement Facility Order").

2. **Emergency DIP Obligations**. The DIP Documents and this Emergency Order shall constitute and evidence the validity and binding effect of the Emergency DIP Obligations, which shall be enforceable against the Debtors, and subject to entry of the Interim Replacement Facility Order, their estates, and any successors thereto. The Emergency DIP Obligations are non-avoidable.

3. **DIP Liens**. In order to secure the Emergency DIP Obligations, effective immediately upon entry of this Emergency Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Secured Parties, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "DIP Liens") on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "DIP Collateral"): (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture,

fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) the proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; and (d) all DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code.

4. DIP Lien Priority. The DIP Liens are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to the Permitted Prior Liens. For avoidance of doubt, Permitted Prior Liens includes any liens held by ProEnergy Services, LLC that are valid, perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date.

5. DIP Superpriority Claims. Upon entry of this Emergency Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor cases (collectively, the "DIP Superpriority Claims") for all Emergency DIP Obligations. The DIP Superpriority Claims shall have priority, to the extent provided by section 507(b) of the

_____

Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, other than the Carve Out.

6.    <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance unless so required under the DIP Documents.

7.    <u>Use of Proceeds of Emergency DIP Facility</u>.  From and after the Petition Date, the Debtors shall use the credit advanced under the Emergency DIP Facility only for the purposes specifically set forth in this Emergency Order, the DIP Documents, and the Approved Budget.

8.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Emergency Order, the Emergency DIP Facility, and the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the Maturity Date (as defined in the Term Sheet).

9.    <u>Adequate Protection Liens</u>.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Adequate Protection Liens</u>") on the DIP Collateral. The Adequate Protection Liens shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to: (i) the DIP Liens; and (ii) the Permitted Prior Liens.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims

against any of the DIP Collateral.

10. <u>Adequate Protection Superpriority Claims</u>. As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor cases (the "<u>Adequate Protection Superpriority Claims</u>"). Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever; *provided*, *however*, the Adequate Protection Superpriority Claims shall be subject to the Carve Out as set forth in this Emergency Order and otherwise junior only to the DIP Superpriority Claim.

11. <u>Adequate Protection Reservation</u>. This Emergency Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, and the rights of all parties in interest are reserved with respect thereto.

12. <u>Amendment of the DIP Documents</u>. The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court, in accordance with the terms of the DIP Documents (including the Term Sheet). Amendments of material terms shall require Court approval.

13. <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate the terms

and provisions of this Emergency Order.

14. <u>Perfection of DIP Liens and Adequate Protection Liens</u>. This Emergency Order shall be and is sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement or mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to evidence, or entitle the DIP Secured Parties and the Prepetition Secured Parties to, the priorities granted herein.

15. <u>Maintenance and Insurance of DIP Collateral</u>. Until all Emergency DIP Obligations and all Prepetition Obligations are Paid in Full, and the DIP Secured Parties' obligation to extend credit under the Emergency DIP Facility has terminated, the Debtors shall: obtain and maintain insurance with respect to the DIP Collateral as required under the Emergency DIP Facility. Upon entry of this Emergency Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (the "<u>DIP Collateral Insurance Policies</u>"). Notwithstanding the foregoing, upon entry of this Emergency Order, the Debtors shall take any and all steps necessary under the DIP Collateral Insurance Policies to name both the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition Agent (on behalf of the Prepetition Secured Parties) as additional insureds and loss payees on each DIP Collateral Insurance Policy.

16.     <u>Limitations on Use of DIP Proceeds and Cash Collateral</u>.  The Emergency DIP Facility, the DIP Collateral, the Prepetition Collateral, and the Cash Collateral may only be used as set forth in the Approved Budget or as otherwise agreed in writing by the DIP Lenders.

17.     <u>DIP Events of Default</u>.  The occurrence of any of the following events without the prior written consent of the DIP Lenders shall constitute an event of default (collectively, the "<u>DIP Events of Default</u>"):  (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Emergency Order; or (b) the occurrence of an "Event of Default" under the Term Sheet.

18.     <u>Remedies Upon an Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lenders may declare (a) all Emergency DIP Obligations to be immediately due and payable, (b) the termination of the Emergency DIP Facility as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the Emergency DIP Obligations, and (c) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, subject to further order of the Bankruptcy Court and (ii) the Approved Budget shall automatically be deemed not to provide for any payment other than (a) the Carve Out; and (b) fees and expenses of the DIP Agent and the DIP Lenders (including attorneys' fees); and (c) such other expenses, if any, as may be expressly approved in writing by the DIP Lenders in their sole discretion.  For the avoidance of doubt, neither the DIP Agent nor the DIP Lender will take any actions or enforce any remedies against the DIP Collateral absent further order of the Court.

