## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| AGILON ENERGY HOLDINGS II LLC, *et al.* | § | Case No. 21-32156 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

### DEBTORS' *EMERGENCY* MOTION FOR ENTRY OF AN ORDER
### (I) APPROVING BIDDING PROCEDURES; STALKING HORSE BID PROTECTIONS;
### ASSUMPTION AND ASSIGNMENT PROCEDURES;
### PURCHASE AND SALE AGREEMENT; AND SALE OF CERTAIN OF THE
### DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
### ENCUMBRANCES; AND (II) GRANTING RELATED RELIEF

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power  LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 480 Wildwood Forest Drive, Suite 475, Spring, Texas 77380.

101047864v.3

Emergency relief has been requested. Relief is requested not later than 8:30 a.m. on December 17, 2021.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on December 17, 2021 at 8:30 a.m. in Courtroom 404, 4th floor, 515 Rusk, Houston, TX 77002 .

You may participate in the hearing either in person or by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.

To the Honorable Marvin Isgur,
United States Bankruptcy Judge:

Agilon Energy Holdings II LLC, Victoria Port Power LLC, and Victoria City Power LLC (collectively, the "***Debtors***") file this motion (the "***Motion***") for entry of an order (I) approving bidding procedures; stalking horse protections; assumption and assignment procedures; the purchase and sale agreement; and the sale of certain of the Debtors' assets free and clear of all liens, claims, interests and encumbrances; and (II) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      The cornerstone of these chapter 11 cases has always been achieving a sale of the Debtors' assets for the highest price.  As part of their efforts to maximize the potential, the Debtors

2

have secured a stalking horse agreement (the "***Stalking Horse Bid***") for the sale of (i) substantially all of the Debtors' businesses, assets and equipment related to the Debtors' Facilities, and (ii) certain of the Debtors' accounts receivable (the "***Acquired Assets***").  The aggregate purchase price for the Stalking Horse Bid is $64,100,000.00, plus the assumption of a significant amount in liabilities.  The Stalking Horse Bid is subject to higher or better offers to be solicited in accordance with the proposed Bidding Procedures.

2.      The Stalking Horse Bid is submitted by: Texas Peaker Power II, LLC (the "***Stalking Horse Bidder***").  The Stalking Horse Bidder has executed an asset purchase agreement a copy which is attached hereto as **Exhibit B** (the "***Stalking Horse Agreement***").  The Stalking Horse Bid and the Stalking Horse Agreement are the result of extensive post-petition marketing efforts and analysis by the Debtors and their advisors.  The Debtors have left no stone unturned in advance of filing and believe that any party that may want to put in a bid is either well aware of or has been participating in the Debtors' marketing process that has been ongoing since September 2021. Given the extensive marketing efforts, the Debtors' financial condition, the restrictions in the Debtors' postpetition financing and use of cash collateral, and the Stalking Horse Bid itself, an expeditious sale of such businesses and assets is critical.

3.      In support of the Debtors' marketing and sale process (the "***Marketing Process***"), the Debtors and their advisors have developed bidding and auction procedures for the orderly and value-maximizing marketing and sale of the Debtors' business (the "***Bidding Procedures***"). Parties may submit bids for the purchase and sale of the Acquired Assets in accordance with the Bidding Procedures. The Bidding Procedures are designed to continue to promote a competitive

101047864v.3

and robust bidding process, and to generate the highest or otherwise best value for the Debtors'
estates, while allowing the Debtors to implement a sale transaction on an expedited basis.

4.       The Bidding Procedures are also intended to provide the Debtors with flexibility to
solicit proposals, negotiate transactions, hold an auction, and proceed to consummate the proposed
Sale Transaction, all while protecting the due process rights of all interested parties with standing
and ensuring that there is a full and fair opportunity to review and consider proposed transactions.
The Debtors propose to establish the following key dates and deadlines for the sale process (subject
to court approval and availability):

| Key Event | Deadline |
|---|---|
| Bidding Procedures Hearing | December 17, 2021 |
| Deadline to file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties | December 20, 2021 |
| Deadline to file the Sale Notice with the Court and serve the Sale Notice | December 20, 2021 |
| Deadline to Object to (a) Stalking Horse Sale Transaction, (b) Cure Costs, and (c) Adequate Assurance of Future Performance (as to the Stalking Horse Bidder) | January 10, 2022 |
| Deadline to Submit Bids | January 26, 2022 at 5:00 p.m. (prevailing Central Time) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | January 28, 2022 |
| Auction, if necessary, to be conducted at (i) the offices of Locke Lord LLP, 600 Travis Street, Suite 2800 Houston, TX 77002, or (ii) virtually, pursuant to procedures to be announced to bidders (if other Qualified Bids received for the Acquired Assets) | February 2, 2022 at 10:00 a.m. (prevailing Central Time) |

101047864v.3

| | |
|---|---|
| Deadline to File Notice of (a) Successful Bid(s) and Back-Up Bid(s) and (b) Identity of Successful Bidder(s) and Back-Up Bidder(s)[2] | February 3, 2022 |
| Sale Hearing on Stalking Horse Agreement (if no other Qualified Bids received) | February 4, 2022 |
| Deadline to File Objections to (a) Sale Transaction (other than the Stalking Horse Sale Transaction) and (b) Adequate Assurance of Future Performance (as to Successful Bidder(s) other than Stalking Horse Bidder) | February 7, 2022 |
| Deadline to File Replies to any Objection | February 8, 2022 |
| Sale Hearing (if Auction held) | February 9, 2022 |

5.      Given the Debtors' financial condition and certain deadlines set forth in the DIP Order (defined below), it is vital that the Debtors consummate the Sale Transaction (as defined below) in a timely manner. Accordingly, the Debtors request approval of a comprehensive set of procedures that will facilitate the Sale Transaction in a timely and efficient manner.

