~~THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE DEBTORS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME.~~

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **AGILON ENERGY HOLDINGS II, LLC,** *et al.* | § | Case No. 21-32156 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

## COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF AGILON ENERGY HOLDINGS II, LLC, *ET AL.*

**THE COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF AGILON ENERGY HOLDINGS II, LLC, *ET AL.* HAS BEEN SET FOR A FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND A HEARING ON CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF AGILON ENERGY HOLDINGS II, LLC, *ET AL.*, ON [●], 2022 AT [●] [●].M. (CENTRAL PREVAILING TIME), IN COURTROOM 404, UNITED STATES COURTHOUSE, 515 RUSK STREET, HOUSTON, TEXAS, 77002. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN AS CONTAINED HEREIN.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II, LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is:  PO Box 163, Plantersville, Texas 77363.

**LOCKE LORD LLP**

Elizabeth M. Guffy
Texas Bar No. 08592525
Simon R. Mayer
Texas Bar No. 24060243
600 Travis St., Suite 2800
Houston, TX 77002
Telephone:  (713) 226-1200
Facsimile:  (713) 223-3717
Email: eguffy@lockelord.com
          simon.mayer@lockelord.com

*Attorneys for*
*Agilon Energy Holdings II LLC, et al.*

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS, RULES OF INTERPRETATION, AND
INCORPORATION OF DOCUMENTS BY REFERENCE ...........................3

**Section 1.1. -** Definitions.................................................................3
**Section 1.2. -** Rule of Interpretation ...................................................12
**Section 1.3. -** Computation of Time .....................................................12
**Section 1.4. -** Governing Law .............................................................12
**Section 1.5. -** Incorporation of Documents by Reference ...............................13

ARTICLE II. DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS ........13

**Section 2.1. -** Important Dates...........................................................13
**Section 2.2. -** Incorporation and Ownership Structure ...................................13
**Section 2.3. -** Assets and Liabilities of the Debtors as of the Petition Date.....................14
**Section 2.4. -** Events Leading to the Debtors' Bankruptcy Filing....................16

ARTICLE III. MAIN EVENTS IN THE BANKRUPTCY CASES ...........................17

ARTICLE IV. CONFIRMATION OF THE PLAN ...........................................20

**Section 4.1. -** Confirmation Procedures ...............................................20
**Section 4.2. -** Plan Objection Procedures ............................................21
**Section 4.3. -** Releases and Procedures for Opting Out ...............................21
**Section 4.4. -** Requirements for Confirmation ........................................23
**Section 4.5. -** Classifications of Claims and Equity Interests.........................24
**Section 4.6. -** Impaired Claims or Equity Interests ..................................25
**Section 4.7. -** Feasibility.............................................................25
**Section 4.8. -** The Best Interests Test & Liquidation Analysis .......................26
**Section 4.9. -** Voting Procedures and Requirements...................................26

ARTICLE V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ........26

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS...........................................................................27

**Section 6.1. -** Overview of Classification.............................................27
**Section 6.2. -** Identification and Treatment of Unclassified Claims ..................28
**Section 6.3. -** Summary of Classification of Claims and Interests ...................29
**Section 6.4. -** Treatment of Claims and Interests....................................30
**Section 6.5. -** Elimination of Classes for Voting Purposes...........................32

ARTICLE VII. MEANS FOR EXECUTION OF THE PLAN ...........................32

**Section 7.1. -** Funding the Plan .......................................................32
**Section 7.2. -** Equity .................................................................32

**Section 7.3. -** Released Claims and Causes of Action........................................................32
**Section 7.4. -** Release of Liens .......................................................................................32
**Section 7.5. -** Vesting of Retained Claims and Causes of Action ...................................33
**Section 7.6. -** Effectuating Documents; Further Transactions ........................................33
**Section 7.7. -** Deemed Substantive Consolidation of the Debtors ..................................33
**Section 7.8. -** Termination of Management....................................................................34
**Section 7.9. -** Plan Administrator ...................................................................................34
**Section 7.10. -** Prosecution of the Retained Claims and Causes of Action......................37

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
               LEASES ...................................................................................................38

ARTICLE IX. RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF  PROPERTY
             UNDER THE PLAN...................................................................................38

**Section 9.1. -** Prosecution and Settlement of Claim Objections.......................................38
**Section 9.2. -** Objection Deadline...................................................................................38
**Section 9.3. -** Responsibility for Objecting to Claims.....................................................39
**Section 9.4. -** Estimation of Claims................................................................................39
**Section 9.5. -** Distributions to be Made..........................................................................39
**Section 9.6. -** Means of Cash Payment...........................................................................39
**Section 9.7. -** Delivery of Distributions..........................................................................40
**Section 9.8. -** Time Bar to Cash Payments .....................................................................40
**Section 9.9. -** Setoffs ......................................................................................................40
**Section 9.10. -** No Distribution Pending Resolution of Claims .......................................40

ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...........................40

ARTICLE XI. RETENTION OF JURISDICTION.................................................................41

ARTICLE XII. DISCHARGE, RELEASES, INJUNCTION, AND RELATED
              PROVISIONS ...........................................................................................43

**Section 12.1. -** Discharge of Claims Against and Interests in the Debtors ......................43
**Section 12.2. -** Releases..................................................................................................43
**Section 12.3. -** Exculpation and Limitation of Liability..................................................44
**Section 12.4. -** Limited Discharge of Debtors and Injunction.........................................44
**Section 12.5. -** Compromise and Settlement ...................................................................44

ARTICLE XIII. MISCELLANEOUS PROVISIONS................................................................45

THE COURT HAS NOT YET APPROVED THIS PLAN FOR SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE DEBTORS ARE NOT SOLICITING YOUR VOTE ON THIS PLAN AT THIS TIME

DISCLAIMERS

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS, OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH HIS/HER/ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS OR PROPERTIES HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONAPPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES

SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION

Agilon Energy Holdings II LLC ("*Agilon*"), Victoria City Power LLC ("*VCP*"), and Victoria Port Power LLC ("*VPP*" and collectively with Agilon and VCP, the "*Debtors*" and each individually, a "*Debtor*") hereby propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Agilon Energy Holdings, LLC, et al.*, pursuant to sections 1125 and 1129[2] and Bankruptcy Rules 3016 and 3017, for resolution of the outstanding Claims against and Interests in the Debtors.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and Holders of Interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, a summary of events that occurred in the bankruptcy cases (the "*Bankruptcy Cases*") that were commenced on June 27, 2021 (the "*Petition Date*"), and a description of certain documents related to the Plan.

## THE SOLICITATION

This Disclosure Statement and Plan is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan.

The Debtors have requested that the Bankruptcy Court hold a hearing on approval of this Disclosure Statement to determine whether this Disclosure Statement contains "adequate information" in accordance with section 1125. Pursuant to section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." All holders of Claims and Interests are encouraged to read and carefully consider this DS/Plan in its entirety before voting to accept or reject the Plan.

In making a decision to accept or reject the Plan, each Holder of a Claim or Interest entitled to vote must rely on its own examination of the Debtors' assets and liabilities as described in this DS/Plan, including the merits and risks involved; thus, this DS/Plan shall not be construed to be providing any legal, business, financial or tax advice. Each Holder of a Claim or Interest should consult with his, her, or its own legal, business, financial and tax advisors as to any such matters

---

[2] Except for internal cross-references, unless otherwise specified, all citations to "section" reference the applicable section of the Bankruptcy Code.

concerning the solicitation, the Plan, or the transactions contemplated thereby. Additionally, confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived or that the Plan will be consummated. Even after the Effective Date, Distributions under the Plan may be subject to delay so that Disputed Claims can be resolved. For avoidance of doubt, there will be no Distribution on a specific Claim until such Claim is an Allowed Claim.

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan has been set for **[●], 2022, at [●] [●].m. (Central Prevailing Time)**, in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas (the "*Confirmation Hearing*"). It is anticipated that all persons may appear either in person or by an audio and video connection at this Confirmation Hearing. For information on attending via an audio and video connection, please see the Bankruptcy Court's website at https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-marvin-isgur.

Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the counsel for the Debtors listed below to ensure receipt by them on or before **[●], 2022 at 5:00 p.m. (Central Prevailing Time)** (the "*Plan Objection Deadline*"). Bankruptcy Rule 3007 governs the form of any such objection.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS TO VOTE TO <u>ACCEPT</u> THE PLAN.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION, AND
## INCORPORATION OF DOCUMENTS BY REFERENCE

**Section 1.1. - Definitions**

For purposes of this DS/Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article, or in the text of the DS/Plan, as applicable. Any term used in this DS/Plan that is not defined herein but is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

As used in this DS/Plan, the following terms have the following meanings:

"*Adequate Protection Claims*" means the Claims of the Prepetition Senior Secured Lenders for Adequate Protection as such term is defined in the Final DIP Order.

"*Administrative Claim*," "*Administrative Expense Claim*," or "*Administrative Priority Claim*" means a Claim asserted against one or more of the Debtors that is entitled to priority under sections 326, 327, 330, 503(b)(1)-(9), 506(c) or 1103, which Claims are described and treated in Article VI of this DS/Plan.

"**Administrative Claim Bar Date**" means the date by which parties seeking to assert an Administrative Claim against the Debtors must timely file a request for payment, which is 11:59 p.m., central prevailing time, on [●], 2022.

"**Allowed**" or "**Allowed Claim**" means or refers to all or a portion of a Claim asserted against one of the Debtors (i) that has been allowed by a Final Order, (ii) that has been Scheduled as a liquidated, noncontingent, undisputed Claim in an amount greater than zero in the Debtors' Schedules, as the same may from time to time be amended in accordance with the Bankruptcy Code, Bankruptcy Rules, or order of the Bankruptcy Court (provided however, if the Debtors' Schedules are amended, parties whose Claims are affected by the amendment shall have thirty (30) days after the filing of such amendment to file or amend their Proof of Claim), and with respect to which no contrary Claim has been filed and to which no objection to its allowance has been filed (either by way of objection or amendment to the Schedules), (iii) that is the subject of a timely filed Proof of Claim as to which no objection to its allowance has been filed on or before the Claims Objection Deadline, or any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, (iv) that has otherwise been previously resolved by the Debtors and the Holder of such Claim prior to the Effective Date, (v) that has otherwise been previously resolved by the Plan Administrator and the Holder of such Claim after the Effective Date, or (vi) that is expressly allowed in a liquidated amount in the Plan; *provided, however,* that with respect to an Administrative Claim, "Allowed" means an Administrative Claim (other than a Professional Fee Claim) as to which a timely request for payment has been duly made before the Administrative Claim Bar Date and as to which (a) a timely objection has not been filed or (b) a timely objection has been filed and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim is or has been timely filed is not considered Allowed and shall be Disallowed without further action by any Person without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt, a Proof of Claim filed after the Bar Date or Administrative Claim Bar Date, as applicable, shall not be an Allowed Claim for any purpose whatsoever absent entry of a Final Order allowing such late-filed Claim.

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement between each of the Debtors as sellers and TXCR Acquisition Co., LLC as buyer, dated February 28, 2022.

"**Avoidance Actions**" means any actions arising under Bankruptcy Code sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or under related state, federal, or foreign statutes and common law, including, without limitation fraudulent transfer laws.

"**Bankruptcy Cases**" means the Chapter 11 bankruptcy cases commenced by the Debtors upon the filing of their voluntary petitions on the Petition Date, styled *In re Agilon Energy Holdings, LLC, et al.,* Case No. 21-32156 (MI) (Jointly Administered).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Bankruptcy Cases.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, where the Bankruptcy Cases are pending.