19.     Prior to exercising the remedies set forth in (i) in the preceding paragraph, the DIP Lenders shall provide the Debtors, the U.S. Trustee, and any statutory committee appointed in the Chapter 11 Cases, if any, with three (3) days written notice of the DIP Lenders'

intent to exercise such remedies and shall promptly file such notice with the Bankruptcy Court.

20.     DIP Fees, and Other Expenses.  As set forth in the Term Sheet, the Debtors shall pay (a) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Term Sheet, any DIP Order (as defined in the Term Sheet) and the Emergency DIP Facility, and (c) all other out-of-pocket costs and expenses of the Prepetition Secured Parties (including, without limitation, the ongoing monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings).  The payment of any and all post-petition professional fees, expenses and disbursements set forth in sub-paragraphs (a), (b) and (c) may be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases of invoices therefor.  Such invoices provided to the Debtors, the U.S. Trustee and, as applicable, any statutory committee appointed in these Chapter 11 Cases, shall be in summary format with reasonably sufficient detail such that the nature and extent of the services can be evaluated.   The fees, costs, and expenses incurred by the DIP Agent and the DIP Lenders shall be earned, due and owing by the Debtors upon the Emergency Funding Closing Date (as defined in the Term Sheet), but shall be payable, in full, in cash, on the Maturity Date.

21.     Indemnification.   Subject to entry of the Interim Replacement Facility

Order, as set forth in the Term Sheet, the DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the indemnified party.

22.     Carve Out.  As used in this Emergency Order, the "Carve Out" means the sum of (i) all fees required to be paid (a) to the Clerk of the Court and (b) to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of the counsel, investment bankers, or financial advisors of the Debtors and any committee[10] (the "Allowed Professional Fees"), not to exceed the lesser of (x) the actual amounts, and (y) the amounts set forth for such professionals in the Approved Budget for such period, incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following the Maturity Date.

23.     This Emergency Order is effective on entry and is not stayed.

24.     Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce the terms of any and all matters arising from or related to the Emergency DIP Facility,

---

[10] The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction.

and/or this Emergency Order.

Signed: July 15, 2021

_____
Marvin Isgur
United States Bankruptcy Judge

## **Exhibit 1**

## **TERM SHEET**

# AGILON ENERGY HOLDINGS II, LLC

## Emergency Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet
## July 12, 2021

This Emergency Senior Secured Superpriority Debtor-in-Possession Financing Term Sheet (this "Term Sheet") describes the principal terms and conditions of a proposed senior secured superpriority priming debtor-in-possession term loan facility (the "Emergency DIP Facility") to be provided by the DIP Lenders (as defined below) to the Borrower (as defined below) in connection with cases (collectively, the "Chapter 11 Cases") filed by the Debtors (defined below) in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on June 27, 2021 (the "Petition Date").

This Emergency DIP Facility shall be provided for a limited period and shall, no later than thirty (30) days after the Emergency Funding Closing Date (as defined below), pursuant to an interim order of the Bankruptcy Court (the "Interim Order" and together with the Emergency Order (as defined below), the "DIP Orders") approving, on an interim basis, Definitive Documentation (as defined below), for a replacement debtor-in-possession facility (the "Replacement Facility") (with such order, documentation and facility, in each case, in in form and substance acceptable to the DIP Lenders in their sole discretion), be indefeasibly paid, in full, in cash with the proceeds of such Replacement Facility.

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party without our express prior written consent. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **Debtors:** | Agilon Energy Holdings II, LLC, as Texas limited liability company ("Agilon"), Victoria Port Power LLC, a Texas limited liability company ("Victoria Port") and Victoria City Power LLC, a Texas limited liability company ("Victoria City", together with Victoria Port, the "Project Companies" and the Project Companies, each individually and collectively with Agilon, the "Borrower"), each of which is a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (collectively, the "Debtors", and each individually, a "Debtor"). The obligations of the Debtors under the Emergency DIP Facility shall be joint and several. |
| **Prepetition Notes:** | Those certain senior secured notes which were issued under and in accordance with (i) that certain Senior Secured Note Purchase Agreement, dated as of February 23, 2018, by and among Agilon, the various financial institutions from time to time party thereto, as purchasers (the "Prepetition Noteholders") and Manufacturers and |