6.      ***The DIP Administrative Agent (as defined in the Final DIP Order) and the Committee support the relief requested in this Motion.***

## **Relief Requested**

7.      By the Motion, pursuant to sections 105(a), 363, 365, and 503 of chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "***Local Rules***"), the Debtors request entry of:

   a.   the "***Bidding Procedures Order***" substantially in the form attached hereto as **Exhibit A**:

---

[2]  As such terms are defined in the Bidding Procedures.

5

   i. authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;

   ii. approving the Stalking Horse Bid as the stalking horse bid for the Acquired Assets in accordance with the Stalking Horse Agreement;

   iii. approving the Stalking Horse Bid Protections (as defined below) for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures;

   iv. setting the deadline for potential bidders to submit a Qualified Bid (as defined below) (the "***Bid Deadline***"), authorizing and scheduling an auction (the "***Auction***"), and scheduling a hearing with respect to the approval of the Sale Transaction (the "***Sale Hearing***");

   v. authorizing and approving the form and manner of notice of the sale of the Acquired Assets, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "***Sale Notice***");

   vi. approving the procedures set forth in the Bidding Procedures Order (the "***Assumption and Assignment Procedures***") for the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "***Assigned Contracts***") and the determination of the amount necessary to cure any monetary defaults under the Assigned Contracts (the "***Cure Costs***"); and

   vii. authorizing and approving the form and manner of notice to each relevant non-Debtor counterparty to an executory contract or unexpired lease (each, a "***Contract Counterparty***", and collectively, the "***Contract Counterparties***") regarding the Debtors' potential assumption and assignment of certain executory contracts and unexpired leases of the Debtors and of the Debtors' calculation of the Cure Costs, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "***Cure Notice***");

b. an order (the "***Sale Order***") approving the sale of the Acquired Assets to the Stalking Horse Bidder or the bidder who submits the highest or otherwise best offer (the "***Sale Transaction***" and the sale to the Stalking Horse Bidder, if applicable, the "***Stalking Horse Sale Transaction***"), attached to the Stalking Horse Agreement, authorizing and approving:

   i. the sale of the Acquired Assets free and clear of liens, claims, interests, and other encumbrances; and

      ii.   the assumption and assignment of the Assigned Contracts as part of the Sale Transaction; and

   c.   granting related relief.

### Jurisdiction and Venue

8.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and General Order *2012-6, Order of Reference* from the United States District Court for the Southern District of Texas, dated May 24, 2012. The Debtors confirm their consent to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

10.     On June 27, 2021 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the chapter 11 cases (the "**Cases**").

11.     The Debtors continue in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On June 28, 2021, the Court entered an order [Docket No. 9] authorizing the joint administration and procedural consolidation of these Cases pursuant to Bankruptcy Rule 1015(b).

12.     On August 2, 2021, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (and as may be reconstituted from time to

101047864v.3

time, the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Cases.

13.     The Debtors are in the business of providing gas-fired peaking electric energy to the ERCOT market.  The Debtors own and operate two (2) facilities located near Victoria, Texas: Victoria Port Generation Station (the "*Victoria Port Facility*") and Victoria City Generation Station (the "*Victoria City Facility*" and together with the Victoria Port Facility, the "*Facilities*").

## Marketing Process

14.     The Debtors determined it was in their best interest to explore a sale and marketing process to maximize the value of the Debtors' estates.  To implement this strategy, the Debtors and Energy Resource Management LLC dba ERM Capital ("*ERM Capital*") designed a process to solicit bids for the Debtors' businesses and assets, including for all or part of the Debtors' businesses and assets.  Beginning in September 2021, ERM Capital began marketing substantially all of the Debtors' businesses and assets (the "*Marketing Process*").  As described in the *Declaration of Craig Orchant in Support of Motion for Entry of Order Approving Bid Procedures*, filed in support of the Motion (the "*Orchant Declaration*"), ERM Capital, on behalf of the Debtors, contacted over one-hundred seventy (170) potential investors, including both strategic and financial investors, with the aim of attracting multiple proposals to acquire the Debtors' businesses and assets on a cash-free, debt-free basis.

15.     In connection with this solicitation, the Debtors and their advisors prepared, among other things, comprehensive marketing materials and an electronic data room to provide potential investors and bidders with adequate information upon which to make a proposal. During this process, thirty-three (33) interested parties executed confidentiality agreements and were granted access to the electronic data room, which contains significant diligence and other confidential

8

information about the Debtors' businesses and assets.  The parties were invited to submit stalking horse bids for the sale of the Debtors' businesses and assets.

16.    The Debtors received five stalking horse bids for the Debtors' Facilities.  In evaluating the stalking horse bids, the Debtors analyzed, among other considerations: (i) the form and amount of consideration offered; (ii) the structure of the proposed transaction; (iii) the proposed timeline; and (iv) any execution or other risks. The Debtors met regularly with their advisors and consulted with their key stakeholders before and after stalking horse bids were submitted.  ERM Capital continued to work with all interested parties to maintain competitive tension and interest.