"***Bankruptcy Estates***" or "***Estates***" means the estates of the Debtors created under section 541 upon the filing of the Bankruptcy Cases.

"***Bankruptcy Rules***" mean, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Bankruptcy Cases or proceedings therein, the Local Rules of the Bankruptcy Court, and the Complex Case Rules for the Southern District of Texas, as applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"***Bar Date***" means November 10, 2021, the date set forth in the UST's *Notice of Chapter 11 Bankruptcy Case* [Docket No. 31] by which Proofs of Claim must be filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding Holders of such Claims or Interests from the requirement of filing Proofs of Claim.

"***Business Day***" means any day other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"***Cash***" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

"***Cause(s) of Action***" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, Contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertible, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or Interests; (iii) Avoidance Actions; and (iii) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558. For the avoidance of doubt, the term "Causes of Action" does not include the claims and causes of action released pursuant to the Final DIP Order, the Sale Order or any other Final Order of the Court entered at any time in the Bankruptcy Cases.

"***Claim***" means a claim against any portion of the Estates, whether or not asserted, as such term is defined in section 101(5).

"***Claims Objection Deadline***" means one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the Plan Administrator may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

"***Claims Register***" means the official register of Claims.

"*Class*" means each category or group of Holders of Claims or Interests as described in the Plan pursuant to section 1122(a).

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Cases Files system.

"*Committee*" means the Official Committee of Unsecured Creditors appointed by the UST in these Bankruptcy Cases on July 30, 2021.

"*Confirmation*" means entry by the Bankruptcy Court of the Confirmation Order finally approving this Disclosure Statement and confirming this Plan.

"*Confirmation Date*" means the date of entry by the Bankruptcy Court of the Confirmation Order.

"*Confirmation Hearing*" means the date set by the Bankruptcy Court for a hearing to finally approve the Disclosure Statement and confirm the Plan, which has been set for [●], 2022, at [●] [●].m. (Central Prevailing Time) in Courtroom 404, United States Courthouse, 515 Rusk Street, Houston, Texas, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means an order in form and substance acceptable to the Debtors and the Prepetition Senior Secured Lenders entered by the Bankruptcy Court finally approving the Disclosure Statement and confirming the Plan.

"*Consummation*" means the occurrence of the Effective Date.

"*Contingent*" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

"*CRO*" means the chief restructuring officer of the Debtors, Hugh Smith.

"*Debtors*" means Agilon Energy Holdings II LLC, Victoria City Power LLC, and Victoria Port Power LLC.

"*DIP Credit Agreement*" means that certain Senior Secured, Superpriority Debtor-In-Possession Credit Agreement dated as of September 7, 2021 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time).

"*DIP Documents*" means the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other loan documents and documents related thereto (including any security agreements, mortgages, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time).

"*DIP Facility*" means the senior secured, superpriority credit facility under the DIP Documents approved by the Bankruptcy Court pursuant to the terms of the Final DIP Order.

"*DIP Secured Parties*" has the meaning ascribed to such term in the Final DIP Order.

"***Disallowed***" means, with reference to any Claim or Interest, a finding or determination of the Bankruptcy Court in a Final Order, including the Bar Date Order and Administrative Claim Bar Date Order, or a provision of the Plan or Confirmation Order, providing that a Claim shall not be Allowed, or as to which the Bankruptcy Court has otherwise ruled or ordered that such Claim should be temporarily disallowed pursuant to section 502(d).

"***Disclosure Statement and Plan,***" "***DS/Plan,***" "***Disclosure Statement***," or "***Plan,***" as applicable, means this entire document and all exhibits, addendums, attachments, schedules, amendments, supplements, and related documents, whether annexed hereto, filed in connection herewith, or related hereto, including the Disclosure Statement portions and the Plan portions, as it may be altered, amended, modified or supplemented from time to time, including in accordance with any documents submitted in support hereof or in accordance with the Bankruptcy Code or the Bankruptcy Rules.

"***Disputed***" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

"***Distribution***" means a distribution to Holders of Allowed Claims made on the Effective Date by the Plan Administrator.

"***Distribution Record Date***" means the Confirmation Date.

"***Effective Date***" means the date that is the first Business Day after the Confirmation Date, on which (i) no stay of the Confirmation Order is in effect, and (ii) all conditions to the effectiveness of the Plan have been satisfied or waived as provided in the Plan.

"***Estate Property***" means all right, title, and interest in and to any and all property of every kind or nature, owned by the Debtors or their Estates on the Petition Date, as defined in section 541.

"***Exculpated Party***" means each of: (a) the Debtors and the Estates; (b) the Post-Effective Date Debtors; (c) the Prepetition Senior Secured Lenders; (d) the DIP Secured Parties (as defined in the Final DIP Order); and (e) the Committee and its members, but only in their capacity as members of the Committee.

"***Executory Contract***" shall mean a contract or lease to which one of the Debtors is a party that is subject to assumption or rejection under section 365.

"***Exhibit***" means an exhibit annexed to the Plan or filed in the Plan Supplement.

"***Final DIP Order***" means that certain Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief [Docket No. 240].

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in the Debtors' Bankruptcy Cases, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof)

the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending and the operation or effect of any such order or judgment has not been stayed.

"*General Unsecured Claim*" shall mean any Unsecured Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not:  (i) an Administrative Claim or an Administrative Priority Claim, (ii) a Priority Tax Claim, (iii) a Priority Unsecured Non-Tax Claim, (v) a Prepetition Senior Secured Claim, or (vi) a Priority Mechanic's Lien Claim.  For the avoidance of doubt, the Prepetition Senior Secured Deficiency Claim shall be a General Unsecured Claim.

 "*Holder*" or "*Holders*" means the legal or beneficial holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a holder of a Claim or Interest in such Class or of such type).

"*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124.

"*Interest*" means any ownership interest in any of the Debtors, as of the Petition Date, including, but not limited to, an interest in any issued, unissued, authorized or outstanding shares or stock and other equity security of the Debtors, together with any warrants, options, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto.

 "*New Equity Interests*" means the membership interest or similar equity interest in the each of the Post-Effective Date Debtors to be issued to the Plan Administrator pursuant to the Plan.

"*Objection(s)*" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

"*Other Secured Claim*" means any Allowed Secured Claim other than the Prepetition Senior Secured Claim, a Priority Mechanic's Lien Claim or a Priority Tax Claim, in each case that is secured by a valid and perfected lien against property of the Estates.

"*Person*" means an individual, corporation, partnership, governmental unit, joint venture, association, joint-stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"*Petition Date*" means June 27, 2021.

"*Plan Administrator*" means Hugh Smith Advisors, LLC and/or any success or appointed pursuant to the provisions of the Plan and the Plan Administrator Agreement.

"*Plan Administrator Agreement*" means the agreement substantially in the form filed as part of the Plan Supplement establishing and delineating the terms and conditions of the Plan Administrator's appointment.

"***Plan Administrator Expense Reserve***" means the account(s) and funds available therein, if any, from which the Plan Administrator may pay reasonable and documented fees, costs and expenses incurred by the Plan Administrator, solely in connection with carrying out the obligations of the Plan Administrator under the Plan. Such funds consist of the Plan Administrator Expense Reserve Amount and the proceeds of the Retained Claims and Causes of Action, if any.

"***Plan Administrator Expense Reserve Amount***" means $533,750, in Cash.

"***Plan Documents***" means any documents referenced in, attached to, or related to the Plan (or as part of any Plan Supplement) that are intended to be executed pursuant to the Plan.

"***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and Exhibits to the Plan, each in form and substance reasonably acceptable to the Debtors and the Prepetition Senior Secured Lenders, which shall be filed in the Bankruptcy Cases, and notice of which shall be served no later than [●], 2022, or such later date as may be approved by the Bankruptcy Court, as may be amended or supplemented by additional documents filed in the Bankruptcy Cases prior to the Effective Date as amendments to the Plan Supplement; provided that such amendments are reasonably acceptable to the Prepetition Senior Secured Lenders.

"***Post-Effective Date Debtors***" mean the Debtors as they exist after the Effective Date.

"***Prepetition Senior Secured Claim***" means the obligations outstanding under the Prepetition Senior Secured Note Documents.

"***Prepetition Senior Secured Deficiency Claim***" means any and all obligations outstanding under the Prepetition Senior Secured Note Documents after application of the Residual Sales Proceeds as provided under the Plan. Subject to and conditioned upon the occurrence of the Effective Date, the Holders of Prepetition Senior Secured Claims have agreed that those portions of the Prepetition Senior Secured Deficiency Claim otherwise entitled to priority as Adequate Protection Claims shall instead be treated as Allowed General Unsecured Claims for the benefit of all General Unsecured Creditors.

"***Prepetition Senior Secured Note Documents***" means that certain Senior Secured Note Purchase Agreement dated as of February 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time.

"***Prepetition Senior Secured Lenders***" means the purchasers and noteholders that are party to the Prepetition Senior Secured Note Documents, including The Prudential Insurance Company of America.

"***Priority Mechanic's Lien Claim***" means a Claim asserted as a Secured Claim against the Debtors or their Estate Property and that under the applicable mechanic's lien laws of the State of Texas is both (i) a valid and perfected lien against Estate Property and (ii) senior in priority to the Prepetition Senior Secured Claim. For the avoidance of doubt, a Priority Mechanic's Lien Claim refers only to the portion of any asserted Claim that is senior in priority to the Prepetition Senior Secured Claim; to the extent that the remainder of any such Claim that is secured but junior to the

Prepetition Senior Secured Claim, it shall be an Other Secured Claim, and to the extent it is not secured, a General Unsecured Claim.

"*Priority Tax Claim*" means a Claim entitled to priority under section 507(a)(8).

"*Priority Unsecured Non-Tax Claim*" means a Claim asserted under sections 507(a)(3–7) against the Estates.

"*Professional*" means an Entity: (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4).

"*Professional Fee Bar Date*" means the deadline for filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Effective Date.

"*Professional Fee Claim*" means a Claim by any professional retained, employed or to be compensated in the Bankruptcy Cases pursuant to sections 327, 328, 330, 331, 363 and/or 1103 for compensation for services rendered and reimbursement for expenses submitted in accordance with sections 330, 331, 363, or 503(b) for fees and expenses incurred after the Petition Date and prior to and including the Effective Date, which Claim shall not be Allowed, if at all, except to the extent that it does not exceed the amount set forth with respect to such Claim in the Wind-down Budget.

"*Professional Fee Escrow*" means Cash to be funded on the Effective Date in an amount not to exceed the maximum amount of all unpaid Professional Fees set forth in the Wind-down Budget.

"*Proof of Claim*" means a Proof of Claim filed against the Debtors in the Bankruptcy Cases by the applicable Bar Date.

"*Released Claims and Causes of Action*" means all Claims, counterclaims, defenses (including setoff, recoupment and all other defenses of the Estates under section 558) and Causes of Action—whether legal or equitable—arising prior to the Effective Date, that the Debtors, the Estates, or any Releasing Party have or may have against any Released Party, other than the Retained Claims and Causes of Action.

"*Released Party*" means each of (a) the Debtors; (b) ~~the~~their Estates; (c) the CRO; (d) the DIP Secured Parties; (e) the Prepetition Senior Secured Parties~~, each~~; and (f) Holders of a Claim that are eligible to vote to accept or reject the Plan who both vote to accept the Plan and do not opt out of the releases, and, (g) solely to the extent of their participation in ~~its capacity as such, and~~transactions with the Debtors or in these Chapter 11 Cases, the agents, employees, and professionals of each Released Party, solely in their capacities as such~~ ~~; *provided, however,* that the Debtors' non-Debtor affiliates, former officers, former directors, former employees, former members, and former managers shall not be Released Parties.  The consideration for each release is set forth in section 4.3 below.