<table>
<tr><td></td><td>Traders Trust Company, as letter of credit issuing bank (the "<u>Prepetition L/C Issuing Bank</u>") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Senior Secured NPA</u>"), (ii) that certain Guaranty Agreement, dated as of February 23, 2018, by the Project Companies in favor of the Prepetition Secured Parties (as defined below) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Secured Guaranty</u>"), (iii) that certain Collateral Agency Agreement, dated as of February 23, 2018, by and among Agilon, the Prepetition Noteholders, the Prepetition L/C Issuing Bank and Wilmington Trust, National Association ("<u>Prepetition Agent</u>", and together with the Prepetition L/C Issuing Bank and the Prepetition Noteholders, the "<u>Prepetition Secured Parties</u>") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the ("<u>Prepetition Collateral Agency Agreement</u>"), (iv) that certain Depositary and Security Agreement, dated as of February 23, 208, by and among Agilon, the Project Companies and the Prepetition Agent (the "<u>Prepetition Depositary and Security Agreement</u>") and (v) the other Financing Documents (together with the Prepetition Senior Secured NPA, the Prepetition Guaranty Agreement, the Prepetition Collateral Agency Agreement and the Prepetition Depositary and Security Agreement, collectively, as amended, restated, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Senior Secured Note Documents</u>"). Capitalized terms not otherwise defined herein shall have the meanings assigned thereto in the Prepetition Senior Secured Note Documents.</td></tr>
<tr><td>**Emergency DIP Facility:**</td><td>The Emergency DIP Facility shall consist of a new money senior secured, superpriority, priming debtor-in-possession multi-draw term loan (each, an "<u>Emergency DIP Loan</u>" and collectively, the "<u>Emergency DIP Loans</u>") in the aggregate principal amount not to exceed $1,000,000 to be funded as set forth below. Subject to the satisfaction of the conditions to the funding of the Initial Emergency DIP Loan set forth below, the initial Emergency DIP Loan shall not exceed $500,000 (the "<u>Initial Emergency DIP Loan</u>") and Borrower may, subject to the satisfaction of the conditions precedent to all Emergency DIP Loans as set forth below, request two (2) additional fundings of the Emergency DIP Loans, each not to exceed $250,000.</td></tr>
<tr><td>**DIP Lenders:**</td><td>The Prudential Insurance Company of America, Prudential Legacy Insurance Company of New Jersey, and Prudential Retirement</td></tr>
</table>

| | Insurance and Annuity Company (from and after consummation of the Emergency DIP Facility, the "<u>DIP Lenders</u>"). |
|---|---|
| **Collateral Agent:** | Wilmington Trust, National Association ("<u>DIP Agent</u>" and together with the DIP Lenders, the "<u>DIP Secured Parties</u>"). |
| **Term/Maturity:** | The Emergency DIP Facility shall mature upon the earliest of: (i) thirty (30) days after the Emergency Funding Closing Date (as defined below), (ii) the date the Interim Order (as defined below) is entered, and (iii) termination by the DIP Lenders following the occurrence of an Event of Default (the "<u>Maturity Date</u>"). |
| **Amortization:** | None. |
| **Security:** | The Emergency DIP Facility shall be secured by a Bankruptcy Court-approved superpriority, priming lien (subject to the Carve Out (as defined below)) on substantially all assets of the Debtors as set forth in the Emergency Order. |
| **Approved Budget and Use of Proceeds:** | Debtors shall deliver to the DIP Lender a budget for the three (3)-week period commencing on the Petition Date (such budget, attached to the Emergency DIP Order, the "<u>Initial Approved Budget</u>") and shall provide the DIP Lenders on Wednesday of each week with an updated three (3)-week budget. Each such three (3)-week budget shall (i) be consistent in form with the Initial Approved Budget, (ii) be subject to approval by the DIP Lenders in their sole discretion and (iii) set forth, among other things, the projected cash disbursements of the Debtors during the three (3)-week period covered thereby (each such approved budget, the "<u>Approved Budget</u>"). If the DIP Lenders do not approve any proposed three (3)-week budget, then the last budget approved by the DIP Lenders shall remain in effect as the Approved Budget. <br><br> The proceeds of the Emergency DIP Loans will be used solely in accordance with the Approved Budget for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses, and (c) costs and expenses related to the Emergency DIP Facility. |
| **Interest Rate:** | The Emergency DIP Facility shall accrue interest at a rate equal to either of the following at the election of the Borrower: (i) LIBO Rate + 8.00% per annum (with one (1)-month Interest Period and 1.00% floor), computed on the basis of the actual number of days elapsed over a year of 360 days or (ii) Prime Rate + 7.00% per annum, computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable. |