17.    The Debtors engaged in extensive negotiations with the potential stalking horse bidders over the terms of potential agreements to purchase the Facilities.  Ultimately the Debtors executed the Stalking Horse Agreement with the Stalking Horse Bidder.

18.    Prospective bidders have continued to express interest and stay engaged. Accordingly, the Debtors believe that the targeted Marketing Process will allow them to maximize value for their estates for the benefit of their stakeholders.  Throughout the Marketing Process, the Debtors coordinated with all of their major stakeholders, allowing such stakeholders to provide input prior to execution of the Stalking Horse Agreement.  Additionally, the Marketing Process for the Debtors' businesses and assets has been, and is expected to remain, comprehensive and vigorous. While the Debtors believe they have conducted a comprehensive outreach in the market to prospective bidders, the Debtors would like to continue to use the Marketing Process to allow additional or existing interested bidders to offer higher or better terms.  The Debtors intend to continue their discussions with bidders who expressed interest in the Debtors' businesses or assets. At the same time, the Debtors and their creditors have the benefit of the Stalking Horse Bid, which

will set a floor price for the Debtors' businesses and assets.  As such, the Debtors have determined that it is in their best interest to (i) continue marketing the Debtors' businesses and assets, (ii) continue the ongoing diligence with all interested parties, and (iii) continue/complete the Marketing Process in these chapter 11 cases, to maximize value of the Debtors' estates.

### Need for a Timely Sale Process

19.     The Debtors believe that the deadlines in the Bidding Procedures are reasonable and will provide Potential Bidders (as defined in the Bidding Procedures) with sufficient time and information to submit a bid for the Acquired Assets and do not prejudice parties in interest.  In formulating the procedures and deadlines set forth therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to run a timely and efficient sale process. The Bidding Procedures are designed to encourage prospective bidders to submit bids to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

20.     The Debtors' formulation of the Bidding Procedures was also informed by the Marketing Process. Potential bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors that is compiled in an electronic data room.  The Debtors and their advisors will continue soliciting competing offers for the Debtors' businesses while a hearing to approve the Bidding Procedures is pending, to quickly and efficiently run a sale process.  In light of the foregoing, the Debtors have determined that pursuing the Bidding Procedures is in the best

101047864v.3

interests of the Debtors' estates, will establish whether and to what extent a market exists for the Debtors' business, and provides interested parties with sufficient opportunity to participate.

**Proposed Sale Transaction**

A.      **Stalking Horse Agreement**[3]

21.      The Stalking Horse Agreement provides the terms for the purchase and sale of the Acquired Assets for the total consideration of $64,100,000.00, subject to certain adjustments.  The Bidding Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments.  The Stalking Horse Agreement includes provisions for the payment of a break-up fee of 4% of the purchase price (the "***Break-Up Fee***") upon the occurrence of certain events, including, but not limited to the Debtors' consummation of an alternative transaction.

22.      The Stalking Horse Bidder has agreed that, if selected as the "Back-Up Bidder," it will hold open its Back-Up Bid (as defined in the Bidding Procedures) for a period of time after the Auction in case the Successful Bid is not consummated.

23.      The Stalking Horse Agreement includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Bidder (the "***Parties***"), as well as certain conditions to closing and rights of termination.

24.      The Stalking Horse Agreement and the Stalking Horse Sale Transaction are subject to approval by the Bankruptcy Court and entry of the Bidding Procedures Order and the Sale Order.

B.      **Terms of Stalking Horse Bid**

25.      Certain material terms of the Stalking Horse Agreement are described below:

---

[3]  In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the general description of such agreements in the Motion, the Stalking Horse Agreement shall control.  The term "Sellers" (as such term is defined in the Stalking Horse Agreement) refers to the Debtors.

| | |
|---|---|
| **Structure** | Assets to be acquired on an "as is, where is" basis.<br><br>Sellers making customary representations and warranties, but such representations terminate at closing and are not subject to post-closing indemnification.<br><br>Texas Peaker Power II, LLC to be designated as stalking horse bidder for the Acquired Assets, and transaction to be implemented pursuant to section 363 of the Bankruptcy Code. |
| **Assets to be Sold** | The assets to be acquired will include the following assets associated with the Debtors (subject to the terms and limitations in the Stalking Horse Agreement: (i) leases, licenses and subleases; (ii) all equipment, machinery, fixtures, furniture, buildings, structures, improvements and other real, personal and mixed property, operational and nonoperational, located on the acquired properties; (iii) certain of the Debtors' permits; (iv) certain contracts; (v) all books, records, files, reports, and accounting records and copies of tax records relating to the Acquired Assets; (vi) certain of the Debtors' accounts receivable; (vii) certain rights, claims, causes, causes of action, remedies, warranties, indemnities, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits; (viii) all inventory wherever located, whether held at any location or facility of any seller or in transit related to the Acquired Assets; (ix) certain business intellectual property rights; (x) all prepaid expenses, creditors, and advance payments related to the Acquired Assets; (xi) all insurance benefits; and (xii) all intangible rights, inchoate rights, transferable rights. |
| **Purchase Price** | $64,100,000.00, subject to potential adjustments, and assumption of certain liabilities in accordance with the Stalking Horse Agreement. |
| **Deposit** | $6,410,000.00 (10% of purchase price), to be funded not less than 5 business days after the entry of the Bid Procedures Order. |
| **Assume Liabilities** | The Stalking Horse Bidder will assume the following specified liabilities: (i) all liabilities under or associated with or appurtenant to the Assets to the extent related to periods from and after the closing date, including without limitation all such liabilities arising out of the operation and/or ownership of the assets from and after the closing Date; (ii) all assumed prepetition accounts payable; (iii) all liabilities associated with the Assets arising under |