"*Releasing Party*" means each of (a) the Released Parties; (b) without limiting the foregoing, each Holder of a Claim against or an Interest in the Debtor that was given notice of the opportunity to opt out of granting the releases set forth in the Plan but did not timely opt out.

"*Residual Sales Proceeds*" means the Sales Proceeds and any other Cash Collateral remaining after payment, Distribution or funding of (i) the Allowed Administrative Claims, (ii) the Allowed Class 2 Claims, (iii) the allowed Class 4 Claims, (iv) the Priority Tax Claims, (v) the Professional Fee Escrow, (vi) the Plan Administrator Expense Reserve, (vii) the U.S. Trustee Fees, and (viii) the reasonable and documented fees of the Prepetition Senior Secured Lenders.

"*Retained Claims and Causes of Action*" means all Claims, counterclaims, defenses (including setoff, recoupment and all other defenses of the Estates under section 558), and Causes of Action— whether legal or equitable—that the Debtors or the Estates have or may have against any Entity, to the extent not waived or released under the Plan or any Order of the Court, and all such other Claims or Causes of Action that are defensive in nature in respect of any Proofs of Claim or Proofs of Interest that have been filed against the Debtors' Estates, including without limitation all such Claims and Causes of Action expressly identified in the Plan Supplement.   Subject to and conditioned upon the occurrence of the Effective Date, the Prepetition Senior Secured Lenders have agreed (a) that, on the Effective Date, the Retained Claims and Causes of Action shall include those causes of action that constitute Collateral (as defined in the Final DIP Order), including (i) the proceeds of commercial tort claims, (ii) the proceeds of any avoidance actions brought against any Insider of the Debtors pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; and (iii) the proceeds of any avoidance actions against any non-Insider, whether or not such action is listed in the Debtors' SOFAs and (b) that the Prepetition Senior Secured Deficiency Claim shall be treated as a General Unsecured Claim.

"*Sale Order*" means that certain Order Approving (A) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief [Docket No. 511].

"*Sale Proceeds*" means the funds received by the Debtors from the asset sale approved by the Sale Order.

"*Schedules*" has the meaning ascribed to such term in Section 1.5 hereof.

"*Secured Claim*" means a Claim that is secured by a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy or non-bankruptcy, but only to the extent of the value, as of the Effective Date or such later date as is established by the Bankruptcy Court, of claimant's interest in the property of one or more of the Debtors securing the Claim as determined by a Final Order of the Bankruptcy Court pursuant to section 506 or as otherwise agreed upon in writing by the Debtors or the Plan Administrator, as applicable, and the Holder of such Claim.

"*SOFAs*" has the meaning ascribed to such term in Section 1.5 hereof.

"*Substantial Consummation*" shall have the meaning given to that term in section 1101(2). Substantial Consummation shall occur on the Effective Date.

"***Unimpaired Claim***" means a Claim that is not an Impaired Claim.

"***Unsecured Claim***" means a Claim that is not a Secured Claim and that is not entitled to priority under Bankruptcy Code section 507(a)(1–9). The term specifically includes, pursuant to Bankruptcy Code section 506(a), any Claim of a creditor against the Debtors to the extent that such creditor's Claim is greater than the value of the Lien securing such Claim, any Claim for damages resulting from rejection of any Executory Contract under Bankruptcy Code section 365, any tort Claims or contractual Claims or Claims arising from damage or harm to the environment and, and any Claim not otherwise classified under the Plan.

"***U.S. Trustee***" means the Office of the United States Trustee for Region 7.

"***Voting Deadline***" means [●], 2022 at 5:00 p.m. (Central Prevailing Time), the deadline by which Ballots to accept or reject the Plan must be received by the Debtors.

"***Wind-down Budget***" means the wind-down budget agreed as between the Debtors and the Prepetition Senior Secured Lenders and filed as part of the Plan Supplement.

## Section 1.2. - Rule of Interpretation

For purposes of this DS/Plan, (a) any reference to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references herein to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this DS/Plan; (d) the words "herein" and "hereto" refer to this DS/Plan in its entirety rather than to a particular portion of this DS/Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this DS/Plan; and (f) the rules of construction set forth in section 102 and in the Bankruptcy Rules shall apply.

## Section 1.3. - Computation of Time

All times referenced in this Plan are Central Prevailing Time. In computing any period of time, date, or deadline prescribed or allowed in the Plan, the provisions of Bankruptcy Rule 9006 shall apply. If the date on which a transaction may or must occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## Section 1.4. - Governing Law

Subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules.

**Section 1.5. - Incorporation of Documents by Reference**

This DS/Plan incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith.  The following documents that have been filed in the Debtors' Bankruptcy Cases are incorporated by reference herein in their entirety: (a) all amendments to the DS/Plan filed prior to the date set for Confirmation, (b) the Debtors' Schedules of Assets and Liabilities ("*Schedules*"), each as filed on August 9, 2021 [Docket Nos. 96, 97 and 98] and, if applicable, as amended on October 14, 2021 [Docket Nos. 290, 291, and 292], and (c) the Statements of Financial Affairs ("*SOFAs*"), including exhibits to the SOFAs, each as filed on August 9, 2021 [Docket Nos. 99, 100 and 101] and, if applicable, as amended on October 14, 2021 [Docket Nos. 293, 294, and 295].

## ARTICLE II.
## DEBTORS' HISTORY, ASSETS, LIABILITIES, AND MAJOR EVENTS

The information provided in this Article is provided in accordance with the requirements of section 1125.  This information includes, among other things, (i) general information about the business, property, and operations of the Debtors, (ii) the events leading to the filing of the Bankruptcy Cases, and (iii) certain significant events which have occurred to date in the Bankruptcy Cases.  To the extent this Article describes events or pleadings that have been filed in the Bankruptcy Cases or ancillary litigation, such matters and events are qualified in their entirety by the actual pleadings filed in the Bankruptcy Cases and ancillary litigation.  To the extent of any inconsistencies between the descriptions in this Article and such pleadings, such pleadings shall control.  All such pleadings are on file with the Bankruptcy Court or the courts where such ancillary matters are pending and may be obtained from the respective courts for review.

**Section 2.1. - Important Dates**

1.   Date by which Ballots must be received, the Voting Deadline**: [●], 2022 at 5:00 p.m., Central Prevailing Time**.

2.   Deadline by which objections to the Disclosure Statement and to Confirmation of the Plan must be filed and served: **[●], 2022 at 5:00 p.m.**, Central Prevailing Time.

3.   Hearing on final approval of the Disclosure Statement and on Confirmation of the Plan: **[●], 2022 at [●] [●].m.**, Central Prevailing Time.

**Section 2.2. - Incorporation and Ownership Structure**

The Debtors were formed in 2017 in the State of Texas as affiliated independent power producers.  They were founded by Ryan Castleman and Gerardo P. Manalac.  Mr. Castleman served as CEO of the Debtors and Mr. Manalac served as president.  The majority ownership of the Debtors rests indirectly with Mr. Castleman.

The Debtors' organizational structure is as follows:



**Section 2.3. - Assets and Liabilities of the Debtors as of the Petition Date**

The Debtors filed their respective Schedules on August 9, 2021 [Docket Nos. 96, 97 and 98], and filed their amended Schedules on October 14, 2021 [Docket Nos. 290, 291, and 292]. Those Schedules provide additional detail about the assets and liabilities of each of the Debtors as of the Petition Date, and those documents are incorporated herein by reference.

**Assets and Liabilities:**

Since the filing of the Debtors' Schedules, the Debtors sold substantially all of their assets in a sale approved by the Sale Order, which sale closed on February 28, 2022. The Residual Sale Proceeds constitute the Debtors' only assets apart from certain claims and causes of action.  As of March 31, 2022, the Debtors collectively have approximately $33,093,866.61[3] in Cash, all of which constitutes Cash Collateral (defined below).

**Prepetition Senior Secured NPA**

Pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Senior Secured NPA***," and together with the other "Financing Documents" as defined therein, the "***Prepetition Senior Secured Note Documents***"), among, *inter alia*, (a) Agilon, as borrower, (b) VPP and VCP, as guarantors, (c) Wilmington Trust, National Association, as the Collateral Agent under the Collateral Agency Agreement (the "***Prepetition Agent***"), and (d)  the Prepetition Senior Secured Lenders (together with the Prepetition Agent, and all other secured

---

[3]  Such amount does not include the Carve Out, which the Debtors are holding in the Professional Fee Account pursuant to the First Stipulation.

parties under the Prepetition Senior Secured Note Documents, the "***Prepetition Senior Secured Parties***"), Agilon issued senior secured term notes in the initial aggregate principal amount of $50,000,000 (the "***Term Notes***," as defined in the Prepetition Senior Secured Note Documents) and senior secured revolving notes in the aggregate principal amount of $23,000,000 (the "***Revolving Notes***," as defined in the Prepetition Senior Secured Note Documents, and together with the Term Notes, the "***Senior Notes***").  As of the Petition Date, the aggregate outstanding principal amount of the Senior Notes was not less than $67,337,975.[4]

As security for the Senior Notes, the Debtors granted to the Prepetition Agent for the benefit of the Prepetition Senior Secured Parties first priority liens upon and senior security interests in substantially all of the Debtors' property and assets (collectively, the "***Prepetition Collateral***").  All of the Debtors' Cash (including any Cash in deposit accounts of the Debtors), wherever located, constitutes Prepetition Collateral (the "***Cash Collateral***") of the Prepetition Senior Secured Parties.

As set forth and approved in the Final DIP Order, a portion of the amount due under the Senior Notes was rolled up into the DIP Facility and repaid at the maturity date of the DIP Facility. The remaining aggregate outstanding amount of principal of, and prepetition accrued interest on, the Senior Notes is not less than $52,337,975.00.

**Mechanic's Lien Claims:**

Prior to the Petition Date, approximately eight (8) creditors had filed mechanic's liens against one or both of the Facilities.  As of the Petition Date, the total amount of the asserted mechanic's liens was approximately $9,400,000.00.  This amount included a Claim asserted by ProEnergy Services, LLC ("***ProEnergy***") in the amount of approximately $7,000,000.00.  The Debtors disputed ProEnergy's Claims and filed an objection with the Bankruptcy Court.  Through a mediation with Bankruptcy Judge Lopez, the Debtors reached a settlement with ProEnergy under which ProEnergy agreed to accept payment of $5.5 million in full satisfaction of its Claims.  The settlement was subsequently approved by the Bankruptcy Court [*See* Docket No. 622], and the settlement amount has been paid to ProEnergy.

The Debtors have made a review of the relevant documents and believe that most, if not all of the remaining asserted mechanic's liens Claims should be Disallowed entirely or reclassified as General Unsecured Claims.  To this end, the Debtors have filed objections to these other Claims. [*See* Docket Nos. 614, 615, 616, and 619].  The Debtors believe that the claim objections will likely be resolved prior to the Confirmation Date.

**Subordinated Notes:**

Pursuant to a separate *Securities Purchase Agreement* dated as of February 23, 2018 (as amended, restated, or otherwise supplemented from time to time), Agilon issued $22 million in

---

[4]  Such amount does not include all secured obligations under the Senior Notes, including, without limitation, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Senior Notes and the other Prepetition Senior Secured Note Documents.