| | Interest shall be payable in cash, on the Maturity Date.  Default rate shall be an incremental 2.00% per annum. |
| --- | --- |
| | Any payment of principal or interest on the Emergency DIP Loans that is due on a date other than a Business Day shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day. |
| | Business Day means any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized to be closed. |
| **Agency Fee:** | $50,000 per annum (which shall be fully earned upon entry of the Emergency Order and payable with the proceeds of the Initial Emergency DIP Loan). |
| **Application of Payments:** | All payments will be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion): |
| | (1)      first, to pay all documented out-of-pocket expenses of the DIP Agent and the DIP Lenders (including, without limitation, fees and expenses of counsel and external advisors); |
| | (2)      second, to pay an amount equal to all accrued and unpaid interest (including, without limitation, any interest that accrued and was "paid in kind") owing to the DIP Lenders; |
| | (3)      third, to repay any principal amounts outstanding in respect of the DIP Loans; and |
| | (4)      fourth, all other amounts owing to the DIP Lenders. |
| **Definitive Documentation:** | The Debtors and the DIP Lenders shall negotiate and execute definitive financing documentation with respect to the Replacement Facility as may be customary and required by the DIP Lenders, including, without limitation, all guaranties thereof, satisfactory in form and substance to each of the DIP Agent, the DIP Lenders and Debtors, which documentation shall be executed by all parties thereto (the "<u>Definitive Documentation</u>"). |
| **Collateral Agent Agreement:** | Except as otherwise provided herein, the terms and conditions of the Prepetition Collateral Agency Agreement shall be applicable to this Term Sheet, the Emergency DIP Facility and the transactions contemplated herein, and shall be incorporated herein by reference, *mutatis mutandis*, as if fully set forth herein. |
| **Borrowing Mechanics:** | The Borrower shall give written notice via a borrowing notice in form and substance acceptable to the DIP Agent and DIP Lenders |

| | |
|---|---|
| | (the "<u>Borrowing Notice</u>") of the proposed borrowing not later than 10:00 a.m. (Houston time) one (1) Business Day's prior to the proposed date of the borrowing. The Borrowing Notice will be effective upon receipt by the DIP Agent and the DIP Lenders, will be irrevocable, and must specify the date and amount of the requested funding of the Emergency DIP Loan. On the requested borrowing date, each DIP Lender shall provide Agilon with immediately available funds, to the account at Allegiance Bank, which shall be specified in the Borrowing Notice covering that DIP Lender's pro rata share of the Emergency DIP Loan; provided that the conditions precedent set forth herein and in the DIP Order with respect to funding of the Emergency DIP Loan have been satisfied. The DIP Agent shall act solely in its capacity as collateral agent for the DIP Lenders and shall have no obligations to make any loans or advance any funds as a lender under the DIP Facility. |
| **Conditions Precedent:** | As conditions precedent to the DIP Lender's obligation to fund the Initial Emergency DIP Loan (the date of satisfaction of such conditions, the "<u>Emergency Funding Closing Date</u>"): <br><br> (i) the entry by the Bankruptcy Court of no later than twenty (20) days after the Petition Date, an order (the "<u>Emergency Order</u>"), in form and substance acceptable to the DIP Agent and DIP Lenders in their sole discretion. Such Emergency Order shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lenders (and the Debtors shall be in compliance in all respects with the Emergency Order and modifications of the Emergency Order shall require the prior written consent of the DIP Lenders); <br><br> (iii) Debtors shall have delivered to the DIP Agent and the DIP Lenders a closing certificate, in form and substance satisfactory to the DIP Agent and the DIP Lenders, duly executed by the independent manager of the Debtors, appropriately completed, in which such manager shall certify to the DIP Lenders all of the conditions precedent to the Initial Emergency DIP Loan have been satisfied; and <br><br> (iv) All of the "first day" motions, orders and related pleadings shall have been reviewed in advance by the DIP Lenders and the DIP Agent and shall be reasonably satisfactory in form and substance to the DIP Lenders; provided, however, that the motions regarding non-substantive administrative matters that were filed prior to the date of this Term Sheet shall be deemed satisfactory to the DIP Lenders. |