101047864v.3

| | |
|---|---|
| | Environmental Law on or after the closing date, including with respect to Environmental Claims related to periods from and after the closing date; (iv) Certain taxes; and (v) all liabilities associated with the Assets arising under Environmental Law on or after the closing date, including with respect to Environmental Claims related to periods from and after the Closing Date, including those related to the control, storage, handling, transporting and disposing of or discharge of all Hazardous Substances from the Assets as set forth in the Stalking Horse Agreement. |
| **Stalking Horse Bid Protections** | **Break-Up Fee:** $2,546,000 (4% of the purchase price) to be treated as a super priority claim in the bankruptcy case, subject to the Carve-Out in the Final DIP Order. |
| **Closing Conditions** | Execution and delivery of the closing deliverables required pursuant to the Stalking Horse Agreement. Entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order. Each party performing all covenants. No Seller material adverse effect has occurred between the execution date and closing date. |
| **Termination Rights/Remedies** | Each party has customary termination rights for breaches by the other party, failure of the other party to satisfy closing conditions, and failure of the other party to close by a specified outside date. If the Sellers consummate an alternative transaction with a party other than the Stalking Horse Bidder, then either party may terminate the Stalking Horse Agreement and the Stalking Horse Bidder to receive the Stalking Horse Bid Protections. The Sellers to receive the deposit if the Sellers terminate due to (i) the Stalking Horse Bidder's breach of its representations, warranties, covenants, or other obligations or (ii) the outside date occurs and Stalking Horse Bidder is in willful breach or Stalking Horse Bidder fails to close when the closing conditions are met and Sellers are ready, willing, and able to close. Stalking Horse Bidder to receive the deposit upon any other termination. |

| | Sellers have right to seek specific performance for breaches or threatened breaches and to enforce the terms and provisions of the Stalking Horse Agreement. |
|---|---|

## Bidding Procedures

### A.     Overview

26.     The Bidding Procedures are designed to promote a competitive and robust sale process for the Debtors' businesses and assets.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential bidders that constitute the highest or otherwise best offers for the Acquired Assets consistent with the Debtors' solicitation timeline.  The Debtors believe that the deadlines set forth in the Bidding Procedures are reasonable and appropriate under the circumstances.

27.     The Bidding Procedures are attached to the Bidding Procedures Order and therefore are not restated herein in their entirety. Certain of the key terms of the Bidding Procedures are highlighted below.  The Debtors will have the ability to alter the Bidding Procedures based upon the exigencies of a given situation if the Debtors determine, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties and subject to the Stalking Horse Agreement, that it is reasonable to do so (except that the Debtors may not unilaterally modify any consultation or consent rights).

a.  **Bid Deadline.** A Potential Bidder that desires to make a bid shall deliver electronic copies of its Qualified Bid so as to be received no later than **January 26, 2022 at 5:00 p.m. (prevailing Central Time)** (the "*Bid Deadline*"); *provided, that,* the Debtors may, in consultation with the Consultation Parties and subject to the Stalking Horse Agreement, extend the Bid Deadline without further order of the Court subject to providing notice to all Potential Bidders and the Stalking Horse Bidder and filing a notice of extension of the Bid Deadline with the Bankruptcy Court.

b.  **Proposed Agreement.** Each Bid must include an executed agreement (the "*Proposed Agreement*") for the acquisition of the Acquired Assets, marked

14

with a redline to show the specific changes to the Proposed Agreement from the Stalking Horse Agreement distributed by the Debtors to Potential Bidders.

c. **Form of Consideration**

1. <u>Purchase Price</u>. Each Bid must clearly identify the purchase price to be paid (the "***Purchase Price***") and specify the aggregate amount of cash and other consideration being offered.

2. <u>Cash Requirements</u>. Each Bid, including any Credit Bid must provide cash consideration sufficient to satisfy the payment of the Break-Up Fee in cash in full (the "***Cash Consideration Amount***") and, with respect to any Credit Bid, must also pay all obligations secured by liens senior to the liens of the party submitting such Bids on any Acquired Assets.

3. <u>Acquired Assets</u>. Each Bid must, in the Proposed Agreement, clearly identify the particular assets the Potential Bidder seeks to acquire from the Debtors if such Acquired Assets differ from those to be acquired pursuant to the Stalking Horse Bid.

4. <u>Assumed Liabilities</u>. Each Bid must clearly identify, in writing and as applicable, the particular liabilities, if any, the Bidder seeks to assume.  For the avoidance of doubt, a Qualified Bid may include a bid for less than all or substantially all of the Debtors' liabilities.