Senior Subordinated Notes due in 2025 (the "**Subordinated Notes**").  The Subordinated Notes are unsecured and are subordinate in all respects to the Senior Notes.  As of the Petition Date, the aggregate principal amount outstanding, excluding fees and expenses, on account of the Subordinated Notes was not less than approximately $26 million.[5]  The Subordinated Notes were guaranteed by both VCP and VPP.

**Priority Unsecured Debt:**

As set forth in the Schedules, as of the Petition Date, unsecured creditors held approximately $1,108,019.70 in priority unsecured Claims.  These Claims consisted of ad valorem property tax Claims of Victoria County and were paid at the closing of the sale of the Debtors' assets.

**Unsecured Debt:**

The Debtors have examined their Schedules and the Proofs of Claim filed in these Cases and determined that, the total amount of unsecured non-priority Claims, excluding intercompany Claims among the Debtors and duplicate Claims, is approximately $13.6 million.  Additionally, Shell Energy North America (U.S.), L.P. has filed Proofs of Claim against the Debtors VCP and VPP asserting General Unsecured Claims in the amounts of $51.3 million and $73.0 million, respectively.

**Section 2.4. - Events Leading to the Debtors' Bankruptcy Filing**

The Debtors were in the business of providing gas-fired peaking electric energy to the Electric Reliability Council of Texas ("**ERCOT**") market.  The Debtors owned and operated two power facilities located near Victoria, Texas: Victoria Port Generation Station ("**Victoria Port Facility**") and Victoria City Generation Station ("**Victoria City Facility**" and together with Victoria Port, the "**Facilities**").  The Facilities were intended to provide energy during times of peak demand.  When operational, the Facilities provide electricity to the ERCOT, which operates the electric grid and manages the deregulated energy market for approximately 75% of the State of Texas.

During the construction of the Facilities, certain disputes arose between the Debtors' former management and certain third parties that increased costs and resulted in delays in bringing the Facilities online.  These delays contributed substantially to the Debtors' inability to timely generate revenues, which in turn resulted in defaults under the Debtors' prepetition financing agreements.  Although the Facilities became commercially operational, continuing maintenance issues with the refurbished combustion turbines resulted in additional delays and expenses.

In light of these circumstances, the Debtors began exploring debt restructuring options with the Prepetition Senior Secured Parties.  The Debtors were making progress toward resolving their

---

[5]  Such amount is based on the Debtors' analysis of its books and records to date.  The Debtors reserve any and all rights to amend such amount as they complete their respective analyses.  Such amount does not include interest, PIK interest, default interest, make-whole, other premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Subordinated Notes.

operational issues when, in February 2021, an extraordinary cold weather event occurred in Texas. The Debtors' combustion turbine engines were isolated from the ERCOT grid at one Facility due to a transmission outage, and both Facilities faced operating constraints due to the extreme low temperatures.  Unable to generate all of the electricity that they were contractually obligated to provide during the cold weather event, the Debtors were forced to incur additional liabilities for a large amount of purchased power that were beyond their ability to pay, which led to the termination of the Debtors' supply and purchase agreements and, ultimately, to the filing of these Bankruptcy Cases.

Despite these difficulties, with post-petition financing and support from the Prepetition Senior Secured Parties, the Debtors sought to operate a viable business and to maximize value during these Bankruptcy Cases.   While stabilizing the Debtors' business operations and successfully taking steps to restart power production, the Debtors and their professionals consummated the sale of their businesses as a going concern.

## ARTICLE III.
## MAIN EVENTS IN THE BANKRUPTCY CASES

**Joint Administration.** On June 28, 2021, the Debtors filed a *Motion for Joint Administration* (the "***Joint Administration Motion***") [Docket No. 5]. Through the Joint Administration Motion, the Debtors sought entry of an order directing joint administration of the Bankruptcy Cases for procedural purposes only.   The Bankruptcy Court granted the relief requested in the Joint Administration Motion on June 28, 2021 [Docket No. 9].

**Claims Bar Date.** Pursuant to the *Notice of Chapter 11 Bankruptcy Cases* [Docket No. 31], the deadline for non-governmental parties to file Proofs of Claim or Interests was set as October 21, 2020, and the deadline for Governmental Units to file Proofs of Claim was set as November 10, 2021.

**Meeting of Creditors.** The 341 meeting of creditors was held and concluded on August 12, 2021.

**Appointment of Official Committee of Unsecured Creditors.**   The U.S. Trustee appointed an Official Committee of Unsecured Creditors in these Bankruptcy Cases on July 30, 2021 [Docket No. 81].

**Retention of Professionals.** On July 27, 2021, the Debtors filed their *Application for Order Authorizing the Employment and Retention of Grant Thornton LLP as Financial Advisor* [Docket No. 76].  An order authorizing and approving this application was entered by the Court on August 20, 2021 [Docket No. 145].

On July 27, 2021, the Debtors filed their Application for Order Authorizing the Retention of Hugh Smith Advisors LLC and to Designate Hugh Smith to Serve as Chief Restructuring Officer and Related Services [Docket No. 77].  An order authorizing and approving this application was entered by the Court on August 20, 2021 [Docket No. 146].

On July 27, 2021, the Debtors filed their Application for Order Authorizing the Employment and Retention of Locke Lord LLP as Attorneys for the Debtors and Debtors in

Possession Effective June 27, 2021 [Docket No. 78].  An order authorizing and approving this application was entered by the Court on August 20, 2021 [Docket No. 147].

On July 30, 2021, the Debtors filed their Application for Order Authorizing the Employment and Retention of Energy Resources Management LLC dba ERM Capital and Independent Brokerage Solutions LLC as Investment Banker [Docket No. 84].  An order authorizing and approving this application was entered by the Court on August 25, 2021 [Docket No. 156].

On July 30, 2021, the Debtors filed their Application for Entry of an Order Authorizing the Retention and Employment of Porter Hedges LLP as Conflicts Counsel for the Debtors and Debtors in Possession [Docket No. 133].  An order authorizing and approving this application was entered by the Court on September 9, 2021 [Docket No. 210].

On August 12, 2021, the Committee filed its Application of the Official Committee of Unsecured Creditors Pursuant to Sections 327, 328, 330, and 1103 of the Bankruptcy Code Federal Rules of Bankruptcy Procedure 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authorization to Retain and Employ Pachulski Stang Ziehl & Jones LLP as Counsel Effective as of August 11, 2021 [Docket No. 114].  An order authorizing and approving this application was entered by the Court on September 7, 2021 [Docket No. 203].

On August 12, 2021, the Committee filed its Application of the Official Committee of Unsecured Creditors Pursuant to Sections 328(a), 330, and 1103 of the Bankruptcy Code Federal Rules of Bankruptcy Procedure 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authorization to Retain and Employ Conway Mackenzie, LLC as Financial Advisor Effective as of August 11, 2021 [Docket No. 115].  An order authorizing and approving this application was entered by the Court on September 7, 2021 [Docket No. 202].  On December 20, 2019, Conway MacKenzie, LLC ("**Conway MacKenzie**") was purchased by a subsidiary of Riveron Parent Holdings, LP ("**Holdco**").  Holdco is controlled by an investment vehicle that is majority owned by H.I.G. Capital Partners V, L.P. and H.I.G. Growth Buyouts & Equity Fund III, L.P., investment funds managed by H.I.G. Capital, LLC.  Riveron and Conway MacKenzie are business advisory firms.  Conway MacKenzie changed its name to Riveron RTS, LLC ("**RTS**") effective as of September 1, 2021, as part of the merger.

**Extension of Deadline to Assume or Reject Unexpired Leases of Non-Residential Real Property.**  On January 13, 2022, the Debtors filed their *Motion for Entry of an Order (I) Extending the Time within Which the Debtors Must Assume or Reject Certain Unexpired Contracts and Leases and (II) Granting Related Relief* [Docket No. 451].  As of the filing of this DS/Plan, the deadline to assume or reject unexpired leases of non-residential real property is set for April 23, 2022. [*See* Docket No. 521].

**Post-Petition Financing**.  At the beginning of these cases, the Debtors' Facilities were not operating, and the Debtors lacked unencumbered funds to restart operations at the Facilities.  In order to stabilize their businesses and restart their operations, by among other things, retaining their insurance coverage and paying critical vendors, on July 13, 2021, the Debtors filed their *Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. §*

*363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Granting the Related Relief* [Docket No. 38] (the "***Emergency DIP Motion***"), in which the Debtors sought approval of limited postpetition funding.  On July 15, 2021, the Court entered the *Emergency Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 49] approving the Emergency DIP Motion.

On August 31, 2021, the Debtors filed their Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Postpetition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Granting the Related Relief [Docket No. 177] (the "***Replacement DIP Motion***") seeking to establish the DIP Facility.  On September 21, 2021, the Court entered the Final DIP Order approving the Replacement DIP Motion.

**The Asset Sale Motion and Sale Order.**  Having secured sufficient postpetition financing from the Prepetition Senior Secured Parties to stabilize their operations, the Debtors turned their attention to monetizing their Estates' assets, including the Facilities.

On December 14, 2021, the Debtors filed their *Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures; Stalking Horse Bid Protections; Assumption and Assignment Procedures; Purchase and Sale Agreement; and Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (II) Granting Related Relief* [Docket No. 393] (the "***Bid Procedures Motion***").  On December 17, 2021, the Court entered an order granting the Bid Procedures Motion, which approved, among other things, certain procedures (the "***Bidding Procedures***") to govern the sale and auction of the assets of the Debtors. [Docket No. 406] (the "***Bidding Procedures Order***").

After entry of the Bidding Procedures Order, the Debtors continued, in coordination with ERM Capital and their other professionals, to market substantially all of the Debtors' businesses and assets.  The Bidding Procedures Order set January 26, 2020, at 5:00 p.m. as the deadline for the submission of bids on the Debtors' businesses and assets (the "***Bid Deadline***").  Prior to the Bid Deadline, the Debtors received one additional competing bid from a Potential Bidder.  The competing bid, received from TXCR Acquisition Co., LLC prior to the Bid Deadline, was in the amount of $67,408,400.

On February 2, 2022, the Debtors held an auction in accordance with the Bidding Procedures.  The auction involved vigorous bidding for the Debtors' assets between Texas Peaker Power II, LLC and TXCR Acquisition Co., LLC.

At the conclusion of the auction, in consultation with the Consultation Parties (as defined in the Bidding Procedures), the Debtors determined, in their business judgment that TXCR Acquisition Co., LLC ("***TXCR***" and together with any affiliates or successors in interest, the "***Buyer***") was the Successful Bidder (as defined in the Bidding Procedures), with a purchase price of $75,500,000.00 and on the terms and conditions of its final bid at the auction.  Texas Peaker

Power II, LLC was named the Back-Up Bidder (as defined in the Bidding Procedures), with a final bid of $73,908,400.00 and on the terms and conditions of its final bid at the auction.

On February 9, 2022, the Bankruptcy Court entered the Sale Order approving the sale of substantially all of the Debtors' assets to the Buyer for a purchase price of $75,500,000.00, subject to final adjustment under the Asset Purchase Agreement. [Docket No. 511]. On February 28, 2022, the sale closed, and limited distributions of Sale Proceeds were made in accordance with the provisions of the Sale Order and the Final DIP Order, including repayment of the DIP Facility, payment of outstanding ad valorem property taxes to the appropriate taxing authorities, and funding the Professional Fee Account (described in further detail below).