| | As conditions precedent to the DIP Lender's obligation to fund all Emergency DIP Loans:<br><br>(a)    Debtors shall have timely delivered to the DIP Lenders the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;<br><br>(b)    Debtors shall have delivered to the DIP Agent and the DIP Lenders a Borrowing Notice in connection with the draw request;<br><br>(c) no Event of Default shall have occurred and be continuing on the Emergency Funding Closing Date, or after giving effect to the Emergency DIP Loan;<br><br>(d)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects to the best knowledge of the independent manager, after due inquiry;<br><br>(e)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate or limited liability company power and authority to make, deliver and perform its obligations under this Term Sheet and the Emergency Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Emergency Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect; and<br><br>(f) the DIP Agent and the DIP Lenders shall have received such other information and/or deliverables as the DIP Agent and DIP Lenders may reasonably require. |
|---|---|
| **Representations and Warranties:** | The representations and warranties set forth in clauses 6.1, 6.2, 6.5, 6.8, 6.11, 6.12, 6.15, 6.18, 6.19(a), (b) and (e), 6.20 and 6.22 of the Prepetition Senior Secured NPA are incorporated herein by reference and shall be deemed made by each of the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of this Term Sheet, the Emergency DIP Facility, the DIP Collateral and Emergency DIP Obligations, *mutatis mutandis*, as if fully set forth herein.<br><br>The representations and warranties set forth in clauses 6.7, 6.9, 6.10, 6.17 and 6.19 (c) and (d) of the Prepetition Senior Secured NPA are incorporated herein by reference and shall be deemed made by each of the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of this Term Sheet, the Emergency DIP Facility, the DIP Collateral and the Emergency DIP Obligations, *mutatis mutandis*, as if fully set forth herein; provided that such representations and |

<table>
<tr><td></td><td>warranties shall be subject to the following introductory statement "Except as otherwise disclosed to the DIP Lenders prior to the Petition Date" and with respect to Section 6.7, shall include the following after such additional introductory statement "and to the best knowledge of the independent manager, after due inquiry".

The following representations shall also be made by, and be applicable to, the Debtors:

All documents, certificates or other writings delivered to the DIP Agent or the DIP Lenders by or on behalf of the Debtors in connection with the Emergency DIP Facility (in each case as modified or supplemented by other information so furnished), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made to the best knowledge of the independent manager after due inquiry. The Approved Budget (a) has been prepared with due care and in good faith on the basis of reasonable assumptions, including as to factual and legal matters material to the estimates included therein, and (b) represented at the time of delivery thereof the best information available to the Debtors.</td></tr>
<tr><td>**Covenants:**</td><td>Unless otherwise provided in the Approved Budget, no Debtor shall, without the express, prior written consent of the DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)      create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except valid, perfected and unavoidable liens existing as of the Petition Date which, other than Permitted Prior Liens, are junior to the liens securing the Emergency DIP Facility (together with the Permitted Prior Liens, the "<u>Permitted Liens</u>");

(ii)      convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired;

(iii)      incur or make any expenditure, investment or other payment, other than in accordance with the Approved Budget;

(iv)      create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date; or

(v)      engage in any activities that will result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under the Investment Company Act of 1940.</td></tr>
</table>

| | Each Debtor shall: |
|---|---|
| | (1)  comply with the Approved Budget and with provisions of this Term Sheet and the Emergency Order (as applicable); |
| | (2)  take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lenders to carry out the provisions of this Term Sheet and the Emergency Order, including entering into Definitive Documentation for the Replacement Facility; |
| | (3)  no later than July 20, 2021, obtain and maintain in full force and effect, insurance consistent with the insurance requirements set forth in the Prepetition Senior Secured NPA and as is otherwise reasonably acceptable to the DIP Lenders.  Such insurance policies shall name DIP Agent, for the benefit of the Secured Parties as additional named insurance or loss payee as applicable; |
| | (4) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than Permitted Liens; and |
| | (5) promptly provide such additional information concerning the Debtors, the Chapter 11 Cases or the DIP Collateral as the DIP Agent and the DIP Lenders may reasonably request. |
| **Use of Cash Collateral:** | The Debtors will be permitted to use Cash Collateral (as defined in and subject to the Emergency Order) in such amounts and for such purposes at such times as set forth in the Approved Budget, subject to the adequate protection provisions as described below. |
| **Priority and Liens:** | (i)  The liens securing all borrowings by the Debtors and other obligations of the Debtors under the Emergency DIP Facility and loan documentation (and all guaranties) (the "Emergency DIP Obligations") shall at all times, subject to the Carve Out: |
| | (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code and, subject to entry of the Interim Order, shall be payable from the proceeds of DIP Collateral (the "DIP Superpriority Claims"); |
| | (b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' estates in the Chapter 11 Cases that is not subject to valid, perfected and non-avoidable liens as of the commencement of the |