5. <u>Credit Bid</u>. Persons or entities holding a valid and perfected security interest in the Acquired Assets may submit a credit bid (a "***Credit Bid***") on such Acquired Assets, to the extent permitted by applicable law or any Bankruptcy Court orders.

d. **Good Faith Deposit.** A Good Faith Deposit must be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "***Escrow Agent***") pursuant to a customary and reasonable escrow agreement to be provided by the Debtors.  To the extent a Qualified Bid is modified before, during, or after the Auction, the Debtors reserve the right, in consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the Purchase Price.   If a Qualified Bidder is required to increase its Good Faith Deposit, its status as a Qualified Bidder shall be suspended pending satisfaction of such adjustment.

e. **Proof of Financial Ability to Perform.** Each Qualified Bid must include such financial and other information that allows the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale Transaction, and such financial and other information setting forth adequate assurance of

future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments if needed to consummate the transaction (not subject to, in the Debtors' reasonable business judgment in consultation with the Consultation Parties, any unreasonable conditions), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors or the Consultation Parties necessary to demonstrate adequate assurance of future performance and to demonstrate that such Potential Bidder has the ability to consummate the Sale Transaction in a timely manner.

f.   **Selection of Qualified Bids.** By no later than January 28, 2022, unless the auction date is extended, in which case, one day before the proposed auction deadline (the "***Qualified Bid Deadline***"), the Debtors shall determine, in their reasonable business judgment, and in consultation with the Consultation Parties, which of the Bids received by the Bid Deadline qualify as Qualified Bids. The Debtors shall notify each Bidder who submits a Qualified Bid of its status as a Qualified Bidder by the Qualified Bid Deadline. The Debtors shall inform counsel to the Stalking Horse Bidder whether the Debtors will consider any other Bid to be a Qualified Bid no later than the Qualified Bid Deadline.

g.   **Auction.** If the Debtors receive two or more Qualified Bids with respect to the Acquired Assets, the Debtors shall conduct the Auction on February 2, 2022, beginning at 10:00 a.m. (prevailing Central Time) at (i) the offices of Locke Lord, LLP, 600 Travis Street, Suite 2800 Houston, TX 77002, or (ii) virtually, pursuant to procedures to be announced to bidders, or such other later date as may be determined by the Debtors in consultation with the Consultation Parties and upon notice to all parties in interest. Only Qualified Bidders will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith and in consultation with the Consultation Parties. In addition, only the professionals and/or other representatives of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, and the Consultation Parties shall be permitted to attend and observe the Auction.

h.   **No Collusion.** Each Bid (as defined in the Bidding Procedures) must include a statement that the Potential Bidder has not (i) engaged in any collusion with respect to the submission of any bid or the Auction, (ii) coordinated or joined with any other party on a bid or bids except as expressly disclosed in the Bid, or (iii) taken any other action to prevent a transparent and competitive auction process; provided, that, certain joint bids may be permitted in accordance with the Bidding Procedures.

i.   **Auction Not Necessary.** If no Qualified Bid (other than the Stalking Horse Bid, which, for the avoidance of doubt, has been designated as a Qualified Bid by the Debtors, in consultation with the Consultation Parties) is received by the Qualified Bid Deadline, the Debtors will not conduct the Auction with respect to the Acquired Assets, and shall file a notice with the Bankruptcy Court indicating that no Auction will be held with respect to the Acquired Assets and the Stalking Horse Bidder will be named the Successful Bidder for the Acquired Assets.  The Debtors shall also publish such notice on the website of their proposed claims and noticing agent, Bankruptcy Management Solutions, Inc. d/b/a Stretto https://cases.stretto.com/agilonenergy) ("*Case Website*").

j.   **Reservation of Rights.** Except as otherwise set forth herein, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, to modify the Bidding Procedures, waive terms and conditions set forth therein with respect to all Potential Bidders, extend the deadlines set forth therein, announce at the Auction modified or additional procedures for conducting the Auction, and alter the assumptions set forth therein; provided, that, any modifications shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other order of the Bankruptcy Court and shall not modify the consent or consultation rights of any party. Subject to the foregoing, the Debtors may, in consultation with the Consultation Parties, provide reasonable accommodations to any Potential Bidder(s) with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids for the Acquired Assets, in each case, to the extent not materially inconsistent with the Bidding Procedures and the Bidding Procedures Order.   All parties reserve their rights to seek Bankruptcy Court relief, including on an expedited basis, with regard to the Auction, the Bidding Procedures, and any related items (including, if necessary, to seek an extension of the Bid Deadline).  The rights of all Consultation Parties with respect to the outcome of the Auction are reserved.  Nothing in the Bidding Procedures or the Bidding Procedures Order shall amend, modify, waive, or impair, or be deemed to amend, modify, waive, or impair, any provision of the Stalking Horse Agreement or any rights or remedies of the Stalking Horse Bidder, all of which are hereby preserved.  For the avoidance of doubt, the Consultation Parties shall be deemed to consent to the Sale Transaction, as applicable, if (i) the Debtors and any Successful Bidder and any Back-Up Bidder adhere to the Bidding Procedures and (ii) liens attach to the proceeds of the Sale Transaction with the same validity and priority as existed on the Acquired Assets prior to the Sale Transaction.

### Assumption and Assignment Procedures

28.   The Assumption and Assignment Procedures set forth in the Bidding Procedures Order will, among other things, govern the Debtors' provision of notice to all Contract

101047864v.3

Counterparties of Cure Costs in the event the Debtors decide to transfer the Assigned Contracts in connection with the Sale Transaction.  On or before December 14, 2021, the Debtors will file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties, which will be specified in the Cure Notice.

29.     Objections, if any, to any proposed Cure Costs set forth on the Cure Notice (each, a "***Cure Objection***") and to the provision of adequate assurance of future performance (each, an "***Adequate Assurance Objection***") must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court.