**Post-Sale Use of Cash Collateral**.  Upon closing the sale, the Debtors ceased operations and generating income.  The DIP Facility was Paid in Full (as defined in the Final DIP Order), the Debtors' authority to use Cash Collateral terminated, the funding of the Carve Out (as defined in the Final DIP Order) was triggered, and all obligations related to the Carve Out under the Final DIP Order terminated upon the funding of the Professional Fee Account (as defined in the First Stipulation).  All use of Cash Collateral by the Debtors post-sale has been with the consent of the Prepetition Senior Secured Parties, whose collateral (and secured position) has been reduced on a dollar by dollar basis by the Debtors' post-closing expenditures.

On March 2, 2022, the Bankruptcy Court entered the *Stipulation and Agreed Bridge Order (I) Extending Debtors' Authorized Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Related Relief* [Docket No. 572] (the "***First Stipulation***"), authorizing the Debtors to continue to use Cash Collateral through and including March 14, 2022.

On March 14, 2022, the Bankruptcy Court entered the *Second Stipulation and Agreed Bridge Order (I) Extending Debtors' Authorized Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Related Relief* [Docket No. 581] (the "***Second Stipulation***"), authorizing the Debtors to continue to use Cash Collateral through and including March 28, 2022.

On March 29, 2022, the Bankruptcy Court entered the *Third Stipulation and Agreed Bridge Order (I) Extending Debtors' Authorized Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Related Relief* [Docket No. 608] (the "***Third Stipulation***"), authorizing the Debtors to continue to use Cash Collateral through and including April 10, 2022.

## ARTICLE IV.
## CONFIRMATION OF THE PLAN

### Section 4.1. - Confirmation Procedures

On April [●], 2022, the Bankruptcy Court entered the order conditionally approving the Disclosure Statement [Docket No. [●]] (the "***Disclosure Statement Order***").  Among other things, the Disclosure Statement Order approved the adequacy of disclosures in the DS/Plan on a conditional basis and established certain dates and deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan, and the Confirmation Hearing.  The Confirmation Hearing has been scheduled for [●], **2022 at [●] [●].m. (Central Prevailing Time)**, which may be adjourned from time to time by the Debtors without further notice, except for an announcement

of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

## Section 4.2. - Plan Objection Procedures

Any objection to final approval of the Disclosure Statement asserting that it does not provide adequate information pursuant to section 1125 and/or Confirmation of the Plan must (i) be in writing; (ii) state the name, address and phone number of the objecting party and the nature of the claim of such party; (iii) state with particularity the basis and nature of any objection; and (iv) be filed, together with proof of service, with the Bankruptcy Court no later than [●], 2022 at 5:00 p.m. (Central Prevailing Time).  Unless an objection is timely filed and served by the Plan Objection Deadline, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

## Section 4.3. - Releases and Procedures for Opting Out

The Plan contains releases for certain parties, which are defined as the Released Parties and include the Debtors, their Estates, the CRO, the DIP Secured Parties, and the Prepetition Senior Secured Lenders and their respective officers, directors, and professionals.  These releases are to be given by the parties included in the definition of Releasing Parties, which includes all of the Released Parties and all creditors who vote in favor of the Plan and do not opt out of the releases.  Any creditor who becomes a Releasing Party will also be a Released Party—meaning that any creditor eligible to vote who votes in favor of the Plan and does not opt out of the releases will be released by all of the Released Parties as to any claims related to transactions with the Debtors or connected to the Chapter 11 Cases.

The Debtors have included these releases in the Plan for two reasons.  First, the Debtors believe that it is in the best interests of their Estates and their creditors to bring finality to the Debtors' affairs to the extent that it is possible.  The mutual releases set out in the Plan will provided certainty to the Released Parties, including those creditors who are eligible to vote and both vote in favor of the Plan and do not opt out of the releases, that they will not be subject to future claims or litigation in connection with the Debtors and their Chapter 11 Cases.

Second, the Debtors believe that the non-Debtor Released Parties have provided value to the Estates that supports the Debtors' decision to provide the releases.  The Debtors' rationale for the release of each of the non-Debtor Released Parties is as follows:

***The CRO***.  The Debtors' CRO, Mr. Hugh Smith, has worked diligently to restore the Debtors' business operations postpetition, which directly led to a successful sale of the Debtors' Assets.  He has also spent considerable time and effort overseeing the administration of the Debtors' Estates and has done so in a very successful and cost-efficient manner and at all times has been under the supervision of the Bankruptcy Court.  Mr. Smith's management of the Debtors began only two days prior to the Petition Date, and the Debtors and their professionals are not aware of any potential claims that may have arisen against him during that time.  Additionally, the Debtors believe that Mr. Smith's assistance after confirmation of the Plan will be of considerable value to the Debtors.  Additionally, given that Mr. Smith's management of the Debtors has been subject to Court oversight, the Debtors do not believe that there are any actionable claims against

Mr. Smith.  The Debtors therefore believe that the release of the CRO is appropriate, that it will facilitate the Debtors' post-Effective Date wind-down, and is in the best interests of the Debtors' estates and their creditors.

*The DIP Secured Parties*.  The DIP Secured Parties provided fresh capital that funded these cases, operations, and administration.  The DIP Secured Parties subordinated their liens and claims to a Carve-Out that permitted estate professionals, including advisors to the Committee and the Debtors, to be paid ahead of them out of their collateral.  The DIP Secured Parties consented to the sale of substantially all of the Debtors' assets pursuant to section 363 of the Code free and clear of their liens, with those liens attaching to the proceeds of the sale.  Upon consummation of the sale, the DIP Secured Parties funded the Carve-Out to permit estate professionals to be paid.  In connection with the DIP Facility, the Debtors indemnified the DIP Secured Parties for any claims that might be brought against them relating to the DIP Facility.  The DIP Facility has terminated, and the Debtors have acknowledged that they do not have any claims against the DIP Secured Parties.  TheBecause the Debtors do not believe that they have any claims against the DIP Secured Parties, the proposed release, therefore, is supported by does not prejudice the Debtors or their Estates.  This lack of prejudice, along with the DIP Secured Parties contributions to the Chapter 11 Cases, supports the proposed release.

*The Prepetition Senior Secured Lenders*.  The Prepetition Senior Secured Lenders provided value to the Debtors and their Estates by consenting to the use of their Cash Collateral to fund all expenses of these Cases, including operations and administrative expenses.  These expenses have totaled approximately $10.4 million (*Debtors' Liquidation Analysis, Notice of Filling of Plan Supplement, Ex. 2* [Docket No. 680]).  The Prepetition Senior Secured Lenders also subordinated their liens and claims to a Carve-Out that permitted estate professionals, including advisors to the Committee and the Debtors, to be paid ahead of them out of their collateral.  The Prepetition Senior Secured Lenders consented to the sale of substantially all of the Debtors' assets pursuant to section 363 of the Code free and clear of their liens, with those liens attaching to the proceeds of the sale.  Following consummation of the sale, the Prepetition Senior Secured Lenders continued to consent to the use of their Cash Collateral, pursuant to an agreed budget, to fund administrative costs of these cases.  The Prepetition Senior Secured Lenders have agreed to fund the orderly wind-down of these Cases so that administrative claimants may be paid, and they have agreed to leave behind free and clear of their adequate protection (or other) liens the Retained Causes of Action for the benefit of all General Unsecured Creditors.  In order to provide a meaningful opportunity for all General Unsecured Creditors to have the opportunity to share in any distribution that may be made from the Retained Causes of Action, the Prepetition Senior Secured Lenders have agreed to waive any adequate protection claims that would otherwise come ahead of General Unsecured Creditors and to treat their deficiency claims as a General Unsecured Claim.  The Debtors have indemnified the Prepetition Senior Secured Lenders, who hold contingent indemnification claims.  Pursuant to the Final DIP Order, the Debtors stipulated, among other things, that they had no claims or causes of action against the Prepetition Senior Secured Lenders.  These stipulations were reviewed and investigated by the Committee, and the Challenge Period (as defined in the Final DIP Order) has expired other than as expressly set forth in that *Stipulation with Senior Secured Noteholders Determining Certain Committee Rights Pursuant to Final Financing Order* [Docket No. 462].  The Debtors entered into their stipulation in the Final DIP Order based on their belief that there were no actionable claims or causes of action against the Prepetition Senior Secured Lenders, and the Debtors have received no information since that

date—neither from the Committee nor from any other source—that would indicate that there are any such claims.  Taking all of the facts into consideration, the Debtors' believe that releasing the Prepetition Senior Secured Lenders will result in no prejudice to the Debtors or their Estates.  To the extent that there are claims against the Prepetition Senior Secured Lenders that would be covered by the releases in the Plan, the Debtors believe that such claims would by necessity be relatively small, and given the considerable value the Prepetition Senior Secured Lenders have provided considerable value to the Debtors and their creditors and, the Debtors believe that their release is fully supported by that value.

Additionally, any ___ *Creditors voting in favor of the Plan and not opting out of the Releases*.  Any creditor eligible to vote to accept or reject the Plan (other than parties who are otherwise expressly excluded from the releases under the Plan) will become both a Released Party and a Releasing Party.  The only Classes of Claims that are eligible to vote on the Plan are Class 1, the Claims of the Prepetition Senior Secured Lenders, and Class 4, the General Unsecured Creditors.  The basis and consideration for the proposed release of the Prepetition Senior Secured Lenders is set out above.  As to the Holders of General Unsecured Claims, the Debtors believe that providing a release is appropriate for two reasons.  First, the Debtors' investigation of potential claims and causes of action against its non-insider general unsecured creditors has shown that the Debtors have very few potential Chapter 5 causes of action against vendors and other unsecured creditors.  This is due primarily to the fact that the Debtors made relatively few payments to creditors during the ninety days prior to the Petition Date.  The Debtors believe that the creditors against which they have the most valuable potential claims are expressly excluded from the releases, are not entitled to vote on the Plan, or both.  Accordingly, the Debtors believe that the claims that would be subject to the proposed release of those creditors eligible to vote on the Plan that do not opt out of the proposed releases will not prejudice the Debtors or their Estates and is supported by the mutual releases that will be granted by these creditors and their support of the Plan.

Any creditor who does not wish to release the Released Parties may opt out of the releases.  The option to opt out and the instructions on how to do so are set out in the Ballots sent to creditors eligible to vote on the Plan and on the Notice of Non-Voting Status sent to all other creditors and interest holders.

The Committee has requested the Debtors to include the following statement:  "The Committee does not believe there is sufficient consideration to support the above releases and intends to objection to some or all of the releases at the time of the Confirmation Hearing."  As stated above, the Debtors disagree with this statement.  Additionally, the Debtors believe that the Committee's position is not in the best interests of the Debtors' creditors, including general unsecured creditors.

## Section 4.4. - Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a

permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

## Section 4.5. - Classifications of Claims and Equity Interests

Section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which pursuant to section 1123(a)(1) need not be and have not been classified). The Debtors are also required, under section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed

Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## Section 4.6. - Impaired Claims or Equity Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Claims in Classes 1, and 5 are Impaired and Holders thereof are entitled to vote on the Plan. Under the Plan, Interests in Class 6 are Impaired but Holders thereof will not receive or retain any property under the Plan on account of such Interests and are deemed to reject the Plan; therefore, they are not entitled to vote on the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1 (ALLOWED PREPETITION SENIOR SECURED CLAIMS), AND CLASS 5 (ALLOWED GENERAL UNSECURED CLAIMS).

The Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) to the extent any Impaired Class of Claims does not vote to accept the Plan ("***Cramdown***").

## Section 4.7. - Feasibility

Section 1129(a)(11) requires that a plan proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. Given the liquidation scenario contemplated hereunder as the Plan structure, the Debtors believe that the Plan meets the feasibility requirements of the Bankruptcy Code.