Chapter 11 Cases, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code;

(c) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' estates in the Chapter 11 Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (such prior liens, the "Permitted Prior Liens") or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clause (d) hereof, which liens shall be primed by the liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, as described in such clause); and

(d) pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property (such property, together with the property described in clauses (c) and (d) above, the "DIP Collateral") of the Debtors' estates in the Chapter 11 Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries) that is subject to the existing liens that secure the obligations of any other lenders under or in connection with any existing credit agreement and related documents and agreements and all of which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Agent, for the benefit of itself and the DIP Lenders, which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens (clauses (b), (c) and (d) collectively, the "DIP Liens").

(ii) The DIP Liens shall be effective and perfected as of the date the Bankruptcy Court enters an Emergency Order, as the case may be, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, in each case subject to the terms and conditions set forth in the Emergency Order, as the case may be.

(iii) The DIP Superpriority Claims and DIP Liens shall be junior in priority only to the Carve Out and any Permitted Prior Liens

| | |
|---|---|
| | As used herein, the "Carve Out" means the sum of (a) all fees required to the paid to (x) the Clerk of the Court and (y) the Office of the U.S. Trustee under section 1930(a) of title 28 of the Bankruptcy Code, plus interest at the statutory rate; (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors and any committee (the "Allowed Professional Fees"), not to exceed the lesser of (x) the actual amounts, and (y) the amounts set forth for such professionals in the Approved Budget for such period, incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code at any time before or on the first business day following the Maturity Date.  The Carve Out does not include any success fee or other fee due and payable upon consummation of a transaction. |
| **Adequate Protection:** | Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value (as defined in the Emergency Order) of such interests in the Prepetition Collateral (as defined in the Emergency Order), the Debtors shall grant to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Adequate Protection Liens") on the DIP Collateral; provided that the foregoing collateral shall not include assets or property (other than Prepetition Collateral, including Cash Collateral and the proceeds thereof) upon which, and solely to the extent that, the grant of an Adequate Protection Lien, unless otherwise expressly permitted by the terms of the applicable executory contracts and unexpired nonresidential leases, would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable nonbankruptcy law), but shall include the proceeds thereof.

The Adequate Protection Liens shall be junior only to: (i) the DIP Liens, (ii) any Permitted Prior Liens and (iii) the Carve Out. The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

As further adequate protection of the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors |

| | |
|---|---|
| | shall grant to the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Cases and any successor cases (the "<u>Adequate Protection Superpriority Claims</u>"). |
| | Except as set forth in the Emergency Order, the Adequate Protection Superpriority Claims shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims, subject to the Carve Out, against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 503(a), 503(b), 507(a) (other than 507(a)(1), 506(c) (subject to entry of the Interim Order), 507(b), 546(c), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code; provided, however, the Adequate Protection Superpriority Claims shall be junior in priority to (i) the DIP Superpriority Claims and (ii) the Carve Out. |
| **Events of Default:** | The Emergency DIP Facility shall be subject to the following events of default (each, an "<u>Event of Default</u>"): |
| | (i)   Any payment default by the Debtors under the Emergency DIP Facility. |
| | (ii) The failure of any representation or warranty to be true and correct in all material respects. |
| | (iii) Any Debtor's failure to comply with any requirement, agreements and covenants of this Term Sheet, the Approved Budget or any DIP Order. |
| | (iv) The granting, creation or approval of any lien on any of the DIP Collateral *pari passu* or senior to the DIP Liens granted to the DIP Agent. |
| | (v) Dismissal of any of the Chapter 11 Cases or any successor case with respect to any Debtor or conversion of any Debtor Chapter 11 Case to a Chapter 7 case or the sale of substantially all of the assets of any Debtor without the advance written consent of the DIP Lenders. |
| | (vi) Appointment of a chapter 11 trustee or examiner with expanded powers or other person with expanded powers in any of the Chapter 11 Cases. |
| | (vii) Granting of relief from the automatic stay to permit foreclosure on any assets of any Debtor. |
| | (viii)   Any request or application is made to the Bankruptcy Court for the reversal, vacation or stay of the effectiveness of any DIP |

<table>
<tr>
<td></td>
<td>

Order or, without the DIP Agent and each DIP Lender's prior written consent, any modification of the DIP Agent's or any DIP Lender's rights under the DIP Documents or DIP Order.