30.     If (a) the Debtors identify (i) additional contracts or leases to be assumed and assigned to a Successful Bidder or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, or (b) a Successful Bidder designates any additional contracts or leases not previously included on the Cure Notice for assumption and assignment, the Debtors will promptly file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Cure Notice (each, a "***Supplemental Cure Notice***").  The Debtors shall assume and assign contracts and leases to the Successful Bidder in accordance with the deadline provided in the Stalking Horse Agreement. As soon as reasonably practicable after filing a Supplemental Cure Notice, the Debtors will post a copy of the Supplemental Cure Notice on the Case Website.  Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice or any Adequate Assurance Objection with respect to the provision of adequate assurance

18

of future performance must be filed within seven (7) days of filing of that Supplemental Cure Notice.

31.     The Debtors request that any party failing to file a timely Cure Objection or an Adequate Assurance Objection be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code and be forever barred from asserting any objection with respect to the treatment of such executory contract and/or unexpired lease.

**Procedures for Holders of
Consent Right and Similar Rights**

32.     The Consent Procedures set forth in the Bidding Procedures Order will, among other things, govern the Debtors' provision of notice to all Contract Counterparties who may assert Consent Rights (defined below).

33.     As part of the Sale Transaction, the Debtors will assign to the Successful Bidder, pursuant to an asset purchase agreement, certain contracts, agreements, leases and other assets, including assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), free and clear of all liens, claims, interests, and encumbrances (other than certain permitted post-closing liabilities, liens, or as otherwise provided in the purchase agreement). A party that objects to such assignment, including any objection based on any alleged approval or consent right or anti-assignment provision contained in or applicable to any contract, lease, or other agreement (a "**_Consent Right_**") must file with the Bankruptcy Court, via ECF, an objection identifying (i) the contract(s), lease(s), or other agreement(s), (ii) the basis for objecting to the assignment of such contract(s), lease(s), or other agreement(s), and (iii) all supporting documentation (each, an "**_Assignment Objection_**"), no later than the Sale Objection Deadline.

19

34.     The Debtors request that any party failing to file a timely Assignment Objection be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the assets to be sold, assumed, and/or assigned in connection with the Sale Transaction, free and clear of all liens, claims, interests, and encumbrances, including Consent Rights (other than certain permitted liens), and (ii) deemed to consent to and approve the transfer, sale, and assumption and/or assignment of the Debtors' right, title, and interest in, to and under such assets free and clear of all liens, claims, interests, and encumbrances, including Consent Rights (other than certain permitted liens), regardless of whether such consent must be in writing pursuant to the terms of any contract, lease, or other agreement.

## Basis for Requested Relief

### A.     Bidding Procedures are Fair and Reasonable

35.     The Bidding Procedures are reasonable and appropriate and should be approved as proposed.  Section 363 of the Bankruptcy Code permits the sale of all or some of a debtor's assets. Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

101047864v.3

36. To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *see also Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and their constructs may serve to "encourage bidding and [] maximize the value of the debtor's assets").

37. The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Acquired Assets. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offers reasonably available for the Acquired Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate the Sale Transaction. The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the potential completion of the Sale Transaction.

38. Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' value and maximize recoveries for the Debtors' stakeholders. In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process.

The Bidding Procedures provide for the marketing of the Acquired Assets to pursue higher or better value than the Stalking Horse Bid. Accordingly, the Bidding Procedures should be approved.

### B.    Stalking Horse Bid Protections are Reasonable and Appropriate

39.    The Debtors have agreed to provide standard bid protections to the Stalking Horse Bidder, primarily in the form of the Break-Up Fee (4% of the purchase price) (the "***Stalking Horse Bid Protections***").   Bid protections such as the Stalking Horse Bid Protections have become commonplace in connection with sales under chapter 11.   Moreover, approval of break-up fees as superpriority administrative expense claims as a form of bidder protections in connection with a sale has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a minimum price threshold the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

40.    Further, the Debtors believe that granting the Stalking Horse Bid Protections to the Stalking Horse Bidder is fair and reasonable under the circumstances.   Courts have acknowledged that the approval of break-up fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers. *See ASARCO, Inc. v. Elliott Mgmt.* (*In re ASARCO, L.L.C),* 650 F.3d 593, 597–98, 601–03 & n.9 (5th Cir. 2011); *In re JW Res., Inc.,* 536 B.R. 193, 195–96 (Bankr. E.D. Ky. 2015); *In re Hupp Indus., Inc.,* 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).   As listed in *Hupp Industries,* courts consider various factors in determining whether to authorize break-up fees, such as:

- whether the fee requested correlates with a maximization of value to the debtor's estate;

22

- whether the transaction in the negotiated agreement is an arms'-length transaction between the debtor's estate and the negotiating acquirer;

- whether the principal secured creditors are supportive of the concession;

- whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

- the existence of available safeguards beneficial to the debtor's estate; and

- whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*Hupp Indus.,* 140 B.R. at 194–96.

41.     To warrant court approval of such break-up fees and expenses, the Fifth Circuit in *ASARCO* required a showing that the requested fees and expenses must be supported by a sound business justification. *ASARCO,* 650 F.3d at 602–03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

42.     Here, the Stalking Horse Bid Protections satisfy the foregoing tests because they are: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) reasonable and appropriate, in light of the size and nature of the proposed Sale Transaction and comparable transactions, to the commitments that have been made and the efforts that have been, and are expended, by the Stalking Horse Bidder; (iv) necessary to induce the Stalking Horse Bidder to continue to pursue the Sale Transaction and to continue to be bound by the Stalking Horse Agreement; and (v) subject to all parties-in-interests' rights to object and be heard with respect to approval of the Stalking Horse Bid Protections.

43.     The Stalking Horse Bid Protections have been negotiated in good faith, and at arms'
length.  In such negotiations, the Debtors acted in the interest of their estates, consistent with their
fiduciary duties.