**Section 4.8. - The Best Interests Test & Liquidation Analysis**

As set forth herein, the Debtors propose a Distribution of the Residual Sale Proceeds pursuant to a waterfall consistent with the priorities established under the Bankruptcy Code and this Plan, which is further enhanced by the Prepetition Senior Secured Parties' agreement to contribute the Retained Claims and Causes of Action free of liens securing their Adequate Protection Claim.  The recoveries proposed herein are, as a result, at least equal to—or, most likely, greater than—that which would be expected for each class of creditors or interest holders in a hypothetical chapter 7 liquidation as further illustrated in the liquidation analysis filed in the Plan Supplement.

**Section 4.9. - Voting Procedures and Requirements**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Disclosure Statement Order.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one Impaired Class of Claims, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL OR SUBMIT ELECTRONICALLY THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE CHAPTER 11 DEBTORS AT SIMON.MAYER@LOCKELORD.COM.

**ARTICLE V.**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

Before voting to accept or reject the Plan, Holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.

THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW

FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

***Risk of Non-Confirmation Chapter 11 Plan.***  Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the

Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if all Impaired Classes of Claims vote in favor of the Plan or the requirements for "Cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization, liquidation, or conversion.

*Non-Consensual Confirmation and Conversion into Chapter 7 Cases.*  If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "Insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  While the Debtors believe that the Plan satisfies these requirements, there is no assurance that the Bankruptcy Court will agree.

*Risk of Non-Occurrence of the Effective Date.*  Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the Effective Date does not occur, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan; the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

*Risks Related to Possible Objections to the Plan*. There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

## ARTICLE VI.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### Section 6.1. - Overview of Classification

Pursuant to section 1122, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest qualifies within the description of that Class; and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with section 1123(a)(1), Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes.

**Section 6.2. - Identification and Treatment of Unclassified Claims**

(a)        Administrative Claims. As provided under section 1123(a)(1), Administrative Claims are not classified for purposes of voting on, or receiving Distributions under, the Plan. Accordingly, Holders of Administrative Claims are not entitled to vote on this Plan.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (or after the Effective Date, by the Plan Administrator), each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive, in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim within the following: If an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter, of (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10) business days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. For the avoidance of doubt, to the extent a Holder of an Administrative Claim is not being paid by the Debtors in the ordinary course, such Holder must file a request for payment of such Administrative Claim by the Administrative Claim Bar Date as set forth below.

Except for Professional Fee Claims, and unless previously filed, requests for payment of Administrative Claims must be filed and served on the Debtors no later than the Administrative Claim Bar Date. Objections to such requests must be filed and served on the Debtors and the requesting party by thirty (30) days after the filing of the applicable request for payment of the Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with a Final Order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to file and serve a request for such payment of such Administrative Claims that do not file and serve such request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or any action by the Bankruptcy Court.

Professional Fee Claims are Administrative Claims, and all applications for allowance and payment of Professional Fee Claims shall be filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such bar date.

(b) U.S. Trustee Fees. The U.S. Trustee quarterly fees encompass those fees assessed pursuant to 28 U.S.C. § 1930(a)(6) (the "***U.S. Trustee Fees***"). The Estates shall be responsible for timely payment of the U.S. Trustee Fees without the need for the U.S. Trustee to file any

- 28 -

request for payment.  Any U.S. Trustee Fees due as of the Confirmation Date will be paid in full on the Effective Date.  The Plan Administrator shall timely pay or cause to be paid post-confirmation U.S. Trustee Fees out of available funds in the Plan Administrator Expense Reserve until such time as the Bankruptcy Court enters a final decree closing these Bankruptcy Cases, or enters an order either converting these Bankruptcy Cases to cases under chapter 7 or dismissing these Bankruptcy Cases.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court and shall transmit to the U.S. Trustee a statement of all disbursements made by the Plan Administrator or the Post-Effective Date Debtors, as applicable, for each quarter or portion thereof during which these Bankruptcy Cases remain open in a format prescribed by the U.S. Trustee.

(b)     <u>Priority Tax Claims</u>.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim, if any, shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Plan Administrator, (i) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (ii) such other treatment consistent with the provisions of section 1129(a)(9).

The Debtors assert that all Priority Tax Claims were paid at the closing of the sale.  The Debtors do not believe that there are any Priority Tax Claims.

### Section 6.3. - Summary of Classification of Claims and Interests

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Estimate |
|---|---|---|---|---|
| 1 | Allowed Prepetition Senior Secured Claims | Impaired | Yes | 56~~60.5~~.7% |
| 2 | Allowed Priority Mechanic's Lien Claims | Unimpaired | No | 100%[6] |
| 3 | Allowed Other Secured Claims | Unimpaired | No | 100%[7] |
| 4 | Allowed Priority Unsecured Non-Tax Claims | Unimpaired | No | 100% |
| 5 | Allowed General Unsecured Claims | Impaired | Yes | 0–1% |
| 6 | Allowed Equity Interests | Impaired | No (deemed to reject) | 0% |

---

[6]  100% of the Allowed amount of such Priority Mechanic's Lien Claim secured by removables of the Debtors.

[7]  100% of the value of the collateral securing such Allowed Other Secured Claim.

**Section 6.4. - Treatment of Claims and Interests**

    (a)    <u>Prepetition Senior Secured Claims (Class 1)</u>.

The Prepetition Senior Secured Claims shall be Allowed in the amount of $52,337,975, being the aggregate outstanding principal amount of the Senior Notes plus prepetition accrued interest on the Senior Notes as of the Petition Date.  Upon the Effective Date or as soon as reasonably practical thereafter, the Holders of the Allowed Prepetition Senior Secured Claims shall receive the Residual Sales Proceeds.  To the extent of the deficiency after application of the Residual Sales Proceeds, the Holders of the Allowed Prepetition Senior Secured Claims shall receive, on account of any such deficiency, Prepetition Senior Secured Deficiency Claims in the aggregate amount of the Allowed Prepetition Senior Secured Claims less the Residual Sales Proceeds distributed to the Holders of the Allowed Prepetition Senior Secured Claims.  The Prepetition Senior Secured Deficiency Claim shall be treated as a Class 5 General Unsecured Claim and shall share pro rata in the Distribution of the proceeds of the Retained Claims and Causes of Action, if any.

Class 1 Claims are impaired and thus the Holders thereof are entitled to vote on the Plan.

    (b)    <u>Priority Mechanic's Lien Claims (Class 2)</u>.

Except to the extent that the Holder of a Priority Mechanic's Lien Claim agrees to a different treatment, such Holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Priority Mechanic's Lien Claim payment in full of the Allowed amount of such Claim secured by removables of the Debtors as soon as reasonably practical on or after the later of (a) the Effective Date, (b) the end of the claims objection period, and (c) such Priority Mechanic's Lien Claim becomes an Allowed Claim.  To the extent any alleged Priority Mechanic's Lien Claim is not secured by removables of the Debtors but is an Allowed Claim secured by other property of the Debtors or the Estates, such Claim shall be treated as a Class 3 Allowed Other Secured Claim.  To the extent any alleged Priority Mechanic's Lien Claim is not secured by property of the Debtors or the  Estates, but is an Allowed Claim, such Claim shall be treated as a Class 5 General Unsecured Claim.

The Debtors do not believe there are any Allowed Class 2 Claims.  The Claims asserted by ProEnergy were resolved during the Bankruptcy Cases pursuant to a motion to compromise under Bankruptcy Rule 9019 that was granted on March 30, 2022.  [*See* Docket No. 622].  The Debtors have pending objections to the other asserted Mechanic's Lien Claims.

Class 2 Claims are unimpaired, and thus the Holders thereof are not entitled to vote on the Plan.

    (c)    <u>Other Secured Claims (Class 3)</u>.

Except to the extent that the Holder of an Allowed Other Secured Claim agrees to a different treatment, such Holder, if any, shall receive, at the election of the Plan Administrator, and in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Other Secured Claim, either (i) the return or abandonment of the collateral securing such Allowed Other Secured Claim or (ii) such other treatment as may be agreed to by such Holder and

the Plan Administrator. In the event of any deficiency on account of such Allowed Other Secured Claim, such deficiency claim shall be treated as a Class 5 General Unsecured Claim.

The Debtors do not believe that there are any Allowed Class 3 Other Secured Claims.

Class 3 Other Secured Claims, if any, are unimpaired under the Plan, and thus the Holders thereof are not entitled to vote on the Plan.

(d)     <u>Priority Unsecured Non-Tax Claims (Class 4)</u>.

Except to the extent that a Holder of an Allowed Priority Unsecured Non-Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Unsecured Non-Tax Claim shall be entitled to receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Priority Unsecured Non-Tax Claim, payment in full in Cash of its Allowed Priority Non-Tax Claim as soon as reasonably practical on or after the later of (a) the Effective Date, and (b) the date such Priority Unsecured Non-Tax Claim becomes an Allowed Claim.

The Debtors do not believe there are any Allowed Class 4 Priority Unsecured Non-Tax Claims.

Allowed Priority Unsecured Non-Tax Claims in Class 4 are unimpaired under the Plan, and thus the Holders thereof are not entitled to vote on the Plan.

(e)     <u>General Unsecured Claims (Class 5)</u>.

Except to the extent that the Holder of an Allowed General Unsecured Claim agrees to a different treatment, such Holder shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, a pro rata Distribution from the proceeds of the Retained Claims and Causes of Action, if any, as soon as reasonably practical on or after the later of (a) the Effective Date, and (b) the date such General Unsecured Claim becomes an Allowed Claim.  For the avoidance of doubt, the Holder of a Prepetition Senior Secured Deficiency Claim shall share in such pro rata Distribution of the proceeds of the Retained Claims and Causes of Action, if any.

Class 5 General Unsecured Claims are impaired under the Plan, and thus the Holders thereof are entitled to vote on the Plan.

(f)     <u>Interests (Class 6)</u>.

On the Effective Date, all Interests in each of the Debtors shall be deemed cancelled and of no further force or effect.  Holders of Interests shall neither retain nor receive any property under the Plan on account of such Interests.

Class 6 Interests are impaired, and the Holders thereof are deemed to reject the Plan and thus are not entitled to vote on the Plan.

## Section 6.5. - Elimination of Classes for Voting Purposes

Any Class of Claims or Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8).

## ARTICLE VII.
## MEANS FOR EXECUTION OF THE PLAN

### Section 7.1. - Funding the Plan

The Plan will be funded by the Cash Collateral of the Prepetition Senior Secured Parties in accordance with the Wind-down Budget and by the contribution to the Estates by the Prepetition Senior Secured Parties of the Retained Claims and Causes of Action otherwise subject to their Adequate Protection Claims and liens.

### Section 7.2. - Equity

**Cancellation of Equity Interests.** On the Effective Date, all existing Interests in each of the Debtors shall be retired, cancelled, extinguished, and/or discharged in accordance with the terms of the Plan. Except as otherwise provided in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest shall be cancelled, and the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged. On the Effective Date, the New Equity Interests shall be issued to the Plan Administrator, free and clear of all liens, Claims, interests and encumbrances.

### Section 7.3. - Released Claims and Causes of Action

On the Effective Date, all Released Claims and Causes of Action shall be deemed waived, discharged, forgiven, and forever compromised, and all Retained Claims and Causes of Action shall be vested in and retained by the Post-Effective Date Debtors to be pursued and prosecuted at the discretion of the Plan Administrator. For the avoidance of doubt, all Released Claims and Causes of Action are vested in or retained by the Post-Effective Date Debtors.