(ix) Failure of any of the DIP Liens or DIP Superpriority Claims to be valid, perfected and enforceable in all respects or any claim to be senior thereto other than the Carve Out.

(x) The use of Cash Collateral for any purpose other than as permitted by this Term Sheet, any DIP Order or the Approved Budget.

(xi) The commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Order) against any of the DIP Agent, any DIP Lender or their agents and employees, to subordinate or avoid any liens made in connection with the DIP Order.

(xii)(a) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Order or Term Sheet is not valid and binding for any reason, or (b) any material provision of the DIP Order or Term Sheet shall for any reason, or any other order of Bankruptcy Court approving the Debtors' use of Cash Collateral, cease to be valid and binding (without the prior written consent of the DIP Lenders).

(xiii) The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any DIP Collateral.

</td>
</tr>
<tr>
<td>

**Remedies upon an Event of Default:**

</td>
<td>

Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lenders may declare (a) all Emergency DIP Obligations to be immediately due and payable, (b) the termination of the Emergency DIP Facility as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the Emergency DIP Obligations, and (c) a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, subject to further order of the Bankruptcy Court and (ii) the Approved Budget shall automatically be deemed not to provide for any payment other than (a) the Carve Out, (b) fees and expenses of the DIP Agent and the DIP Lenders (including attorneys' fees) and (c) such other expenses, if any, as may be expressly approved in writing by the DIP Lenders in their sole discretion. If the DIP Lenders elect to take any of the actions set forth in the foregoing clause (i) of this provision, the DIP Lenders shall provide three (3) days written notice to the Debtors and other required notice parties and shall promptly file such notice with the Bankruptcy Court.

</td>
</tr>
</table>

| Expenses and Indemnification: | (i)    The Debtors shall pay (a) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsels and financial advisors), (b) all out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of this Term Sheet, any DIP Order and the DIP Facility, and (c) all other out-of-pocket costs and expenses of the Prepetition Secured Parties (including, without limitation, the ongoing monitoring of the Chapter 11 Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court and the preparation of any and all pleadings).  The reimbursement of such costs and expenses shall be earned, due and owing by the Debtors upon the Emergency Funding Closing Date, but shall be payable, in full, in cash, on the Maturity Date.<br><br>(ii)  The DIP Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, partners, members, counsel, professionals, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the indemnified party. |
| **Counsel to the DIP Lenders:** | Morgan, Lewis & Bockius LLP and Gray Reed & McGraw LLP. |
| **Counsel to the DIP Agent:** | Ballard Spahr LLP |
| **Governing Law and Forum:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet, except with respect to conflicts of laws.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **DIP Order Governs** | To the extent of any inconsistency between this Term Sheet and the DIP Orders, the terms of the DIP Orders shall govern. |