44.     Indeed, the Stalking Horse Bid Protections were the product of hard-fought
negotiations between the Debtors and the Stalking Horse Bidder, in which the Debtors sought to
minimize the amount and circumstances under which they are payable.  The resulting Stalking
Horse Bid Protections fall within the range of stalking horse bid protections approved in this
District and others. *See, e.g., In re McDermott Int'l, Inc.,* No. 20-30336 (DRJ) (Bankr. S.D. Tex.
Feb 24, 2020) (Docket No. 476) (approving break-up fee equal to 3% percent of the purchase price
and expense reimbursement not to exceed $25 million); *In re Neighbors Legacy Holdings, Inc.,*
No. 18-33836 (MI) (Bankr S.D. Tex. Aug. 8, 2018) (Docket No. 203) (approving break-up fee
equal to 3% and expense reimbursement not to exceed $320,000); *In re Geokinetics Inc.,* No. 18-
33410 (DRJ) (Bankr. S.D. Tex. July 2, 2018) (Docket No. 110) (approving break-up fee equal to
5% percent of the purchase price and expense reimbursement not to exceed $1 million); *In re
Vanguard Natural Res., LLC,* No. 17-30560 (MI) (Bankr. S.D. Tex. Apr. 13, 2017) (Docket No.
583) (approving break-up fee equal to 3% of the purchase price and expense reimbursement not to
exceed $500,000); *In re Stone Energy Corp.,* No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017)
(Docket No. 316) (approving break-up fee equal to 3% of the purchase price and expense
reimbursement not to exceed 1% percent of the purchase price); *In re Things Remembered, Inc.,*
No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (Docket No. 150) (approving break-up fee and
expense reimbursement equal to 4.4% of the purchase price); *In re Weinstein Co. Holdings LLC,*
18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018) (Docket No. 190) (approving break-up fee equal
to 3% of the purchase price and expense reimbursement not to exceed 2% of the purchase price).

Moreover, parties in interest will be given notice and an opportunity to object if they do not believe the Stalking Horse Bid Protections are in the best interest of the Debtors' estates.

45.     The proposed Stalking Horse Bid Protections are necessary to promote the interests of the Debtors' estates.  The Stalking Horse Bidder would not keep its Stalking Horse Bid open until the Auction without such protections, and the Stalking Horse Bid establishes and ensures an acceptable price threshold, virtually eliminating the risk that the Auction might not generate sufficient interest among bidders to ensure adequate consideration for the Acquired Assets.  The Stalking Horse Bidder is reasonably entitled for compensation for its risk in laying the foundation for the Debtors' sale process and serving as a catalyst for other Qualified Bids.  Without the Stalking Horse Bid Protections, the Debtors might lose the opportunity to obtain the highest and best offer for the Acquired Assets and would certainly lose the downside protection afforded by the existence of the Stalking Horse Bidder.  Accordingly, the Break-Up Fee is reasonable and appropriate.

46.     Further, the Stalking Horse Bid Protections should be afforded superpriority administrative expense status pursuant to section 364(c)(1) of the Bankruptcy Code. Section 364(c)(1) states:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title.

11 U.S.C. 364(c)(1).  Section 101(12) further defines "debt" to mean "liability on a claim" and section 101(5) defines "claim" to mean any "right to payment," including a contingent right of payment. 11 U.S.C. 101(5), (12).  Nothing in section 364(c)(1) or the foregoing definitions limits superiority status to funded debt or suggests that a contingent claim for expense reimbursement

cannot be a superpriority administrative expense claim.  *See* Hr'g Tr. at 105:5-18, *In re Exide Holdings, Inc.,* No. 20-11157 (CSS) (Bankr. D. Del. June 18, 2020) (Court: "[I]f the trustee is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an admin expense, the court, after noticing and a hearing, may authorize the obtaining of credit or the incurring of debt with priority over...all admin expenses. By entering into this transaction, the debtors are agreeing to pay an amount of money in the future to the Stalking Horse Bidder in the event certain circumstances don't occur. So by definition they are obtaining credit[.]"); *In re Things Remembered, Inc.,* No. 19-10234 (KG) (Bankr. D. Del. Feb. 25, 2019) (Docket No. 177) (explaining the statutory basis in the Bankruptcy Code for affording superpriority status to bid protections).

47.     For all of the foregoing reasons, the Debtors believe that granting the Stalking Horse Bid Protections is reasonable and warranted under the circumstances.

### C.     Assumption and Assignment of Assigned Contracts Should be Approved

48.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Richmond Leasing Co. v. Cap. Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.),* 524 F.3d 373, 383 (2d Cir. 2008) (explaining that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage"); *In re Del Grosso,* 115 B.R. 136, 138 (Bankr. N.D.

101047864v.3

Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard. . . ."). Accordingly, any assumption of the Assigned Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts or leases is necessary to the Debtors' ability to obtain the best value for the Acquired Assets. Moreover, the Assigned Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

49.     Further, the consummation of the Sale Transaction, including the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Assignment under section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract. The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs.

50.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See*

27

*Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (noting that adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and expressed a willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

51.     As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Assigned Contracts. The Debtors will provide Adequate Assurance Information to all counterparties to the Assigned Contracts and counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

52.     In addition, to facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that the Court find all anti-assignment provisions in the Assigned

Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, unenforceable under section 365(f) of the Bankruptcy Code.

53.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures.