### Section 7.4. - Release of Liens

Except as otherwise provided in the Plan, on the Effective Date, subject to the occurrence of the Effective Date, and concurrently with the applicable Distributions made pursuant to the Plan, all liens against any property of the Estates will be fully released. For the avoidance of doubt, all mortgages, deeds of trust, liens, pledges or other security interests against any property of the

Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code. As of the Effective Date, any Claim that asserts liens against any property of the Estates but that was not the subject of a Proof of Claim filed in these Bankruptcy Cases on or before the Bar Date is hereby Disallowed and discharged, specifically including, but not limited to:

| Claimant | Debtor(s) | County | County Clerk File No. | Date of Recording |
|---|---|---|---|---|
| American Moistening Company | Agilon Energy Holdings II LLC; Victoria City Power LLC | Victoria County | 202010613 | 09/25/2020 |
| American Moistening Company | Agilon Energy Holdings II LLC; Victoria City Power LLC | Victoria County | 202010614 | 09/25/2020 |
| Allied Fire Protection | Victoria City Power LLC | Victoria County | 202006566 | 06/25/2020 |

## Section 7.5. - Vesting of Retained Claims and Causes of Action

The Debtors shall retain the Retained Claims and Causes of Action on the Effective Date, to hold in trust for the benefit of all Holders of Allowed Class 5 Claims pursuant to the terms of this Plan and to be managed in accordance with the Plan Administrator Agreement. Except as otherwise provided by this Plan, upon the Effective Date, the Retained Claims and Causes of Action shall be vested in the Post-Effective Date Debtors and be free and clear of all Claims and Interests, in accordance with section 1141.

## Section 7.6. - Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, in each case, in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

## Section 7.7. - Deemed Substantive Consolidation of the Debtors

The Plan constitutes a motion for the substantive consolidation of the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan. Voting on the Plan shall be counted on a consolidated basis. On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making Distributions under the Plan: (a) the assets of the Debtors will be pooled for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors; (c) all Claims of each Debtor against any other Debtor will be eliminated; and (d) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors. Additionally, Holders of Allowed Claims who assert identical Claims against multiple Debtors shall be entitled to only a single satisfaction of such Claims, and any such duplicate Claims shall be deemed Disallowed as against the Debtors

without need for the filing of a Claim Objection or further order of the Court and such duplicate Claims shall receive no Distribution under the Plan.

## Section 7.8. - Termination of Management

Upon the Effective Date, the Debtors' existing employment agreements with Hugh Smith Advisors LLC and Cristi Hirschbuehler shall be deemed terminated.

## Section 7.9. - Plan Administrator

(a)     *Appointment.* The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court has entered an order or orders closing each of the Bankruptcy Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with this Plan, the Confirmation Order, and the Plan Administrator Agreement.  If for any reason, notwithstanding the provisions of this section or any provision of the Plan Administrator Agreement, if a successor Plan Administrator has not been appointed prior to the Plan Administrator's removal, resignation or incapacity, all rights (including receipt of notice or granting any consent) and duties of the Plan Administrator under the Plan shall be conferred upon the Post-Effective Date Debtors until a successor Plan Administrator has been duly appointed.

(b)     *Authority.* Subject to this Plan and the Confirmation Order, the Plan Administrator shall have all the rights, powers, authority, and duties on behalf of each of the Debtors and the Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Article IX of the Plan, except to the extent a Claim has been previously Allowed, control and effectuate the Claims reconciliation process (including allowance or disallowance of Claims), in accordance with the terms of this Plan and the Confirmation Order, including to object to, seek to subordinate, compromise, estimate, or settle any and all Claims against the Debtors or the Post-Effective Date Debtors;

(ii)     determine the Distribution Record Date and make Distributions to Holders of Allowed Claims and Interests in accordance with this Plan and the Confirmation Order, including Distributions from the Professional Fee Escrow;

(iii)     exercise its reasonable business judgment to direct and control Post-Effective Date Debtors under this Plan and in accordance with applicable law as necessary to maximize Distributions to Holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator or the Post-Effective Date Debtors, as described in this Plan or the Plan Administrator Agreement;

(v)     abandon any property determined by the Plan Administrator to be of *de minimis* value or burdensome to the Estates;

(vi)     stand in the same position as the Debtors with respect to any claim the Debtors, their Estates, and/or the Post-Effective Date Debtors may have as to any attorney-client privilege, the work-product doctrine, or any other privilege attaching to any documents or communications (whether written or oral), and succeed to all of the rights of the Debtors, their Estates, and/or the Post-Effective Date Debtors to preserve, assert, or waive any such privilege;

(vii)     pursue litigation funding and/or legal representation on a contingency fee basis to prosecute the Retained Claims and Causes of Action, and then prosecute and/or settle the Retained Claims and Causes of Action as authorized pursuant to, and in accordance with, Section 7.10 hereof on behalf of the Post-Effective Date Debtors and for the benefit of the Holders of Allowed Class 5 General Unsecured Claims; however, the Plan Administrator may not employ any professional to investigate or prosecute the Retained Claims and Causes of Action if that professional would have an actual conflict of interest related to such employment;, nor may the Plan Administrator agree to accept a waiver of any such professional's conflict of interest.  For the avoidance of doubt, the firm of Locke Lord LLP shall not be employed to investigate, prosecute, or advise the Plan Administrator as to any of the Retained Claims and Causes of action as to which Locke Lord LLP has a conflict of interest;

(viii)     retain, employ, terminate, or replace professionals to assist or represent it in performing its duties under the Plan Administrator Agreement, this Plan, and the Confirmation Order without further Bankruptcy Court approval;

(ix)     pay fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors from the Plan Administrator Expense Reserve;

(x)     maintain the books and records and accounts of the Post-Effective Date Debtors;

(xi)     establish and maintain bank accounts in the name(s) of the Post-Effective Date Debtors;

(xii)     establish the Plan Administrator Expense Reserve, deposit the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve, and use the Plan Administrator Expense Reserve solely to satisfy the expenses of the Plan Administrator and the Post-Effective Date Debtors as set forth in this Plan and the Plan Administrator Agreement;

(xiii)     incur and pay, from the Plan Administrator Expense Reserve, reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(xiv)     administer each Debtor's and Post-Effective Date Debtors' tax obligations, including (a) filing tax returns and paying tax obligations, (b) implementing tax allocation and/or tax sharing agreements among the Post-Effective Date Debtors and their subsidiaries, and (c) representing the interest and account of each Debtor, each Debtor's

- 35 -

Estate, or each Post-Effective Date Debtor before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xv)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors or Post-Effective Date Debtors that are required hereunder, by any Governmental Unit or applicable law, including any forms and filings required by the Government;

(xvi)   cause the Post-Effective Date Debtors to pay statutory fees in accordance with Article XIII of this Plan;

(xvii)  file a status report with the Bankruptcy Court on a quarterly basis setting forth the activities of the Plan Administrator during such quarter, including an accounting of the Plan Administrator Expense Reserve during such quarter;

(xviii) perform other duties and functions that are consistent with the implementation of the Plan or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan;

(xix)   close the Bankruptcy Cases of the Post-Effective Date Debtors;

(xx)    following the Effective Date, in the Plan Administrator's sole discretion, cause each Post-Effective Date Debtor to take such actions as permitted by applicable law and the applicable corporate governance documents;

(xxi)   following the Effective Date, cause the Post-Effective Date Debtors to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan;

(xxii)  issue, execute, and deliver any agreements, documents, and instruments contemplated herein (or necessary or desirable to effect the transactions contemplated herein);

(xxiii) cause the Post-Effective Date Debtors to take all actions consistent with this Plan and the Confirmation Order as may be necessary or appropriate to effect any transaction described in connection with this Plan; and

(xxiv)  submit one or more orders to the Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes and issues a final decree for each of the Bankruptcy Cases of the Post-Effective Date Debtors.

(c)    _Preservation of Privileges and Defenses._ The actions taken by the Plan Administrator, the Debtors or the Post-Effective Date Debtors shall not be (or be deemed to be) a waiver of any privilege of the Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any document or communications (whether written or oral).

**Section 7.10. - Prosecution of the Retained Claims and Causes of Action**

(a)      *Authority and Obligations of the Plan Administrator.*   Subject only to the limitations contained in this Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall have, by way of illustration and not limitation, the following duties, responsibilities, authorities, and powers: (A) the power and authority to prosecute and resolve all Retained Claims and Causes Action; and (B) the power and authority to perform such other functions as are provided in the Plan and Plan Administrator Agreement.  The Plan Administrator Expense Reserve Amount may be used both to preserve documents related to the Retained Claims and Causes of Action and to seek litigation financing and/or contingency fee representation to pursue such litigation for the benefit of the Holders of the Allowed Class 5 General Unsecured Claims.

After the Effective Date, the Plan Administrator shall be authorized to commence or continue any suit or other proceeding for the enforcement of any Retained Claims and Causes of Action which the Post-Effective Date Debtors have or have power to assert.  The Plan Administrator may, but is not required to, seek approval, pursuant to Bankruptcy Rule 9019, of any settlement or compromise of any and all Retained Claims and Causes of Action. Notwithstanding the foregoing, however, the Plan Administrator shall file with the Bankruptcy Court a written notice of any proposed settlement of a Retained Claims and Cause of Action that was asserted in an amount greater than $500,000 and serve such notice on the parties listed in the Debtors' most recent Master Service List filed in the Bankruptcy Cases.  If no party with standing files an objection within fourteen days after service of the notice, the settlement shall be deemed approved without further order of the Bankruptcy Court; however, if any party with standing files an objection, such settlement shall not be approved without further order of the Bankruptcy Court.

(b)      *Distribution of Proceeds of the Retained Claims and Causes of Action.*  The Plan Administrator shall be responsible for distributing the proceeds of the Retained Claims and Causes of Action, if any, to the Holders of Allowed Class 5 General Unsecured Claims.  For the avoidance of doubt, all expenses of the Plan Administrator that are directly related to the administration of the Retained Claims and Causes of Action shall be taxed against the gross proceeds of the Retained Claims and Causes of Action and shall be satisfied prior to any subsequent Distribution of such proceeds.

(c)      *Retention of Professionals by the Plan Administrator.*  The Plan Administrator may retain and reasonably compensate counsel and other professionals to assist in his/her duties as Plan Administrator with respect to the Retained Claims and Causes of Action on such terms as the Plan Administrator deems appropriate without Bankruptcy Court approval, including on a contingency fee basis or by means of litigation funding.

(d)      *Preservation of Right to Investigate.*  The Plan Administrator shall have the same rights as the Debtors to conduct investigations pursuant to Bankruptcy Rule 2004 as those held by the Debtors prior to the Effective Date.  Such powers to investigate pursuant to Bankruptcy Rule 2004 shall vest with the Plan Administrator.

## ARTICLE VIII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all Executory Contracts of the Debtors that were not previously assumed or rejected by the Debtors shall be deemed rejected, and shall be treated as if such Executory Contracts had been breached on the date immediately preceding the Petition Date. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim, with respect to Claims arising from the rejection of the Executory Contracts, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within 30 days after the later of: (i) the date of entry of any order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (ii) the effective date of such rejection; (iii) the Effective Date; or (iv) the date after the Effective Date that the applicable Schedules are altered, amended, modified, or supplemented, but only with respect to any Executory Contract thereby affected.  Any Claims arising from the rejection of an Executory Contract not filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Plan Administrator, the Estates, or their property without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as Class 5 General Unsecured Claim and shall be treated in accordance with Article VI.