**Exhibit 2**

**INITIAL APPROVED BUDGET**

**Agilon Energy Holdings II LLC**
**Weekly Cash Flow Forecast**
**Forecast Start Date:  6/27/2021 (Petition Date)**

| Week ending Sunday | Reference | Estimate 7/4/2021 Week 0 | Estimate 7/11/2021 Week 1 | Forecast 7/18/2021 Week 2 | Forecast 7/25/2021 Week 3 | Forecast 8/1/2021 Week 4 |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| HRCO Energy Revenue | | $        - | $        - | $        - | $        - | $        - |
| HRCO Capacity Revenue | | - | - | - | - | - |
| Net ERCOT Sale (Purchase) | | - | - | - | - | - |
| **Total NET  Receipts** | | $        - | $        - | $        - | $        - | $        - |
| | | | | | | |
| **Disbursements** | | | | | | |
| Fuel Supply | | - | - | - | - | - |
| Gas Transport (Kinder for VC) | | - | - | - | - | - |
| Gas Transport (Tennesse for VP) | | - | - | (13,000) | - | - |
| Gas Transport (Victoria Midstream) | | - | - | (37,716) | - | - |
| Water | | - | - | (11,000) | - | - |
| IntelliTrace Communications | | - | - | (9,500) | - | - |
| Other Variable Costs | | - | - | (20,000) | (10,000) | (20,000) |
| **Total Variable O&M Disbursements** | A | - | - | (91,216) | (10,000) | (20,000) |
| | | | | | | |
| Consultants | | - | - | - | - | - |
| Information Technology (IT) | | - | - | (600) | - | - |
| Insurance | | - | - | (85,000) | - | - |
| Plant Management | B | - | - | - | - | (100,000) |
| Asset Management | C | - | - | - | (60,000) | - |
| Rent or Lease | | - | - | (23,617) | - | - |
| Utility Electricity | | - | - | (8,808) | - | - |
| Waste/Trash | | - | - | (550) | - | - |
| Other Expenses | | - | - | (15,000) | (15,000) | (15,000) |
| **Total Other Disbursements** | | - | - | (133,575) | (75,000) | (115,000) |
| | | | | | | |
| **Total Operating Disbursements** | | - | - | (224,791) | (85,000) | (135,000) |
| | | | | | | |
| **Operating Cash Flow** | | - | - | (224,791) | (85,000) | (135,000) |
| | | | | | | |
| **Major Project Outlays** | | | | | | |
| GE Turbine Repair | | - | - | - | - | - |
| Alliance - RATA Testing | | - | - | - | (44,500) | - |
| Major Maintenance | | - | - | - | - | - |
| **Major Project Outlays** | | - | - | - | (44,500) | - |
| | | | | | | |
| **Net Operating Cash Flow** | | - | - | (224,791) | (129,500) | (135,000) |
| | | | | | | |
| **Non-Recurring Expense** | | | | | | |
| Collateral - Gas | | - | - | - | - | - |
| Collateral - QSE | | - | - | - | - | - |
| Adequate Assurances Payment - Utility | D | - | - | (15,000) | - | - |
| Other Non-recurring expense | | - | - | - | - | - |
| **Non-Recurring Expense** | | - | - | (15,000) | - | - |

**Agilon Energy Holdings II LLC**
**Weekly Cash Flow Forecast**
**Forecast Start Date: 6/27/2021 (Petition Date)**

| *Week ending Sunday* | Reference | Estimate 7/4/2021 Week 0 | Estimate 7/11/2021 Week 1 | Forecast 7/18/2021 Week 2 | Forecast 7/25/2021 Week 3 | Forecast 8/1/2021 Week 4 |
|---|---|---|---|---|---|---|
| **Restructuring Costs** | | | | | | |
| Grant Thornton (FA) | | (24,119) | (34,000) | (17,000) | (13,600) | (13,600) |
| Locke Lord (Legal) | | (52,000) | (91,200) | (45,600) | (45,600) | (45,600) |
| Hugh Smith Associates (CRO) | | - | - | (4,667) | - | - |
| ERM Capital (Ibanker) | | - | - | - | - | (30,000) |
| UCC Advisors | | - | - | - | - | - |
| US Trustee | | - | - | - | - | - |
| Claims Agent | | - | (3,000) | (6,000) | (6,000) | (10,000) |
| Other | | - | - | - | - | - |
| Restructuring Costs | | (76,119) | (128,200) | (73,267) | (65,200) | (99,200) |
| **Net Cash Flow before DIP Financing** | | **(76,119)** | **(128,200)** | **(313,058)** | **(194,700)** | **(234,200)** |
| **Beginning Cash** | E | **2,806** | **2,806** | **2,806** | **258,348** | **128,848** |
| Net Change in Cash | | (76,119) | (128,200) | (313,058) | (194,700) | (234,200) |
| DIP Draw (Repayment) | | - | - | 500,000 | - | 250,000 |
| Costs incurred but not yet paid | F | 76,119 | 128,200 | 68,600 | 65,200 | 69,200 |
| **Ending Cash Balance** | | **2,806** | **2,806** | **258,348** | **128,848** | **213,848** |
| **Beginning DIP Balance** | | - | - | - | 500,000 | 500,000 |
| DIP Draw/(Paydown) | | - | - | 500,000 | - | 250,000 |
| **Ending DIP Balance** | | - | - | 500,000 | 500,000 | 750,000 |
| **DIP Commitment/ Availablity** | | 1,000,000 | 1,000,000 | 1,000,000 | 500,000 | 500,000 | 250,000 |

**Notes:**

**[A]** While the facilities are not operating and do not incur any variable fuel costs, there are fixed fuel transportations and communication costs to keep the facilities on standby

**[B]** Third-party plant operator to continue to provide site security, routine maintenance safety and operational checks while the facilities are on standby

**[C]** Third-party asset manager to provide all back office and operational support functions

**[D]** Adequate Assurances dollars for electric, water and communications services

**[E]** Bank balance as of May 31, 2021.

**[F]** Includes Debtor advisors and claims agent for fee incurred (less 20% holdbacks) to be paid upon court approval.