     **D.**     **Sale of the Debtors' Businesses and Assets**

          *I.*    *The Sale Transaction Should be Approved as an Exercise of the Debtors' Sound Business Judgment*

54.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also ASARCO,* 650 F.3d at 601; *In re Cowin,* No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *West v. Flores (In re St. Marie Clinic PA),* No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle*

*Drilling Techs., Inc.,* No. 09-33744, 2009 WL 2382030, at \*2 (Bankr. S.D. Tex. July 29, 2009);

*In re San Jacinto Glass Indus., Inc.,* 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

55.     Once the Debtors articulate a valid business justification, "the business judgment rule . . . 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re S.N.A. Nut Co.,* 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *see also Integrated Res.,* 147 B.R. at 656; *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.),* 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

56.     The Debtors have a sound business justification for selling the Debtors' businesses and assets pursuant to a competitive-bidding process consistent with the Bidding Procedures. Based upon an analysis of the Debtors' ongoing business, the Debtors' concluded that a sale of the Acquired Assets pursuant to a competitive-bidding process, with a threshold price established by the Stalking Horse Bid, would likely be the best way to maximize recoveries for the Debtors' creditors.

57.     The Debtors submit that a Successful Bid resulting from the Bidding Procedures will constitute the highest or best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Acquired Assets pursuant to a competitive-bidding process as provided for in the Bidding Procedures is a valid and sound exercise of the Debtors' business judgment.  The Debtors believe that they have proposed a fair process for obtaining the highest and best offer and sale of the Acquired Assets for the benefit of the Debtors' estates and their

101047864v.3

creditors.  The fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by a "market check" through the process outlined in the Bidding Procedures.

*II.   Adequate and Reasonable Notice of the Sale Transaction Will Be Provided*

58.     As set forth above, the Sale Notice (a) informs interested parties of the deadlines for objecting to the Sale Transaction, and (b) otherwise includes all information relevant to parties interested in, or affected by, the Sale Transaction.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served and, as such, the Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

*III. The Sale Transaction Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code*

59.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) upon satisfaction of any one of the five conditions set forth therein.  *In re Nature Leisure Times, LLC,* No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

60.     Additionally, the Court may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  *See In re Ditech Holding Corp.,* 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.,* No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts

31

have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

61.     The Debtors believe that they will be able to demonstrate at the Sale Hearing that the Sale Transaction satisfies one or more of the conditions set forth in section 363(f). For example, certain of the Debtors' creditors may consent to the sale free and clear under section 363(f)(2).  In the event such creditors do not consent, a sale free and clear may proceed pursuant to section 363(f)(5) of the Bankruptcy Code because such creditors may be paid from the proceeds of the sale and the Debtors will establish at the Sale Hearing that such creditors can be compelled to accept a monetary satisfaction of their claims.

> *IV. The Sale Transaction Has Been Proposed in Good Faith and Without Collusion, and The Successful Bidder Will Be a "Good Faith Buyer"*

62.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *O'Dwyer v. O'Dwyer* (*In re O'Dwyer*), 611 F. App'x 195, 200 (5th Cir. 2015); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse), Inc.,* 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.,* No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

63.     In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Bleaufontaine, Inc. v. Roland International (In re Bleaufontaine, Inc.),* 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)).

64.     The Debtors submit that the Successful Bidder identified at the Auction, if any, will be a "good faith" purchaser within the meaning of section 363(m) and the terms of a purchase agreement with any Successful Bidder will be negotiated at arms'-length and in good faith without any collusion or fraud.  The Bidding Procedures are designed to produce a fair, transparent, and competitive bidding process.  All parties in interest will have an opportunity to evaluate and object to any particular party's conduct or the satisfaction of the requirements of section 363(m) of the Bankruptcy Code.  Accordingly, the Debtors will be prepared to show, at the Sale Hearing, that the Successful Bidder is entitled to the full protections of section 363(m) and will seek a finding that the Successful Bidder is a good faith purchaser entitled to the full protections of the Bankruptcy Code.

## Notice

65.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) those persons who have formally appeared and requested notice of service in this proceeding pursuant to Bankruptcy Rules 2002; (iii) counsel for the Creditors' Committee; (iv) counsel for and the members of any other committees appointed by this Court; (v) counsel for the Debtors' senior secured noteholders and debtor-in-possession lenders; (vi) the consolidated thirty

101047864v.3

(30) largest unsecured creditors of the Debtors; (vii) governmental agencies having a regulatory or statutory interest in these cases; and (viii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  A copy of this Motion is also available on the website of the Debtors' notice and claims agent at http://cases.stretto.com/agilonenergy.  In light of the nature of the relief requested, and the exigent circumstances of these Cases, the Debtors submit that no further notice is necessary.

## Conclusion

The Debtors respectfully request that the Court grant the relief requested herein and such other relief as the Court finds appropriate and deems just and proper.

DATED this the 14th day of December, 2021.

/s/ Simon R. Mayer
Elizabeth M. Guffy
Texas Bar No. 08592525
Simon R. Mayer
Texas Bar No. 24060243
**LOCKE LORD LLP**
600 Travis St., Suite 2800
Houston, TX 77002
Telephone:  (713) 226-1200
Facsimile:  (713) 223-3717
Email: eguffy@lockelord.com
            simon.mayer@lockelord.com

***Attorneys for***
***Agilon Energy Holdings II LLC, et al.***

34

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing pleading was served electronically through the Court's ECF system on December 14, 2021, on all parties registered for electronic service.

*/s/ Simon R. Mayer*
Simon R. Mayer