## ARTICLE IX.
## RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF
## PROPERTY UNDER THE PLAN

### Section 9.1. - Prosecution and Settlement of Claim Objections

After the Effective Date, the Plan Administrator shall be authorized to commence or continue an objection to any Claim against the Debtors, provided that such objection must be filed by the applicable deadline set forth in the Plan, as it may be extended by the Bankruptcy Court. The Plan Administrator shall also have the power to settle or compromise any objection to any Claim, pursuant to Bankruptcy Rule 9019 and section 105(a), without further order of the Bankruptcy Court, and the Claims Register shall be adjusted accordingly.

### Section 9.2. - Objection Deadline

Unless a different date is set by order of the Bankruptcy Court, all Claim Objections shall be served and filed no later than the Claims Objection Deadline; provided, however that such deadline may be extended pursuant to a motion filed with the Bankruptcy Court by the Plan Administrator.  Any Proof of Claim filed after the Bar Date shall be of no force and effect, shall be deemed Disallowed, and will not require objection.  All contested Claims shall be litigated to Final Order, subject to the provisions of Section 9.1.

## Section 9.3. - Responsibility for Objecting to Claims

Until the Effective Date, all parties identified by the Bankruptcy Rules may file objections to Claims.  From the Effective Date and beyond, the Plan Administrator shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, including without limitation, any objections to Claims filed by the Debtors prior to the Effective Date.

## Section 9.4. - Estimation of Claims

Before the Effective Date, the Debtors, and after the Effective Date, the Plan Administrator, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is Contingent or unliquidated pursuant to section 502(c) for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, Contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim.  Notwithstanding section 502(j), in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

## Section 9.5. - Distributions to be Made

The Plan Administrator shall be responsible for making Distributions required to be made under the Plan.  To the extent required by applicable law, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on him/her by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Plan Administrator may require any Holder of an Allowed Claim entitled to a Distribution under the Plan to furnish its, his, or her employer or taxpayer identification number (the "*TIN*") assigned by the Internal Revenue Service.  Any Distribution under the Plan may be conditioned on the receipt of such TIN. If any such Holder of an Allowed Claim entitled to a Distribution hereunder fails to provide a requested TIN within thirty (30) days after receiving a written request therefor from the Plan Administrator, then such failure shall be deemed to be a waiver of such Holder's interest in such Distribution, including the right to receive any future Distributions. The Plan Administrator may but shall not be required to make any Distribution of less than $50.00.

## Section 9.6. - Means of Cash Payment

Payments of Cash to be made by the Plan Administrator pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**Section 9.7. - Delivery of Distributions**

Distributions and deliveries to Holders of Allowed Claims shall be made at the addresses set forth on the Debtors' Schedules and/or proofs of claim filed by such Holders (if such proofs of claim have been filed), or at the last known addresses of such Holders if no Proof of Claim is filed; or if the Plan Administrator has been notified of a change of address, at the address set forth in such notice.

**Section 9.8. - Time Bar to Cash Payments**

Checks issued by or at the direction of the Plan Administrator in respect of Allowed Claims shall be null and void if not cashed within sixty (60) days of the date of delivery thereof.  After such date, the Plan Administrator shall be entitled to stop payment on such check.  Checks issued by or at the direction of the Plan Administrator in respect of Allowed Claims that are returned as undeliverable shall be deemed unclaimed property and shall be null and void.  Any unclaimed property held on account of such voided or returned checks shall vest back to the Plan Administrator free and clear of all claims and interests and shall be made available for Distribution to the other Holders of Allowed Claims in accordance with the Plan.

**Section 9.9. - Setoffs**

The Plan Administrator may, but shall not be required to, set off against any Claim (and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim) of any nature whatsoever that the Debtors may have had against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by any Person of any such Claim against such Holder.

**Section 9.10. - No Distribution Pending Resolution of Claims**

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim until and to the extent such Claim becomes an Allowed Claim.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The occurrence of each of the following events shall be a separate condition to the Effective Date; *provided however*, that any of the following conditions may be waived by agreement of the Debtors and the Prepetition Senior Secured Lenders:

(a)      The Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the Bankruptcy Court's docket in form and substance acceptable to the Debtors and the Prepetition Senior Secured Lenders, and shall include, among other things, findings of fact and/or conclusions of law that:

      1)      approve the terms of the Plan, as it may be amended or modified, and all other agreements contemplated by the Plan;

2)      reserve the jurisdiction of the Bankruptcy Court in accordance with Article XI below; and

3)      provide, pursuant to section 1125(e), that persons who have solicited acceptances or rejections of the Plan have acted in good faith and in compliance with the provisions, and are not liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

(b)      The Confirmation Order shall either have become a Final Order, or such condition shall have been waived by an order of the Bankruptcy Court.

(c)      The estimate of Allowed Administrative Expense Claims, to be conducted in good faith by the Debtors, in consultation with the Prepetition Senior Secured Lenders, shall not exceed the sum of (i) amount of the Professional Fee Escrow and (ii) $150,000;

(d)      The aggregate amount of Residual Sales Proceeds shall not be less than $31,625,000 29,652,326;

(e)      The Debtors shall have deposited the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve;

(f)      The Plan Administrator Agreement, in a form and substance reasonably acceptable to the Debtors and the Prepetition Senior Secured Lenders, shall have been fully executed;

(g)      The Debtors shall have paid all reasonable and documented fees and expenses of the Prepetition Senior Secured Lenders; and

(h)      The Residual Sales Proceeds shall have been distributed to the Prepetition Senior Secured Parties in accordance with the Plan.

On the Effective Date, Substantial Consummation of the Plan shall be deemed to have occurred.

**ARTICLE XI.
RETENTION OF JURISDICTION**

Under sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and passage of the Effective Date, the Bankruptcy Court retains exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim or Administrative Priority Claim or the resolution of any objections to the allowance or priority of Claims or Interests;

(b)      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors or Post-Effective Date Debtors may be liable, including, if necessary, the liquidation or allowance of any Claims arising therefrom;

(c)      effectuate performance of and payments under the provisions of the Plan;

(d)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(e)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(f)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(h)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(i)      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(j)      hear and determine all adversary proceedings, contested matters, and related matters filed by or on behalf of the Plan Administrator, or Post-Effective Date Debtors, as applicable, including any Claim Objections, to the extent provided for by applicable law;

(k)      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Bankruptcy Cases;

(l)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146;

(m)      hear and determine all matters related to the property of the Estates from and after the Effective Date;

(n)      hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code;

(o)      hear and determine all matters concerning or otherwise related to any Professional Fee Claims and related fee applications; and

(p)      enter a final decree closing the Debtors' Bankruptcy Cases or any of them.

## ARTICLE XII.
## DISCHARGE, RELEASES, INJUNCTION, AND RELATED PROVISIONS

### Section 12.1. - Discharge of Claims Against and Interests in the Debtors

Upon the Effective Date in consideration of the Distributions to be made hereunder, except as otherwise expressly provided under the Plan, each Holder (as well as any representatives, trustees, or agents on behalf of each Holder) of a Claim or Interest and any Affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtors to the fullest extent permitted by section 1141, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141, from prosecuting or asserting any such discharged Claim against or terminated Interest in or against the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, or any of their assets or property, whether or not such Holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### Section 12.2. - Releases

As of the Effective Date and in consideration of the Distributions to be made hereunder, the mutual releases granted hereunder, and the funding provided by the DIP Secured Parties and the Prepetition Senior Secured Lenders, except as otherwise expressly provided under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, causes of action, and liabilities of any kind, whether known or unknown, liquidated or unliquidated, fixed or Contingent, matured or unmatured, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts (including any orders entered in connection therewith), the formulation, preparation, dissemination, negotiation, or filing of this DS/Plan, the Bankruptcy Cases, the filing of the Bankruptcy Cases, the pursuit of confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, indebtedness under which any Debtor is or was a borrower or guarantor, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided, however*, the foregoing releases shall not release claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

For the avoidance of any doubt, any Holder of a Claim against, or an Interest in, the Debtors who timely opts out of these releases will not be a Releasing Party.  The procedure for opting out

- 43 -

of the releases is set forth in the Ballots and Notices of Non-Voting Status that are served on the appropriate Holders.

Notwithstanding anything contained herein to the contrary, this release does not release any (a) post-Effective Date obligations of any party under (x) the Plan or (y) any document, instrument or agreement implementing the Plan or (b) continuing contractual obligation owed by any Released Party to or for the benefit of any Debtor or Post-Effective Date Debtor.  This release also does not release the Debtors' non-Debtor affiliates, former officers, former directors, former employees, former members, and former managers, regardless of their election as to the Plan's opt-out provisions.

## Section 12.3. - Exculpation and Limitation of Liability

None of the Exculpated Parties or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, will have or incur any liability to any Holder of a Claim or Interest, or any other party in interest, under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Cases, or the Estates, including, but not limited to, the solicitation of votes to accept the Plan, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, administration, confirmation or consummation of the DS/Plan, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the DS/Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their fraud, gross negligence, or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

The Committee has requested the inclusion of the following statement:  "The Committee intends to object to the inclusion of the Prepetition Senior Secured Parties and the DIP Secured Parties in such exculpation."  For the same reasons set out in section 4.3 above, the Debtors believe that the exculpation of these parties is appropriate and fully supported by the facts.

## Section 12.4. - Limited Discharge of Debtors and Injunction

THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY, OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, OR LIABILITIES RELEASED PURSUANT TO THE PLAN, INCLUDING THE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES RELEASED OR EXCULPATED IN THE PLAN OR THE CONFIRMATION ORDER.

## Section 12.5. - Compromise and Settlement

Pursuant to section 363 and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective

Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

### ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

*Severability of Plan Provisions*. If, prior to confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of a party in interest, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*Binding Effect*. The Plan shall be binding upon all present and former Holders of Claims and Interests and their respective successors and assigns, whether or not they accept this Plan. On the Effective Date, all Holders of Claims shall be precluded and enjoined from asserting any Claim (i) against the Debtors or their assets based on any transaction or other activity of any kind that occurred prior to the Confirmation Date; and (ii) any derivative claims, including claims against third parties asserting alter ego claims, fraudulent transfer claims or any other type of successor liability.

*Successors and Assigns.* The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

*Consummation of Plan*. The Confirmation Order shall include (a) a finding by the Bankruptcy Court that FED. R. CIV. P. 62(a) shall not apply to the Confirmation Order; and (b) the Bankruptcy Court's authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

*Governing Law.* Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and (ii) corporate governance matters shall be governed by the laws of the state of incorporation, without giving effect to the principles of conflicts of law thereof.

- 45 -

*Payment of Post-Confirmation Quarterly Fees.*  The Plan Administrator shall continue to report to the U.S. Trustee regarding post-confirmation Distributions made by the Estates so that the U.S. Trustee can determine the fees incurred pursuant to 28 U.S.C. §1930(a)(6), and timely pay same until the clerk of the Court closes the Bankruptcy Cases.

*Modifications and Amendments.*  The Debtors may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to the Effective Date, the Debtors may, under section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims or Interests under the Plan; *provided however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation of the Plan is desirable and in the best interests of all Holders of Claims and Interests.  The Debtors therefore urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONAPPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

**Date:  April 8, 2022.**

**DEBTORS:**

**Agilon Energy Holdings II, LLC**

By: _____/s/ Hugh Smith_
Name: Hugh Smith
Title:   Chief Restructuring Officer

**Victoria Port Power, LLC**

By: _____/s/ Hugh Smith_
Name: Hugh Smith
Title:   Chief Restructuring Officer

**Victoria City Power, LLC**

By: _____/s/ Hugh Smith_
Name: Hugh Smith
Title:   Chief Restructuring Officer